**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF OCEAN CITY, MARYLAND, a Political Subdivision of the State of Maryland, 301 N. Baltimore Avenue, Ocean City, MD 21842; | Case No. _____ |
| MAYOR AND TOWN COUNCIL OF FENWICK ISLAND, DELAWARE, a Political Subdivision of the State of Delaware, 800 Coastal Highway, Fenwick Island, DE 19944; | |
| COMMISSIONERS OF WORCESTER COUNTY, MARYLAND, a Maryland non-profit organization, 1 W. Market Street, Room 1103, Snow Hill, MD 21863; | |
| BAY SHORE DEVELOPMENT CORPORATION; a Maryland corporation, 2200 Baltimore Avenue, Ocean City, MD 21842; | |
| CAINE WOODS COMMUNITY ASSOCIATION, INC., a Maryland non-profit corporation, P.O. Box 4681, Ocean City, MD 21842; | |
| CASTLE IN THE SAND, INC., a Maryland corporation, 3701 Atlantic Avenue, Ocean City, MD 21842; | |
| COASTAL ASSOCIATION OF REALTORS OF MARYLAND, INC., a Maryland corporation, 314 Franklin Avenue, Suite 106, Berlin, MD 21811; | |
| DELMARVA COMMUNITY MANAGERS ASSOCIATION, INC., a Maryland corporation, P.O. Box 3484, Ocean City, MD 21842; | |

1

GEORGE TOPPING, a resident of
Maryland, 32182 Bonhill Road,
Salisbury, MD 21804;

HARRISON GROUP GENERAL LLC, a
Maryland limited liability company, 1801
Philadelphia Avenue, Ocean City, MD
21842;

JAMES HOSPITALITY LLC, a
Maryland limited liability company,
12004 Coastal Highway, Ocean City, MD
21842;

JEANENE AND EARL GWIN Jr.,
Maryland residents and owners of
SKILLIGALEE SEAFOOD, LLC, a
Maryland limited liability company; and
SKILLIGALEE, INC., a Maryland
corporation, 10448 Azalea Road,
Berlin, MD 21811;

LITTLE SALISBURY CIVIC
ASSOCIATION, INC., a Maryland
corporation, 621 S Pacific Avenue,
Ocean City, MD 21842;

OCEAN AMUSEMENTS, INC., a
Maryland corporation, 2901 Philadelphia
Avenue, Ocean City, MD 21842;

OCEAN CITY DEVELOPMENT
CORPORATION; a Maryland
corporation, 108 Dorchester Street,
Ocean City, MD 21842;

OCEAN CITY HOTEL-MOTEL-
RESTAURANT ASSOCIATION, INC., a
Maryland corporation, 5700 Coastal
Highway #302, Ocean City, MD 21842;

OCEAN CITY MARLIN CLUB, INC., a
Maryland corporation, 9659 Golf Course
Road, Ocean City, MD 21842;

OCEAN CITY, MARYLAND,
CHAMBER OF COMMERCE,
INCORPORATED, a Maryland non-
stock organization, 12320 Ocean
Gateway, Ocean City, MD 21842;

SAVE RIGHT WHALES COALITION,
an unincorporated organization, 287
Parker Hill Road, Lyman, NH 03585;

SUNSET MARINA, LLC (D/B/A/
OCEAN CITY FISHING CENTER, OC
FISHERMAN'S MARINA, AND
SUNSET MARINA), a Maryland limited
liability company, 12911 Sunset Avenue,
Ocean City, MD 21842;

TIME, INC., a Maryland corporation,
P.O. Box 572, Ocean City, MD 21842;

WATERMAN'S ASSOCIATION OF
WORCESTER COUNTY, INC., a
Maryland corporation, 10448 Azalea
Road, Berlin, MD 21811;

WHITE MARLIN OPEN, INC., a
Maryland corporation, #400 6th Street,
Ocean City, MD 21842;

       Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, 1849 C Street NW,
Washington, DC 20240;

DEB HAALAND, in her official
capacity as the Secretary of the Interior,
1849 C Street NW, Washington, DC
20240;

BUREAU OF OCEAN ENERGY
MANAGEMENT, 1849 C Street NW,
Washington, DC 20240;

LIZ KLEIN, in her official capacity as
the Director of the Bureau of Ocean
Energy Management, 1849 C Street NW,
Washington, DC 20240;

NATIONAL MARINE FISHERIES
SERVICE, 1315 East-West Highway
Silver Spring, MD 20910;

JANET COIT, in her official capacity as
the Assistant Administrator of the
National Marine Fisheries Service, 1315
East-West Highway Silver Spring, MD
20910;

      Defendants.

## COMPLAINT TO REVERSE AND SET ASIDE FINAL AGENCY ACTION

When the Government announced its goal of deploying 30 gigawatts of offshore wind

energy projects by 2030, it set into motion a coordinated effort to approve major federal

undertakings on the Outer Continental Shelf as fast as possible, sacrificing a transparent approval

process, the purpose of notice and comment rulemaking, and shortcutting the statutory and

regulatory requirements that were enacted to protect our nation's environmental and natural

resources, its industries, and its people.[1]

On September 4, 2024, the United States Bureau of Ocean Energy Management (BOEM)

approved the Construction and Operations Plan ("COP") for the Maryland Offshore Wind

Project, an 80,000 acre wind Project constructed by US Wind Inc. ("US Wind") just 10.7 miles

off the coast of Ocean City, Maryland and Fenwick Island, Delaware, by issuing a Record of

---

[1] *See* Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (March 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

Decision.[2] This final agency approval, together with BOEM's approval of a Final Environmental Impact Statement ("EIS") for the Project[3] and a collection of other various permits from other federal agencies provides US Wind with authorization to commence construction of the Maryland Offshore Wind Project.

In authorizing this Project, Defendants failed to comply with numerous statutes and their implementing regulations:[4] Administrative Procedure Act,[5] National Environmental Policy Act,[6] Endangered Species Act,[7] Marine Mammal Protection Act,[8] Migratory Bird Treaty Act,[9] Coastal Zone Management Act,[10] and National Historic Preservation Act.[11]

## PARTIES AND STANDING

1.      Plaintiff, Mayor and City Council of Ocean City, Maryland ("Ocean City"), is a political subdivision of the State of Maryland. Surrounded by the waters of the Atlantic Ocean, the Ocean City Inlet, and coastal bays, and with 10 miles of beautiful beaches, Ocean City's local economy and culture are centered around the waters of the Atlantic Ocean and are heavily dependent on tourism, recreation, and the health and preservation of the ocean and its coast. An ocean resort town since the early 1900s, Ocean City welcomes and hosts around 8 million visitors each summer in its more than 10,000 hotel rooms and 21,000 condominiums and homes.

---

[2] *See* Bureau of Ocean Energy Management, *Record of Decision* (Sept. 4, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/ROD-OCS-A-0490_0.pdf (Record of Decision).

[3] *See* Bureau of Ocean Energy Management, *Final Environmental Impact Statement* (July 29, 2024), https://www.boem.gov/renewable-energy/state-activities/maryland-offshore-wind-final-environmental-impact-statement-eis (Final EIS).

[4] Plaintiffs plan to amend their complaint to add additional causes of action and plaintiffs.

[5] 5 U.S.C. § 701-706.

[6] 42 U.S.C. § 4321-4370h.

[7] 16 U.S.C. § 1540(g)(1)(A), (B).

[8] 16 U.S.C. § 1371.

[9] 16 U.S.C. § 703.

[10] 16 U.S.C. § 1451.

[11] 54 U.S.C. § 300101-307101.

And Ocean City's classic wooden boardwalk, a local fixture since 1900, offers 3 miles of food, games, and shopping. Ocean City is also a popular destination for fishing and hosts numerous fishing tournaments. The city is also known as the White Marlin Capital of the World, and each year, Ocean City hosts the White Marlin Open, which attracts boats from all over the country and more than 1,500 of the best anglers. Every year, millions of visitors come to Ocean City and spend billions of dollars to sunbathe on the town's beaches, enjoy the open, unindustrialized views of the ocean, observe whales and dolphins, fish, birdwatch, and enjoy the historic boardwalk, shops, and amusement parks. With an economy based almost entirely on tourism, commercial fishing, and recreational fishing, Ocean City cannot sustain a drastic change in its workforce and culture—changes that will occur because of the recently approved Maryland Offshore Wind Project. As discussed in the Declaration of the City Manager of Ocean City, Terence McGean, attached as Exhibit 1, Ocean City will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the construction and operations of the Maryland Offshore Wind Project—injuries that would be avoided absent the Government's approval of the Project. Ocean City's Mayor and City Manager commented on the Draft EIS and submitted comments following the publication of the Final EIS, calling on BOEM to publish a Supplemental EIS to discuss and evaluate the risk of blade failure and release of toxic chemicals into the ocean.[12]

2.      Plaintiff, the Mayor and Town Council of Fenwick Island, Delaware ("Fenwick Island"), an incorporated municipality at the southeastern tip of Sussex County bordering on Ocean City, Maryland. Fenwick Island is a quiet, family-oriented community that protects its natural beach and bay environments. While Fenwick Island has a year-round population of 400

---

[12] Rick Meehan, *Town of Ocean City, Maryland Comment on the Draft Environmental Impact Statement* (Nov. 20, 2023), https://www.regulations.gov/comment/BOEM-2023-0050-0520.

residents, in the summer the population swells to nearly 3,000, with tourists visiting from across the nation. Fenwick Island's economy relies on tourism during the summer months to create employment opportunities and to support local restaurants, beach shops, and other beach-related businesses. Tourists and residents are attracted to Fenwick Island's ocean beaches and they visit to experience the stunning open ocean views, observe whales and other marine life, bird watch, and enjoy recreational activities on the ocean, like fishing and surfing. The presence of this Project's 114 turbines 10.7 miles off the coast, which will destroy the pristine ocean view, degrade water quality, injure marine life, and create safety issues, will deter seasonal residents and tourists from traveling to Fenwick Island. Fenwick Island's main attractions are the waters of the Atlantic and the beaches and without the pristine, unimpeded ocean views, the community and economy will suffer immensely. As discussed in the Declaration of the Fenwick Island Mayor, Natalie Magdeburger, attached as Exhibit 2, the Town of Fenwick Island will suffer significant, cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project. Fenwick Island, and its Environmental Committee is a member of Plaintiff, Save Right Whales Coalition. The Mayor of Fenwick Island and the Fenwick Environmental Committee commented on the Draft Environmental Impact Statement, raising concerns over the adverse impacts to tourism, the town's viewshed, the marine environment, and the highly endangered North Atlantic Right Whale.[13] The Mayor also submitted comments on the proposed Marine Mammal Protection Act Letter of Authorization.[14]

---

[13] Natalie Magdeburger, *Town of Fenwick Island, DE Comment on Draft Environmental Impact Statement* (Nov. 20, 2023), https://www.regulations.gov/comment/BOEM-2023-0050-0517.
[14] Natalie Magdeburger, *Town of Fenwick Island, DE Comment on Marine Mammal Protection Act* (Feb. 2, 2024), https://www.regulations.gov/comment/NOAA-NMFS-2023-0110-0080.

3.      Plaintiff, Commissioners of Worcester County, Maryland ("Worcester County"),
is governed by seven County Commissioners who are duly elected by citizens of the County
every four years.[15] Currently, the Worcester County Commissioners include Caryn Abbot, Diana
Purnell, Eric Fiori, Theodore J. Elder, Anthony W. Bertino, Jr., Madison J. Bunting, Jr., and
Joseph M. Mitrecic. Under the Worcester County Code, Worcester County Commissioners
constitute the executive body authorized to act on behalf of Worcester County.[16] Worcester
County, Maryland includes four cities, Berlin, Ocean City, Snow Hill and Pocomoke City.
Worcester County is home to Maryland's coast, where visitors from across the country come to
enjoy recreational fishing and boating, water sports, fresh local-caught sea food, and observe
ocean species and migratory birds. Worcester County is also home to Assateague Island National
Seashore and State Park, which draws nature lovers each year who come to observe the Park's
unique wild horses in their natural beachfront habitat. The County depends on its unobstructed
ocean views, healthy marine environment, and commercially accessible ports to support its
tourism, seafood industry and property values. Because the unobstructed views, healthy marine
life, and property values of the County will be adversely impacted by the Project, as stated in the
Declaration of the County Attorney for Worcester County, Roscoe Leslie, attached as Exhibit 3,
Worcester County will suffer direct, substantial, and cognizable injuries-in-fact by the
construction and operations of the Maryland Offshore Wind Project—injuries that would not
occur without the Government's approval of the Project. In addition, Worcester County
Commissioners actively participated in the Maryland Offshore Wind Project's environmental

---

[15] *See* Worcester County Code § CG 2-102.
[16] *Id.*

review process, attending public meetings held by BOEM on the Project and providing comments and objections to the proposed Project.[17]

4.      Plaintiff, Bay Shore Development Corporation, a Maryland corporation with its principal place of business in Ocean City, is the parent company for Ocean City Maryland's Jolly Roger Amusement Park at 30th Street and Boardwalk Hotel Group. Bay Shore Development's Boardwalk Hotel Group consists of the Days Inn by Wyndham Oceanfront, the Howard Johnson by Wyndham Oceanfront Plaza Hotel, and the Howard Johnson by Wyndham Oceanfront Plaza Inn. Bay Shore Development is one of Worcester County's major employers, employing approximately 600 workers. Bay Shore Development Corporation's businesses depend heavily on the consistent stream of tourism in Ocean City, as well as the health of the marine environment that draws tourism, supports recreational activities, and supports the signature seafood industry in the region. Because the Project will cause adverse impacts to tourism, recreation, and industry in the area, as stated in the Declaration of Bay Shore Development Corporation's Founder, Chairman, and CEO, Charles Jenkins, attached as Exhibit 4, Bay Shore Development Corporation will suffer direct, substantial, and cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project.

5.      Plaintiff, Caine Woods Community Association, Inc., is a Maryland non-profit corporation that was founded in 1981. The Association supports the Caine Woods community, one of the few green enclaves of single-family homes, town houses, and condominiums in Ocean City. Approximately half of the 800 households in the Caine Woods community are members of

---

[17] *See*, *e.g.*, BOEM, Public Hearing on US Wind Maryland Offshore Wind Project (Oct. 24, 2023), https://www.regulations.gov/comment/BOEM-2023-0050-0932.

the Association, including residents, homeowners, and renters. The Association hosts numerous events each year for the community, including a community picnic at the beginning and end of the summer, a cornhole tournament, Christmas caroling during the holiday season, a neighborhood yard sale, and monthly Association board meetings. The Association has also taken action to support the community environment, including its neighborhood watch program, which is dedicated to protecting residents' homes and families, as well as a Beautification Committee, which maintains several flower beds throughout Caine Woods. The Association includes members who rent out units to tourists that come to Ocean City for its scenic ocean views, recreational activities, and thriving marine life. Because the Project will cause adverse impacts to the ocean views and pristine marine environment that draws tourists to Ocean City and supports property values in the Caine Woods community, as stated in the Declaration of Michael Quade, attached as Exhibit 5, President of Caine Woods Community Association, the Association will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

6.       Plaintiff, Castle in the Sand, Inc., a Maryland corporation with its principal place of business in Ocean City, owns and operates Castle in the Sand Hotel, Coconuts Beach Bar and Grill, and the Barefoot Mailman Motel in Ocean City, Maryland, which has operated as a family business in the area since 1958. Castle in the Sand Hotel is an oceanfront resort consisting of 180 units and is conveniently located near the Ocean City boardwalk, amusement parks, waterparks, water sports, restaurants, golf courses, and Convention Center. The Castle in the Sand offers several types of accommodations, including standard hotel rooms, cottage apartments, one-bedroom suites, condominiums, and efficiencies with fully equipped kitchenettes and balconies. The Barefoot Mailman Motel is located two blocks away from the oceanfront Castle in the Sand

property and consists of 28 units, each with private balconies. The Barefoot Mailman Motel is also conveniently situated close to the popular Ocean City vacation destinations including the Ocean City Convention Center, the Boardwalk, rides, amusements, golf courses, water sports, restaurants, and fishing. The beautiful beaches, unobstructed ocean views, and healthy marine environment are essential to the survival of the hotels managed by Castle in the Sand. Because the Project will adversely impact the beautiful beaches, unobstructed ocean views, and healthy marine environment that Castle in the Sand's hotels depend on, as discussed in the Declaration of Castle in the Sand's owner, Adam Showell, attached as Exhibit 6, Castle in the Sand, Inc. will suffer direct, substantial, and cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project.

7.      Plaintiff, Coastal Association of REALTORS® of Maryland, Inc., is a Maryland corporation with its principal place of business in Ocean City, and the local chapter of the National Association of REALTORS®, with a membership that spans the areas of Somerset, Wicomico, and Worcester Counties. The Association's purpose is to advocate for the interests of its 1,299 members and to provide services that enhance the professionalism and success of its members' businesses. The Association's members work as realtors for residential and commercial properties in Ocean City, helping to find housing for workers and seasonal residents near and in Ocean City. The Association's purpose, and its members interests, are inextricably linked to the health of the marine environment and the pristine unobstructed ocean views along the Maryland coast because these features are substantial drivers of property values along Maryland's coast. People purchase homes in Ocean City to be close to the ocean so that they can enjoy the open ocean view, swim in clean ocean waters, and relax on debris-free beaches with

pristine ocean views. The Project's adverse impacts on the environment and coastal visual resources will adversely affect the property values in Ocean City and nearby communities. As stated in the Declaration of the Chief Executive Officer of Coastal Association of REALTORS®, Bernice Flax, attached as Exhibit 7, the Association will suffer direct, substantial, and cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project.

8.      Plaintiff, Delmarva Community Managers Associations, Inc., a Maryland corporation with its principal place of business in Ocean City, is an organization of nearly 200 members, who are property managers of apartments and condominiums, property management companies, and associate members, including banks, restaurants, roofers, and other businesses that provide services to homeowners and condominium associations. The Association works with property managers, prospective buyers of property, and local vendors in Ocean City and the surrounding area. Since its inception in 1976, the Association's purpose has been to bring together property management professionals in all fields to address and solve issues affecting rental properties in and around Ocean City. Because Ocean City's economy depends heavily on tourism, the Association and its members work tirelessly to foster a healthy tourism industry for Ocean City and its environment. As stated in the Declaration of Delmarva Community Managers Association's President, Michele Nadeau, attached as Exhibit 8, because this Project will cause fewer tourists to come to Ocean City, the Association will suffer direct, substantial, and cognizable injuries-in-fact as a result of the construction and operations of the Maryland Offshore Wind Project—injuries that that would not occur without the Government's approval of the Project.

9.      Plaintiff, George Topping, is a commercial fisherman who has fished in and around the Maryland Offshore Wind Project area, as well as the inshore coastal areas of Maryland and Delaware for the past 64 years. For more than 20 years, Mr. Topping has worked as a horseshoe crab fisherman, harvesting horseshoe crabs for biomedical purposes, rather than human consumption. Horseshoe crab blood is highly valuable for its unique biomedical utility. Horseshoe crab blood contains a compound called Limulus amebocyte lysate or LAL and is the only FDA-approved test for endotoxin, which is a type of toxin that cannot be sterilized. The need for this substance is difficult to overstate: Every drug certified by the FDA must be tested using LAL, and the same goes for almost every type of medical device, like implants, pacemakers, needles, and scalpels. As a commercial horseshoe crab fisherman, the integrity and health of the ocean area that sustains horseshoe crabs is of paramount importance to him. His livelihood depends on the ability to fish for these crabs. As stated in the Declaration of George Topping, attached as Exhibit 9, Mr. Topping will suffer direct, substantial, and cognizable injuries-in-fact from the Project's adverse impacts on the marine environment and ocean-based business and industry—injuries that that would not occur without the Government's approval of the Project.

10.      Plaintiff, Harrison Group General LLC ("Harrison Group"), a Maryland limited liability company with its principal place of business in Ocean City, owns and operates an extensive portfolio of destination hotels and restaurants in Ocean City, Maryland, Virginia Beach, Virginia, and Corolla, North Carolina. The Harrison Group is a third-generation family business welcoming guests to the oceanfront hotels that they have owned and operated in Ocean City, Maryland since 1951. The Group manages 14 hotels in and around Ocean City and operates 12 restaurants and eateries in Ocean City. The Groups hotels provide elevated, unimpeded views

of the Atlantic Ocean and eateries that draw in visitors from across the country who want to experience amazing views while dining. Each hotel owned by the Harrison Group in Ocean City is along the famous Ocean City beachfront and attracts thousands of visitors each year. Because the Maryland Offshore Wind Project will adversely impact the unobstructed ocean views, healthy marine environment, and limit full enjoyment of Maryland's beaches, as stated in the Declaration of John Harrison, attached as Exhibit 10, Harrison Group General LLC will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

11.     Plaintiff, James Hospitality, LLC ("James Hospitality"), a Maryland limited liability company with its principal place of business in Ocean City, is a privately owned hotel management company that handles the operations, management, human resources, and marketing for several hotels in Ocean City, Maryland. James Hospitality provides management services for the Carousel Oceanfront Resort, Fenwick Inn, Crystal Beach Oceanfront Hotel, Bonita Beach Hotel, Coastal Palms Beach Hotel, Tidelands Caribbean Hotel & Suites, and Cayman Suites. Each hotel James Hospitality manages in Ocean City sits on or in close proximity to the famous Ocean City beachfront and depends on the steady stream of tourism that Ocean City's unobstructed ocean views and thriving marine life attract. Because this Project will cause fewer tourists to come to Ocean City, as stated in the Declaration of James Hospitality's President, Michael James, attached as Exhibit 11, James Hospitality will suffer direct, substantial, and cognizable injuries-in-fact from the Project's impacts on the environment and tourism—injuries that would not occur without the Government's approval of the Project.

12.     Plaintiffs, Jeanene and Earl Gwin, have owned and operated a commercial fishing business and seafood market in Ocean City for 35 years. What started as a small family business

has since grown into two thriving Ocean City businesses: Skilligalee, Inc. and Skilligalee

Seafood, LLC. Through their businesses the Gwin's operate as both a commercial fishery and a

local fish market for local fishermen to sell their fresh caught seafood. As part of their

commercial fishing business, the Gwin's fish for lobster and black seabass, which require the use

of lobster and seabass pots. These pots have doors that open, weights that anchor the pots to the

ocean floor, and small openings that allow smaller fish to escape. The Gwin's have around 1,300

of these pots which they regularly place into the waters of Ocean City, typically within the

Maryland Offshore Wind lease area. The Gwin's also utilize gillnetting, which is similar to crab

potting, but rather than a pot, uses a net with sinkers. Because the Project's adverse impacts will

degrade the marine environment, create navigational hazards, exclude commercial fisheries from

popular fishing spots, and stymie tourism, as stated in the Declaration of Earl Gwin, attached as

Exhibit 12, the Gwins will suffer direct, substantial, and cognizable injuries-in-fact as a direct

result of the Project—injuries that would not occur without the Government's approval of the

Project.

13.     Plaintiff, Little Salisbury Civic Association, Inc., a Maryland corporation with its

principal place of business in Ocean City, represents the Little Salisbury community and the

many year-round residential homeowners and rental homeowners who reside there. The

neighborhood has about 350 homes and is one of only three districts in Ocean City comprised

largely of year-round residents. The Association represents the interests and the needs of the

homeowners in the community and assists in maintaining the common areas of the community,

including the Little Salisbury Neighborhood Park and boat ramps on the bay. Because the

construction and operation of the turbines for this Project will substantially and adversely impact

the marine environment, the unimpeded view, and destroy access to fishing areas, fewer people

will buy or lease properties in this community, and property values will go down. As stated in the Declaration of Little Salisbury Civic Association's President, Peck Miller, attached as Exhibit 13, as a result of the Project Little Salisbury Civic Association will suffer direct, substantial, and cognizable injuries-in-fact from the Project's impacts on Ocean's City's visual resources, marine environment, property values, tourism, recreation and wildlife—injuries that would not occur without the Government's approval of the Project.

14.     Plaintiff, Ocean Amusements, Inc., a Maryland corporation with its principal place of business in Ocean City, is the parent company for Ocean City's Jolly Roger at the Pier, which is Ocean City's only full-service Family Amusement Facility. Jolly Roger at the Pier offers classic amusement park rides, including bumper cars, roller coasters, a slingshot, double decker carousel, a Ferris wheel, as well as midway games and fishing off of the pier. Ocean Amusements, Inc.'s businesses depend heavily on the consistent stream of tourism in Ocean City, as well as the health of the marine environment that draws tourism, supports recreational activities, and supports the signature seafood industry in the region. Because the Project will cause adverse impacts to tourism, recreation, and industry in the area, as stated in the Declaration of Ocean Amusements, Inc.'s CEO and Chairman, Charles Jenkins, attached as Exhibit 4, Ocean Amusements, Inc. will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism—injuries that would not be possible without the Government's approval of the Project.

15.     Plaintiff, the Ocean City Development Corporation ("OCDC"), is a nonprofit working to revitalize downtown Ocean City, one building at a time. OCDC provides financial and technical assistance to local businesses, works with the city whenever there are zoning or policy changes, and consults with the city on new construction projects and design guidance.

OCDC also assists with employee housing and sponsors public events and public art. Downtown Ocean City runs from the bay to the beach from 17th Street in Ocean City to the end of the Inlet and OCDC's development area includes the historic Ocean City Boardwalk, Ocean City Fishing Pier, and hundreds of hotels, restaurants, shops, and amusements. Development and maintenance of this area is crucial because most of the tourists that visit Ocean City center their visit around the attractions and accommodations in Downtown. The Maryland Offshore Wind Project and its 114 turbines sited 10.7 miles off the beach will directly impact OCDC because it will deter people from visiting Ocean City, which will substantially injure the Downtown community and its businesses. Those coming to Ocean City for a beach vacation will not want to come if they can no longer look out at the open ocean, view marine and coastal animals nearby, swim in clean waters, or enjoy a debris-free beach. When people stop coming to Ocean City because the features that they once enjoyed are gone—which will happen once this Project is built—the Downtown businesses will face serious if not ruinous financial hardship, and the essence of Downtown Ocean City will be destroyed, injuring OCDC. As discussed in the Declaration of Joseph Wilson, the President of OCDC, attached as Exhibit 14, OCDC will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism—injuries that would not be possible without the Government's approval of the Project.

16.     Plaintiff, Ocean City Hotel-Motel-Restaurant Association, Inc., is a non-profit, 501(c)(6) trade organization that represents the interest of more than 400 member hotels, motels, restaurants, and other tourism-related business partners in the Ocean City, Maryland area. Since 1971, the Association has connected industry interests through advocacy, education, and partnerships to advance Ocean City as a leading tourist destination. The Association assists its member businesses, helps to solve common issues relative to the hospitality industry, and

disseminates information on local and state laws, policies, and regulations relevant to member businesses so that they can make informed decisions. The Association's activities include: cooperating with other organizations to promote Ocean City as a premier family destination; promoting events to attract visitors to Ocean City; providing industry standards and trends to members; addressing industry concerns and issues; providing information to visitors; advocating and representing the interests of its members and the hospitality industry; and connecting member businesses with industry and hospitality vendors to provide the best services for members and their guests. The Association's members rely on the more than 8 million tourists that visit Ocean City each summer and the more than 22 recreational and sport fishing tournaments. The Association's members and their businesses are the heart of Ocean City's economy, and it is because of these hotels, motels, restaurants, and tourism-related businesses that Ocean City can host millions of visitors each year. By extension, the Association and its members depend on tourists coming to Ocean City, and any activity or change that could deter people from visiting threatens the livelihood of the Association's members and their business's continued existence. The Maryland Offshore Wind Project's 114 turbines, 10.7 miles off the beach pose an immediate concrete threat to the tourism-based businesses who are members of the Association. As discussed in the Declaration of Executive Director Susan Jones, attached as Exhibit 15, the Association will suffer significant cognizable injuries-in-fact by the construction and operation of the Maryland Offshore Wind Project—injuries that would not be possible without the Government's approval of the Project.

17.     Plaintiff, Ocean City Marlin Club, Inc., a Maryland limited liability company with its principal place of business in West Ocean City, Maryland, is a Maryland corporation that has served for over 80 years as a hub for fishermen in the Mid-Atlantic region. Since 1936, the

18

Ocean City Marlin Club has served as a place where fishermen can meet and share their love for the sport of fishing. The Marlin Club is in the only commercial harbor on the east coast of Maryland and the only inlet to gain access to the Atlantic Ocean. The approximately 800 Club members are dedicated to enjoying, protecting, and participating in recreational fishing off the shores of Ocean City. They are familiar with how devastating the Maryland Offshore Wind Project will be on the now picturesque, unimpeded views of the Ocean City Inlet, Assateague Island, and the Atlantic Ocean, visible from the 5,200 square-foot Clubhouse that sits at the mouth of the Ocean City commercial harbor. Because this Project will cause fewer tourists to come to Ocean City, as stated in the Declaration of Club member, Ryan Freese, attached as Exhibit 16, the Project will suffer direct, substantial, and cognizable injuries-in-fact from the Project's impacts on the marine environment, navigability, port utilization, and marine safety—injuries that would not occur without the Government's approval of the Project.

18.     Plaintiff, the Ocean City, Maryland, Chamber of Commerce, Incorporated, a Maryland non-stock corporation with its principal place of business in Ocean City, represents the interests of more than 700 members and business owners in Ocean City and continuously works to enhance the economic growth in the region. As resort town businesses, the Chamber's member businesses are mostly those related to tourism and include restaurants, hotels, attractions, fisheries, and other tourism-related businesses. Every year over 8 million tourists come to Ocean City and spend billions of dollars at the Chamber of Commerce's members' businesses and sunbathe on its beaches, enjoy the open and unimpeded ocean views, observe whales and other marine life, stay in rental properties and hotels, enjoy the historic boardwalk and shops, and experience the City's festivals, celebrations, and over 22 annual fishing tournaments. The Chamber's members, which are mostly tourism and hospitality-based businesses, rely on the

clean and healthy waters of the Atlantic Ocean and Ocean City's beaches to attract visitors. The Project will drive tourists away from Ocean City by degrading the ocean and marine environment, endangering marine mammals, birds, and fish, excluding fishermen from the Project area, and destroying the open ocean view. Surveys conducted by universities and offshore wind developers have shown that a significant number of tourists will likely not return if turbines are visible from the beach.[18] When tourists can no longer enjoy trash and debris-free beaches, swim in clean waters, fish and boat off Ocean City, enjoy coastal birds and marine life that fly and swim offshore, and enjoy the vast, unindustrialized ocean views, they will not come to Ocean City, and they will not spend their money supporting the Chamber's businesses. As stated in the Declaration of Executive Director, Amy Thompson, attached as Exhibit 17, the Ocean City, Maryland, Chamber of Commerce will suffer significant, cognizable injuries-in-fact from the Project's impacts on the environment and tourism—injuries that would not occur without the Government's approval of the Project.

19.    Plaintiff, Save Right Whales Coalition, is an alliance of grassroots environmental and community organizations, scientists, and conservationists working to protect the North Atlantic Right Whale and other marine life from the industrialization of the ocean through large-scale offshore wind development. The Coalition advocates against offshore wind projects that could be harmful to wildlife and is committed to educating the public and political leaders on the

---

[18] Center for Environmental and Resource Economic Policy, *Offshore Wind: Tourism* (Apr. 3, 2016), https://cenrep.ncsu.edu/2016/04/03/offshore-wind-tourism/; Landry et al., *Wind Turbines and Coastal Recreation Demand*, Resource and Energy Economics (2012) 93–111. https://doi.org/10.1016/j.reseneeco.2011.10.001.
[18] Mario F. Teisl, et al., *Seeing Clearly in Virtual Reality: Tourist Reactions to an Offshore Wind Project*, Energy Policy (2018), https://umaine.edu/vemi/wp-content/uploads/sites/220/2018/08/Teisl-etal-2018-EP-using-VR-with-wind-projects.pdf.

harms of offshore wind on ocean life and for those who live, work, and visit our coastal communities. The Coalition is also actively involved in the fight to protect marine life, including whales, dolphins, sea turtles, seals, and other species—as well as the marine environment on which they depend. Save Right Whales Coalition actively engages with regulators, federal agencies, and state/local stakeholders to provide comments on how to protect marine life and on the impacts offshore development will have on marine life. Because the Project's adverse impacts threaten the continued viability of the North Atlantic Right Whale, as stated in the Declaration of Save Right Whales Coalition co-founder, Lisa Linowes, attached as Exhibit 18, the Coalition will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project's impacts on the marine environment, including marine mammals and the interconnected marine benthic habitat—injuries that would not occur without the Government's approval of the Project. An injury to the North Atlantic Right Whale is an injury to the organization's core purpose.

20.     Plaintiff, Sunset Marina, LLC ("Sunset Marina"), is a Maryland limited liability company with its principal place of business in West Ocean City, Maryland, that owns and operates Sunset Marina, OC Fisherman's Marina, and Ocean City Fishing Center. Since 1999, the Sunset Marina has served as Ocean City's premier full-service marina resort. The marina is conveniently located a quarter of a mile from the Atlantic Ocean, near the Ocean City Inlet. This marina features high-class amenities, including a self-service boatyard, two swimming pools with expansive sundecks, three climate-controlled bathhouses, a tackle and bait shop, an on-site marine supply and convenience store, a fully equipped fitness center open 24/7, and the Sunset Grille, which was voted Maryland's Favorite Restaurant for two consecutive years. Sunset Marina offers 250 seasonal wet slips for boats to dock in the water and also offers dry storage for

boats, with a boatyard that can hold up to 125 boats and dry-stack storage that can store 350 boats. Sunset Marina also hosts seasonal angling tournaments and boasts a charter fleet of licensed sport fishing boats. The Ocean City Fishing Center, located just minutes from the Ocean City Inlet, is home to the largest charter fishing fleet in Ocean City, MD, providing 180 wet slips for boats to dock and dry storage that can store up to 25 boats. The OC Fisherman's Marina is at the head of the commercial fishing harbor in west Ocean City, MD, offering boaters quick, unobstructed access to the Ocean City Inlet and open Atlantic Ocean. Ocean City's spectacular open ocean access, recreational, sport, and commercial fishing, and unimpeded ocean views are the main attractions that keep visitors coming to the LLC's marinas. Because the Project will degrade the marine environment and add turbines that will be obstacles to fishing vessels offshore, as stated in the Declaration of Brian Tinkler, attached as Exhibit 19, Sunset Marina, LLC will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

21.     Plaintiff, Time, Inc., a Maryland corporation with its principal place of business in Ocean City, is the parent company of Thrasher's French Fries, a food service company that has not changed its famous French fry recipe since its incorporation in 1929. Thrashers has three locations in Ocean City, two situated on the boardwalk and one on the pier. Customers are drawn to experience Thrasher's original French fry recipe, excellent quality, and traditional cooking procedure. Time, Inc.'s businesses depend heavily on the consistent stream of tourism in Ocean City, as well as the health of the marine environment that draws tourism, supports recreational activities, and supports the signature seafood industry in the region. Because the Project will cause adverse impacts to tourism, recreation, and industry in the area, as stated in the Declaration of Time, Inc.'s CEO and Chairman, Charles Jenkins, attached as Exhibit 4, Time, Inc. will suffer

significant, cognizable injuries-in-fact due to the Project's impacts on tourism—injuries that would not be possible without the Government's approval of the Project.

22.     Plaintiff, Waterman's Association of Worcester County, Inc., a Maryland corporation with its principal place of business in Ocean City, is an organization dedicated to advocating for the fishermen of Worcester County, Maryland. Their mission is to protect the fishing industry, feed the community through hard work, dedication, and sustainable practices, and advocate for the well-being of watermen and the preservation of the waters offshore Worcester County. Many of the members of the Waterman's Association fish in and around the Maryland Offshore Wind lease area. The 114 Project turbines will become a safety hazard for their members to navigate through and will create congested transit lanes for their boaters and fishermen who are to travel through a safe passage around the Project. The Project will increase the amount of time it takes for their members to reach their fishing grounds, which will reduce the amount of time they have to fish and will decrease their income. Because the Project creates navigational hazards that block the traditional transit lanes, as stated in the Declaration of the President of the Waterman's Association, Earl Gwin, attached as Exhibit 12, the Waterman's Association of Worcester County will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

23.     Plaintiff, White Marlin Open, Inc., a Maryland corporation with its principal place of business in Ocean City, operates a world-renowned fishing tournament known as the "White Marlin Open," hosted annually in Ocean City, Maryland. The White Marlin Open is the largest billfishing tournament in the world. Originally hosted in 1974, the Open has grown from its humble beginnings to a massive draw of competitive recreational fishermen around the globe.

Recreational and sport fishing is one of the core activities that draw visitors to Ocean City, and the White Marlin Open has been the climactic event of the sport fishing season each year. By placing the Project structures right where the gamefish are located, the Project threatens to destroy both the fish population and the sport of large game fishing in Ocean City, Maryland. The Project also poses navigational hazards for fishermen who must navigate around the many Project structures, often times hours out of the way, to reach their fishing destinations. Because the Project creates navigational hazards and degrades the marine life that the Open depends on to draw visitors each year, as stated in the Declaration of James Motsko, attached as Exhibit 20, White Marlin Open, Inc. will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

24.     Defendant, the United States of America, is a republic whose powers are defined and limited by the Constitution and statutes of the United States. The United States acts through its various departments, agencies, instrumentalities, and officials.

25.     Defendant, the United States Department of the Interior, is an agency of the federal government that plays a central role in how the United States stewards its public lands and waters, increases environmental protections, and pursues environmental justice. The agency's mission is to protect and manage the Nation's natural resources and provide scientific and other information about those resources. The Department of the Interior prioritizes investing in climate research and environmental innovation to incentivize the rapid deployment of clean energy solutions while reviewing existing programs to restore balance on America's public lands and waters to benefit current and future generations. The Department of the Interior is authorized

24

to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities that produce or support the production of energy from oil, gas, and other sources.[19]

26.     Defendant, Deb Haaland, is the Secretary of the United States Department of the Interior and is responsible for overseeing the nation's Outer Continental Shelf lands and oceans, including those selected for offshore wind projects. Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Secretary Haaland is sued in her official capacity as Secretary of the Interior.

27.     Defendant, Bureau of Ocean Energy Management, is a federal agency within the Department of the Interior established in 2010 to oversee the energy development of the Outer Continental Shelf. BOEM's stated mission is "to manage the development of U.S. Outer Continental Shelf (OCS) energy and mineral resources in an environmentally and economically responsible way."[20] BOEM evaluates the resources of the Outer Continental Shelf and leases portions of it. BOEM also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases.

28.     Defendant, Liz Klein, is the Director of BOEM. She issued the final agency decision challenged here—the approval of Maryland Offshore Wind's Construction and Operations Plan. Director Klein is sued in her official capacity as Director of the Bureau of Ocean Energy Management.

29.     Defendant, the National Marine Fisheries Service (NMFS), is a federal agency founded in 1871 and placed within the National Oceanic and Atmospheric Administration (NOAA) in 1970. NMFS oversees national marine resources, conserves fish species, and manages

---

[19] 16 U.S.C. § 1337(p)(1)(C).
[20] U.S. Department of the Interior: Bureau of Ocean Energy Management, *About Us* https://www.boem.gov/about-boem (last visited Oct. 11, 2024).

fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction. NMFS also implements and enforces the Endangered Species Act with regard to marine organisms and authorizes the incidental take and harassment of listed species, and also administers the Marine Mammal Protection Act and authorizes the incidental harassment of marine mammals.

30.    Defendant, Janet Coit, is the Assistant Administrator of the National Marine Fisheries Service. She is responsible for the Biological Opinion, Incidental Take Statement, Letter of Authorization, and Incidental Harassment Authorization challenged here. Administrator Coit is sued in her official capacity as Assistant Administrator of NMFS.

**JURISDICTION AND VENUE**

31.    The United States has waived its sovereign immunity, and this Court has jurisdiction of this case under the Administrative Procedure Act,[21] National Environmental Policy Act,[22] Endangered Species Act,[23] Marine Mammal Protection Act,[24] Migratory Bird Treaty Act,[25] Coastal Zone Management Act,[26] and the National Historic Preservation Act.[27]

32.    The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 702 (Administrative Procedure Act or "APA").

33.    Venue is proper and appropriate in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because substantially all Plaintiffs reside in Maryland.

---

[21] 5 U.S.C. § 701-706.
[22] 42 U.S.C. § 4321-4370h.
[23] 16 U.S.C. § 1540(g)(1)(A), (B).
[24] 16 U.S.C. § 1371.
[25] 16 U.S.C. § 703.
[26] 16 U.S.C. § 1451.
[27] 54 U.S.C. § 300101-307101.

34.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because the Defendants' approval of the Maryland Offshore Wind Project's Construction and Operations Plan, the issuance of the Incidental Harassment Authorization and incidental take permits, approval of the Final Environmental Impact Statement for the Project, and grant of an easement are final agency actions under the Administrative Procedure Act.

35.     Plaintiffs have exhausted all administrative remedies, the agency actions challenged in this suit are final and ripe for review, and they have standing because they are injured in fact by the federal Defendants' actions or omissions, and this court has the power to redress those injuries.

**STATEMENT OF FACTS**

36.     The Town of Ocean City is Maryland's only beachfront city and each year, millions of tourists come to Ocean City and spend billions of dollars in Ocean City,[28] visit the free and public beaches, enjoy the pristine open ocean view, observe whales and marine life, stay in hotels or rental properties, enjoy the boardwalk and shops, and experience the City's festivals, celebrations, and more than 20 fishing tournaments. As a major resort town, tourism is Ocean City's primary economic driver, with tourism generating $2.1 billion and supporting more than 13,000 jobs.[29] Ocean City's Boardwalk is more than 130 years old and has been named one of the best classic wooden boardwalks in the United States by the Travel Channel and USA Today. At nearly three miles long, the Boardwalk is filled with hundreds of activities, restaurants, shops,

---

[28] Economics, Prepared for Maryland Office of Tourism, *Economic Impact of Tourism in Maryland – 2021* (Nov. 2022) at 91,
https://www.kentcounty.com/images/Economic_Development/Economic_Impact_of_Tourism_in
_Maryland_-_2021__state_counties_11_2022.pdf.
[29] *Id.*

and tourist attractions. Ocean City is also home to several historic properties eligible for listing on the National Historic Register of Places and three properties named on the National Historic Register of Places: the Captain Robert S. Craig Cottage, Sandy Point Archaeological Site, and St. Paul's by-the-Sea Protestant Episcopal Church.

37.     The Town of Fenwick Island, Delaware, is located at the southeastern tip of Sussex County and neighbors Ocean City. Fenwick Island is a small, family-oriented community. The Town's vision statement describes Fenwick Island as "a quiet, family-oriented and walkable community which protects its natural beach and bay environment while including a desirable and sustainable primary residential area as well as a vibrant commercial area."[30] While the year-round population is about 400 people, every summer thousands of seasonal residents and tourists travel to Fenwick Island to enjoy the quiet, beach-oriented atmosphere. Fenwick's residents and visitors cherish the area because it provides a safe place for family and friends to gather and enjoy the natural environment. Fenwick Island's economy is heavily dependent on tourism. The thousands of visitors that travel to Fenwick each year create employment opportunities and generate significant revenue for the town. Tourists travel to Fenwick to enjoy the ocean beaches, experience the amazing ocean views, observe whales and other marine life, birdwatch, and enjoy recreational activities in the ocean. Fenwick Island is also home to the Fenwick Island Lighthouse Station, which is a National Historic Site.

38.     Because Ocean City and Fenwick Island are surrounded by various coastal bays and the Atlantic Ocean, the area is home to a sizeable commercial fishing industry. Local

---

[30] Town of Fenwick Island, *2024 Comprehensive Plan* (Feb. 23, 2024) at 7, https://fenwickisland.delaware.gov/files/2024/05/Town-of-Fenwick-Island-2024-Comprehensive-Plan-1.pdf.

commercial fisheries harvest dozens of species including flounder, striped bass, croaker, bluefish, squid, blue crabs, scallops, clams, and lobsters.

39.     Recreational and tournament fishing are also major parts of Fenwick Island's and Ocean City's economy and local culture. Popular recreational billfish species, like white marlin, roundscale spearfish, blue marlin, and Atlantic sailfish are found in the waters off Ocean City, which is the white marlin capital of the world. These billfish travel to the waters off Ocean City every summer to feed and migrate back to southern waters in the fall and winter. Each year, more than 20 fishing tournaments are hosted out of Ocean City's West Harbor and marinas. These tournaments bring thousands of visitors to Ocean City every year and generate tens of millions of dollars for the City and its businesses annually. The most famous of these tournaments, the White Marlin Open, has been held annually for over 50 years and has awarded more than $113 million in prize money. In recent years, the five-day White Marlin Open generates at least $20 to $30 million for local businesses and companies in and around Ocean City.

40.     Horseshoe crab harvesting is also a major industry in Delaware and Maryland and one of the primary habitats for horseshoe crabs is found in those waters. Because of the abundance of the species in the area, the Atlantic States Marine Fisheries Commission created a 1,500-mile Reserve, which runs from the waters off Delaware up to New Jersey from 3 nautical miles to 30 nautical miles from shore, where horseshoe crab fishing is prohibited. 41.5 miles of the Project overlap with the Reserve. Horseshoe crabs are harvested in the waters off Maryland and Delaware not for human consumption but for biomedical purposes, as their blood contains a compound called Limulus amebocyte lysate (LAL). LAL is the only FDA-approved test for endotoxins and is used to test every FDA-certified drug and every medical device or tool, such as implants, pacemakers, needles, and scalpels. Horseshoe crabs are collected alive in areas

nearshore (1 to 10 miles off the coast) and transported to a facility where three tablespoons of blood is removed from each crab. After the blood is collected, the live crabs are transported back to the waters where they were collected. Harvesting horseshoe crabs is crucial for the medical industry and ensuring that drugs and medical equipment are free from endotoxins, which cannot be sterilized. In the winter, horseshoe crabs travel to deeper waters and bury themselves in the mud and sand. Then in the warmer months, from mid-June to November, the crabs travel inshore to spawn, and this is when the crabs can be harvested.

41.     The coastal areas and waters offshore Maryland and Delaware also provide habitat for 99 marine invertebrates, 164 species of birds (including migratory and endangered), and many species of endangered marine life, including: fin whales, sei whales, North Atlantic Right Whales, Northwest Atlantic Distinct Population Segment (DPS) of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, shortnose sturgeon, and all five DPSs of Atlantic sturgeon.

**Federal Offshore Wind Program**

42.     Congress enacted the Outer Continental Shelf Lands Act (OCSLA) in 1953, authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases through a competitive bid process managed by the Department of the Interior.[31] The Act "establishe[d] a procedural framework under which Interior may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf] submerged lands."[32]

---

[31] 43 U.S.C. § 1331-1356.
[32] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).

43.    In 2005, Congress amended OCSLA, placing regulatory authority for renewable energy projects with the Minerals Management Service (BOEM's predecessor agency), an agency within the Department of the Interior, and authorizing the Minerals Management Service to grant leases for offshore renewable energy projects.[33] Congress declared its policy in creating the offshore wind program:

> It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments. . . .[34]

44.    In 2007, the Department of the Interior issued a "Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf."[35] Published before any leases were granted, the Programmatic Environmental Impact Statement, "examine[d] the potential impacts of alternative energy and alternate use activities that could result from implementation" of OCSLA's new authority.[36] The proposed actions analyzed included offshore wind, wave, and ocean current energy capture technologies.

---

[33] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).
[34] 43 U.S.C. § 1332.
[35] Bureau of Ocean Energy Management, *Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf* (Oct. 2007), https://www.boem.gov/renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-eis.
[36] *Id.* at ES-2.

45.    BOEM listed Maryland, Delaware, and Virginia as areas where offshore wind projects could be built, but the Programmatic EIS also set forth the agency's evaluation and analysis of how offshore wind development could negatively impact the environment and threaten endangered species. Specifically, BOEM noted the threat to the North Atlantic Right Whale:[37] "[M]oderate to major impacts to some threatened and endangered species (e.g., North Atlantic [R]ight [W]hale) from noise from pile driving or drilling, facility avoidance, and from physical injury from vessel strikes."[38]

46.    In 2011, the Minerals Management Service (BOEM's predecessor agency) revised its offshore wind energy leasing regulations to implement the "Smart from the Start" policy to "accelerate" [39] leasing on the Outer Continental Shelf and "speed offshore wind energy development off the Atlantic Coast."[40] These revisions streamlined the review and approval of leases, letting BOEM's predecessor bypass the multiple, public-comment periods otherwise required. Before the revisions, the issuance of a lease and approval of development had four phases: (1) Planning and analysis, (2) lease issuance, (3) Site Assessment Plan approval, and (4) Construction and Operations Plan approval. The 2011 revisions merged the first three steps into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance. These new regulations allowed for most details of these projects—lease location, size, distance from land—to be determined before the release of the

---

[37] *Id.* at 4-57.
[38] *Id.* at 2-11.
[39] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.
[40] *Id.*

project information and before any notice and comment, depriving impacted communities and industries of the ability to comment.

47.     The Interior Department began identifying locations for constructing 30 offshore wind projects, which together will contain thousands of offshore wind turbine generators. In March 2021, the Government announced its goal of deploying 30 gigawatts of offshore wind energy projects by 2030 and announced it was taking "coordinated steps to support rapid offshore wind deployment."[41] And in 2022, BOEM and NOAA entered into a memorandum of agreement to "support[] the goal . . . to responsibly deploy 30 gigawatts of energy production on the Outer Continental Shelf by 2030. . . ."[42] The memorandum boldly proclaims the intent of BOEM and NOAA to "proactively refine administrative procedures" without mention of the public rulemaking process required by the Administrative Procedures Act.[43]

**Maryland Offshore Wind Project**

48.     In July 2014, BOEM leased the 80,000-acre Maryland Offshore Wind Area as two leases (OCS-A 0489 and OCS-A 0490) to US Wind.[44] After submitting a site assessment plan for one of the leases, US Wind requested to merge the lease areas together into one single lease. BOEM approved this request on March 1, 2018.

---

[41] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.
[42] NOAA, NMFS, BOEM and RODA, *Memorandum of Understanding Between NOAA, NMFS, BOEM and RODA* (Mar. 25, 2019), https://media.fisheries.noaa.gov/dam-migration/noaa-boem-roda-memorandum-of-understanding.pdf.
[43] *Id.* at 1.
[44] 79 Fed. Reg. 38060.

49.      In 2017, Maryland awarded US Wind Offshore Wind Renewable Energy Credits for a 248 MW offshore wind Project.[45] In 2021, Maryland awarded US Wind another set of Offshore Wind Renewable Energy Credits for an 808 MW facility. In March 2023, Maryland increased their clean energy goal again, increasing the goal for offshore wind energy to 8.5 GW. This law, and additional laws passed in 2024, requires the Department of General Services to issue bids for power purchase agreements with possible developers by July 31, 2024, with a second solicitation to be issued on or before December 31, 2025. At this time, US Wind has not obtained any additional power purchase agreements beyond the 248 MW and 808 MW grants.

50.      In its Construction and Operations Plan, US Wind describes the Maryland Offshore Wind Project as a three-phase Project. Phase 1, MarWin, is a 300 MW facility approximately 20 miles off the coast of Ocean City, which corresponds to Maryland's 2017 grant of Offshore Wind Renewable Energy Credits.[46] Phase 2 consists of Momentum Wind, which is an 808 MW facility, approximately 15 miles off the coast of Ocean City, which corresponds to 2021 grant of Offshore Wind Renewable Energy Credits. Phase 3, which is the "build out of the remainder of the Lease area to fulfill ongoing, government-sanctioned demands, for offshore wind energy," does not currently have any purchase power agreements or Offshore Wind Renewable Energy Credits in place and will be built just 10.7 miles off the coast of Ocean City.

---

[45] Order No. 88192, Case No. 9431, Public Service Commission, State of Maryland (May 11, 2017) at 5, https://www.psc.state.md.us/wp-content/uploads/Order-No.-88192-Case-No.-9431-Offshore-Wind.pdf.
[46] *Id.*

51.     On October 6, 2023, BOEM published a Draft EIS for public review and comment for the Maryland Offshore Wind Project.[47] On August 2, 2024, BOEM published its Final EIS.[48]

52.     On June 18, 2024, NMFS published a Biological Opinion for ESA-listed species and critical habitat. NMFS concluded that the Maryland Offshore Wind Project would not jeopardize any Endangered Species Act-listed species, including the highly endangered North Atlantic Right Whale.

53.     On September 4, 2024, BOEM and NMFS published their Record of Decision, announcing their decision to approve the Construction and Operations Plan for the Maryland Offshore Wind Project.[49]

54.     On October 23, 2024, NMFS issued Incidental Take Regulations, approving the take of thousands of marine mammals during the Project's construction.[50]

**First Cause of Action**

**Violation of the Administrative Procedure Act**

55.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

56.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[51] The reviewing court shall

---

[47] 88 Fed. Reg. 69658.
[48] 89 Fed. Reg. 63221.
[49] *See* Record of Decision *supra* note 2.
[50] 89 Fed. Reg. 84674.
[51] 5 U.S.C. § 702.

"hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[52]

57.     An agency's action is arbitrary and capricious within the meaning of the Administrative Procedure Act if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[53]

58.     BOEM's September 4, 2024 approval of the Maryland Offshore Wind Project's Construction and Operations Plan is arbitrary, capricious, and not in accordance with law for all the reasons stated in this Complaint, including violations of the National Environmental Policy Act,[54] Endangered Species Act,[55] Marine Mammal Protection Act,[56] Migratory Bird Treaty Act,[57] Coastal Zone Management Act,[58] and the National Historic Preservation Act.[59]

59.     This Court should therefore reverse and set aside these approvals and permits and remand this matter to the agencies for further consideration in accordance with the relevant statutes and the Administrative Procedure Act.

---

[52] 5 U.S.C. § 706.
[53] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[54] 42 U.S.C. § 4321-4370h.
[55] 16 U.S.C. § 1531-1544.
[56] 16 U.S.C. § 1371.
[57] 16 U.S.C. § 703.
[58] 16 U.S.C. § 1456(c)(1).
[59] 54 U.S.C. § 300101-307101.

**Second Cause of Action**

**Violation of the National Environmental Policy Act and
the Administrative Procedure Act**

60.     Plaintiffs reallege and incorporate by reference all of their previous allegations

and further allege as follows:

61.     NEPA serves as our "basic national charter for the protection of the

environment"[60] and requires "the federal government to identify and assess in advance the likely

environmental impact of its proposed actions, including its authorization or permitting of private

actions" like the Maryland Offshore Wind Project.[61] NEPA achieves its purpose by "action

forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences"

of their proposed actions.[62] NEPA's "hard look" requires federal agencies to analyze and consider

"any reasonably foreseeable adverse environmental effects which cannot be avoided should the

proposal be implemented[.]"[63] To comply with NEPA, agencies must consider "[b]oth short- and

long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and

safety . . . [and e]ffects that would violate Federal . . . law protecting the environment."[64]

62.     Under NEPA, agencies must "identify and develop methods and procedures . . .

which will ensure that presently unquantified environmental amenities and values may be given

appropriate consideration in decisionmaking along with economic and technical

considerations."[65] Specifically, NEPA requires federal agencies to prepare a "detailed statement

---

[60] 40 C.F.R. § 1500.1(a).
[61] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).
[62] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).
[63] 42 U.S.C. § 4332(C)(ii).
[64] 42 U.S.C. § 4332(C)(ii).
[65] 42 U.S.C. § 4332(B).

[for all major agency actions] significantly affecting the quality of the human environment,"[66] known as an Environmental Impact Statement (EIS). An EIS must "provide full and fair discussion of significant environmental impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[67] This must include discussions of direct, indirect, and cumulative impacts for each reasonable alternative and must identify "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[.]"[68]

63.     The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[69] NEPA

> ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.[70]

64.     BOEM's July 29, 2024 Final Environmental Impact Statement is incomplete and inaccurate and fails to comply with multiple requirements of NEPA. And because BOEM failed to comply with NEPA by failing to take a hard look at the environmental impacts of the Maryland Offshore Wind Project, its September 4, 2024 Record of Decision approving the Project's Construction and Operations Plan was arbitrary, capricious, and not in accordance with

---

[66] 42 U.S.C. § 4332(C).
[67] 40 C.F.R. § 1502.1.
[68] 42 U.S.C. § 4332(2)(C)(ii).
[69] *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981).
[70] *Robertson*, 490 U.S. at 349.

law—and should therefore be set aside. NMFS's Marine Mammal Protection Act authorization is

also arbitrary, capricious, and not in compliance with law. For the same reasons, any permit or

authorization the Corps of Engineers may issue under the authority of the Rivers and Harbors

Act or the Clean Water Act, or both, will also be arbitrary, capricious, and not in compliance with

law to the extent they rely on BOEM's defective July 29, 2024 Final EIS.

**Defendants Have Violated NEPA by Impermissibly Segmenting Analysis of the Multiple Areas of the Offshore Wind Program and Ignoring the Cumulative Environmental Impacts of Thousands of Turbines on Millions of Acres of Ocean that BOEM Will Approve in the Near Future**

65.     NEPA requires that an Environmental Impact Statement include within its scope

"[c]umulative actions [that] when viewed with other proposed actions have cumulatively

significant impacts and should therefore be discussed in the same impact statement"[71] and

similar actions that "when viewed with other reasonably foreseeable or proposed agency actions,

. . . have similarities that provide a basis for evaluating their environmental consequences

together."[72] This cumulative impact requirement ensures that agencies consider the collective

effects of individually minor but related actions over time when analyzing the environmental

impacts of a proposed government action.

66.     NEPA regulations define cumulative impacts as "the impact on the environment

which results from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions. Cumulative impacts can result from individually minor but

collectively significant actions taking place over a period of time."[73]

---

[71] *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1314 (D.C. Cir. 2014).
[72] *Id.*
[73] 40 C.F.R. § 1508.1(i)(3).

67.     In preparing its EIS for the Maryland Offshore Wind Project, BOEM impermissibly segmented its NEPA review by dividing the connected, cumulative, and similar federal actions—approving construction and operation of thousands of wind turbine generators on millions of acres of offshore federal lands along the Atlantic Coast—into separate projects and thereby failed to address the true scope and impact of the activities that must be analyzed under NEPA. As the Supreme Court has held, under NEPA, "proposals for . . . actions that will have cumulative or synergistic environmental impact upon a region [] pending concurrently before an agency . . . must be considered together."[74]

68.     The Maryland Offshore Wind Project is a single segment of the "national offshore wind energy mandate"[75] to deploy at least 30 gigawatts of offshore wind energy by 2030, which includes coordinated steps to support rapid offshore wind deployment."[76] To meet the Government's policy goals, BOEM "plans to advance new lease sales and complete review of at least 16 Construction and Operations Plans (COPs) by 2025, representing more than 19 GW of new clean energy for our nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050. . . ."[77] BOEM's approval of the Maryland Offshore Wind Project "represents the power of a government-wide approach to offshore wind permitting."[78]

---

[74] *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).

[75] Department of the Interior, *Interior Department Approves Second-Major Offshore Wind Project U.S. Federal Waters* (Nov. 24, 2021), https://www.doi.gov/pressreleases/interior-department-approves-second-major-offshore-wind-project-us-federal-waters.

[76] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[77] *Id.*

[78] Department of the Interior, *Biden-Harris Administration Approves First Major Offshore Wind Project in U.S. Waters* (May 11, 2021), https://www.doi.gov/pressreleases/biden-harris-administration-approves-first-major-offshore-wind-project-us-waters.

69.     The Maryland Offshore Wind Project does not stand alone, but will be physically integrated into a single grid system to power major cities along the East Coast, creating one massive wind Project.[79] In a 2024 report titled *An Action Plan for Offshore Wind Transmission Development in the U.S. Atlantic Region*, the U.S. Department of Energy and BOEM set forth their plan to connect various projects along the eastern seaboard through subsea cables and offshore platforms.[80] In the mid-Atlantic and New England, there would be three independent, multi-terminal lines that would connect each of the three planning regions—Independent Systems Operator, New England Inc, New York Independent System Operator, and PJM Interconnection LLC—"via an HVDC system of subsea cables and offshore platforms."[81] "HVDC transmission lines use voltage converter stations to change the alternating current used in typical electricity transmission systems to direct current for transfer over the line."[82] Under this plan, Projects off Maryland and Delaware would be connected with Projects off New Jersey and New York—effectively creating one continuous Project.

70.     The Maryland Offshore Wind Project is one of about 30 projects already constructed or planned to be constructed off the east coast, with even more in the planning pipeline. When built out, there will be 3,141 turbines, 4,953 miles of export cables, 5,912 miles of inter-array cables, and tens of millions of gallons of coolants, lubricants, and fluids sitting in

---

[79] Biden Administration, *Fact Sheet: Biden-Harris Administration Advances Offshore Wind Transmission, Strengthens Regional Supply Chain Buildout, and Drives Innovation* (Sept. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/21/fact-sheet-biden-harris-administration-advances-offshore-wind-transmission-strengthens-regional-supply-chain-buildout-and-drives-innovation/.

[80] U.S. Department of Interior and Bureau of Ocean Energy Management, *An Action Plan for Offshore Wind Transmission Development in the U.S. Atlantic Region* (Apr. 2024), https://www.energy.gov/sites/default/files/2024-04/Atlantic_Offshore_Wind_Transmission_Plan_Report_v16_RELEASE_508C.pdf.

[81] *Id.* at 28.

[82] *Id.*

turbines, offshore substations, and cables,[83] all costing the United States taxpayer over $100

billion in subsidies and grants. Although BOEM included an appendix in its Final EIS entitled

"Future Planned Activities," BOEM did not actually analyze the combined impacts of the

thousands of turbines and thousands of miles of cable that will cover millions of acres of pristine

seabed and open ocean on the human and natural environment.

71.    Defendants acknowledged the offshore wind program's interrelated and

cumulative effects in 2007 when they produced a Programmatic Environmental Impact

Statement for Alternative Energy Development and Production and Alternate Use of Facilities on

the Outer Continental Shelf.[84] Defendants intended this Programmatic Environmental Impact

Statement to provide a "baseline analysis that helps to satisfy the requirements of NEPA for

offshore renewable energy leasing,"[85] because "many wind energy projects will have similar

environmental impacts."[86] This Programmatic Environmental Impact Statement does not satisfy

NEPA's cumulative impacts requirement today because Defendants have significantly altered and

expanded their offshore wind program, rendering the Programmatic Environmental Impact

Statement's analysis of cumulative environmental impacts inaccurate and outdated and requiring

a supplemental or new Environmental Impact Statement analyzing the current program as it now

exists.

---

[83] *See* Bureau of Ocean Energy Management, *Maryland Offshore Wind Final Environmental Impact Statement—Appendix D Planned Activities Scenario* (July 29, 2024) at D-126–D-129, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Maryland%20Offshore%20Wind%20Final%20EIS_AppD%20Planned%20Activities%20Scenario.pdf.

[84] *See* Bureau of Ocean Energy Management, United States Department of the Interior, *Guide to the OCS Alternative Energy Final Programmatic Environmental Impact Statement,* https://www.boem.gov/renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-eis (last visited Oct. 23, 2024).

[85] *Id.* at 7.

[86] *Id.*

72.     Because BOEM's Final EIS for this Project fails to take a hard look at the cumulative impacts of the Maryland Offshore Wind Project in combination with the other projects that have been constructed, are awaiting final approval, or that are planned for the Atlantic Coast, it fails to comply with NEPA, and is arbitrary, capricious, and not in compliance with the law.

**BOEM Failed to Conduct a True Alternatives Analysis as NEPA requires, Impermissibly Limiting Its Review of Available Alternatives**

73.     NEPA also requires that the Environmental Impact Statement provide a "detailed statement" on alternatives to the proposed action.[87] and that the agency "[s]tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[88] The Environmental Impact Statement must include consideration of alternatives, which include the no-action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action) in an agency's environmental review of an action under consideration.[89]

74.     NEPA regulations state that the alternatives analysis is the "heart of the environmental impact statement."[90] Agencies are guided by a rule of reason when selecting alternatives and should select a reasonable range of alternatives that are "technically, economically, and environmentally feasible."[91] NEPA prohibits government agencies from limiting their analysis of reasonable alternatives "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private

---

[87] 42 U.S.C. § 4332(2)(C).
[88] *Id.* § 4332(2)(E).
[89] 40 C.F.R. § 1502.14.
[90] 40 C.F.R. § 1502.14.
[91] 40 C.F.R. § 1508.1(hh).

objectives."[92] Nor can the agencies lawfully "craft a purpose and need statement so narrowly

drawn as to foreordain approval of" a project proposed by a private party.[93] Under NEPA,

government agencies are not permitted to limit their analysis of reasonable alternatives "by

adopting private interests to draft a narrow purpose and need statement that excludes alternatives

that fail to meet specific private objectives," nor can they lawfully "craft a purpose and need

statement so narrowly drawn as to foreordain approval of" a project proposed by a private

party.[94]

75.     To allow the preparation of a proper alternatives analysis, NEPA requires that the

agency first specify "the underlying purpose and need for the proposed action."[95] This

identification of the purpose and need for the Project then allows the agency to identify and

analyze reasonable alternatives to the proposed Project that may be less environmentally

damaging.

76.     But, for the Maryland Offshore Wind Project Environmental Impact Statement,

BOEM impermissibly limited its analysis to a set of alternatives that would allow US Wind to

perform its existing private contract with the state of Maryland. BOEM rejected out-of-hand all

true alternatives, and selected alternatives with only minor differences in number of turbines and

the route for the power cables from the proposed action.

77.     Directly contrary to NEPA's requirements, BOEM flatly rejected the option of not

authorizing the Maryland Offshore Wind Project—as though approval were foreordained, with

only the details to be determined.

---

[92] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).
[93] *Id.*
[94] *National Parks & Conservation Ass'n*, 606 F.3d at 1072.
[95] 40 C.F.R. § 1502.13.

78.     Directly contrary to NEPA's requirements, BOEM also failed to analyze any alternatives that proposed a different location, had smaller turbines, caused less environmental impact, or were located farther off the shore. Defendants failed to study, develop or describe reasonable alternatives to the proposed Project outside and inside the Project area that would avoid, minimize, reduce, and compensate for the environmental impacts of the Project. Specifically, Defendants failed to consider:

- Options to meet the purpose and need of the action outside of the lease area through the onshore production of electrical energy, both fossil and nonfossil, including coal, gas, nuclear, solar, and onshore wind—among others, or methods to increase energy efficiency and reduce waste;

- Other offshore locations for the wind energy Project—a set of alternatives foreclosed by Defendants' failure to prepare the Environmental Impact Statement until after leasing the area to the Project's sponsor;

- Project designs and specifications that did not necessarily satisfy the terms of US Wind's contract with Maryland and had far less adverse environmental impact; or

- Project designs that only fulfilled US Wind's 248 MW and 808 MW agreements with Maryland and saved approving and considering any additional turbines/approved MW for future projects when agreements in Maryland would be in place.

79.     Despite the significant impacts of approving the Project in the lease area, Defendants impermissibly and summarily dismissed significant, concrete, well-justified, and reasonable alternatives that would locate the Project farther away from the shoreline and reduce the number of turbines. BOEM also failed to consider a wide range of reasonable alternative

project layouts, structures, construction methods, and activities within the lease area that would have minimized or reduced the Project's adverse environmental impacts.

80.     BOEM's failure to consider numerous available alternatives to the proposed Project, including the no-action alternative, was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law.[96]

**Defendants' Failed to Disclose and Fully Analyze the Three Phases of the Project**

81.     The Maryland Offshore Wind Project consists of three phases: MarWin, "a wind farm of approximately 300 MW," Momentum Wind, a windfarm "of approximately 808 MW," and "build-out of the remainder of the Lease area to fulfill ongoing, government-sanction demands for offshore wind energy."[97]

82.     BOEM's Final EIS provides no discussion of just how many turbines are necessary to meet MarWin's 300 MW or Momentum Wind's 808 MW energy goals. Nor is there any discussion of how many additional turbines will be included in Phase 3. Instead, after mentioning the three phases and providing a map, BOEM lumps the three phases together and analyzes them together as though they will be built out as a single Project.

83.     The third phase, which was presented as an open, undefined future development, is not analyzed in the EIS at all. US Wind does not even include the third phase on its informational website. Even more troubling, BOEM rejected most of the alternatives because they did not "allow for full build out of the Project,"[98] even though full buildout was not necessary to meet Maryland's existing contracts with US Wind. And, based on the most recent

---

[96] 5 U.S.C. § 706.
[97] Final EIS *supra* note 3 at ES-6.
[98] Record of Decision *supra* note 2 at 30.

COP, which was approved, US Wind has not obtained any additional energy credits or contracts from Maryland.

84.     By failing to fully discuss the Project components and what is needed to meet all three phases, BOEM failed to fully identify and analyze the Project and its impacts on the human environment and environmental resources, in violation of NEPA.

**Defendants Failed to Analyze Less Environmentally Damaging Alternatives**

85.     The Final Environmental Impact Statement confirmed that the Maryland Offshore Wind Project would harm the ecosystem, air quality, bats, benthic resources, birds, sea turtles, coastal habitat and fauna, commercial fisheries and for-hire recreational fishing, cultural resources, demographics, employment, and economics, environmental justice, finfish, invertebrates, and essential fish habitats, land use and coastal infrastructure, marine mammals, navigation and vessel traffic, national security and military, aviation and air traffic, scientific research, recreation and tourism, scenic and visual resources, water quality, and wetlands.[99]

86.     Despite these known impacts from the Project in the lease area, BOEM opted not to seriously consider any of the alternatives that would lessen the environmental impacts because they would not "allow for full build-out of the Project."[100] BOEM failed to select legitimate alternatives and the failure to consider alternatives that would avoid, minimize, or mitigate impacts was arbitrary, capricious, an abuse of discretion, and otherwise unlawful.

---

[99] *See* Final EIS *supra* note 3 at ES-9–ES-13.
[100] Record of Decision *supra* note 2 at 30.

**Defendants Failed to Adequately Analyze Climate Change Effects of Constructing and Operating the Project**

87.     The Final Environmental Impact Statement does not sufficiently evaluate the Project's impacts on greenhouse gas emissions and climate change. BOEM analyzes partial, Project-specific climate impacts in the nearby geographic area but attempts to quantify only emissions offsets from the Project, with limited qualitative descriptions of emissions generated from construction.

88.     BOEM failed to analyze activities associated with the supply chain, such as minerals sourcing, component fabrication, and eventual disposal of turbine components in landfills, which would not occur under the No Action Alternative and differ among other alternatives BOEM did or should have considered.

89.     The Final Environmental Impact Statement only compares the Project's climate benefits with fossil-fuel generating stations[101] and does not compare the Project's climate impacts with other alternative renewable energy sources or Project locations and designs.

90.     Nor is there any cumulative-level analysis of climate impacts (positive or negative) associated with the proposed scale of offshore wind development. In fact, BOEM admits that the Project will have no considerable impact to climate change: "U.S. offshore wind projects would likely have a limited impact on global emissions and climate change."[102]

91.     Because Defendants' Environmental Impact Statement fails to adequately analyze the impacts on the human environment of the Project, Defendants' authorizations and permits that rely on that Environmental Impact Statement are arbitrary, capricious, and otherwise not in accordance with law, and therefore should be declared unlawful and set aside.

---

[101] *See* Final EIS *supra* note 3 at 1-11.
[102] *Id.* at 3-17.

92.     Defendants' actions have deprived Plaintiffs of the procedural protections in

NEPA and will irreparably harm Plaintiffs' interests.

**Defendants Failed to Analyze Impacts of Blade and Turbine Failure and the Degradation of Project Components**

93.     Missing from BOEM's Final EIS is any discussion or analysis of the

environmental impacts in the event of blade and turbine failure and the degradation of Project

components, which are known and foreseeable possibilities that should have been reviewed and

analyzed by BOEM. Risks of blade and turbine failure and component degradation are not

hypothetical. Rather, they pose real dangers to the water quality of the ocean, fish and essential

fish habitats, marine mammals, benthic resources, and recreational and commercial boaters.

94.     Recent events at the Vineyard Wind 1 Project—where a large portion of a 350-

foot fiberglass and PVC blade broke off the turbine and shattered into thousands of pieces that

were scattered by the ocean—underscores the risk of blade and turbine generator failure at wind

facilities. In the last six months, two blades have failed at a large wind facility in England.[103] And

globally, 0.54% of blades fail each year, with around 3,800 blade failures yearly.[104] In 2022, a

blade at an Oregon wind farm—the height of an 11-story building weighing over four Toyota

Camrys—flew off a turbine at the Bigelow Canyon project and landed in a nearby field, creating

a four-foot-deep trench where it landed.[105] There are also repeated instances of turbines

---

[103] *Second GE Vernova Turbine Blade Reportedly Fails at UK's Dogger Bank Wind Farm*, Offshore (Aug. 23, 2024), https://www.offshore-mag.com/renewable-energy/article/55135538/second-ge-vernova-turbine-blade-reportedly-fails-at-uks-dogger-bank-wind-farm.

[104] Leon Mishnaevsky, Jr., *Root Causes and Mechanisms of Failure of Wind Turbine Blades: Overview*, National Library of Medicine (Apr. 19, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9101399/pdf/materials-15-02959.pdf.

[105] Ted Sickinger, *Wind Bust*, The Oregonian (Aug. 27, 2022), https://projects.oregonlive.com/wind-farms/.

collapsing across the world. Turbines in Germany, Oklahoma, Wisconsin, Whales, and Colorado have all collapsed within the last several years,[106] and many were caused by turbine fires and lightning strikes.

95.     The Final EIS neither addresses nor analyzes the risk of blade failure, turbine collapse, turbine fires, or emergency response and mitigation measures in the event of a failure. The COP also does not mention what would happen in the event of turbine or blade failure, and the two appendices that may cover such events—Oil Spill Response and Safety Management Systems—are labeled "confidential" and barred from public view and comment.

96.     Nor is there any discussion or analysis in the Final EIS regarding Project component degradation. These metal turbines will be placed in corrosive ocean water, encountering high winds, and experiencing temperature fluctuations of at least 80 degrees every year. There is no discussion of what happens if one of the turbines starts to leak oil, coolant, or other fluids, or if the turbines start to rust, or if screws and other materials fall off the turbines. BOEM fails to analyze the environmental impacts of component degradation, writing off the risks as highly unlikely. But even highly unlikely events can still be devastating, as we have seen with major disasters at energy facilities.

97.     BOEM's failure to analyze the risk of blade failure, turbine, collapse, turbine fires, or component degradation is arbitrary and capricious and violates NEPA.

98.     In the wake of the Vineyard Wind disaster, BOEM should, at a minimum, have supplemented its EIS with analysis of the possibility of equipment failure. Plaintiffs even sent

---

[106] Tim Newcomb, *Giant Wind Turbines Keep Mysteriously Falling Over. This Shouldn't Be Happening.*, Popular Mechanics (Jan. 23, 2023), https://www.popularmechanics.com/technology/infrastructure/a42622565/wind-turbines-falling-over/.

BOEM a letter on September 20, 2024, demanding a Supplemental EIS. Yet, BOEM has failed to undertake any analysis of the environmental impacts of blade or turbine failure—a failure that is arbitrary, capricious, and contrary to NEPA.

**Defendants Failed to Analyze the Project's Impacts on the Horseshoe Crab**

99.    The horseshoe crab is a species that is vital to the medical industry in the United States and the health and safety of nearly every citizen. The blood of horseshoe crabs contains the compound LAL, which is the only FDA approved test for endotoxins. When LAL is in the presence of an endotoxin, it clots and traps the endotoxin in a gel-like substance. Every drug certified by the FDA must be tested using LAL and every medical device or instrument that will go into someone's body is also tested with LAL. This test is so ubiquitous that every single person in the United States who has ever had an injection or a vaccine has been protected by the blood of horseshoe crabs. The blood of horseshoe crabs was essential in creating the COVID-19 vaccines.

100.    The areas off Delaware, Maryland, and New Jersey support a major stock of horseshoe crabs, and it is the primary area along the East Coast where horseshoe crabs live. Because of this region's importance, the Atlantic States Marine Fisheries Commission established the Carl N. Shuster Jr. Horseshoe Crab Reserve off the coast of Delaware, where horseshoe crab fishing is prohibited. This Reserve covers an area of nearly 1,500 square miles and 41.9 square miles of the Maryland Offshore Wind Project overlap with the Reserve. There are also additional offshore wind projects that overlap with the Reserve. Every fall and winter, horseshoe crabs migrate from inshore areas to the Reserve, which goes as far out as 30 miles from shore, and bury themselves in the sand and mud. The crabs do not return to shore until mid-

June, where they mate and spawn. The Reserve is crucial to ensuring the stock of horseshoe crabs and their habitat are protected.

101.    In November of 2020, the Assistant Secretary of Health and Human Services sent a letter to the Secretary of the Interior, raising the importance of LAL and encouraging "the Department of the Interior to properly assess any impacts to the habitat of the North American Horseshoe Crab before any offshore wind project is approved on the East Coast."[107] The Department of Interior was warned that because LAL "is an important resource for the medical community," "the United States Government should fully understand any consequences before moving forward."[108] Even though the Department of Health and Human Services asked the Department of the Interior to assess the impacts on the horseshoe crab, BOEM failed to analyze the impacts on the horseshoe crab during its environmental review. BOEM failed to adequately analyze and assess the impacts of this Project, as well as the cumulative impacts, to the habitats within the Shuster Horseshoe Crab Reserve. BOEM also failed to evaluate the bio-medical importance of horseshoe crabs and how any decrease in population or changes in habitat might impact the medical industry and health and safety.

102.    Plaintiff, the Mayor and City Council of Ocean City, raised these concerns with BOEM in their comments on the Draft EIS.[109] In those comments they asked BOEM to defer their approval until further studies were conducted on the Project's impacts on the horseshoe crab from construction and acoustic noise. Ocean City also asked BOEM to consider an alternative that eliminated any development in the Reserve and provide additional analyses to support the

---

[107] Ex. 9, Decl. of G. Topping, Attachment 2, Letter from Assistant Secretary Giroir to Sec. Bernhardt (Nov. 13, 2020).
[108] *Id.*
[109] *See* Ex. 1, Decl. of T. McGean, Attachment 1, Letter to BOEM RE Draft EIS for US Wind Proposed Wind Energy Facility Offshore Maryland (Nov. 17, 2023).

conclusions that population levels would not be impacted and how the sensitive timing of the horseshoe crab movements from offshore to the beaches, bays and wetlands to spawn as well as early finfish life cycles are to be avoided to minimize potential impacts. BOEM failed to address any of these concerns in the Final EIS and failed to fully analyze and identify impacts on the horseshoe crab.

**Defendants Failed to Analyze Impacts on Tourism and Local Economies**

103.    NEPA requires the Government to analyze impacts on the human environment. As part of that analysis, BOEM is required to analyze impacts on local economies, employment, housing, and local industries. Here, BOEM failed to adequately analyze the impacts on the local economy and tourism-based industries of Ocean City, Maryland, Fenwick Island, Delaware, and Worcester County, Maryland.

104.    BOEM relies on outdated, inapplicable studies to conclude that tourism will not be negatively impacted. But those studies, published following the construction of the Block Island pilot Project in Rhode Island, which has only five small turbines—a sparsely populated area with fewer than ten hotels—are simply not applicable to a major, tourism-based economy like the ones in Ocean City and Worcester County. Other than those studies, BOEM has no basis to support its conclusions that tourism will not be impacted. Even though Plaintiffs raised this issue in comments to the Draft EIS, BOEM did not supplement its analysis or conduct surveys in Ocean City or other major resort towns. Instead, it drew an unsupported conclusion that turbines do not affect tourism.

105.    BOEM also disregarded studies, including ones conducted by other offshore wind developers, that found that offshore wind turbines are unattractive to tourists.[110] One study by Orsted, the offshore wind developer, found that 15% of tourists would not return to Cape May County, New Jersey, once the wind projects were completed because the turbines would be visible from the beach. And a study from North Carolina State found that 80% of beachgoers surveyed would not return to the beach if wind turbines were visible.[111]

106.    BOEM's decision to rely on inapplicable studies to support its conclusions regarding tourism and its impacts on the local economy is arbitrary and capricious. BOEM had an obligation to conduct more research regarding these impacts. By failing to do so, BOEM violated NEPA.

**BOEM Failed to Analyze the Impacts on Historic Properties in Ocean City and Fenwick Island**

107.    Despite having nationally listed historic properties, BOEM failed to identify impacts to the three historic properties in Ocean City, Maryland and the one historic property in Fenwick Island, Delaware. BOEM's failure to identify impacts and consult with these projects during the National Historic Preservation Act Section 106 process is arbitrary and capricious and violated NEPA.

**BOEM Failed to Analyze the Maryland Offshore Wind Project's Other Environmental Impacts**

108.    The July 29, 2024 Final EIS prepared by BOEM was inaccurate, incomplete, and failed to comply with multiple requirements of NEPA. Defendants failed to comply with NEPA

---

[110] Mario F. Teisl, et al., *Seeing Clearly in Virtual Reality: Tourist Reactions to an Offshore Wind Project*, Energy Policy (2018), https://umaine.edu/vemi/wp-content/uploads/sites/220/2018/08/Teisl-etal-2018-EP-using-VR-with-wind-projects.pdf.
[111] Center for Environmental and Resource Economic Policy, *Offshore Wind: Tourism* (Apr. 3, 20216), https://cenrep.ncsu.edu/2016/04/03/offshore-wind-tourism/.

by failing to fully analyze and take a hard look at the environmental impacts that will arise from the construction, operations and maintenance, and decommissioning of the Maryland Offshore Wind Project. For many of these failures, BOEM justifies its lack of analysis by stating that obtaining the information would be too time consuming or costly, but that alone does not excuse BOEM from ignoring very real, adverse impacts on the environment and then approving a Project without complete analyses.

109.    BOEM failed to adequately analyze the Project's impacts on benthic resources. Defendants failed to analyze impact producing factors on benthic resources and conduct studies to determine "specific stimuli-response[s]" from underwater noise and EMF.[112] BOEM also failed to analyze and understand "secondary impacts, such as changes in diets throughout the food chain resulting from habitat modification and synergistic behavioral impacts."[113]

110.    BOEM failed to adequately analyze the Project's impacts on birds. BOEM does not have complete information on the distribution and habitat use of the 164 species of birds that are found in the area.[114] Defendants utilized data from onshore wind facilities to make their conclusions regarding birds and failed to examine how offshore bird mortality rates would differ from onshore bird mortality rates.[115] Defendants also failed to analyze and estimate mortality rates based on different species present in the area and the life history and behavior of the species.[116]

111.    BOEM failed to adequately analyze the Project's impacts on finfish and Essential Fish Habitat. Defendants also failed to analyze and discover the "spatial and temporal occurrence

---

[112] Final EIS *supra* note 3 at E-3.
[113] *Id.* at E-4.
[114] *Id.*
[115] *Id.*
[116] *Id.*

of finfish and essential fish habitat" throughout the lease area.[117] Defendants failed to analyze the impacts of electromagnetic fields and underwater noise on vital invertebrate resources.[118] Defendants also failed to understand the "secondary impacts such as changes in diets throughout the food chain resulting from habitat modification," on finfish and invertebrates.[119]

112.    BOEM failed to adequately analyze the Project's impacts on marine mammals. Defendants have not considered the impacts of electromagnetic frequencies on marine mammal populations or their prey in the geographic area,[120] and even though no studies have been conducted, BOEM erroneously concludes that "current literature does not support a conclusion that electromagnetic frequencies could lead to changes in behavior that would cause significant adverse effects on marine mammals."[121] BOEM also failed to fully understand and analyze the effect of underwater noise, noting that while "NMFS disturbance criteria appl[ies] a single threshold for impulsive noise sources and does not consider the overall duration, exposure or frequency," "behavioral responses are not necessarily predictable."[122] BOEM failed to conduct studies and failed to fully analyze the behavioral effects of pile-driving noise on marine mammals other than harbor porpoises and seals,[123] and "uncertainty remains regarding long-term cumulative acoustic impacts associated with multiple pile-driving projects that may occur over several years," and "vessel traffic, high-resolution surveys, geotechnical drilling, and dredging activities."[124] BOEM also failed to analyze or research "the responses of large whale species to

---

[117] *Id.* at E-5.
[118] *Id.*
[119] *Id.*
[120] *Id.* at E-6.
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] *Id.*

extensive networks of new structures" in the Atlantic Ocean.[125] And although there will be thousands of wind turbines along the marine mammal migration routes, BOEM states that "no physical obstruction of marine mammal migration routes or habitat areas are anticipated."[126] BOEM also does not know and failed to analyze and understand whether marine mammals will avoid "offshore wind lease areas due to new structures."[127]

113.    BOEM failed to adequately analyze the Project's impacts on sea turtles. BOEM failed to fully analyze the distribution of sea turtle species in the lease area and failed to fully understand and evaluate the effects of the Project on sea turtles and their habitat.[128] BOEM does not know how EMF will impact sea turtles.[129] Nor does BOEM know how sea turtles will respond to the Project's construction activities.[130] BOEM failed to understand how the hazard lights and navigation lights on the turbines would impact sea turtles.[131] BOEM also failed to understand and analyze how "sea turtles would interact with the long-term changes in biological productivity and community structure resulting from the reef effect of offshore wind farms across the geographic analysis area."[132]

114.    BOEM failed to adequately analyze the Project's impacts on commercial fisheries and for-hire recreational fishing. Defendants based their analysis on the impacts to commercial fisheries and for-hire recreational fishing, which are substantial, on "an incomplete understanding of fish stock dynamics and effects of environmental factors on fish

---

[125] *Id.* at ES-7.
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] *Id.*
[130] *Id.* at E-8.
[131] *Id.*
[132] *Id.*

populations."[133] BOEM also failed to obtain accurate and complete vessel monitoring system data for several species and fishery trips, making its analysis limited.[134]

115.    BOEM failed to adequately analyze the Project's impacts on navigation and vessel traffic. Defendants failed to fully analyze how these turbines will impact navigation. Defendants failed to mention and consider how turbines near the lease area have caused fishing vessels to sink.[135] In 2019, a fishing vessel sank off the Block Island wind farm, and search and rescue operations were halted due to an inability to maneuver around the turbines, resulting in the death of three fishermen. Defendants fail to mention this incident and analyze how adding 114 turbine generators will impact navigation and vessel traffic.

116.    BOEM failed to adequately analyze the Project's impacts on recreation and tourism. BOEM failed to analyze the Project's impacts on the sport and recreational fishing tournaments held in Ocean City. BOEM also failed to analyze how rental property values and property values would change due to the presence of this Project. BOEM failed to analyze and understand how the Project would impact annual visitors and local businesses.

117.    BOEM's failure to provide complete and accurate analyses makes BOEM's Final EIS arbitrary, capricious, and contrary to law and it should be set aside.

### Third Cause of Action

### Violation of the Endangered Species Act and
### Administrative Procedure Act

118.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

---

[133] *Id.* at E- 9.
[134] *Id.*
[135] *See* United States Coast Guard, *MISLE Incident Investigation Report for F/V Mistress Sinking/Loss of Life.*

119.    Congress enacted the Endangered Species Act (ESA) in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] to provide a program for the conservation of such endangered species and threatened species."[136] "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."[137]

120.    Section 7 of the ESA imposes on every federal agency the duty to protect endangered species:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."[138]

The Supreme Court has stated that "[t]his language admits of no exception.[139]

121.    Here, Section 7 required BOEM to consult with NMFS to determine whether the Maryland Offshore Wind Project does or does not jeopardize the species' continued existence and recovery,[140] based on the "best scientific and commercial data available."[141] ESA regulations define "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[142]

---

[136] 16 U.S.C. § 1531(b).
[137] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
[138] 16 U.S.C. § 1536(a).
[139] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536 (1976)).
[140] 16 U.S.C. § 1536(a)(2) & (b)(3)(A).
[141] 16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.14(g)(8).
[142] 50 C.F.R. § 402.02; *see also Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019) (confirming that "the plain language" of the regulation requires the agencies "to assess 'both the survival and recovery of a listed species'" (quoting 50 C.F.R. § 402.02)).

122.    Because the Biological Opinion NMFS issued on June 18, 2024 was not based on the best scientific and commercial information available, and intentionally excluded consideration of the adverse impacts of up to 29 other offshore wind projects to be constructed directly in the migration path of the endangered Right Whale, NMFS's no-jeopardy finding was arbitrary, capricious, and did not comply with the Endangered Species Act.

**The North Atlantic Right Whale Is in Grave Jeopardy**

123.    Few species are as imperiled as the North Atlantic Right Whale. As NMFS's Biological Opinion states, the species is extremely close to extinction, easily susceptible to stress and chronic injuries from construction, vessel strikes, or entanglements, and has incredibly low reproductive rates.[143] BOEM and NMFS report that, since 2011, roughly 237 North Atlantic Right Whales have died and 42% of the population is known to be in reduced health.[144]

124.    Although the Right Whale was among the first species to be listed as endangered,[145] none of the species' recovery goals have been achieved: "Despite . . . efforts to reduce the decline and promote recovery, progress toward right whale recovery has continued to regress."[146] Today, North Atlantic Right Whales are experiencing an unusual mortality event,[147]

---

[143] National Marine Fisheries Service, *Maryland Offshore Wind Project Biological Opinion* (June 18, 2024) at 26–27, https://doi.org/10.25923/49f3-n596 (Biological Opinion) (The Biological Opinion contains two pages labeled "Page 26," due to a page numbering discrepancy. This cite is referencing the second page 26.).

[144] *See* Bureau of Ocean Energy Management, *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (Jan. 2024) at 8, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW _0.pdf (Strategy on the North Atlantic Right Whale).

[145] *See* National Oceanic and Atmospheric Administration, *North Atlantic Right Whale,* https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last accessed Apr. 26, 2024).

[146] Biological Opinion *supra* note 143 at 35 (This cite is referencing the second "Page 35" in the Biological Opinion).

[147] Strategy on the North Atlantic Right Whale *supra* note 144 at 7.

and the population has dwindled to 338 individuals.[148] There are only about 70 breeding females capable of reproducing left.[149] The species has low genetic diversity and is not resilient.[150] Calving rates have slowed from one calf per female every three to four years to one calf per female every seven to ten years.[151]

125.    In the last several years, there has been a tragic and unexplained increase in injuries and deaths of North Atlantic Right Whales. In 2022, 11 North Atlantic Right Whales suffered serious injury or illness.[152] In 2023, two North Atlantic Right Whales were killed and 20 were seriously injured or in declining health.[153] The two deaths included a newborn calf found dead in Morehead City, North Carolina,[154] and a 20-year-old male found dead in the surf on Virginia Beach in February 2023.[155] The year 2024 has already seen five deaths of North Atlantic Right Whales and four other severe injuries.[156] In January of this year, a deceased female North Atlantic Right Whale, born in the 2021 calving season, was found near a beach in Martha's

---

[148] Biological Opinion *supra* note 143 at 25 (This cite is referencing the second "Page 25" in the Biological Opinion).
[149] Strategy on the North Atlantic Right Whale *supra* note 144 at 7.
[150] *Id.*
[151] *Id.*
[152] *See* NOAA Fisheries, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness) (last visited Oct. 24, 2024).
[153] *Id.*
[154] Bureau of Ocean Energy Management, *North Atlantic Right Whale Updates*, https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-updates#new-dead-right-whale-calf-documented-under-pier-in-north-carolina (last visited Oct. 23, 2024).
[155] *Id.*
[156] *See* NOAA Fisheries, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness) (last visited Oct. 24, 2024).

Vineyard, Massachusetts.[157] In February, another juvenile female was found dead off Savannah, Georgia.[158] In March authorities found a dead calf off Cumberland Island in Georgia.[159] And in April 2024, a company conducting whale surveys for the navy notified NMFS of a dead North Atlantic Right Whale female offshore Virginia Beach/Norfolk, Virginia.[160] Notably, this female had just given birth to her sixth calf this winter and the calf was not seen in the vicinity of the carcass,[161] and it is unlikely the calf survived without its mother.[162]

126.    BOEM and NMFS state that this species is at such a severe risk of extinction, that the loss of one individual reduces the likelihood of recovery, which is already almost non-existent:

> Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction . . . [and] the loss of even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[163]

**NMFS and BOEM Admit that the Offshore Wind Program Threatens the North Atlantic Right Whale**

127.    In October 2022, BOEM and NMFS issued a joint draft "North Atlantic Right Whale and Offshore Wind Strategy,"[164] in which the agencies admitted that, when viewed in its

---

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] New England Aquarium, *North Atlantic Right Whale that Recently Gave Birth Found Dead Off Coast of Virginia* (Apr. 2, 2024), https://www.neaq.org/about-us/press-room/press-releases/north-atlantic-right-whale-that-recently-gave-birth-found-dead-off/ ("Calf not likely to survive without its mother.").

[163] *Id.* at 10.

[164] National Marine Fisheries Service and Bureau of Ocean Energy Management, *Draft North Atlantic Right Whale and Offshore Wind Strategy* (Oct. 2022) at 4, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.

entirety, BOEM's Atlantic Offshore Wind Turbine program has the potential to harm North Atlantic Right Whales and cause population-scale impacts to the species: "This species, whose range overlaps with the area proposed for [offshore wind] development, is one of the most endangered large whales in the world,"[165] which makes them "more susceptible to threats generally, including the potential impacts from [offshore wind] development."[166]

128.    In January 2024, the agencies published the final version of their Strategy, concluding that "[t]he activities associated with [offshore wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales]."[167] These stressors include "exposure to noise and/or pressure (particularly from construction activities),"[168] resulting in "hearing impairment, masking of [North Atlantic Right Whale] vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury . . . ."[169]

129.    The Strategy also states that the Right Whale faces a "high risk of extinction" and that its population is small enough that "the loss of even one individual a year" reduces the likelihood of recovery and the species achieving an optimum sustainable population.[170] And the strategy concedes that the negative impacts of each project will be compounded:

> Effects to [North Atlantic Right Whales] could result from stressors generated from a single project; there is potential for these effects to be compounded by exposure to multiple projects. [North Atlantic Right Whales] migrating along the U.S. Atlantic Coast have the potential to travel near or through many currently proposed OSW developments along the Atlantic Coast.[171]

---

[165] *Id.* at 4.
[166] *Id.* at 6.
[167] *See* Strategy on the North Atlantic Right Whale *supra* note 144 at 12.
[168] *Id.*
[169] *Id.*
[170] *Id.* at 6–7.
[171] *Id.* at 13.

130.    Although BOEM and NMFS prepared this Strategy document to protect whales from undue harm and although they published the final Strategy months before NMFS issued its Biological Opinion, the wealth of scientific information, analysis, and conclusions contained in the Strategy is not mentioned once or referenced in the Maryland Offshore Wind Project's Biological Opinion. Nor is there any discussion regarding the compounded impacts on the North Atlantic Right Whale from all of the projects that will be built along its migration route.

131.    NMFS's failure to use this best scientific information, though readily available in its own "North Atlantic Right Whale and Offshore Wind Strategy," completely undermines the validity of its no-jeopardy conclusion and renders its Biological Opinion arbitrary, capricious, and irreconcilable with the requirements of the Endangered Species Act.

**The Biological Opinion Also Excludes Critical Scientific Information About the Adverse Effects of Other Offshore Wind Projects Directly in the Migration Path of the North Atlantic Right Whale**

132.    The North Atlantic Right Whale breeds in the waters offshore New England and then migrates annually along the Atlantic coast through the waters where the Maryland Offshore Wind Project is situated down to Florida and other warmer waters to give birth.[172] While generally a migratory species, some individuals become residents of preferred locations and do not migrate, and North Atlantic Right Whales have been found to live in the waters of Maryland, Delaware, and Virginia year-round. Pregnant females give birth in shallow waters only a few miles offshore.[173] In the springtime, the females who have given birth to a calf migrate back up the Atlantic coast and return to high latitude foraging grounds.[174]

---

[172] *See* Strategy on the North Atlantic Right Whale *supra* note 144.
[173] *See* Biological Opinion *supra* note 143 at 23 (This references the second "Page 23" in the Biological Opinion.).
[174] *Id.*

133.     Although BOEM has issued more than 30 offshore wind leases along the Right Whale's Atlantic migration path, and has already approved or is in the process of approving more than 20 of those projects, NMFS intentionally excluded the adverse effects of those other projects from ESA jeopardy consideration, stating "reasonably foreseeable future actions by federal agencies must be considered (*see* 40 CFR 1508.7) in the NEPA process but not the ESA Section 7 process."[175] NMFS's Biological Opinion thus excluded critical scientific information about the adverse effects of these projects on the Right Whale—which must traverse all of them in its annual migration—undermining NMFS's conclusion that approving the Maryland Offshore Wind Project does not jeopardize the species. By considering the projects one at a time, rather than the program as a whole, NMFS came to a no-jeopardy opinion that is supportable only because it ignored how the gauntlet of multiple projects will impact the North Atlantic Right Whale, which migrates through these areas twice a year.

134.     NMFS also ignored the "takes" it has authorized (not to mention those it must authorize for future Atlantic Coast offshore wind projects) under the Marine Mammal Protection Act. To date NMFS has approved or proposed the take of 404 Right Whales in 12 offshore wind projects—an average of about 33 takes per project. NMFS has already authorized more takes of Right Whales than the total number of individuals remaining,[176] and will continue to authorize takes in future projects, all of which will jeopardize the existence of the species. The effects of these takes on the individual whale are cumulative since, a migrating Right Whale is threatened with take each time it swims through any one of the dozens of approved or planned offshore wind projects—accumulating damage as it goes and increasing its chances of injury, death or

---

[175] *Id.* at 350.
[176] *Id.* at 25 (This cite is referencing the second "Page 25" in the Biological Opinion).

disease. By ignoring the damage done at each of the other projects, approved and planned, NMFS undermines the validity of its no-jeopardy opinion both scientifically and statutorily.

**NMFS Irresponsibly and Arbitrarily Failed to Consider Impacts from Turbine and Blade Failures on the North Atlantic Right Whale**

135.     In July 2024, a large portion of a 350-foot, 57-ton fiberglass PVC blade broke off a newly constructed turbine at the BOEM-approved Vineyard Wind 1 Project, scattering thousands of shards across the ocean's surface. This incident is just one many that have occurred both onshore and offshore over the last several years. The blade materials are hazardous to fish and marine mammals that come into contact with the toxic materials or eventually consume part of the materials. Yet, even though NMFS knew of the risk of blade failure or turbine components going into the ocean, NMFS never considered impacts to endangered species from these toxic materials. Nor has NMFS prepared a Supplemental Biological Opinion analyzing the effects of such mechanical and equipment failures on the North Atlantic Right Whale and other endangered species.

**NMFS Failed to Consider Other Available Scientific and Commercial Information**

136.     NMFS failed to assess the likely effects of oil and coolant spills from the 114 turbines that will be constructed in the lease area. This Project's turbines and offshore substations will hold 1,430,142 gallons of fluids, lubricants, and fuels.[177] Should one, or several turbines, fail, leak, or sustain damage from being exposed to the elements, equipment failure, or severe weather, the impacts will be catastrophic. NMFS dismissed any concern of possible spills or

---

[177] *See* Bureau of Ocean Energy Management, *Maryland Offshore Wind Final Environmental Impact Statement—Appendix D Planned Activities Scenario* (July 29, 2024) at D-128, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Maryland%20Offshore%20Wind%20Final%20EIS_AppD%20Planned%20Activities%20Scenario.pdf.

accidents as too remote and opted not to explain or consider the impacts to endangered marine species.

137.     NMFS arbitrarily and improperly failed to account for or otherwise incorporate population and habitat changes caused by other offshore wind projects when analyzing whether the harm caused by this Project would jeopardize the endangered species in the area. NMFS does not know what will happen once these projects begin construction and operation. There is no analysis of how the thousands of turbines across the 30-plus projects will impact the travel and behavioral patterns of these endangered whales. If there are wind projects all along migration routes, will whales stay in areas where construction has not yet started? Where will whales go to avoid increased vessel traffic, construction noises, explosions, and the destruction or displacement of food? Will whales continue to visit areas where these projects are built? If the construction and operation of Vineyard Wind, South Fork Wind, and Revolution Wind drives the North Atlantic Right Whale further south to off the coast of Maryland, for longer periods of the year, how will this Project's construction impact the species? NMFS's Biological Opinion does not answer or analyze any of those questions. NMFS further failed to use the best available science on the cumulative impacts of other offshore projects.

138.     NMFS arbitrarily and improperly failed to account for how climate change related alterations to population structures and distributions of threatened and endangered species will interact with the effects of the Project when analyzing whether the action would jeopardize endangered species.

139.     NMFS arbitrarily and improperly failed to independently analyze whether the proposed action would reduce the likelihood of recovery—as opposed to survival—of the North Atlantic Right Whale. ESA regulations require NMFS to "assess 'both the survival and recovery

of a listed species.'"[178] NMFS makes the conclusory assertion that the "proposed action will not appreciably reduce the likelihood of recovery of North Atlantic Right Whales," because the Project is only anticipated to cause behavioral impacts to 6 individuals.[179] That statement, however, conflicts with NMFS's own analysis of the state of the species, which is that their "resilience to future perturbations"—behavioral impacts from noise, increased vessel traffic, and pile driving—affect "health, reproduction, and survival."[180] Any action that causes behavioral distress, like the approved Level B takes, has the potential to be deadly, impact reproduction, or cause such distress that the whale dies later, which would reduce the likelihood of recovery of the North Atlantic Right Whale.

140.    NMFS arbitrarily and improperly failed to analyze how the Project's impacts on zooplankton and other food sources would impact endangered species when determining whether the Project would jeopardize endangered species, which NMFS made a priority in their Strategy on the North Atlantic Right Whale.[181]

141.    NMFS's conclusions that the proposed action will not jeopardize the continued existence of the North Atlantic Right Whale is not based on rational scientific analyses nor does it consider all relevant factors or use the best available science.

142.    For all these reasons, NMFS's Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with Section 7 of the Endangered Species Act, in violation of the APA.

---

[178] *See Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019).
[179] Biological Opinion *supra* note 143 at 399
[180] *Id.* at 28 (This cite is referencing the second "Page 28" in the Biological Opinion).
[181] Strategy on the North Atlantic Right Whale *supra* note 144 at 20.

**NMFS's Mitigation Measures Are Inadequate and Fail to Ensure that Endangered Species Will be Protected**

143.     NMFS's Incidental Take Statement contains what it calls mitigation measures to ensure that endangered species are protected. But just because those measures are in place, does not mean they are effective or have the intended effect of mitigating harm.

144.     A July 2023 BOEM-funded study evaluating the effects of offshore wind development on the North Atlantic Right Whale, concluded that an agency's mitigation plans include actions to protect the species, but that does not mean that the actions will necessarily be effective:

> Effectiveness of Mitigation Measures
>
> Broadly speaking, once implemented, conservation measures are not often evaluated for their effectiveness in achieving intended goals (e.g., Selig and Bruno 2010). Likewise, scant information exists on attempts to assess the effectiveness of measures designed and implemented to reduce the impacts of OSW activities on marine mammals.
>
> ***
>
> Given the species' vulnerable status, it is critical that action be taken from the start to prevent noise impacts which could further stress the species and impair its recovery.[182]

145.     Here, NMFS's mitigation measures fall far short of protecting the North Atlantic Right Whale because they will not mitigate impacts from pile driving noise. BOEM's only real mitigation measure for noise is a bubble curtain, which is a grouping of artificially made bubbles created around a source of underwater noise, such as a pile driver. While effective for some species, for baleen whales like the endangered North Atlantic Right Whale, Sei Whale, and Fin

---

[182] Bureau of Ocean Energy Management, *Offshore Wind Energy Development and North Atlantic Right Whales* (July 2023), https://espis.boem.gov/Final%20Reports/BOEM_2023-051.pdf.

Whale, bubble curtains are not effective because they do not reduce low-frequency sounds—the noises that harm baleen whales—below 200 Hz.[183]

146.    There are also no mitigation measures that ensure the pile driving activities will not exceed the approved noise levels. NMFS's Biological Opinion sets forth very strict requirements for noise thresholds from pile driving, yet in practice, the mitigation measures provide no assurance that the Developer will not exceed those levels. In 2023, an acoustic specialist traveled to the Vineyard Wind lease area and acquired multiple acoustic recordings during monopile activities. After analyzing the recordings, he found that the pile driving noise and the noise generated from support vessels with the bubble curtain as mitigation exceeded the decibel threshold approved by NMFS in Vineyard Wind's Incidental Take Statement and Biological Opinion.[184] In the event that pile driving noise thresholds will be exceeded here, which is likely to occur, NMFS's mitigation measures fail to protect nearby endangered species.

147.    NMFS also requires vessels to reduce their speed to 10 knots or less. Not only is this speed ineffective at reducing vessel strike mortality, but none of the mitigation measures have any mechanisms to enforce construction vessels' speed. In the Biological Opinion, NMFS concedes that vessel speeds of 8.6 knots or higher increase the probability of a vessel strike being lethal for an endangered species from 21% to 79%.[185]

---

[183] *See* Bureau of Ocean Energy Management, *Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* (Feb. 11, 2021) at 21, https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.
[184] Rand Acoustics, LLC, *Pile Driving Noise Survey Technical Report* (Mar. 28, 2024), https://save-the-east-coast.org/wp-content/uploads/2024/04/RandAcoustics_PileDrivingNoiseSurvey.pdf.
[185] Biological Opinion *supra* note 143 at 265.

**The Record of Decision Fails to Incorporate All of the Requirements from the Incidental Take Statement in Violation of the ESA**

148.    Where NMFS finds that the proposed action will not jeopardize but will adversely affect or incidentally take members of a listed species, it must provide an incidental take statement specifying the impacts of the incidental taking to the endangered species and "those reasonable and prudent measures that [NMFS] considers necessary or appropriate to minimize such impact[s],"[186] and setting forth the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the" reasonable and prudent measures.[187]

149.    When NMFS issues a Biological Opinion and an Incidental Take Statement outlining the requirements and conditions that must be met, that constitutes a permit authorizing the action agency's permittee to take the endangered species, provided that it respects and adopts the terms and conditions of the Incidental Take Statement.[188] However, if the action agency fails to incorporate all the requirements outlined in the Biological Opinion and Incidental Take Statement in its final approval of a project, then any incidental take is a prohibited take and in violation of the Endangered Species Act.

150.    The Record of Decision's Terms and Conditions of Approval omitted several requirements from the Biological Opinion and the Incidental Take Statement, in violation of the ESA:

- The Biological Opinion requires, as part of the approved action, that "BOEM, BSEE [Bureau of Safety and Environmental Enforcement], and USACE [United States Army

---

[186] 16 U.S.C. § 1536(b)(4)(i)-(ii).
[187] 16 U.S.C. § 1536(b)(4)(iv).
[188] 16 U.S.C. § 1536(o)(2).

Corps of Engineers] must require, and US Wind must develop, a Sound Field Verification Plan, addressing Thorough and Abbreviated SFV, consistent with the requirements in T&C [terms and conditions] 10.d below."[189] The Record of Decision, does not expressly require a Sound Field Verification Plan at all and only mentions such a plan once: "The interim report must include data from hydrophones identified for interim reporting in the SFV Plan and include a summary of pile installation activities . . . ."[190]

- The Biological Opinion requires, as part of the approved action, that "To implement the requirements of RPMs [Reasonable and Prudent Measures] 1 and 2, BOEM, BSEE, and/or USACE must require that US Wind inspect and carry out appropriate maintenance on the noise attenuation system prior to every foundation installation event (i.e., for each pile driven foundation) and prepare and submit a Noise Attenuation System (NAS) inspection/performance report to NMFS GARFO and NMFS OPR."[191] The Record of Decision fails to require maintenance on the Noise Attenuation System before foundation installation.

- The Biological Opinion, as part of the approved action, requires BOEM, BSEE, and/or the Corps to require "US Wind document and report project vessel trips to/from ports in the Chesapeake Bay and the Delaware River, including the number of vessel calls to Sparrows Point, Hampton Roads, New Jersey Wind Port, and Paulsboro Marine Terminal. This must be included in the monthly project reports submitted to NMFS GARFO over

---

[189] Biological Opinion *supra* note 143 at 416.
[190] Record of Decision *supra* note 2 at 5.13.8.1.
[191] Biological Opinion *supra* note 143 at 420.

the life of the project."[192] The Record of Decision fails to require US Wind to document

or report vessel trips to the Chesapeake Bay or Delaware River.

- The Biological Opinion, as part of the approved action, requires US Wind to submit a

  final abbreviated Sound Field Verification report within 60 days of the end of each

  construction season. The Record of Decision fails to require the submission of an

  abbreviated Sound Field Verification report.

- The Biological Opinion requires that "[a]ll plans must be submitted at least 180 days in

  advance of the planned start of relevant activities (e.g., the foundation installation

  monitoring plan must be submitted at least 180 days before the planned date for

  installation of the first pile)."[193] The Record of Decision sets forth a less strict

  requirement allowing the plans to be submitted "no later than 120 days prior to

  instrument deployment and before any construction begins, the Lessee must submit to

  BOEM and BSEE (renewable_reporting@boem.gov;

  renewableenergyoperations@bsee.gov and TIMSWeb) the Longterm PAM Plan that

  describes all proposed equipment (including number and configuration of instruments),

  deployment locations, mooring design, detection review methodology, and other

  procedures and protocols related to the required use of PAM. If there are fewer than 120

  days between the commencement of any construction activity and this COP approval, the

  Lessee must submit the plan as soon as practicable and no later than 60 days prior to

  commencing activities."[194]

---

[192] *Id.* at 421.
[193] *Id.* at 428.
[194] Record of Decision *supra* note 2 at 5.10.4.1.1.

- The Biological Opinion requires the submission of a Vessel Strike Avoidance Plan. The Record of Decision, however, does not expressly require US Wind to submit such a plan and the section of the ROD's terms and conditions of approval that BOEM identifies as requiring this plan, Section 5.5 *Non-Avian Protected Species Monitoring Plan Conditions*, only generally discusses submitted required documents and does not specifically discuss the Vessel Strike Avoidance Plan.

151.   Because BOEM failed to include all the requirements listed in the Biological Opinion and the Incidental Take Statement in the Record of Decision's Conditions of Approval, BOEM failed to comply with the Endangered Species Act, rendering its approval of the Project arbitrary, capricious, and otherwise not in accordance with the requirements of the Endangered Species Act.

### Fourth Cause of Action

### Violation of the Marine Mammal Protection Act
### and the Administrative Procedure Act

152.   Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

153.   The Marine Mammal Protection Act ("MMPA") was the first national legislation to mandate an ecosystem-based approach to marine resource management. Under the Marine Mammal Protection Act, Congress directed that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine mammals. In 2018, Congress enacted a general moratorium on the take of marine mammals without a permit: "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this

74

chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases. . . ."[195]

154.    The permit exception to this moratorium provides that "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock" if the Secretary "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock. . . ."[196]

155.    The Marine Mammal Protection Act also prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the jurisdiction of the United States or on the high seas.[197] The baseline under the MMPA is that "no permit may be issued for the taking of any marine mammal."[198] That said, NMFS is permitted to authorize the incidental take of only "small numbers of marine mammals of a species or population stock."[199] Under the MMPA, "take" means to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[200]

156.    The National Marine Fisheries Service has further defined "harassment" as consisting of two types: Level A harassment, which "means any act of pursuit, torment, or

---

[195] 16 U.S.C. 1371(a)(1).
[196] 16 U.S.C. 1371(5)(a).
[197] 16 USC 1372(a)(l)-(2).
[198] 16 U.S.C. § 1371.
[199] 16 U.S.C. § 1371.
[200] 16 U.S.C. § 1362(13).

annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild"; and Level B harassment, which "means any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns . . . but which does not have the potential to injure a marine mammal or marine mammal stock in the wild."[201]

157.   Exposure of marine mammals to anthropogenic underwater sound may constitute "take" if the pressure level of the received sounds has the potential to cause injury or behavioral disturbance.[202] Continuous sound sources like vibratory pile driving or drilling are considered takes when the root-mean-square sound pressure level is above 120 dB.[203] Non-explosive impulsive or intermittent sound sources are considered takes when the sound pressure level is above 160 dB.[204]

158.   In deciding whether to issue an Incidental Take Authorization under the Marine Mammal Protection Act, the Secretary of Commerce is required to "give full consideration to all factors which may affect the extent to which such animals may be taken[,]"[205] including:

> (1) [E]xisting and future levels of marine mammal species and population stocks;
> *     *     *
> (3) [T]he marine ecosystem and related environmental considerations;
> (4) [T]he conservation, development, and utilization of fishery resources; and
> (5) [T]he economic and technological feasibility of implementation.[206]

---

[201] 50 C.F.R. § 216.3.
[202] 89 Fed. Reg. 84674, 84690.
[203] *Id.*
[204] *Id.*
[205] 16 U.S.C. § 1373(b).
[206] 16 U.S.C. § 1373(b)(1), (3)-(5).

159.    On October 23, 2024, NMFS issued its final Incidental Take Regulations and Letter of Authorization authorizing US Wind to incidentally take marine mammals from 19 species, comprising 20 stocks during the Project's construction, including the take of 4 North Atlantic Right Whales and thousands of other protected marine mammals.[207]

**NFMS has Authorized the Take of More Than a Small Number of Marine Mammals, Which Will Have More Than a Negligible Effect on Stocks of the North Atlantic Right Whale**

160.    For the Maryland Offshore Wind Project, NMFS authorized a maximum of 4,313 takes in any given year[208] 6,865 takes over the course of the five-year permit.[209] Of the marine mammals for which takes were authorized, three are also protected under the Endangered Species Act, the North Atlantic Right Whale, the Fin Whale, and the Sei Whale.

161.    There are fewer than 338 North Atlantic Right Whales still alive,[210] and more are dying each year. Each individual North Atlantic Right Whale is vital to the continuation of the species and NMFS has found that biological removal for the species—"defined as the maximum number of animals that can be removed annually while allowing the stock to reach or maintain its optimal sustainable population level"[211]—is 0.7 deaths per year.[212] Just this year, five North Atlantic Right Whales have been found dead.

162.    NMFS's final decision to issue a Letter of Authorization and implementing regulations for the Maryland Offshore Wind Project's construction and operation was arbitrary, capricious, and not in accordance with law because it fails to comply with the Marine Mammal

---

[207] 89 Fed. Reg. 84674 (Oct. 23, 2024).
[208] *Id.* at 84692.
[209] *Id.* at 84691.
[210] *Id.* at 84692 (NMFS Stock Abundance 338).
[211] Strategy on the North Atlantic Right Whale *supra* note 144 at 7.
[212] National Marine Fisheries Service, *Population Size Estimation of North Atlantic Right Whales From 1990-2023* (Oct. 2024) at 5, https://www.fisheries.noaa.gov/s3/2024-10/TM324-508_0.pdf.

Protection Act and its implementing regulations, allows the take of a substantial, non-negligible, number of marine mammals; fails to analyze the cumulative effects of other approved and proposed offshore wind projects; fails to analyze the increased risk of vessel strikes caused by the Project's obstructions; and fails to analyze takes resulting from interference with migration routes, breeding and feeding grounds, and calving.

**NMFS's Incidental Take Regulation and Permit Fail to Fully Examine the Effects of the Project on the North Atlantic Right Whale**

163.    NMFS has determined that North Atlantic Right Whales have been "detected in the vicinity of the project area year-round" and "the waters off the coast of Maryland, including those surrounding the project area in the MD WEA, have documented North Atlantic [R]ight [W]hale presence as the area is an important migratory route for the species to the Northern feeding areas. . . and to their southern breeding and calving grounds."[213] Even though the North Atlantic Right Whale is frequently found in the waters near the Project, NMFS's regulations and authorization fail to address and mitigate the impacts on the North Atlantic Right Whale.

164.    Since 2017, the North Atlantic Right Whale has been experiencing an Unusual Mortality Event of "stranding[s] that [are] unexpected; involve[] a significant die-off of any marine mammal population; and demands immediate response."[214] As of October 2023, "this event has includes a total of 121 documented animals: 36 dead stranded NARWs [North Atlantic Right Whales], 34 seriously injured free-swimming NARWs, and 51 sublethal injuries/illness (i.e., morbidity)."[215] 2024 has already seen five dead North Atlantic Right Whales and two others

---

[213] 89 Fed. Reg. 84674, 84707.
[214] 16 U.S.C. § 1361.
[215] *See* Strategy on the North Atlantic Right Whale *supra* note 144 at 8.

with severe injuries from vessel strike and entanglement.[216] Even with this Unusual Mortality Event ongoing, NMFS has approved prior to this Project the take of 400 North Atlantic Right Whales—more than the current population—and proposed the take of an additional 149 North Atlantic Right Whales since 2020.

165.    For North Atlantic Right Whales, the loud underwater noise that will be generated during Project construction can cause "avoidance, temporary cessation of foraging or communicating, changes in respiration or group dynamics, masking)," "auditory impacts such as hearing loss," or "lower-level physiological stress responses (e.g., change in respiration, change in heart rate)."[217] The best available science establishes that the North Atlantic Right Whale is extremely sensitive to low-frequency continuous noise and the impacts of masking.[218] And recent research demonstrates that exposure to intermittent or continuous anthropogenic noise has the potential to induce a state of chronic stress in marine mammals.[219] Chronic stress can have adverse health consequences on marine mammals, including higher mortality and morbidity, reduced reproductive success, immuno-suppression, heart disease, depressed reproductive rates, physical malformations, and birth defects.[220] By extension, chronic stress induced by exposure to anthropogenic sound can have a detrimental impact on marine mammal populations by affecting

---

[216] National Marine Fisheries Service, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness)-cases (last visited Oct. 23, 2024).
[217] 89 Fed. Reg. 84674, 84703.
[218] Christopher W. Clark et al., *Comments on Arctic Ocean Draft EIS* (Feb. 28, 2012) at 2, https://tinyurl.com/5fsfmwst.
[219] *See* J.W. Wright et al., *Concerns Related to Chronic Stress in Marine Mammals*, IWC SCI. COMM. DOC. IWC/SC/61/E16 (2009).
[220] *See* A.J. Wright et al., *Do marine mammals experience stress related to anthropogenic noise?*, 20 *Int'l J. Comparative Psychology* 274 (2007).

fertility, mortality and growth rates.[221] Such impacts would directly reflect the health of marine mammals and as they are around more noise, the higher likelihood that they will experience injuries or behavioral deviations that lead to death. Plaintiff, Fenwick Island, raised concerns over the impact of construction noise on the North Atlantic Right Whale in its comments on NMFS's Proposed Incidental Take regulations, but those concerns went unaddressed in NMFS's final regulations.

166.    Although NMFS was fully aware of the severe damage this type of noise causes North Atlantic Right Whales, the Project Incidental Take Regulations fail to require any meaningful measure to protect against risk. Nor do the regulations consider the fact that even intermittent noise from impact pile driving may cause stress beyond a Level B take. The Incidental Take Regulations underestimate the actual extent of the take and fail to consider a factor that is highly relevant to NMFS's determination to issue a permit.

167.    Further, NMFS ignored recent data from other offshore wind sites determined by independent acousticians that showed that pile driving activities exceeded the decibel levels authorized by NMFS's Incidental Take Regulations for other offshore wind projects. NMFS's decision to approve construction activities that consistently create noise above the decibel levels set by NMFS to protect marine mammals, without adequate mitigation measures, is arbitrary and capricious and not in accordance with law.

168.    NMFS also was fully aware that increases in noise over long periods of time cause habitat displacement. In fact, even temporary displacement increases energetic costs as the whales search for new (and possibly less productive) foraging areas and in turn, "could lead to

---

[221] *See id.*; *see also* 87 Fed. Reg. at 79,102 ("Chronic disturbance can cause population declines through reduction of fitness (e.g., decline in body condition) and subsequent reduction in reproductive success, survival, or both.").

increased susceptibility to other stressors (e.g., a shift in distribution can change the overlap with vessel traffic and fishing activities)."[222]

169.    Here, NMFS acknowledges the Project may result in the displacement of North Atlantic Right Whales from the Project area and its surrounding vicinity,[223] yet fails to require any mitigation measures to reduce the likelihood of displacement for these whales.

170.    NMFS's decision to authorize the Project's construction and operation, in light of the severe impacts on the North Atlantic Right Whale, are arbitrary, capricious, and contrary to law and have deprived the Plaintiffs of the substantive protections of the Marine Mammal Protection Act and threaten to irreparably harm the Plaintiffs' interests.

**Fifth Cause of Action**

**Violation of the Migratory Bird Treaty Act
and Administrative Procedure Act**

171.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

172.    The Migratory Bird Treaty Act[224] prohibits the take—the killing, capturing, selling, trading, and transportation—of protected migratory bird species.[225] The Act applies broadly to the killing of any migratory bird "at any time, by any means or in any manner."[226]

---

[222] *See* BOEM and NOAA's Draft Strategy on the North Atlantic Right Whale and Offshore Wind (Oct. 2022) at 11, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.
[223] 89 Fed. Reg. 84674, 84703.
[224] 16 U.S.C. § 703.
[225] *Id.*
[226] 16 U.S.C. § 703(a).

173.    The Maryland Offshore Wind Project lease area is a "major route for migratory birds, which are protected under the Migratory Bird Treaty Act of 1918"[227] and a broad group of avian species may pass through the Offshore Project area, including" migrants, coastal birds, and marine birds.[228] More than 164 species have been identified as potentially occurring along the Atlantic Flyway, which includes 9 state-listed endangered birds, 4 state-listed as threatened birds, 19 state-listed special concern species, 7 migratory birds that are listed as breeding birds of conservation concern, 3 federally listed threatened birds, and 1 federally listed endangered bird.[229] Four federally threatened and endangered birds are found in the area: roseate tern, piping plover, eastern black rail, and rufa red knot.

174.    The Maryland Offshore Wind Project will injure, displace, and even kill migratory birds in the following ways:

- Onshore construction will impact habitats for nesting shorebirds.[230]

- Offshore accidental releases of fuel, hazardous materials, and trash and debris could cause "mortality, decreased fitness, and health effects."[231]

- "Inclement weather and reduced visibility cause changes to migration altitudes and could lead to large-scale mortality events."[232]

---

[227] Final EIS *supra* note 3 at F-56.
[228] *Id.* at F-58.
[229] *Id.* at F-58.
[230] *Id.* at F-77.
[231] *Id.* at F-78.
[232] *Id.* at F-81.

- And the ESA listed piping plover and rufa red knot will encounter operating turbines, which will cause "direct mortality" due to collisions and "behavioral avoidance and habitat loss,"[233] and "adversely affect these species."[234]

175.     In approving the Construction and Operations Plan, BOEM failed to adequately consider the impact the Project will have on migratory birds, consider and adopt mitigation measures, alter the Project to avoid injuring or killing migratory birds, and require the Developer to apply for a Migratory Bird Take Permit. As such, the decision to approve the Construction and Operations Plans was arbitrary, capricious, and not in accordance with the law.

176.     Because the Maryland Offshore Wind Project will take migratory birds, in clear violation of the Migratory Bird Treaty Act, Defendants' approval of the Project is arbitrary, capricious, and not in accordance with the law and BOEM's approval should be invalidated and set aside.

**Sixth Cause of Action**

**Violation of the Coastal Zone Management Act
and Administrative Procedure Act**

177.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

178.     Congress enacted the Coastal Zone Management Act (CZMA) to "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations."[235] To accomplish these goals, the CZMA encourages

---

[233] *Id.*
[234] *Id.*
[235] 16 U.S.C. § 1456(c)(1).

coastal states to create "management plans" for their coastal zones,[236] which the State of Maryland and Delaware have done.

179.    The CZMA requires that "[e]ach federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs."[237] The Coastal Zone Management Act further requires that, for federal activities in the Outer Continental Shelf, "all federal license or permit activities . . . which affect any coastal use or resource are conducted in a manner consistent with approved management programs."[238] Violations of the CZMA by Federal agencies are reviewed under the Administrative Procedure Act.

180.    The State of Delaware has adopted, and the federal government has approved, the Delaware Coastal Zone Act as a comprehensive state coastal management plan under the CZMA.[239] The Delaware Coastal Zone Act provides

> It is hereby determined that the coastal areas of Delaware are the most critical areas for the future of the State in terms of the quality of life in the State. It is therefore, the declared public policy of the state to control the location, extent and type of industrial development in Delaware coastal areas. In so doing, the State can better protect the natural environment of its bays and coastal areas and safeguard their use primarily for recreation and tourism.[240]

181.    The Act also declares that the "expansion of heavy industry" in the bay and coastal areas is "incompatible with the protection of that natural environment in those areas."[241] And "[w]hile it is the declared public policy of the state to encourage the introduction of new

---

[236] 16 U.S.C. § 1456.
[237] 16 U.S.C. § 1456(c)(1).
[238] 15 C.F.R. § 930.70.
[239] Del. Code Ann. tit. 7, § 7001-7015 (West 1953).
[240] Del. Code Ann. tit. 7, § 7001.
[241] *Id.*

industry into Delaware, the protection of the environment, natural beauty and recreation potential of the State is also of great concern."[242]

182.    The Maryland Offshore Wind Project is inconsistent with Delaware's Coastal Zone Act in numerous respects, including:

- The Project's visual impacts to nearby communities, from the turbines being located just 10.7 miles from the coast, destroys the open ocean view that draws tourists to the Town of Fenwick Island and the Delaware shore.

- The Project disrupts and excludes recreational anglers and boaters from the Project area.

- The Project disrupts the natural functions of fish and marine mammals, and there will be mortality to eggs, larvae, fish, shellfish, and benthic species at each turbine foundation, adversely impacting the fishery resources in the lease area, harming commercial and recreational fishing.

183.    Maryland has also adopted a Coastal Zone Management Policy, which is a partnership among local, regional and State agencies. Maryland's Coastal Zone Management Policy sets forth the following requirements for all developments in the coastal areas of Maryland, which include the area where the Maryland Offshore Wind Project will be built:

- "The environment shall be free from noise which may jeopardize health, general welfare, or property, or which degrades the quality of life."[243]

- "The safety, order, and natural beauty of State parks and forests, State reserves, scenic preserves, parkways, historical monuments and recreational areas shall be preserved."[244]

---

[242] *Id.*
[243] MDE (C9) Md. Code Regs. 26.02.03.02."
[244] DNR (B1) Md. Code Ann., Nat. Res. § 5-209 (West).

- "Operations on the Outer Continental Shelf must be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well 3 control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or property, or which may endanger life or health."[245]

- "All waters of the State shall be protected for water contact recreation, fish, and other aquatic life and wildlife. Shellfish harvesting and recreational trout waters and waters worthy of protection because of their unspoiled character shall receive additional protection."[246]

- The "discharge of any pollutant in toxic amounts including: (a) Substances which accumulate to toxic amounts during the expected life of organisms in the surface water or (b) Substances which produce deleterious behavioral effects on [] organisms" is prohibited.[247]

184.    The Maryland Offshore Wind Project, as approved by BOEM, fails to comply with Maryland's Coastal Zone Management Plan in numerous respects:

- The Project will destroy the open ocean view along the Coastal area of Maryland.

- The Project will disrupt the natural functions of fish and marine mammals and there will be mortality to eggs, larvae, fish, shellfish, and benthic species at each turbine foundation, adversely impacting the fishery resources in the lease area.

---

[245] (B2) Md. Code Ann., Envir. §§ 17-101 to -403; Md. Code Regs. 26.24.01.01; Md. Code Regs. 26.24.02.01, .03; Md. Code Regs. 26.24.05.01.
[246] MDE (A1) Md. Code Regs. 26.08.02.02.
[247] MDE (A4) Md. Code Regs. 26.08.03.01.

- The Project's components will hold 1,430,142 gallons of fluids, lubricants, and fuels and the Developer has failed to disclose its plans for if there is a leak from any of the components.

- There is a heightened risk of toxins entering the ocean and washing ashore due to turbine blades shattering and falling into the ocean.

- The Developer has not developed plans for the event of blade or turbine failure, turbine collapse, or turbine fire.

185.    Although Delaware and Maryland both issued consistency determinations for the Project, those determinations are not consistent with their coastal management plans and policies. Because BOEM's approval of the Project is inconsistent with the requirements of Delaware's Coastal Zone Management Act and Maryland's Coastal Zone Management Program, the approval constitutes final agency actions that is arbitrary, capricious, and otherwise not in accordance with the law. BOEM's approval should therefore be invalidated and set aside by this Court.

**Seventh Cause of Action**

**Violation of the National Historic Preservation Act
and Administrative Procedure Act**

186.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

187.    Ocean City is home to three historic properties listed in the National Register of Historic Places that are inescapably connected to their historic Atlantic Ocean viewshed:

- The Captain Robert S. Craig Cottage (Bay Breeze), located near the Boardwalk in Ocean City, Maryland, is listed on the National Register of Historic Properties. The Cottage is a "well-preserved 1 ½ story gable-front house, constructed n 1949-50 of

concrete block with concrete, brick-edged, porch floors and four 4x4 unadorned posts supporting the full-width front porch's shallow hipped roof."[248] The interior of the home consists of "large living room/dining room, three bedrooms, one bath, and a knotty pine kitchen (popular in Ocean City at the time)."[249] Bay Breeze is a significant historic site in Ocean City due to its association with Captain Robert S. Craig, who created and led the Ocean City Beach Patrol for more than 50 years and helped contribute to Ocean City's growth as a beach resort. During his leadership, Ocean City's Beach Patrol "became nationally known for its management and ocean rescue work."[250] For more than three decades, Bay Breeze served as the patrol's "informal headquarters, where meetings were held, records were kept, and summer lifeguards found sleeping accommodations."[251] In 2017, the Maryland Historic Trust Nominated Bay Breeze for designation on the National Register of Historic Places and was added to the register that year.

- Sandy Point Archeological Site, located near Ocean City, Maryland. The Sandy Point Site is the southernmost component of the Townsend Series on the Delaware Peninsula and is one of the few known Woodland period village sites in this area. Sandy Point was listed on the National Register in 1975 due to its historical significance.

---

[248] Maryland's Historical Trust, *Maryland's National Register Properties: Captain S. Craig Cottage*, https://apps.mht.maryland.gov/nr/NRDetail.aspx?NRID=1678 (last visited Oct. 11, 2024).
[249] *Id.*
[250] *Id.*
[251] Department of Interior, *National Register of Historic Places Registration Form: Captain Robert S. Craig Cottage* (Nov. 9, 2017), https://apps.mht.maryland.gov/medusa/PDF/NR_PDFs/NR-1575.pdf.

- St. Paul's by-the-Sea Protestant Episcopal Church, located in Ocean City, Maryland, is listed on the National Register of Historic Properties. In the modern streetscape of Ocean City, the 1900-01 church and the 1923 rectory are among a diminishing collection of surviving buildings that represent the first quarter century of the resort's history.

188.   Several other properties in Ocean City are eligible for listing.

189.   Located in the Town of Fenwick Island, the 87-foot Fenwick Island Lighthouse Station was opened in 1859. The original Lighthouse lamp burned whale oil and was kept lit to warn ships off the Fenwick Shoals. The Lighthouse was added to the National Register of Historic Places in 1979.

**Violation of Section 106 of the National Historic Preservation Act**

190.   Section 106 of the National Historic Preservation Act[252] requires federal agencies to consider and take into account the effect of federal undertakings, permits, and projects on any historic property prior to approval of the undertaking.[253] Section 106 prevents federal agencies from approving any undertaking unless the agency takes into account the effects on historic properties and resolves the adverse effects on those properties.[254]

191.   As a major federal undertaking, the Maryland Offshore Wind Project is governed by Section 106 of the National Historic Preservation Act. Here, BOEM, as the lead federal agency in charge of the Project's permitting review, failed to identify, and take reasonable steps to identify, historic properties that the Project would adversely affect. At the outset of permitting, BOEM impermissibly and arbitrarily narrowed the scope of its review of historic properties,

---

[252] 54 U.S.C. §§ 100101 to 307101.
[253] 54 U.S.C. § 306108.
[254] *Id.*

resulting in a failure to identify historic properties in Ocean City, Maryland and Fenwick Island, Delaware.

192.     In approving the Maryland Offshore Wind Project, BOEM failed to comply with Section 106 of the National Historic Preservation Act in numerous respects, including:

- BOEM failed to identify historic properties that the Project would adversely affect.

- BOEM impermissibly and arbitrarily narrowed the scope of review of historic properties.

- BOEM failed to assess the adverse effects, including all direct, indirect, and cumulative effects including adverse economic effects of the Project, on all historic properties in Ocean City Maryland and Fenwick Island, as Section 106 requires.

-  BOEM failed to determine appropriate avoidance, minimization, and mitigation measures based on the adverse effects of the Project on historic properties.

- BOEM executed an illusory Memorandum of Agreement (MOA) that failed to resolve adverse effects to all historic properties and called for the future development of "Historic Preservation Treatment Plans," which violates Section 106's requirement that adverse effects be avoided, minimized, or mitigated prior to approval of the undertaking.

193.     Authorizing the Maryland Offshore Wind Project without a proper Section 106 consultation and without Section 106 compliance was arbitrary, capricious, and contrary to law.

194.     As a direct and proximate result of the Government's approval of this Project, Plaintiffs have and will suffer substantial and direct injuries to their historic properties, and their property values, tax revenues, and local economies.

## PRAYER FOR RELIEF AS TO ALL COUNTS

Plaintiffs, the Mayor and City Council of Ocean City, Maryland, et al., ask the Court for the following relief:

1.      An order holding unlawful, vacating, and setting aside Defendants' September 4, 2024 decision approving the Construction and Operations Plan for the Maryland Offshore Wind Project, June 18, 2024 Biological Opinion, and the October 23, 2024 Incidental Take Regulations;

2.      Remand of the matter to BOEM and NMFS, respectively, for further action not inconsistent with the Court's decision;

3.      That the Court maintain jurisdiction over this action until BOEM and NMFS are in compliance with the APA, NEPA, ESA, MMPA, Migratory Bird Treaty Act, Coastal Zone Management Act, and National Historic Preservation Act, and every order of this Court;

4.      Reasonable attorneys' fees and costs for bringing this suit; and

5.      Such other further relief as the Court deems appropriate.


                                                  Respectfully submitted,

Dated: October 25, 2024                           /s/ Bruce F. Bright
                                                  Bruce F. Bright (#27236)
                                                  6200 Coastal Hwy., Suite 200
                                                  Ocean City, Maryland 21842
                                                  Tel: 410-723-1400
                                                  Fax: 410-723-1861
                                                  bbright@ajgalaw.com

                                                  Nancie G. Marzulla (pro hac vice pending)
                                                  Roger J. Marzulla (pro hac vice pending)
                                                  Marzulla Law, LLC
                                                  1150 Connecticut Ave., NW
                                                   Suite 1050
                                                  Washington, D.C. 20036

(202) 822-6760
nancie@marzulla.com
roger@marzulla.com

Counsel for Plaintiffs