## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL OF
OCEAN CITY, MARYLAND, a Political
Subdivision of the State of Maryland,
301 N. Baltimore Avenue, Ocean City,
MD 21842;

MAYOR AND TOWN COUNCIL OF
FENWICK ISLAND, DELAWARE, a
Political Subdivision of the State of
Delaware, 800 Coastal Highway,
Fenwick Island, DE 19944;

COMMISSIONERS OF WORCESTER
COUNTY, MARYLAND, a Maryland
non-profit organization, 1 W. Market
Street, Room 1103, Snow Hill, MD
21863;

ATLANTIC COAST SPORTFISHING
ASSOCIATION, INC., a Maryland
corporation, 11036 Piney Island Dr.
Bishopville, MD 21813;

BAY SHORE DEVELOPMENT
CORPORATION, a Maryland
corporation, 2200 Baltimore Avenue,
Ocean City, MD 21842;

CAESAR RODNEY INSTITUTE, a
Delaware corporation, 420 Corporate
Blvd. Newark, DE 19702;

CAINE WOODS COMMUNITY
ASSOCIATION, INC., a Maryland non-
profit corporation, P.O. Box 4681, Ocean
City, MD 21842;

CASTLE IN THE SAND, INC., a
Maryland corporation, 3701 Atlantic
Avenue, Ocean City, MD 21842;

Case No. 1:24-cv-03111-SAG

1

CITIZENS FOR OCEAN CITY, INC., a
Maryland corporation, 9800 Coastal
Hwy., Ocean City, MD 21842;

COASTAL ASSOCIATION OF
REALTORS OF MARYLAND, INC., a
Maryland corporation, 314 Franklin
Avenue, Suite 106, Berlin, MD 21811;

JOHN COLLINS, a Maryland resident,
12702 West End Ct. Ocean City,
Maryland 21842;

DELMARVA COMMUNITY
MANAGERS ASSOCIATION, INC., a
Maryland corporation, P.O. Box 3484,
Ocean City, MD 21842;

FAGERS ISLAND, LTD., a Maryland
corporation, 60th St. and the Bay
Ocean City, MD 21842;

GEORGE TOPPING, a resident of
Maryland, 32182 Bonhill Road,
Salisbury, MD 21804;

HARRISON GROUP GENERAL LLC, a
Maryland limited liability company, 1801
Philadelphia Avenue, Ocean City, MD
21842;

JAMES HOSPITALITY LLC, a
Maryland limited liability company,
12004 Coastal Highway, Ocean City, MD
21842;

JEANENE AND EARL GWIN Jr.,
Maryland residents and owners of
SKILLIGALEE SEAFOOD, LLC, a
Maryland limited liability company,
10448 Azalea Road, Berlin, MD 21811;
and SKILLIGALEE, INC., a Maryland
corporation, 10448 Azalea Road,
Berlin, MD 21811;

JENNIFER PAWLOSKI, a Delaware
resident, 32886 Reba Rd.
Millville, DE 19967;

JOHN TRADER, a Maryland resident,
9301 Coastal Hwy., Ocean City, MD
21842;

LITTLE SALISBURY CIVIC
ASSOCIATION, INC., a Maryland
corporation, 621 S Pacific Avenue,
Ocean City, MD 21842;

MICHAEL COPPA, a New Jersey
resident and owner of CDK
TRAWLERS, INC., a New Jersey
corporation, P.O. Box 4416 Ocean City,
MD 21843, and INSTIGATOR FRESH
LLC, a New Jersey corporation, P.O. Box
4416 Ocean City, MD 21843;

OCEAN AMUSEMENTS, INC., a
Maryland corporation, 2901 Philadelphia
Avenue, Ocean City, MD 21842;

OCEAN CITY DEVELOPMENT
CORPORATION; a Maryland
corporation, 108 Dorchester Street,
Ocean City, MD 21842;

OCEAN CITY HOTEL-MOTEL-
RESTAURANT ASSOCIATION, INC., a
Maryland corporation, 5700 Coastal
Highway #302, Ocean City, MD 21842;

OCEAN CITY MARLIN CLUB, INC., a
Maryland corporation, 9659 Golf Course
Road, Ocean City, MD 21842;

OCEAN CITY, MARYLAND,
CHAMBER OF COMMERCE,
INCORPORATED, a Maryland non-
stock organization, 12320 Ocean
Gateway, Ocean City, MD 21842;

OCEAN PINES ASSOCIATION, INC., a
Maryland corporation, 239 Ocean Pkwy,
Ocean Pines, MD 21811;

SAVE RIGHT WHALES COALITION,
an unincorporated organization, 287
Parker Hill Road, Lyman, NH 03585;

SPIROS BUAS AND PETER BUAS,
residents of Maryland, 9923 Stephen
Decatur D3, Ocean City, MD 21842;

SUNSET MARINA, LLC (D/B/A/
OCEAN CITY FISHING CENTER, OC
FISHERMAN'S MARINA, AND
SUNSET MARINA), a Maryland limited
liability company, 12911 Sunset Avenue,
Ocean City, MD 21842;

TIME, INC., a Maryland corporation,
P.O. Box 572, Ocean City, MD 21842;

WATERMAN'S ASSOCIATION OF
WORCESTER COUNTY, INC., a
Maryland corporation, 10448 Azalea
Road, Berlin, MD 21811;

WHITE MARLIN OPEN, INC., a
Maryland corporation, #400 6th Street,
Ocean City, MD 21842;

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, 1849 C Street NW,
Washington, DC 20240;

DEB HAALAND, in her official
capacity as the Secretary of the Interior,
1849 C Street NW, Washington, DC
20240;

BUREAU OF OCEAN ENERGY
MANAGEMENT, 1849 C Street NW,
Washington, DC 20240;

LIZ KLEIN, in her official capacity as
the Director of the Bureau of Ocean
Energy Management, 1849 C Street NW,
Washington, DC 20240;

NATIONAL MARINE FISHERIES
SERVICE, 1315 East-West Highway
Silver Spring, MD 20910;

JANET COIT, in her official capacity as
the Assistant Administrator of the
National Marine Fisheries Service, 1315
East-West Highway Silver Spring, MD
20910;

     Defendants.

## AMENDED COMPLAINT TO REVERSE AND SET ASIDE FINAL AGENCY ACTION

When the Government announced its goal of deploying 30 gigawatts of offshore wind energy projects by 2030, it set into motion a coordinated effort to approve major federal undertakings on the Outer Continental Shelf as fast as possible, sacrificing a transparent approval process, the purpose of notice and comment rulemaking, and shortcutting the statutory and regulatory requirements that were enacted to protect our nation's environmental and natural resources, its industries, and its people.[1]

On September 4, 2024, the United States Bureau of Ocean Energy Management (BOEM) approved the Construction and Operations Plan ("COP") for the Maryland Offshore Wind

___
[1] *See* Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

5

Project, an 80,000 acre wind Project constructed by US Wind Inc. ("US Wind") just 10.7 miles

off the coast of Ocean City, Maryland and Fenwick Island, Delaware, by issuing a Record of

Decision.[2] This final agency approval, together with BOEM's approval of a Final Environmental

Impact Statement ("EIS") for the Project[3] and a collection of other various permits from other

federal agencies provides US Wind with authorization to commence construction of the

Maryland Offshore Wind Project.

　　　　In authorizing this Project, Defendants failed to comply with numerous statutes and their

implementing regulations:[4] Administrative Procedure Act,[5] Outer Continental Shelf Lands Act,[6]

National Environmental Policy Act,[7] Endangered Species Act,[8] Marine Mammal Protection Act,[9]

Migratory Bird Treaty Act,[10] Coastal Zone Management Act,[11] and National Historic

Preservation Act.[12]

## PARTIES AND STANDING

　　　　1.　　　　Plaintiff, Mayor and City Council of Ocean City, Maryland ("Ocean City"), is a

political subdivision of the State of Maryland. Surrounded by the waters of the Atlantic Ocean,

the Ocean City Inlet, and coastal bays, and with 10 miles of beautiful beaches, Ocean City's local

---

[2] *See* Bureau of Ocean Energy Management, *Record of Decision* (Sept. 4, 2024),
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/ROD-
OCS-A-0490_0.pdf (Record of Decision).
[3] *See* Bureau of Ocean Energy Management, *Final Environmental Impact Statement* (July 29,
2024), https://www.boem.gov/renewable-energy/state-activities/maryland-offshore-wind-final-
environmental-impact-statement-eis (Final EIS).
[4] Plaintiffs plan to amend their complaint to add additional causes of action and plaintiffs.
[5] 5 U.S.C. § 701-706.
[6] 43 U.S.C. § 1331.
[7] 42 U.S.C. § 4321-4370h.
[8] 16 U.S.C. § 1540(g)(1)(A), (B).
[9] 16 U.S.C. § 1371.
[10] 16 U.S.C. § 703.
[11] 16 U.S.C. § 1451.
[12] 54 U.S.C. § 300101-307101.

economy and culture are centered around the waters of the Atlantic Ocean and are heavily dependent on tourism, recreation, and the health and preservation of the ocean and its coast. An ocean resort town since the early 1900s, Ocean City welcomes and hosts around 8 million visitors each summer in its more than 10,000 hotel rooms and 21,000 condominiums and homes. And Ocean City's classic wooden boardwalk, a local fixture since 1900, offers 3 miles of food, games, and shopping. Ocean City is also a popular destination for fishing and hosts numerous fishing tournaments. The city is also known as the White Marlin Capital of the World, and each year, Ocean City hosts the White Marlin Open, which attracts boats from all over the country and more than 1,500 of the best anglers. Every year, millions of visitors come to Ocean City and spend billions of dollars to sunbathe on the town's beaches, enjoy the open, unindustrialized views of the ocean, observe whales and dolphins, fish, birdwatch, and enjoy the historic boardwalk, shops, and amusement parks. With an economy based almost entirely on tourism, commercial fishing, and recreational fishing, Ocean City cannot sustain a drastic change in its workforce and culture—changes that will occur because of the recently approved Maryland Offshore Wind Project. As discussed in the Declaration of the City Manager of Ocean City, Terence McGean, attached as Exhibit 1, Ocean City will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the construction and operations of the Maryland Offshore Wind Project—injuries that would be avoided absent the Government's approval of the Project. Ocean City's Mayor and City Manager commented on the Draft EIS and submitted comments following the publication of the Final EIS, calling on BOEM to publish a Supplemental EIS to discuss and evaluate the risk of blade failure and release of toxic chemicals into the ocean.[13]

---

[13] Rick Meehan, *Town of Ocean City, Maryland Comment on the Draft Environmental Impact Statement* (Nov. 20, 2023), https://www.regulations.gov/comment/BOEM-2023-0050-0520.

2.      Plaintiff, the Mayor and Town Council of Fenwick Island, Delaware ("Fenwick Island"), an incorporated municipality at the southeastern tip of Sussex County bordering on Ocean City, Maryland. Fenwick Island is a quiet, family-oriented community that protects its natural beach and bay environments. While Fenwick Island has a year-round population of 400 residents, in the summer the population swells to nearly 3,000, with tourists visiting from across the nation. Fenwick Island's economy relies on tourism during the summer months to create employment opportunities and to support local restaurants, beach shops, and other beach-related businesses. Tourists and residents are attracted to Fenwick Island's ocean beaches, and they visit to experience the stunning open ocean views, observe whales and other marine life, bird watch, and enjoy recreational activities on the ocean, like fishing and surfing. The presence of this Project's 114 turbines just 10.7 miles off the coast will destroy the pristine ocean view, degrade water quality, injure marine life, and create safety issues, and will deter seasonal residents and tourists from traveling to Fenwick Island. Fenwick Island's main attractions are the unimpeded access to and views of the waters of the Atlantic Ocean and its beaches and without the pristine, unimpeded ocean views and access, the community and economy will immediately and concretely suffer immensely. The Declaration of the Fenwick Island Mayor, Natalie Magdeburger, attached as Exhibit 2, states that the Town of Fenwick Island will suffer significant, cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project. Fenwick Island, and its Environmental Committee is a member of Plaintiff, Save Right Whales Coalition. The Mayor of Fenwick Island and the Fenwick Environmental Committee commented on the Draft Environmental Impact Statement, raising concerns over the adverse impacts to tourism, the town's viewshed, the marine environment, and the highly endangered

North Atlantic Right Whale.[14] The Mayor also submitted comments on the proposed Marine Mammal Protection Act Letter of Authorization.[15]

      3.      Plaintiff, Commissioners of Worcester County, Maryland ("Worcester County"), is governed by seven County Commissioners who are duly elected by citizens of the County every four years.[16] Currently, the Worcester County Commissioners include Caryn Abbot, Diana Purnell, Eric Fiori, Theodore J. Elder, Anthony W. Bertino, Jr., Madison J. Bunting, Jr., and Joseph M. Mitrecic. Under the Worcester County Code, Worcester County Commissioners constitute the executive body authorized to act on behalf of Worcester County.[17] Worcester County, Maryland includes four cities: Berlin, Ocean City, Snow Hill and Pocomoke City. Worcester County includes Maryland's coastline, where visitors from across the country come to enjoy recreational fishing and boating, water sports, freshly caught, local sea food, and to observe ocean species and migratory birds. Worcester County is also home to Assateague Island National Seashore and State Park, which draws nature lovers each year who come to observe the Park's unique wild horses in their natural beachfront habitat. The County depends on its unobstructed ocean views, healthy marine environment, and commercially accessible ports to support its tourism, seafood industry, and property values. Because the unobstructed views, healthy marine life, and property values of the County will be adversely impacted by the Project, as stated in the Declaration of the County Attorney for Worcester County, Roscoe Leslie, attached as Exhibit 3, Worcester County will suffer direct, substantial, and cognizable injuries-in-

---

[14] Natalie Magdeburger, *Town of Fenwick Island, DE Comment on Draft Environmental Impact Statement* (Nov. 20, 2023), https://www.regulations.gov/comment/BOEM-2023-0050-0517.
[15] Natalie Magdeburger, *Town of Fenwick Island, DE Comment on Marine Mammal Protection Act* (Feb. 2, 2024), https://www.regulations.gov/comment/NOAA-NMFS-2023-0110-0080.
[16] *See* Worcester County Code § CG 2-102.
[17] *Id.*

fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project. In addition, Worcester County Commissioners actively participated in the Maryland Offshore Wind Project's environmental review process, attending public meetings held by BOEM on the Project and providing comments and objections to the proposed Project.[18]

4.     Plaintiff, Atlantic Coast Sportfishing Association, Inc., is an association of more than 140 fishermen who sportfish off the coast of Ocean City, Maryland. Sportfishing is one of the core activities that draws visitors to Ocean City each year and the Association's members participate in the more than 22 fishing tournaments that are hosted out of Ocean City and sportfish in the area where the Project will be built. Because the Project will degrade the marine environment, create navigational hazards, exclude sportfishermen from their popular and traditional fishing spots, as stated in the Declaration of John O'Dell, the Public Relations Advisor for the Association, attached as Exhibit 21, the Association and its members will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

5.     Plaintiff, Bay Shore Development Corporation, a Maryland corporation with its principal place of business in Ocean City, is the parent company for Ocean City Maryland's Jolly Roger Amusement Park at 30th Street and Boardwalk Hotel Group. Bay Shore Development's Boardwalk Hotel Group consists of the Days Inn by Wyndham Oceanfront, the Howard Johnson by Wyndham Oceanfront Plaza Hotel, and the Howard Johnson by Wyndham Oceanfront Plaza Inn. Bay Shore Development is one of Worcester County's major employers, employing

---

[18] See, e.g., BOEM, Public Hearing on US Wind Maryland Offshore Wind Project (Oct. 24, 2023), https://www.regulations.gov/comment/BOEM-2023-0050-0932.

approximately 600 workers. Bay Shore Development Corporation's businesses depend heavily on the consistent stream of tourism in Ocean City, as well as the health of the marine environment that draws tourism, supports recreational activities, and supports the signature seafood industry in the region. Because the Project will cause adverse impacts to tourism, recreation, and industry in the area, as stated in the Declaration of Bay Shore Development Corporation's Founder, Chairman, and CEO, Charles Jenkins, attached as Exhibit 4, Bay Shore Development Corporation will suffer direct, substantial, and cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project.

6.     Plaintiff, the Caesar Rodney Institute, is a 501(c)(3), non-profit public-policy research organization in Delaware that promotes the protection of our environmental resources. The Institute seeks to promote sensible energy policies by advocating for governmental sound energy and environmental policies that balance environmental concerns with cost and reliability to promote conservation and a thriving economy. Many of the Institute's members will suffer injury-in-fact caused by this Project, including David T. Stevenson, whose declaration is attached as Exhibit 22. The Project will generate unreliable energy for the Institute and its members and has already increased energy prices in Delaware, forcing the Institute, and its members, to pay more for electricity. Prices will continue to rise once the Project is constructed. The Project's impacts to the marine environment and commercial fishermen will injure the Institute's members. Additionally, the Institute's Center for Energy & Environmental Policy, which has devoted significant time and resources to studying the impact of recent offshore wind development on the critically endangered North Atlantic Right Whale, will be injured by the Project because the Project directly injures the Institute's, and the ability of David Stevenson, the

Director of the Center for Energy & Environment and member of the Institute, to study the North Atlantic Right Whale. As the population dwindles, fewer whales will travel through the waters of Delaware and Stevenson and the Institute will have fewer opportunities to study the whale. Because the Project adversely impacts tourism, degrades the marine environment, excludes commercial fishermen from their traditional fishing grounds, and threatens the continued existence and presence of the North Atlantic Right Whale, as stated in the Declarations of David Stevenson and John Toedtman, Director of the Institute's Center for Energy & Environment and Executive Director of the Institute, attached as Exhibits 22 and 23, the Caesar Rodney Institute will suffer significant, cognizable injuries—injuries that would not be possible without the Government's approval of the Project.

7.     Plaintiff, Caine Woods Community Association, Inc., is a Maryland non-profit corporation that was founded in 1981. The Association supports the Caine Woods community, one of the few green enclaves of single-family homes, town houses, and condominiums in Ocean City. Approximately half of the 800 households in the Caine Woods community are members of the Association, including residents, homeowners, and renters. The Association hosts numerous events each year for the community, including a community picnic at the beginning and end of the summer, a cornhole tournament, Christmas caroling during the holiday season, a neighborhood yard sale, and monthly Association board meetings. The Association has also taken action to support the community environment, including its neighborhood watch program, which is dedicated to protecting residents' homes and families, as well as a Beautification Committee, which maintains several flower beds throughout Caine Woods. The Association includes members who rent out units to tourists that come to Ocean City for its scenic ocean views, ocean-based recreational activities, and thriving marine life. Because the Project will

cause adverse impacts to the ocean views and pristine marine environment that draws tourists to Ocean City and supports property values in the Caine Woods community, as stated in the Declaration of Michael Quade, attached as Exhibit 5, President of Caine Woods Community Association, the Association will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

8.     Plaintiff, Castle in the Sand, Inc., a Maryland corporation with its principal place of business in Ocean City, owns and operates Castle in the Sand Hotel, Coconuts Beach Bar and Grill, and the Barefoot Mailman Motel in Ocean City, Maryland, which has operated as a family business in the area since 1958. Castle in the Sand Hotel is an oceanfront resort consisting of 180 units and is conveniently located near the Ocean City boardwalk, amusement parks, waterparks, water sports, restaurants, golf courses, and Convention Center. The Castle in the Sand offers several types of accommodations, including standard hotel rooms, cottage apartments, one-bedroom suites, condominiums, and efficiencies with fully equipped kitchenettes and balconies. The Barefoot Mailman Motel is located two blocks away from the oceanfront Castle in the Sand property and consists of 28 units, each with private balconies. The Barefoot Mailman Motel is also conveniently situated close to the popular Ocean City vacation destinations including the Ocean City Convention Center, the Boardwalk, rides, amusements, golf courses, water sports, restaurants, and fishing. The beautiful beaches with their unobstructed ocean views and healthy marine environment are essential to the survival of the hotels managed by Castle in the Sand. Because the Project will adversely impact the unobstructed ocean views and destroy the healthy marine environment that Castle in the Sand's hotels and businesses depend on, as discussed in the Declaration of Castle in the Sand's owner, Adam Showell, attached as Exhibit 6, Castle in the

Sand, Inc. will suffer direct, substantial, and cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project—injuries that would not occur without the Government's approval of the Project.

9.      Plaintiff, Citizens for Ocean City, Inc., Plaintiff, Citizens for Ocean City, Inc., is an organization that educates the local Ocean City, Maryland population regarding local news and politics. Founded in 2015, Citizen's for Ocean City has a mailing list of over 1,100 members, which consists of residents, fishermen, business owners, and tourists and Citizen's for Ocean City provides an impartial local source of information. The Project will negatively impact Citizen's for Ocean City's members, who include residents, business owners, and fishermen of Ocean City, and they will experience a decrease in tourism, which will lead to a loss of revenue, navigation issues that will create safety hazards, and an industrialized ocean view that will decrease property values and discourage people from living in Ocean City. The Project will cause Citizens for Ocean City to lose members, who will leave the community and no longer utilize the information sources Citizens for Ocean City provides. Because the Project will cause adverse impacts to the tourism industry, degrade the marine environment, drive commercial fishermen from their traditional fishing locations, and push residents and tourists out of Ocean City, Citizens for Ocean City will suffer significant, cognizable injuries—injuries that would not be possible without the Government's approval of the Project.

10.     Plaintiff, Coastal Association of REALTORS® of Maryland, Inc., is a Maryland corporation with its principal place of business in Ocean City, and the local chapter of the National Association of REALTORS®, with a membership that spans the areas of Somerset, Wicomico, and Worcester Counties. The Association's purpose is to advocate for the interests of its 1,299 members and to provide services that enhance the professionalism and success of its

members' businesses. The Association's members work as realtors for residential and commercial properties in Ocean City, helping to find housing for workers and seasonal residents near and in Ocean City. The Association's purpose, and its members interests, are inextricably linked to the health of the marine environment and the pristine unobstructed ocean views along the Maryland coast because these features are substantial drivers of property values in the area. People purchase homes in Ocean City to be close to the ocean so that they can enjoy the open ocean view, swim in clean ocean waters, and relax on debris-free beaches with pristine ocean views. The Project's adverse impacts on the marine environment and coastal visual resources will adversely affect the property values in Ocean City and nearby communities. As stated in the Declaration of the Chief Executive Officer of Coastal Association of REALTORS®, Bernice Flax, attached as Exhibit 7, the Association will suffer direct, substantial, and cognizable injuries-in-fact by the construction and operations of the Maryland Offshore Wind Project— injuries that would not occur without the Government's approval of the Project.

11.    Plaintiff, John Collins, is a resident of Ocean City, Maryland and lives on waterfront property just south of the Ocean City Inlet and Harbor. Collins is a recreational boater and sails through the Maryland Offshore Wind Project lease area. The construction boats for the Project, which will be utilizing the Ocean City Inlet and Harbor, causing boat traffic congestion and dangerous conditions for Collins when he is traveling in and out of the Harbor. The construction and operation of the turbines and substations will force Collins out of the Project area, and he will lose access to the beautiful, unimpeded ocean landscape that Collins has enjoyed for many years. The Project will also interfere with the navigation and radar systems that Collins relies on to safely travel through the Project's lease area. Collins also visits the beaches in Ocean City five days a week to enjoy the wide, open ocean views. He uses binoculars to view

the open ocean, and he regularly observes whales breaching and feeding off the coast of Ocean

City and the waters that will by the Project. The viewshed that Collins has enjoyed for years will

be destroyed and will drive the whales that he views out of the area. Collins also is an avid

birdwatcher and often travels to Assateague Island, which is near Ocean City, to view migratory

and endangered birds, like the Piping Plover. His home sits within the Atlantic Flyway and he

often watches migratory birds from his home and throughout Ocean City. The Project's turbines

will endanger these birds, which will be killed by flying into the turbines. Because this Project

will cause adverse impacts to Collins' recreational boating, birdwatching, and whale watching

activities and because the Project will degrade the marine environment, as stated in the

Declaration of John Collins, attached as Exhibit 24, Collins will suffer significant, cognizable

injuries-in-fact due to the Project's impacts on recreational boating, whale watching, and

birdwatching and the impacts to whales and migratory and endangered birds—injuries that

would not be possible without the Government's approval of the Project.

      12.    Plaintiff, Delmarva Community Managers Associations, Inc., a Maryland

corporation with its principal place of business in Ocean City, is an organization of nearly 200

members, who are property managers of apartments and condominiums, property management

companies, and associate members, including banks, restaurants, roofers, and other businesses

that provide services to homeowners and condominium associations. The Association works with

property managers, prospective buyers of property, and local vendors in Ocean City and the

surrounding area. Since its inception in 1976, the Association's purpose has been to bring

together property management professionals in all fields to address and solve issues affecting

rental properties in and around Ocean City. Because Ocean City's economy depends heavily on

tourism, the Association and its members work tirelessly to foster a healthy tourism industry for

Ocean City and its environment. As stated in the Declaration of Delmarva Community Managers Association's President, Michele Nadeau, attached as Exhibit 8, because this Project will cause fewer tourists to come to Ocean City, the Association will suffer direct, substantial, and cognizable injuries-in-fact as a result of the construction and operations of the Maryland Offshore Wind Project—injuries that that would not occur without the Government's approval of the Project.

13.    Plaintiff, Fagers Island, Ltd., is a Maryland corporation with its principal place of business in Ocean City, Maryland. Fagers Island owns and operates two luxury hotels in Ocean City, the Lighthouse Club Hotel and The Edge Hotel, the historic Atlantic Hotel, located in the center of the town's Historic and Entertainment Districts, as well as the Fagers Island Restaurant and Bad Monkey Bar & Grill in Ocean City, and the Bad Monkey Bar & Grill in West Ocean City. Fagers Island's restaurants and hotels depend on the hundreds of thousands of tourists that visit and spend money each year. The visitors and tourists who visit also depend on the pristine ocean views and healthy marine life. The construction, installation, and operation of the Maryland Offshore Wind Project will cause tourists and seasonal visitors to choose to visit other resort locations with unindustrialized views and destroyed healthy marine environments, meaning less demand and less revenue for the Fagers Island hotels and restaurants. As stated in the Declaration of John Fager, owner of Fagers Island Ltd., attached as Exhibit 25, because this Project will cause fewer tourists to come to Ocean City, Fagers Island Ltd. will suffer direct, substantial, and cognizable injuries-in-fact as a result of the construction and operations of the Maryland Offshore Wind Project—injuries that that would not occur without the Government's approval of the Project. During the environmental review process for this Project, John Fager

submitted public comments and attended public meetings to voice his concerns about the negative impacts of the Project on the environment and the Ocean City community.

14.    Plaintiff, George Topping, is a commercial fisherman who has fished in and around the Maryland Offshore Wind Project area, as well as the inshore coastal areas of Maryland and Delaware for the past 64 years. For more than 20 years, Mr. Topping has worked as a horseshoe crab fisherman, harvesting horseshoe crabs for biomedical purposes, rather than human consumption. Horseshoe crab blood is highly valuable for its unique biomedical utility. Horseshoe crab blood contains a compound called Limulus amebocyte lysate or LAL and is the only FDA-approved test for endotoxin, which is a type of toxin that cannot be sterilized. The need for this substance is difficult to overstate: Every drug certified by the FDA must be tested using LAL, and the same goes for almost every type of medical device, like implants, pacemakers, needles, and scalpels. As a commercial horseshoe crab fisherman, the integrity and health of the ocean area that sustains horseshoe crabs is of paramount importance to him. His livelihood depends on the ability to fish for these crabs. As George Topping states in his Declaration (Exhibit 9), Mr. Topping will suffer direct, substantial, and cognizable injuries-in-fact from the Project's adverse impacts on the marine environment and ocean-based business and industry—injuries that that would not occur without the Government's approval of the Project.

15.    Plaintiff, Harrison Group General LLC ("Harrison Group"), a Maryland limited liability company with its principal place of business in Ocean City, owns and operates an extensive portfolio of destination hotels and restaurants in Ocean City, Maryland, Virginia Beach, Virginia, and Corolla, North Carolina. The Harrison Group is a third-generation family business welcoming guests to the oceanfront hotels that they have owned and operated in Ocean City, Maryland since 1951. The Group manages 14 hotels in and around Ocean City and operates

12 restaurants and eateries in Ocean City. The Groups hotels provide elevated, unimpeded views of the Atlantic Ocean and eateries that draw in visitors from across the country who want to experience amazing views while dining. Each hotel owned by the Harrison Group in Ocean City is along the famous Ocean City beachfront and attracts thousands of visitors each year. Because the Maryland Offshore Wind Project will adversely impact the unobstructed ocean views, healthy marine environment, and interfere with the full enjoyment of Maryland's beaches, as stated in the Declaration of John Harrison, attached as Exhibit 10, Harrison Group General LLC will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

16.    Plaintiff, James Hospitality LLC ("James Hospitality"), a Maryland limited liability company with its principal place of business in Ocean City, is a privately-owned hotel management company that handles the operations, management, human resources, and marketing for several hotels in Ocean City, Maryland. James Hospitality provides management services for the Carousel Oceanfront Resort, Fenwick Inn, Crystal Beach Oceanfront Hotel, Bonita Beach Hotel, Coastal Palms Beach Hotel, Tidelands Caribbean Hotel & Suites, and Cayman Suites. Each hotel James Hospitality manages in Ocean City sits on or in close proximity to the famous Ocean City beachfront and depends on the steady stream of tourism that come for Ocean City's unobstructed ocean views, thriving marine life, and unimpeded access to the ocean. Because this Project will cause fewer tourists to come to Ocean City, as stated in the Declaration of James Hospitality's President, Michael James, attached as Exhibit 11, James Hospitality's business will suffer direct, substantial, and cognizable injuries-in-fact from the Project's impacts on the environment and tourism—injuries that would not occur without the Government's approval of the Project.

17.    Plaintiffs, Jeanene and Earl Gwin, have owned and operated a commercial fishing business and seafood market in Ocean City for 35 years. What started as a small family business has since grown into two thriving Ocean City businesses: Skilligalee, Inc. and Skilligalee Seafood, LLC. Through their businesses the Gwin's operate as both a commercial fishery and a local fish market for local fishermen to sell their freshly caught seafood. As part of their commercial fishing business, the Gwin's fish for lobster and black seabass, which require the use of lobster and seabass pots. These pots have doors that open, weights that anchor the pots to the ocean floor, and small openings that allow smaller fish to escape. The Gwin's have around 1,300 of these pots which they regularly place into the waters of Ocean City within the Maryland Offshore Wind lease area. The Gwin's also utilize gillnetting, which is similar to crab potting, but rather than a pot, uses a net with sinkers. Because the Project will degrade the marine environment, create navigational hazards, exclude commercial fisheries from popular fishing spots, and stymie tourism, as stated in the Declaration of Earl Gwin, attached as Exhibit 12, the Gwins will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project

18.    Plaintiff, Jennifer Pawloski, is a resident of Delaware and an avid, semi-pro and hobby photographer who documents ocean landscapes in Maryland and Delaware. For more than 20 years, she has enjoyed capturing the beautiful, unimpeded open ocean views from Ocean City, Fenwick Island, and other local beaches. Because this Project will destroy the open ocean landscape that Pawloski photographs and destroy her aesthetic enjoyment of the Delaware and Maryland coastlines, as stated in the Declaration of Jennifer Pawloski, attached as Exhibit 26, Pawloski will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

Pawloski participated in the Maryland Public Service Commission meetings and local meetings held by BOEM, DNREC, and Senator Andy Harris to voice her concerns and opposition to the Project. Pawloski also submitted public comments on the Draft Environmental Impact Statement for the Project.

19.    Plaintiff, John Trader, is an Ocean City, Maryland resident and homeowner and the owner of four restaurants in Ocean City and one restaurant in Fenwick Island Delaware. Trader's restaurants, Liquid Assets, Annabelle's BBQ & Creamery, the Border Bar, Barrio Taco, and Our Harvest, offer a wide variety of food for residents and tourists. The summer months, when tourists flock to Ocean City and Fenwick Island, are his busiest months. Trader owns an oceanfront home on 116th Street in Ocean City where he enjoys panoramic, unobstructed views and enjoys observing the natural environment, watching marine life and migratory birds. For more than 60 years, Trader has enjoyed birdwatching from his ocean front property and frequently observes the migratory and endangered roseate tern, piping plover, eastern black rail, and rufa red knot. Because this Project will cause adverse impacts to tourism, recreation, and industry in the area, and because the Project will degrade the marine environment that migratory and endangered birds rely on and injure and kill migratory birds, as stated in the Declaration of John Trader, attached as Exhibit 27, Trader will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism and impacts on migratory and endangered birds—injuries that would not be possible without the Government's approval of the Project.

20.    Plaintiff, Little Salisbury Civic Association, Inc., a Maryland corporation with its principal place of business in Ocean City, represents the Little Salisbury community and the many year-round residential homeowners and rental homeowners who reside there. The neighborhood has about 350 homes and is one of only three districts in Ocean City comprised

largely of year-round residents. The Association represents the interests and the needs of the homeowners in the community and assists in maintaining the common areas of the community, including the Little Salisbury Neighborhood Park and boat ramps on the bay. Because the construction and operation of the turbines for this Project will substantially and adversely impact the marine environment, the unimpeded view, and destroy access to fishing areas, fewer people will buy or lease properties in this community, and property values will go down. As stated in the Declaration of Little Salisbury Civic Association's President, Peck Miller, attached as Exhibit 13, as a result of the Project, the Little Salisbury Civic Association will suffer direct, substantial, and cognizable injuries-in-fact from the Project's impacts on Ocean's City's visual resources, marine environment, property values, tourism, recreation and wildlife—injuries that would not occur without the Government's approval of the Project.

21.    Plaintiff, Michael Coppa, is a commercial fishermen and business owner in Ocean City, Maryland. He is also a member of Plaintiff, Waterman's Association of Worcester County. For more than 20 years, he has owned the most commercial fishing permits in Maryland and has spent hundreds of thousands of dollars to maintain these permits over the years. He uses these permits to meet his own fishing quotes and then rents out his boat, the Instigator, to other commercial fishermen to meet their own fishing quotas. Each year, Coppa's boat lands roughly 60-70% of the state quotas for several fish species. In 2024, 60% of Delaware's seabass quota was caught and landed on the Instigator. He also sells some of the fish he catches to consumers through his shoreside business, Instigator Fresh LLC. For decades, Coppa has fished in the waters where the Maryland Offshore Wind Project will be built and has offloaded his catch at the seafood docks in Ocean City where the Project's facilities will be located. Because the Project will degrade the marine environment where he fishes, create navigational hazards, exclude him

and the fishermen who rent his boat from fishing in their traditional fishing grounds, and reduce the population of target species, as stated in the Declaration of Mike Coppa, attached as Exhibit 28, Coppa will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

22.    Plaintiff, Ocean Amusements, Inc., a Maryland corporation with its principal place of business in Ocean City, is the parent company for Ocean City's Jolly Roger at the Pier, which is Ocean City's only full-service Family Amusement Facility. Jolly Roger at the Pier offers classic amusement park rides, including bumper cars, roller coasters, a slingshot, double decker carousel, a Ferris wheel, as well as midway games and fishing off of the pier. Ocean Amusements, Inc.'s businesses depend heavily on a consistent stream of tourism in Ocean City, as well as the health of the marine environment that draws tourism, supports ocean-based recreational activities, and supports the signature seafood industry in the region. Because the Project will cause adverse impacts to tourism, recreation, and industry in the area, as stated in the Declaration of Ocean Amusements, Inc.'s CEO and Chairman, Charles Jenkins, attached as Exhibit 4, Ocean Amusements, Inc. will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism—injuries that would not be possible without the Government's approval of the Project.

23.    Plaintiff, the Ocean City Development Corporation, is a nonprofit working to revitalize downtown Ocean City, one building at a time. The Corporation provides financial and technical assistance to local businesses, works with the city whenever there are zoning or policy changes, and consults with the city on new construction projects and design guidance. The Corporation also assists with finding suitable housing for employees. Downtown Ocean City runs from the bay to the beach from 17th Street in Ocean City to the end of the Inlet and the

Corporation's development area includes the historic Ocean City Boardwalk, Ocean City Fishing Pier, and the hundreds of hotels, restaurants, shops, and amusements within that area. Development and maintenance of this area is crucial because most of the tourists that visit Ocean City center their visit around the attractions and accommodations in Downtown. The Maryland Offshore Wind Project and its 114 turbines sited 10.7 miles off the beach will directly impact the Corporation because it will deter people from visiting Ocean City, directly injuring the Downtown community and the businesses. Tourists come to Ocean City for a beach vacation, and they will go elsewhere if they can no longer look out at the open ocean, view marine and coastal animals nearby, swim and boat in clean waters, and enjoy a debris-free beach in Ocean City. When people stop coming to Ocean City because the features that they once enjoyed are gone—which will happen once this Project is built—the Downtown businesses will face substantial if not ruinous financial hardship, and the essence of Downtown Ocean City will be destroyed, injuring the Corporation. As discussed in the Declaration of Joseph Wilson, the President of the Ocean City Development Corporation, attached as Exhibit 14, the Corporation will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism— injuries that would not be possible without the Government's approval of the Project.

24.     Plaintiff, Ocean City Hotel-Motel-Restaurant Association, Inc., is a non-profit, 501(c)(6) trade organization that represents the interest of more than 400 member hotels, motels, restaurants, and other tourism-related business partners in the Ocean City, Maryland area. Since 1971, the Association has connected industry interests through advocacy, education, and partnerships to advance Ocean City as a leading tourist destination. The Association assists its member businesses, helps to solve common issues relative to the hospitality industry, and disseminates information on local and state laws, policies, and regulations relevant to member

businesses so that they can make informed decisions. The Association's activities include: cooperating with other organizations to promote Ocean City as a premier family destination; promoting events to attract visitors to Ocean City; providing industry standards and trends to members; addressing industry concerns and issues; providing information to visitors; advocating and representing the interests of its members and the hospitality industry; and connecting member businesses with industry and hospitality vendors to provide the best services for members and their guests. The Association's members rely on the more than 8 million tourists that visit Ocean City each summer to participate in the than 22 recreational and sport fishing tournaments. The Association's members are the heart of Ocean City's economy, and it is because of these hotels, motels, restaurants, and tourism-related businesses that Ocean City can host millions of visitors each year. The Association and its members depend on tourists coming to Ocean City and, because this Project will deter people from visiting, the Project will directly threaten the livelihood of the Association's members and their business's continued existence. The Maryland Offshore Wind Project's 114 turbines, 10.7 miles off the Ocean City beach, pose an immediate concrete threat to the tourism-based businesses who are members of the Association. As discussed in the Declaration of Executive Director Susan Jones, attached as Exhibit 15, the Association will suffer significant cognizable injuries-in-fact by the construction and operation of the Maryland Offshore Wind Project—injuries that would not be possible without the Government's approval of the Project.

       25.     Plaintiff, Ocean City Marlin Club, Inc., a Maryland limited liability company with its principal place of business in West Ocean City, Maryland, is a Maryland corporation that has served for over 80 years as a hub for fishermen in the Mid-Atlantic region. Since 1936, the Ocean City Marlin Club has served as a place where fishermen can meet and share their love for

the sport of fishing. The Marlin Club is in the only commercial harbor on the east coast of Maryland and the only inlet to gain access to the Atlantic Ocean. The approximately 800 Club members are dedicated to enjoying, protecting, and participating in recreational fishing off the shores of Ocean City. They are familiar with how devastating the Maryland Offshore Wind Project will be on the now picturesque, unimpeded views of the Ocean City Inlet, Assateague Island, and the Atlantic Ocean, visible from the 5,200 square-foot Clubhouse that sits at the mouth of the Ocean City commercial harbor. Because this Project will cause fewer tourists to come to Ocean City, as stated in the Declaration of Club member, Ryan Freese, attached as Exhibit 16, the Project will suffer direct, substantial, and cognizable injuries-in-fact from the Project's impacts on the marine environment, navigability, port utilization, and marine safety—injuries that would not occur without the Government's approval of the Project.

26.     Plaintiff, the Ocean City, Maryland, Chamber of Commerce, Incorporated, a Maryland non-stock corporation with its principal place of business in Ocean City, represents the interests of more than 700 members and business owners in Ocean City and continuously works to enhance the economic growth in the region. As resort town businesses, the Chamber's member businesses are largely based on tourism and include restaurants, hotels, attractions, fisheries, and other tourism-related businesses. Every year over 8 million tourists come to Ocean City and spend billions of dollars at the Chamber of Commerce's members' businesses and sunbathe on its beaches, enjoy the open and unimpeded ocean views, observe whales and other marine life, enjoy ocean-based recreational activities, stay in rental properties and hotels, enjoy the historic boardwalk and shops, and experience the City's festivals, celebrations, and over 22 annual fishing tournaments. The Chamber's members, which are mostly tourism and hospitality-based businesses, rely on the clean and healthy waters of the Atlantic Ocean and Ocean City's beaches

to attract visitors. The Project will drive tourists away from Ocean City by degrading the ocean and marine environment, interfere with boating and sailing, endangering marine mammals, birds, and fish, excluding fishermen from the Project area, and destroying the open ocean view. Surveys conducted by universities and offshore wind developers have shown that a significant number of tourists will likely not return if turbines are visible from the beach.[19] When tourists can no longer enjoy trash and debris-free beaches, swim, boat, sail, and fish in clean waters off Ocean City, enjoy coastal birds and marine life that fly and swim offshore, and enjoy the vast, unindustrialized ocean views, they will not come to Ocean City, and they will not spend their money supporting the Chamber's businesses. As stated in the Declaration of Executive Director, Amy Thompson, attached as Exhibit 17, the Ocean City, Maryland, Chamber of Commerce will suffer significant, cognizable injuries-in-fact from the Project's impacts on the environment and tourism—injuries that would not occur without the Government's approval of the Project.

27.    Plaintiff, Ocean Pines Association, Inc., is a homeowner's association in Ocean Pines, Maryland, located on the east coast of Worcester County. The community features more than nine miles of waterfront property on 3,000 acres of wooded areas and represents approximately 8,500 homes with 12,000 full time residents and 8,000 part-time seasonal residents and tourists who rent homes. Using dues paid for by homeowners, Ocean Pines offers a Beach Club with a beachfront restaurant and bar in Ocean City, a public Yacht Club, five pools,

---

[19] Center for Environmental and Resource Economic Policy, *Offshore Wind: Tourism* (Apr. 3, 2016), https://cenrep.ncsu.edu/2016/04/03/offshore-wind-tourism/; Landry et al., *Wind Turbines and Coastal Recreation Demand*, Resource and Energy Economics (2012) 93–111. https://doi.org/10.1016/j.reseneeco.2011.10.001.
[19] Mario F. Teisl, et al., *Seeing Clearly in Virtual Reality: Tourist Reactions to an Offshore Wind Project*, Energy Policy (2018), https://umaine.edu/vemi/wp-content/uploads/sites/220/2018/08/Teisl-etal-2018-EP-using-VR-with-wind-projects.pdf.

two marinas, a racquet sports complex, and a championship golf course. The Association's proximity to Ocean City and its beautiful, unimpeded beaches are the main attractions for Ocean Pines' residents, visitors, and prospective renters and buyers. The Association's income depends on the consistent flow of tourists that visit and spend money at its public amenities. Because this Project will cause adverse impacts to tourism and will degrade the marine environment, as stated in the Declaration of John Viola, the General Manager of Ocean Pines Association, Inc., attached as Exhibit 29, the Association will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism—injuries that would not be possible without the Government's approval of the Project.

28.     Plaintiff, Save Right Whales Coalition, is an alliance of grassroots environmental and community organizations, scientists, and conservationists working to protect the North Atlantic Right Whale and other marine life from the industrialization of the ocean through large-scale offshore wind development. The Coalition advocates against offshore wind projects that will be harmful to wildlife and is committed to educating the public and political leaders on the harms of offshore wind on ocean life and for those who live, work, and visit our coastal communities. The Coalition is also actively involved in the fight to protect marine life, including whales, dolphins, sea turtles, seals, and other species—as well as the marine environment on which they depend. An injury to the North Atlantic Right Whale is an injury to the organization's core purpose. Save Right Whales Coalition actively engages with regulators, federal agencies, and state/local stakeholders to provide comments on how to protect marine life and on the impacts offshore development will have on marine life. Because the Project's adverse impacts threaten the continued viability of the North Atlantic Right Whale, as stated in the Declaration of Save Right Whales Coalition co-founder, Lisa Linowes, attached as Exhibit 18, the Coalition will

suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project's impacts on the marine environment, including marine mammals and the interconnected marine benthic habitat—injuries that would not occur without the Government's approval of the Project.

29.     Plaintiffs, Spiros Buas and Peter Buas, are residents of Maryland. Spiros Buas is the trustee, managing member, and president of various family trusts that own and operate four hotels along the coast of Maryland and Delaware, including Fenwick Shores, Kokomo Suites, Park Place Hotel, and Madison Beach Motel. Fenwick Shores is a hotel located at 1501 Coastal Highway, Fenwick Island, DE, in the heart of Fenwick Island, Delaware and is about a mile from the Fenwick Island Boardwalk. Kokomo Suites is located at 7300 Coastal Hwy, Ocean City, Maryland 21842. Kokomo Suites is situated just steps away from the Atlantic Ocean and the Ocean City Boardwalk, with rooms that boast views of the unobstructed ocean. Madison Beach Motel is located at 9 North Baltimore Avenue Boardwalk, Ocean City, MD 21842. Madison Beach Motel is situated in the heart of downtown Ocean City, Maryland. The Motel is just steps away from the Atlantic Ocean and Ocean City's famous boardwalk. Park Place Hotel is located at 208 North Baltimore Avenue, Ocean City, MD 21842. The Park Place Hotel provides guests with pristine ocean front views and has direct access to Ocean City's famous boardwalk. The Maryland Offshore Wind Project will adversely impact the tourism that the Buas hotels and motel depend on by cluttering the Ocean City viewshed with massive physical structures that will be visible during the day and night. By degrading the marine environment, endangering wildlife, excluding fishermen from the Project area, and littering debris and trash on the beaches, fewer tourists will choose to come to Ocean City, and fewer tourists means less revenue for the hotel. Because the Project will cause adverse impacts to the tourism industry by destroying the viewshed and degrading the marine environment, as stated in the Declaration of Spiros Buas,

attached as Exhibit 30, Spiros Buas will suffer significant, cognizable injuries—injuries that would not be possible without the Government's approval of the Project.

30.     Plaintiff, Sunset Marina, LLC ("Sunset Marina"), is a Maryland limited liability company with its principal place of business in West Ocean City, Maryland, that owns and operates Sunset Marina, OC Fisherman's Marina, and Ocean City Fishing Center. Since 1999, the Sunset Marina has served as Ocean City's premier full-service marina resort. The marina is conveniently located a quarter of a mile from the Atlantic Ocean, near the Ocean City Inlet. This marina features high-class amenities, including a self-service boatyard, two swimming pools with expansive sundecks, three climate-controlled bathhouses, a tackle-and-bait shop, an on-site marine supply and convenience store, a fully equipped fitness center open 24/7, and the Sunset Grille, which was voted Maryland's Favorite Restaurant for two-consecutive years. Sunset Marina offers 250 seasonal wet slips for boats to dock in the water and also offers dry storage for boats, with a boatyard that can hold up to 125 boats and dry-stack storage that can store 350 boats. Sunset Marina also hosts seasonal angling tournaments and boasts a charter fleet of licensed sport fishing boats. The Ocean City Fishing Center, located just minutes from the Ocean City Inlet, is home to the largest charter fishing fleet in Ocean City, MD, providing 180 wet slips for boats to dock and dry storage that can store up to 25 boats. The OC Fisherman's Marina is at the head of the commercial fishing harbor in west Ocean City, MD, offering boaters quick, unobstructed access to the Ocean City Inlet and open Atlantic Ocean areas that will now house the project's wind turbine generators. Ocean City's spectacular open ocean access, recreational, sport, and commercial fishing, and unimpeded ocean views are the main attractions that keep visitors coming to the LLC's marinas. Because the Project will degrade the marine environment critical for the recreational fishing industry and add massive turbines that will obstruct the safe

passage of vessels offshore, as stated in the Declaration of Brian Tinkler, attached as Exhibit 19, Sunset Marina, LLC will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

31.    Plaintiff, Time, Inc., a Maryland corporation with its principal place of business in Ocean City, is the parent company of Thrasher's French Fries, a food service company that has not changed its famous French fry recipe since its incorporation in 1929. Thrashers has three locations in Ocean City, two situated on the boardwalk and one on the pier. Time, Inc.'s businesses depend heavily on the consistent stream of tourism in Ocean City, who come to fish and recreate in a healthy marine environment and to enjoy ocean-based recreational activities. Because the Project will cause adverse impacts to tourism, marine and ocean-based recreation and industry in the area, as stated in the Declaration of Time, Inc.'s CEO and Chairman, Charles Jenkins, attached as Exhibit 4, Time, Inc. will suffer significant, cognizable injuries-in-fact due to the Project's impacts on tourism—injuries that would not be possible without the Government's approval of the Project.

32.    Plaintiff, Waterman's Association of Worcester County, Inc., a Maryland corporation with its principal place of business in Ocean City, is an organization dedicated to advocating for the fishermen of Worcester County, Maryland. Their mission is to protect the fishing industry, feed the community through hard work, dedication, and sustainable practices, and advocate for the well-being of watermen and the preservation of the waters offshore of Worcester County. Members of the Waterman's Association fish in and around the Maryland Offshore Wind lease area. The 114 Project turbines will be a safety hazard for their members to navigate through and will create congested transit lanes for their boaters and fishermen who are

to travel through a safe passage around the Project. The Project will increase the amount of time it takes for their members to reach their fishing grounds, which will reduce the amount of time they have to fish and will decrease their income. Because the Project creates navigational hazards that block the traditional transit lanes, as stated in the Declaration of the President of the Waterman's Association, Earl Gwin, attached as Exhibit 12, the Waterman's Association of Worcester County will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

33.     Plaintiff, White Marlin Open, Inc., a Maryland corporation with its principal place of business in Ocean City, operates a world-renowned fishing tournament known as the "White Marlin Open," hosted annually in Ocean City, Maryland. The White Marlin Open is the largest billfishing tournament in the world. Originally hosted in 1974, the Open draws massive numbers of competitive recreational fishermen around the globe. Recreational and sport fishing is one of the core activities that draw visitors to Ocean City, and the White Marlin Open has been the most popular event of the sport fishing season each year. By placing the Project structures right where the gamefish are located, the Project threatens to destroy the areas fish habitat and decrease the fish population and directly impair the sport of large game fishing in Ocean City, Maryland. The Project also poses navigational hazards for fishermen who must navigate around the many Project structures, often times hours out of the way, to reach their fishing destinations. Because the Project creates navigational hazards and degrades the marine life that the Open depends on to draw visitors each year, as stated in the Declaration of James Motsko, attached as Exhibit 20, White Marlin Open, Inc. will suffer direct, substantial, and cognizable injuries-in-fact as a direct result of the Project—injuries that would not occur without the Government's approval of the Project.

34.     Defendant, the United States of America, is a republic whose powers are defined and limited by the Constitution and statutes of the United States. The United States acts through its various departments, agencies, instrumentalities, and officials.

35.      Defendant, the United States Department of the Interior, is an agency of the federal government charged with the responsibility of protecting and managing its public lands and resources. Defendant, Deb Haaland, is the Secretary of the United States Department of the Interior and is responsible for overseeing the nation's Outer Continental Shelf lands and oceans, including those selected for offshore wind projects. Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Secretary Haaland is sued in her official capacity as Secretary of the Interior.

36.     Defendant, Bureau of Ocean Energy Management, is a federal agency within the Department of the Interior established in 2010 to oversee the energy development of the Outer Continental Shelf. BOEM's stated mission is "to manage the development of U.S. Outer Continental Shelf (OCS) energy and mineral resources in an environmentally and economically responsible way."[20] BOEM evaluates the resources of the Outer Continental Shelf and leases portions of it. BOEM also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases. Defendant, Liz Klein, is the Director of BOEM. She issued the final agency decision challenged here—the approval of Maryland Offshore Wind's Construction and Operations Plan. Director Klein is sued in her official capacity as Director of the Bureau of Ocean Energy Management.

---

[20] U.S. Department of the Interior: Bureau of Ocean Energy Management, *About Us* https://www.boem.gov/about-boem (last visited Oct. 11, 2024).

37.     Defendant, the National Marine Fisheries Service ("NMFS"), is a federal agency founded in 1871 and placed within the National Oceanic and Atmospheric Administration ("NOAA") in 1970. NMFS oversees national marine resources, conserves fish species, and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction. NMFS also implements and enforces the Endangered Species Act with regard to marine organisms and authorizes the incidental take and harassment of listed species, and also administers the Marine Mammal Protection Act and authorizes the incidental harassment of marine mammals. Defendant, Janet Coit, is the Assistant Administrator of the National Marine Fisheries Service. She is responsible for the Biological Opinion, Incidental Take Statement, Letter of Authorization, and Incidental Harassment Authorization challenged here. Administrator Coit is sued in her official capacity as Assistant Administrator of NMFS.

**JURISDICTION AND VENUE**

38.     The United States has waived its sovereign immunity, and this Court has jurisdiction of this case under the Administrative Procedure Act,[21] Outer Continental Shelf Lands Act,[22] National Environmental Policy Act,[23] Endangered Species Act,[24] Marine Mammal Protection Act,[25] Migratory Bird Treaty Act,[26] Coastal Zone Management Act,[27] and the National Historic Preservation Act.[28]

---

[21] 5 U.S.C. § 701-706.
[22] 43 U.S.C. § 1331.
[23] 42 U.S.C. § 4321-4370h.
[24] 16 U.S.C. § 1540(g)(1)(A), (B).
[25] 16 U.S.C. § 1371.
[26] 16 U.S.C. § 703.
[27] 16 U.S.C. § 1451.
[28] 54 U.S.C. § 300101-307101.

39.     The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 702 (Administrative Procedure Act or "APA").

40.     Venue is proper and appropriate in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because a significant number of Plaintiffs reside in Maryland.

41.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because the Defendants' approval of the Maryland Offshore Wind Project's Construction and Operations Plan, the issuance of the Incidental Harassment Authorization and incidental take permits, approval of the Final Environmental Impact Statement for the Project, and grant of an easement are final agency actions under the Administrative Procedure Act.

42.     Plaintiffs have exhausted all administrative remedies, the agency actions challenged in this suit are final and ripe for review, and they have standing because they are injured in fact by the federal Defendants' actions or omissions, and this court has the power to redress those injuries.

**STATEMENT OF FACTS**

43.     The Town of Ocean City is Maryland's only beachfront city, and each year, millions of tourists come to Ocean City and spend billions of dollars in Ocean City,[29] visiting the free and public beaches, enjoying the pristine open ocean view, observing whales and marine life, staying in hotels or rental properties, enjoying the boardwalk and shops, and experiencing

---

[29] Economics, Prepared for Maryland Office of Tourism, *Economic Impact of Tourism in Maryland – 2021* (Nov. 2022) at 91, https://www.kentcounty.com/images/Economic_Development/Economic_Impact_of_Tourism_in_Maryland_-_2021__state_counties_11_2022.pdf.

the City's festivals, celebrations, and more than 22 fishing tournaments. As a major resort town, tourism is Ocean City's primary economic driver, with tourism generating $2.1 billion annually and supporting more than 13,000 jobs.[30] Ocean City's Boardwalk is more than 130 years old and has been named one of the best classic wooden boardwalks in the United States by the Travel Channel and USA Today. At nearly three miles long, the Boardwalk is filled with hundreds of activities, restaurants, shops, and tourist attractions. Ocean City is also home to several historic properties eligible for listing on the National Historic Register of Places and three properties named on the National Historic Register of Places: The Captain Robert S. Craig Cottage, Sandy Point Archaeological Site, and St. Paul's by-the-Sea Protestant Episcopal Church.

44.      The Town of Fenwick Island, Delaware, is located at the southeastern tip of Sussex County and neighbors Ocean City. Fenwick Island is a small, family-oriented community. The Town's vision statement describes Fenwick Island as "a quiet, family oriented and walkable community which protects its natural beach and bay environment while including a desirable and sustainable primary residential area as well as a vibrant commercial area."[31] While the year-round population is about 400 people, every summer thousands of seasonal residents and tourists travel to Fenwick Island to enjoy the quiet, beach-oriented atmosphere. Fenwick's residents and visitors cherish the area because it provides a safe place for family and friends to gather and enjoy the natural environment. Fenwick Island's economy is heavily dependent on tourism. The thousands of visitors that travel to Fenwick each year create employment opportunities and generate significant revenue for the town. Tourists travel to Fenwick to enjoy the ocean beaches,

---

[30] *Id.*
[31] Town of Fenwick Island, *2024 Comprehensive Plan* (Feb. 23, 2024) at 7, https://fenwickisland.delaware.gov/files/2024/05/Town-of-Fenwick-Island-2024-Comprehensive-Plan-1.pdf.

experience the amazing ocean views, observe whales and other marine life, birdwatch, and enjoy recreational activities in the ocean. Fenwick Island is also home to the Fenwick Island Lighthouse Station, which is a National Historic Site.

45.    Because Ocean City and Fenwick Island are surrounded by various coastal bays and the Atlantic Ocean, the area is home to a sizeable commercial fishing industry. Local commercial fisheries harvest dozens of species including flounder, striped bass, croaker, bluefish, squid, blue crabs, scallops, clams, and lobsters.

46.    Recreational, for-hire, and tournament sportfishing are also major parts of Fenwick Island's and Ocean City's economy and local culture. Popular recreational billfish species, like white marlin, roundscale spearfish, blue marlin, and Atlantic sailfish are found in the waters off Ocean City, which is known as the White Marlin Capital of the world. These billfish travel to the waters off Ocean City every summer to feed and migrate back to southern waters in the fall and winter. Each year, more than 22 fishing tournaments are hosted out of Ocean City's West Harbor and marinas. These tournaments bring thousands of visitors to Ocean City every year and generate tens of millions of dollars for the City and its businesses annually. The most famous of these tournaments, the White Marlin Open, has been held annually for over 50 years and has awarded more than $113 million in prize money. In recent years, the five-day White Marlin Open generates at least $20 to $30 million for local businesses and companies in and around Ocean City.

47.    Horseshoe crab harvesting is also a major industry in Delaware and Maryland and one of the primary habitats for horseshoe crabs is found in the waters off the coast of Delaware and Maryland. Because of the abundance of the species in the area, the Atlantic States Marine Fisheries Commission created a 1,500-mile Reserve, which runs from the waters off Delaware up

to New Jersey from three nautical miles to 30 nautical miles from shore. Horseshoe crab fishing

is prohibited in the Reserve. 41.5 miles of the Project overlap with the Reserve. Horseshoe crabs

are harvested in the waters off Maryland and Delaware not for human consumption but for

biomedical purposes, as their blood contains a compound called Limulus amebocyte lysate

(LAL). LAL is the only Food and Drug Administration (FDA)-approved test for endotoxins and

is used to test every FDA-certified drug and every medical device or tool, such as implants,

pacemakers, needles, and scalpels. Horseshoe crabs are collected alive in areas nearshore (1 to

10 miles off the coast) and transported to a facility where three tablespoons of blood are removed

from each crab. After the blood is collected, the live crabs are transported back to the waters

where they were collected. Harvesting horseshoe crabs is crucial for the medical industry and

ensuring that drugs and medical equipment are free from endotoxins, which cannot be sterilized.

In the winter, horseshoe crabs travel to deeper waters and bury themselves in the mud and sand.

Then in the warmer months, from mid-June to November, the crabs travel inshore to spawn, and

this is when the crabs can be harvested.

48.    The coastal areas and waters offshore Maryland and Delaware also provide

habitat for 99 marine invertebrates, 164 species of birds (including migratory and endangered),

and many species of endangered marine life, including: fin whales, sei whales, North Atlantic

Right Whales, Northwest Atlantic Distinct Population Segment ("DPS") of loggerhead sea

turtles, North Atlantic DPS of green sea turtles, Kemp's ridley sea turtles, leatherback sea turtles,

shortnose sturgeon, and all five DPSs of Atlantic sturgeon.

**Federal Offshore Wind Program**

49.    Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") in 1953,

authorizing the Secretary of the Interior to oversee mineral exploration and development on the

Outer Continental Shelf by granting oil and gas leases through a competitive bid process managed by the Department of the Interior.[32] The Act "establishe[d] a procedural framework under which Interior may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf] submerged lands."[33]

50.    In 2005, Congress amended OCSLA, placing regulatory authority for renewable energy projects with the Minerals Management Service (BOEM's predecessor agency), an agency within the Department of the Interior, and authorizing the Minerals Management Service to grant leases for offshore renewable energy projects.[34] Congress declared its policy in creating the offshore wind program:

> It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments. . . .[35]

51.    In 2007, the Department of the Interior issued a "Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf."[36] Published before any leases were granted, the

---

[32] 43 U.S.C. § 1331-1356.
[33] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).
[34] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).
[35] 43 U.S.C. § 1332.
[36] Bureau of Ocean Energy Management, *Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf* (Oct. 2007), https://www.boem.gov/renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-eis.

Programmatic Environmental Impact Statement (EIS), "examine[d] the potential impacts of alternative energy and alternate use activities that could result from implementation" of OCSLA's new authority.[37] The proposed actions analyzed included offshore wind, wave, and ocean current energy capture technologies.

52.    BOEM listed Maryland, Delaware, and Virginia as areas where offshore wind projects could be built, but the Programmatic EIS also set forth the agency's evaluation and analysis of how offshore wind development could negatively impact the environment and threaten endangered species. Specifically, BOEM noted the threat to the North Atlantic Right Whale:[38] "[M]oderate to major impacts to some threatened and endangered species (e.g., North Atlantic [R]ight [W]hale) from noise from pile driving or drilling, facility avoidance, and from physical injury from vessel strikes."[39]

53.    In 2011, the Minerals Management Service (BOEM's predecessor agency) revised its offshore wind energy leasing regulations to implement the "Smart from the Start" policy to "accelerate"[40] leasing on the Outer Continental Shelf and "speed offshore wind energy development off the Atlantic Coast."[41] These revisions streamlined the review and approval of leases, letting BOEM's predecessor bypass the multiple, public-comment periods otherwise required. Before the revisions, the issuance of a lease and approval of development had four phases: (1) Planning and analysis, (2) lease issuance, (3) Site Assessment Plan approval, and (4)

---

[37] *Id.* at ES-2.
[38] *Id.* at 4-57.
[39] *Id.* at 2-11.
[40] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.
[41] *Id.*

Construction and Operations Plan approval. The 2011 revisions merged the first three steps into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance. These new regulations allowed for most details of these projects—lease location, size, distance from land—to be determined before the release of the project information and before any notice and comment, depriving impacted communities and industries of the ability to comment.

54.     The Interior Department began identifying locations for constructing 30 offshore wind projects, which together will contain thousands of offshore wind turbine generators. In March 2021, the Government announced its goal of deploying 30 gigawatts of offshore wind energy projects by 2030 and announced it was taking "coordinated steps to support rapid offshore wind deployment."[42] And in 2022, BOEM and the National Oceanic and Atmospheric Administration (NOAA) entered into a memorandum of agreement to "support[] the goal . . . to responsibly deploy 30 gigawatts of energy production on the Outer Continental Shelf by 2030. . . ."[43] The memorandum boldly proclaims the intent of BOEM and NOAA to "proactively refine administrative procedures" without mention of the public rulemaking process required by the Administrative Procedure Act.[44]

---

[42] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.
[43] NOAA, NMFS, BOEM and RODA, *Memorandum of Understanding Between NOAA, NMFS, BOEM and RODA* (Mar. 25, 2019), https://media.fisheries.noaa.gov/dam-migration/noaa-boem-roda-memorandum-of-understanding.pdf.
[44] *Id.* at 1.

**Maryland Offshore Wind Project**

55.    In July 2014, BOEM leased the 80,000-acre Maryland Offshore Wind Area as two leases (OCS-A 0489 and OCS-A 0490) to US Wind Inc. (US Wind or the Developer).[45] After submitting a site assessment plan for one of the leases, US Wind requested to merge the lease areas together into one single lease. BOEM approved this request on March 1, 2018.

56.    In 2017, Maryland awarded US Wind Offshore Wind Renewable Energy Credits for a 248 megawatts (MW) offshore wind facility.[46] In 2021, Maryland awarded US Wind another set of Offshore Wind Renewable Energy Credits for an 808 MW offshore wind facility. In March 2023, Maryland increased their clean energy goal again, increasing the goal for offshore wind energy to 8.5 gigawatts (GW). This law, and additional laws passed in 2024, requires the Maryland Department of General Services to issue bids for power purchase agreements with possible developers by July 31, 2024, with a second solicitation to be issued on or before December 31, 2025. At this time, US Wind has not obtained any additional power purchase agreements beyond the 248 MW and 808 MW grants.

57.    In its Construction and Operations Plan, US Wind describes the Maryland Offshore Wind Project as a three-phase Project.[47] Phase 1, MarWin, is a 300 MW facility approximately 20 miles off the coast of Ocean City, which corresponds to Maryland's 2017 grant

---

[45] 79 Fed Reg. 38060.

[46] Order No. 88192, Case No. 9431, Public Service Commission, State of Maryland (May 11, 2017) at 5, https://www.psc.state.md.us/wp-content/uploads/Order-No.-88192-Case-No.-9431-Offshore-Wind.pdf.

[47] US Wind Inc., *Construction and Operations Plan: Maryland Offshore Wind Project* (Revised June 2024) at ES-1, 1-4, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/2024-06-25_US%20Wind%20Construction%20and%20Operations%20Plan%20Volume%20I_Rev%208.pdf ("Construction and Operations Plan").

of Offshore Wind Renewable Energy Credits.[48] Phase 2 consists of Momentum Wind, which is

an 808 MW facility, approximately 15 miles off the coast of Ocean City, which corresponds to

Maryland's 2021 grant of Offshore Wind Renewable Energy Credits. Phase 3, which is the

"build out of the remainder of the Lease area to fulfill ongoing, government-sanctioned demands,

for offshore wind energy,"[49] does not currently have any purchase power agreements or Offshore

Wind Renewable Energy Credits in place and will be built just 10.7 miles off the coast of Ocean

City.

58.    On October 6, 2023, BOEM published a Draft EIS for public review and

comment for the Maryland Offshore Wind Project.[50] On August 2, 2024, BOEM published its

Final EIS.[51]

59.    On June 18, 2024, NMFS published a Biological Opinion for ESA-listed species

and critical habitat. NMFS concluded that the Maryland Offshore Wind Project would not

jeopardize any Endangered Species Act-listed species, including the highly endangered North

Atlantic Right Whale.

60.    On September 4, 2024, BOEM and NMFS published their Record of Decision,

announcing their decision to approve the Construction and Operations Plan for the Maryland

Offshore Wind Project.[52]

---

[48] Order No. 88192, Case No. 9431, Public Service Commission, State of Maryland (May 11, 2017) at 5, https://www.psc.state.md.us/wp-content/uploads/Order-No.-88192-Case-No.-9431-Offshore-Wind.pdf.
[49] Construction and Operations Plan *supra* note 47 at ES-1, 1-4.
[50] 88 Fed. Reg. 69658.
[51] 89 Fed. Reg. 63221.
[52] *See* Record of Decision *supra* note 2.

61.    On October 23, 2024, NMFS issued Incidental Take Regulations, approving the take of thousands of marine mammals during the Project's construction.[53]

62.    On December 2, 2024, the Department of the Interior formally approved the Project's Construction and Operations Plan and granted US Wind (the Developer) with the easements to build.[54] Permits from the Army Corps of Engineers and the States of Maryland and Delaware are still pending.

**First Cause of Action**
**Violation of the Administrative Procedure Act**

63.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

64.    The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[55] The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[56]

65.    An agency's action is arbitrary and capricious within the meaning of the Administrative Procedure Act if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

---

[53] 89 Fed. Reg. 84674.
[54] Department of the Interior, *Letter Approving Construction and Operations Plan* (Dec. 2, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/02_MD%20Wind%20OCS-A%200490%20COP%20Approval%20Letter_%20signed.pdf.
[55] 5 U.S.C. § 702.
[56] 5 U.S.C. § 706.

implausible that it could not be ascribed to a difference in view or the product of agency expertise.[57]

66.    BOEM's September 4, 2024 approval of the Maryland Offshore Wind Project's Construction and Operations Plan is arbitrary, capricious, and not in accordance with law for all the reasons stated in this Complaint, including violations of the Outer Continental Shelf Lands Act,[58] National Environmental Policy Act,[59] Endangered Species Act,[60] Marine Mammal Protection Act,[61] Migratory Bird Treaty Act,[62] Coastal Zone Management Act,[63] and the National Historic Preservation Act.[64]

67.    This Court should therefore reverse and set aside these approvals and permits and remand this matter to the agencies for further consideration in accordance with the relevant statutes and the Administrative Procedure Act.

**Second Cause of Action**
**Violation of the Outer Continental Shelf Lands**
**Act and the Administrative Procedure Act**

68.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

69.    The Outer Continental Shelf, where this Project will be built, "is a vast underwater expanse nearly equal in size to the Australian continent. Beginning a few miles from the U.S. coast, where states' jurisdiction ends, the [Outer Continental Shelf] extends roughly two

---

[57] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[58] 43 U.S.C. § 1331.
[59] 42 U.S.C. § 4321-4370h.
[60] 16 U.S.C. § 1531-1544.
[61] 16 U.S.C. § 1371.
[62] 16 U.S.C. § 703.
[63] 16 U.S.C. § 1456(c)(1).
[64] 54 U.S.C. § 300101-307101.

hundred miles into the ocean to the seaward limit of the international-law jurisdiction of the United States."[65]

70.    Congress enacted the Outer Continental Shelf Lands Act in August 1953, authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases.[66] Then, in a 2005 amendment, Congress added leasing for renewable energy projects as well.[67] However, Congress made clear that offshore wind projects would not be allowed to affect navigation, fishing, and the character of the high seas: "It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected." [68]

71.    Specifically, the 2005 amendment added Section 1337(p)(4), a list of mandatory requirements the Secretary must ensure before approving any proposed Outer Continental Shelf offshore wind lease:

> The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for—
>
> (A)    safety;
>
> (B)    protection of the environment;
>
>        . . .
>
> (D)    conservation of the natural resources of the outer Continental Shelf;
>
>         . . .
>
> (H)     a fair return to the United States for any lease, easement, or right-of-way under this subsection;

---

[65] *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015).
[66] 43 U.S.C. §§ 1331–1356.
[67] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).
[68] 43 U.S.C. § 1332.

(I)    prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;

(J)    consideration of—
. . .

ii.    any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation. . . .[69]

72.    In approving the Maryland Offshore Wind Project's Construction and Operations Plan, Defendants violated Section 1337(p)(4) of the Outer Continental Shelf Lands Act in numerous respects.[70] This Court should vacate and set aside Defendants' approval as arbitrary, capricious, and otherwise not in accordance with law, in violation of OCSLA.

**BOEM's Approval Failed to Ensure that the Activities Will Be Carried Out Safely**

73.    BOEM failed to ensure the safety of the Project area by failing to require any mitigation or emergency response measures for blade or project equipment failures. In July 2024, a fiberglass blade from a turbine at the Vineyard Wind facility off Nantucket shattered, sending massive pieces of foam to the bottom of the ocean and scattering thousands of shards across the ocean's surface. These blades have a fail rate of 0.54% and, over the course of this Project, several blades could fail in the same way as the blade at the Vineyard Wind facility. Failing blades and other equipment failures pose an immeasurable threat to the safety of nearby vessels. Falling pieces could land on vessels, ensnare in gear, sink vessels, or pose dangerous obstacles in times of low visibility or bad weather. BOEM failed to require the Developer to prepare any mitigation measures or emergency response plans before approving this Project, endangering the safety of vessels and those onboard who travel near these turbine generators.

---

[69] 43 U.S.C. § 1337(p).
[70] *See* Exhibit 31, Plaintiffs' Sixty-Day Notice of Intent to Sue (Oct. 16, 2024).

74.    The installation of 114 turbine generators and 4 offshore substations will create long-term "navigational complexity and increase the risk of allision or collision [], particularly in bad weather or low visibility."[71] "Allisions and collisions could result in damage to vessels, injury to crews, and vessel fuel spills."[72]

75.    Construction, operations and maintenance, and the addition of 114 wind turbine generators and four offshore substations in the ocean will have devastating, long-term, continuous impacts on search and rescue operations.[73] The presence of the structures will add navigational challenges and safety risks and search and rescue missions "would need to maneuver around" the turbine generators and other structures.[74] "The layout and density" of the Project will complicate search and rescue "activities during operations and lead to abandoned [search and rescue] missions and result[ in] increased fatalities."[75] The potential for loss of life or abandoned search and rescue operations due to the turbine generators is not hypothetical—it has, in fact, already happened. In 2019, a vessel, the F/V Mistress, took on water and sank in the turbine generator area for Block Island. Three individuals were onboard at the time. The Coast Guard sent a helicopter to the area to conduct a search and rescue operation, but due to weather conditions and wind turbine generators in the area—which the Coast Guard identified as hazards—the search and rescue operation was canceled, and two of the three people died.[76]

---

[71] Final EIS *supra* note 3 at 3-444.
[72] *Id.* at 3-447.
[73] *Id.* at 3-472.
[74] *Id.* at 3-475.
[75] *Id.*
[76] *See* United States Coast Guard, *MISLE Incident Investigation Report for F/V Mistress Sinking/Loss of Life*.

76.    During construction and operations, "the presence of slow-moving (or stationary) installation or maintenance vessels" will "increase the risk of collisions and spills."[77] If the developer cannot achieve sufficient depth for cabling, the risks will be greater.[78]

77.    The structures will impact marine vessel radar, which "is the main tool used to help locate other nearby vessels that are not otherwise visible, particularly in adverse weather when visibility is limited."[79] The impacts on radar create additional navigational complexity, increasing the risks of collisions and allisions.[80]

78.    The cable protection used to cover the cables, in the form of rock berms, concrete mattresses, fronded mattresses, and rock bags, are "below water hazards"[81] that create the risk of fishing gear and equipment snagging or hooking on the structures.[82] If the approved cable depth of 3.3 to 9.8 feet cannot be achieved, vessels also risk snagging the cable, which, once electrified, can cause electrical shock to the vessel.[83] Electrical shock to a marine vessel could cause mechanical failures or fires, and injuries to the individuals onboard.

**BOEM's Authorization Failed to Ensure Protection of the Environment**

79.    BOEM is required to ensure that any project it approves is carried out in a manner that protects the environment.[84] But, in leasing and later approving construction and operations of the Maryland Offshore Wind Project, BOEM authorized activities that will have highly detrimental impacts on the environment while ignoring ways in which those destructive

---

[77] Final EIS *supra* note 3 at 3-444.
[78] *Id.* at 3-446.
[79] *Id.* at 3-448.
[80] *Id.*
[81] *Id.* at 3-447.
[82] *Id.* at 3-444.
[83] *Id.*
[84] 43 U.S.C. § 1337(p)(4)(B).

environmental impacts could have been avoided—as shown by the various public comments, agency comments and studies, as well as BOEM's own Environmental Impact Study.

**BOEM's Authorization Despoiled the Viewshed Environment**

80.    The marine environment where the Project will be built has, for centuries, been characterized by its pristine, open ocean viewsheds. Once this Project is built, those viewsheds will no longer exist and "[o]bservers on Atlantic beaches, the first row of buildings or houses, and inland portions of Assateague Island and the island shores west of Assateague Island" will have clear views of these 114 turbine generators and 4 offshore substations for more than 35 years.[85] At night, the blinking lights on each of the turbine generators and substations, located just 10.7 miles from shore, will litter the night sky, destroying this once pristine viewshed. The industrialization of this pristine, open ocean, culturally significant viewshed damages the coastal and marine environment.

**BOEM's Authorization Failed to Protect the Carl N. Shuster Jr. Horseshoe Crab Reserve**

81.    BOEM's decision to approve this Project, even though the Project will be built within 41.9 square miles of the Carl N. Shuster Jr. Horseshoe Crab Reserve highlights BOEM's failure to protect the natural environment. The Reserve is a federally managed area consisting of 1,500 square miles in federal waters off Delaware Bay up to New Jersey. Most of the Reserve is located on the Outer Continental Shelf, and harvesting horseshoe crabs within the area is prohibited. While crabs live within the Reserve year-round, most of the crabs migrate to the Reserve in the fall and winter until mid-June, where they bury themselves in the sand and mud to hibernate. The Reserve was created to protect the horseshoe crab population from overharvesting

---

[85] Final EIS *supra* note 3 at 3-509.

and to ensure the species' survival and preservation for its vital biomedical uses. As discussed throughout this complaint, horseshoe crab blood contains the limulus amebocyte lysate (LAL) compound, which is the only Food and Drug Administration-approved test for endotoxins and is used on every medical device or instrument used in the United States. As such, ensuring the protection of this species and continued population growth is of great concern to the United States, and the Reserve serves this purpose.

82.    Authorizing the Developer to build this Project over 41.9 square miles of the Reserve harms the horseshoe crab population and its habitat. Pile-driving activities and the placement of turbine generators, cables, and underwater construction will trap and kill buried crabs, destroy their habitat, and destroy the benthic food sources for these crabs. Pile driving and underwater construction activities during the summer months, when the crabs are traveling inshore, will crush crabs that are moving through the lease area. Once constructed, blade and turbine failures resulting in oil and chemical spills, or the release of toxic materials would have "catastrophic" impacts on horseshoe crab spawning and the population on the East Coast.[86] The decrease in the population of these crabs due to the Project's construction will create a shortage of the vital biomedical resource these crabs produce.

**BOEM's Authorization Failed to Protect Finfish, Invertebrates, and Essential Fish Habitat**

83.    The Project will adversely impact fish, invertebrates, and essential fish habitats, and BOEM's approval of the Project with these impacts violates Section 1337(p)(4)(B) of OCSLA because it fails to ensure the protection of vital species within the marine environment.

---

[86] David Smith et al., *Conservation Status of the American Horseshoe Crab, (Limulus Polyphemus): A Regional Assessment*, Rev Fish Biol Fisheries (Dec. 10, 2016) at 155, https://link.springer.com/article/10.1007/s11160-016-9461-y.

The presence of offshore structures in the lease area will wreak havoc on the pelagic habitats necessary for more than 100 fish species to thrive.[87]

84.    Inshore construction and operations will disturb essential fish habitat along the Indian River Bay.[88] Anchoring and dredging will "disturb the benthic resources, suspend sedimentation, and increase short-term turbidity" and cause "scarring or additional damage to finfish habitats."[89] Anchoring along the bay will cause widespread mortality among benthic species, impacting fish habitats.[90] Construction related to burying the export cable will result in significant disturbances to the benthic soft-bottom habitat and "directly impact and displace infaunal, epibenthic, and demersal Mobile/Epibenthic soft bottom habitat organisms and their consumers," which are finfish "from the areas of dredging."[91] These activities will bury and smother fish, fish eggs, larvae, and invertebrates.[92] For slow-moving organisms that come in contact with gear or construction equipment, "total mortality [will] occur."[93] And cable installation will "kill filter feeding organisms" and "sensitive larval life stages of finfish."[94] Fish that are nearby when pile driving and underwater construction are occurring will suffer injury and even death from the noise.[95]

85.    Offshore, impacts to finfish, invertebrates, and essential fish habitats will be even more significant. Vessels that are anchoring during construction will degrade sensitive fish

---

[87] Final EIS *supra* note 3 at 3-178.
[88] *Id.* at 3-155.
[89] *Id.* at 3-156.
[90] *Id.*
[91] *Id.* at 3-158.
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.* at 3-159.

habitats and cause mortality of vital benthic species, impacting the health of fish in the area.[96]

Species like Atlantic surf clam, ocean quahog, sea scallops, and calico scallops will be displaced

during cable burial and turbine construction and will be killed "due to potential direct burial

impacts."[97] Finfish, eggs, larvae, and invertebrates will suffer impacts from underwater noise and

hours of pile driving each day.[98] Summer flounder, Atlantic surf clam, sea scallop, calico

scallops, and longfin squid will have their available habitat reduced once the 114 turbine

generators are installed, which will cause "hydrodynamic disturbance, fish aggregation resulting

in increased predation on benthic invertebrates, and habitat conversion."[99]

86.    The Project will also adversely impact endangered fish species in the area, such as

the shortnose sturgeon, Atlantic sturgeon, oceanic whitetip shark, giant manta ray, and scalloped

hammerhead shark.[100] These species will be vulnerable to vessel collisions due to the increased

number of vessels in the area.[101] The species are also at risk for entanglement with construction

equipment.[102]

87.    The National Marine Fisheries Service has documented many of the adverse

impacts on marine species that BOEM failed to address or mitigate in its approval of the

Maryland Offshore Wind Project.

**BOEM's Authorization Failed to Protect Migratory and Endangered Birds**

88.    The turbine generators' size and placement in the lease area, the construction on

land for the export cables and onshore development, the risk of mortality and injury from

---

[96] *Id.* at 3-161.
[97] *Id.* at 3-163.
[98] *Id.* at 3-167.
[99] *Id.* at 3-168.
[100] *Id.* at 3-175.
[101] *Id.* at 3-176.
[102] *Id.* at 3-177.

collisions with turbine blades and other Project structures, and the potential for offshore accidental releases of fuel, hazardous materials, and trash and debris will cause "mortality, decreased fitness, and health effects"[103] to all bird species.

89.    The Project sits within the Atlantic Flyway which is a "major route for migratory birds, which are protected under the Migratory Bird Treaty Act of 1918."[104] "A broad group of avian species may pass through the Offshore Project area, including" migrants, coastal birds, and marine birds.[105] 164 species have been identified as potentially occurring along the Atlantic Flyway, which includes nine state-listed endangered birds, four state-listed as threatened birds, 19 state-listed as special concern species, seven migratory birds that are listed as breeding birds of conservation concern, three federally listed as threatened birds, and one federally listed as endangered bird.[106]

90.    Once constructed, these turbine generators will have major adverse impacts to ESA-listed species, such as the piping plover and the rufa red knot, which will suffer from adverse impacts and will encounter the Project's operating turbine generators, which will cause "direct mortality" due to collisions and "behavioral avoidance and habitat loss."[107] Additionally, "inclement weather and reduced visibility" causing "changes to migration altitudes" and will "lead to large-scale mortality events."[108]

---

[103] *Id.* at F-78.
[104] *Id.* at F-56.
[105] *Id.* at F-58.
[106] *Id.*
[107] *Id.* at F-81.
[108] *Id.*

**BOEM's Authorization Failed to Protect Benthic Organisms and Benthic Habitats**

91.    Offshore, releases from vessel traffic, construction activity, and heat from cables will have devastating impacts to benthic resources. The use of jack-up vessels and spud barges will "directly affect the benthos."[109] Spud cans used will cause "total mortality" for benthic organisms within the footprint of each can, leg, or anchor.[110] Anchor drag will "increase impacts, potentially resulting in scarring or additional damage to benthic habitats," and some organisms will be killed.[111] Jet plowing, cable laying, and other sand mining operations will harm crustaceans and mollusks, and it will take years for deep burrowing mollusks to recover.[112] Construction activities will also cause increased "entrainment and impingement."[113] Electromagnetic frequencies and heat from cables will cause "alterations of behavior" for benthic species, such as skates and lobsters, near the cables.[114]

92.    Inshore, construction of the export cable and the substation will cause massive disturbance of Indian River Bay and barges anchoring in the bay installing cables will disturb benthic resources through sediment suspension and increased short-term turbidity.[115] This activity will cause sediment contaminants like "PAHs, PCBs, Nickel, Arsenic" to be "re-introduced into the marine environment. . . ."[116] The re-release of these chemicals will harm inshore benthic habitats and organisms and alter the ecosystem.

---

[109] *Id.* at 3-67.
[110] *Id.*
[111] *Id.*
[112] *Id.* at 3-69.
[113] *Id.* at 3-71.
[114] *Id.*
[115] *Id.* at 3-61 to 3-62.
[116] *Id.* at 3-62.

**BOEM's Authorization Failed to Ensure the Environment Will Be Protected From Toxic Chemicals and Waste**

93.    Each Maryland Offshore Wind turbine and offshore substation requires several thousands of gallons of coolants, fuels, oils, and lubricants. Each turbine will hold up to 1,390 gallons of oil and each offshore substation will contain 84,972 gallons of fluids.[117] Any release or spill of these coolants, lubricants, or fuels—which is really a matter of if, not when—will be devastating to the marine environment, causing mortality and injuries to marine habitats, benthic organisms, fish, marine mammals, birds, and even humans.

94.    BOEM approved this Project without requiring the Developer to prepare, in advance of any approval, a plan for what would happen should there be a turbine leak or a major spill. Instead, the Developer "will prepare a Project-specific [Spill Prevention, Control, and Countermeasure] Plan and [Oil Spill Response Plan] prior to construction."[118] Because no such plans have yet to be developed, BOEM's terms and conditions of approval fail to include mitigation measures for leaks or major spills.

95.    US Wind has admitted that it will likely use the highly potent greenhouse gas sulfur hexafluoride (SF6) in either its turbine generators or substation and BOEM has admitted that there is a risk of SF6 leaks.[119] SF6 is a greenhouse gas 23,500 times more potent than CO2 that persists in the atmosphere for thousands of years.[120] Scotland outlawed the use of SF6 in offshore structures after sustaining a devastating leak in a substation.[121] Neither BOEM nor the

---

[117] *Id.* at 3-355.

[118] *Id.* at 3-66, 3-107.

[119] *Id.* at 3-24.

[120] Matt McGrath, *Climate Change: Electrical Industry's 'Dirty Secret' Boosts Warming*, BBC News (Sept. 13, 2019), https://www.bbc.com/news/science-environment-49567197.

[121] Dimitris Mavrokefalidis, *Gas Leak at Scotland's 'Largest' Wind Farm Lead to Evacuation of Workers*, Energy Live News (Nov. 9, 2022), https://www.energylivenews.com/2022/11/09/gas-leak-at-scotlands-largest-wind-farm-lead-to-evacuation-of-workers/.

Developer have disclosed, or included in the terms and conditions of approval, any leak
protection or response measures aimed at preventing this chemical from leaking or spilling into
the ocean.

96.    Nor has BOEM required any mitigation or protection measures for what would
happen in the event of blade or turbine failure, which would cause dangerous and toxic materials
(such as fiberglass and plastic foam) and oils, lubricants, and fluids to spill in the ocean. Just this
year, before BOEM approved this Project, a section of the 350-foot, 57-ton, fiberglass and foam
blade from a Vineyard Wind 1 turbine shattered into the ocean, scattering thousands of shards
across the ocean's surface. As outlined in Plaintiffs' letter to BOEM on September 20, 2024
requesting a supplemental EIS, such failures are not hypothetical or isolated and occur rather
frequently. BOEM's failure to take this recent blade failure into consideration when making its
final determination on the Project, and failure to include comprehensive response plans,
highlights its utter disregard for OCSLA's directives.

**BOEM's Authorization Failed to Ensure Protection of North Atlantic Right Whales**

97.    The North Atlantic Right Whale, one of the most endangered creatures on the
planet, teeters on the brink of extinction. With fewer than 350 individuals remaining—including
only 70 females capable of reproduction—it is easily susceptible to stress and chronic injuries
from construction, vessel strikes, or entanglements, and has an extremely low reproductive
rate.[122] As a species, the North Atlantic Right Whale's resilience to perturbations and
disturbances is low,[123] and the maximum number of whales that can be lost each year without

---

[122] *See* Bureau of Ocean Energy Management, *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* (Jan. 2024) at 7,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf (Strategy on the North Atlantic Right Whale).
[123] *Id.*

destroying the whale's ability to return to a sustainable population level "is less than 1."[124] Yet, since 2017, 41 dead North Atlantic Right Whales have been found. And in 2024 alone, there have been five confirmed Right Whale deaths and four missing calves—an unsustainable rate of population loss.

98.    The Project generates thunderous underwater noise resulting from increased vessel presence, pile driving, installation vessels, surveys, cable laying, trenching, and dredging that will adversely affect the Right whales and cause "auditory injury (i.e., [Permanent Threshold Shift])," [125] which is an "irreversible loss of hearing," [126] "behavioral disturbance, and other effects," "such as auditory masking and physiological stress." [127] The noise from these activities will cause auditory fatigue and impact the whales' ability to communicate and hear other nearby activities.[128] While seasonal restrictions for some activities will be in place, those restrictions are meaningless for whales like fin, humpback, and mink whales who are found in the waters near the Project year-round and will face exposure to above-threshold noise.[129]

99.    Due to the number of vessels in the project area during construction and operations, whales will be at high risk of vessel strike and entanglement.[130] BOEM considers this risk severe in intensity "because potential receptors include species," like the North Atlantic Right Whale and Humpback Whale, "which have a higher susceptibility to vessel strikes compared" to other whales.[131]

---

[124] *Id.*
[125] Final EIS *supra* note 3 at 3-247.
[126] *Id.* at 3-206.
[127] *Id.* at 3-247.
[128] *Id.*
[129] *Id.* at 3-257.
[130] *Id.* at 3-262.
[131] *Id.* at 3-267.

100.    BOEM's primary noise mitigation measure, the bubble curtain, falls far short of protecting against underwater noise because it does not minimize low-frequency noises, which are the noises that baleen whales, like the endangered North Atlantic Right Whale, blue whale, fin whale, and sei whale, hear and rely upon for navigation and communication. Bubble curtains only dampen high-frequency noises and do not reduce low-frequency sounds below 200 Hz.[132] The bubble curtain BOEM is requiring will do nothing to protect these endangered whales from underwater construction noises. Furthermore, any of the mitigation measures that BOEM argues will mitigate construction impacts will fall short, because, as the Chief of Protected Species for NOAA acknowledged, "unlike vessel traffic and noise, which can be mitigated to some extent, oceanographic impacts from installed and operating turbines cannot be mitigated . . . unless they are decommissioned."[133]

**BOEM Fails to Ensure a Fair Return to the United States for the Lease Area**

101.    BOEM did not require financial assurances for decommissioning,[134] diverging from the requirements for other sources of offshore energy production. Without financial assurances, should US Wind go bankrupt, experience financial issues, or become defunct before decommissioning, the American taxpayers will be on the hook for the costs of decommissioning.[135] US Wind is a new, untested company that is about to undertake a massive

---

[132] BOEM, *Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* (Feb. 11, 2021) at 21, https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.

[133] Sean Hayes, *Letter from Sean A. Hayes, PhD, Chief of Protected Species, NOAA NEFSC to Brian R. Hooker, Lead Biologist of Bureau of Ocean Energy management, Office of Renewable Energy Programs* (May 13, 2022) at 21, https://www.noaa.gov/sites/default/files/2022-,11/North_Atlantic_Right_Whale_NARW_112022_0.pdf.

[134] *See* 43 U.S.C. § 1337(p)(4)(H).

[135] 88 Fed. Reg. 5968 (Jan. 30, 2023).

construction project that will cost millions of dollars. There is no guarantee that the Project will ever be profitable or break even or that US Wind will be around in 35 years when it is time to decommission the Project. BOEM had no legitimate reason to waive the financial assurance requirement for US Wind.

**The Project Interferes with Commercial and Recreational Fishing, Violating Sections 1337(p)(4)(I) and (J)**

102.    Maryland and Delaware have deeply rooted histories of commercial, recreational fishing. Commercial fishing in Maryland contributes nearly $600 million to the State's economy and Maryland is the leading producer of blue crabs and soft clams.[136] Commercial fisheries harvest dozens of species each year, including striped bass, oysters, soft clams, flounder, perch, spot, croaker, catfish, sea trout, and bluefish.[137] Delaware's commercial fishing industry is also substantial, contributing more than $60 million to the state's economy.[138]

103.    Recreational and for-hire fishing is a popular pastime in Ocean City, Maryland, because it is just a short boat ride away from the deep, fertile waters of the Outer Continental Shelf—waters where the Project will be constructed. The combination of the warm Gulf Stream currents with the cooler northern waters creates an ideal marine environment that is rich in biodiversity and incredibly productive for fishing. Recreational fishermen travel from Ocean City to the Outer Continental Shelf to fish for striped bass, flounder, perch, spot, croaker, catfish, sea trout, and bluefish, as well as billfish like marlin and tuna. The for-hire fishing industry in

---

[136] Maryland State Government, *Maryland At a Glance: Seafood*, https://msa.maryland.gov/msa/mdmanual/01glance/html/seafoodp.html#:~:text=Besides%20blue %20crabs%2C%20important%20commercial,million%20to%20the%20State's%20economy (last visited Oct. 16, 2024).
[137] *Id.*
[138] Sea Grant Delaware, *Fisheries and Aquaculture*, https://www.deseagrant.org/fisheries-aquaculture#:~:text=Global%20seafood%20demand%20is%20growing,million%20to%20Delaw are's%20economy%20annually (last visited Oct. 16, 2024).

Ocean City brings in roughly $70 million per year,[139] and most of the for-hire fishing charters travel to the Outer Continental Shelf to fish.

104.    Once construction commences, commercial, recreational, and for-hire fishing off Ocean City, Maryland and Delaware will be harmed through increased cable placement, pile driving, noise, underwater infrastructure, turbine generators and substations, and increased vessel traffic. The construction of the turbine generators and offshore substations will "restrict harvesting and fishing activities in the Project area."[140] And "fishing vessels transiting in proximity to the Project area or to ports being utilized by construction and installation vessels would be required to avoid" the area, resulting in exclusion from fishing areas.[141]

105.    The 125.6 miles of inter-array cables, 142.5 miles of offshore export cables, and the 42.2 miles of inshore export cables will create hazards for fishing vessels that utilize trawl, nets, and other equipment that drag along the seafloor and cable laying activities will restrict large areas of the lease area for extended periods of time.[142] Trawl and net fishermen will be at risk of getting their equipment caught on the underwater cables or concrete infrastructure placed on the ocean floor, which, if entangled, could damage or even sink vessels and harm anyone on board. Fishing vessels that can no longer fish in the area due to the risk of gear entanglement or due to increased vessel traffic and navigation obstacles will be excluded from their traditional fishing grounds, leading "to reduced revenue if alternative fishing locations are not available" and "increased conflict over other fishing grounds."[143] And because fishing permits are location-

---

[139] Jordan Martin et. al. *Economic Value of Maryland Coastal Bays Watershed: Prepared for Maryland Coastal Bays Program* (Sept. 2018) at 14, https://mdcoastalbays.org/app/uploads/2020/10/delaware-economic-value.pdf.
[140] Final EIS *supra* note 3 at 3-321.
[141] *Id.* at 3-322.
[142] *Id.* at 3-320.
[143] *Id.*

specific, fishermen with permits for the Project area may not be able to go elsewhere to fish. Recreational and for-hire fishermen will also be forced to abandon the area because of these safety concerns.

106.    The Project's turbine generators and substations will interfere with navigation radar used by commercial, recreational, and for-hire fishing boats. The turbine generators and the substations will cause radar clutter and radar will "obscure smaller vessels" and may "duplicate[]" radar returns "under certain meteorological conditions like heavy fog."[144] Unreliable radar when out on the ocean could lead to collisions with other boats or a stationary turbine, which could lead to severe injury and death. Fishermen will be forced to either abandon their traditional fishing grounds or risk their safety to fish within the Project-area.

107.    Underwater noise from construction, will disturb fish and invertebrates, driving them from the areas, which will impact commercial fisheries and other types of fishing.[145] During construction, operation and maintenance, vessels will be excluded from the area, experience longer transit times to and from more distant grounds and the Project will cause lower revenues "due to fishing potentially less-productive fishing grounds, potentially having to switch to less valuable species, and potentially encountering more competition for a given resource."[146]

**The Project Interferes with Sportfishing, Violating Sections 1337(p)(4)(I) and (J)**

108.    From May to October each year, Ocean City's marinas and harbor host 22 fishing tournaments and one fishing challenge. In 2024, these tournaments and challenges awarded over $15.5 million in prizes and had more than 700 participating boats. Plaintiff, the White Marlin Open, is the longest-running billfish tournament in the world and has been hosted from Ocean

---

[144] *Id.* at 3-321.
[145] *Id.* at 3-320.
[146] *Id.* at 3-331.

City for more than 51 years. These tournaments are a large driver of tourism for Ocean City and the White Marlin Open alone has an economic impact of around $20 million each year.

109.    The White Marlin Open's fishing area is right where the turbine generators and substations will be constructed. Once construction begins, the turbine generators will be massive obstacles for the participants of these tournaments, blocking the routes and fishing locations of the hundreds of boats that participate each year. Boating equipment and gear could get caught on the hundreds of miles of underwater cables, underwater concrete infrastructure, and turbine generators, which could damage the vessels and the individuals on board. Radar interference from the turbine generators could endanger the vessels and their crew in times of low visibility or bad weather due to increased risks of collision with other vessels or the turbine generators. And underwater noise from construction, along with the destruction of habitats and benthic resources, will also disturb the target fish species, driving them from the areas where tournament participants have fished for decades.[147]

110.    This Project makes fishing in these tournament areas more dangerous and less productive. If participants can no longer safely fish in the tournament fishing grounds or consistently catch fish, they will no longer register for the tournament and visit Ocean City to fish. Without reliable and safe fishing grounds to travel through and fish in, these tournaments will move to other coastal towns where participants will not be at risk. BOEM's failure to ensure that sportfishing would be protected violates OCSLA.

**BOEM Failed to Ensure Other Reasonable Uses of the Outer Continental Shelf Remain Protected**

111.    The Project will interfere with almost all other reasonable uses of the Outer Continental Shelf. BOEM's approval of a Project that decimates fishing in the area, degrades the

---

[147] See *id.* at 3-320.

habitat for fish, adversely impacts recreation and tourism, interferes with navigation and radar systems, and destroys pristine visual and scenic resources proves that BOEM violated Section 1337(p)(4)(I) of OCSLA.[148]

**The Project Interferes with Recreation and Tourism**

112.    The Project will substantially interfere with tourism by disrupting recreational activities during construction, altering the pristine viewshed, disrupting recreational activities and access to the lease area, and hindering the ability of recreational fishing in the Project area.

113.    People visit Ocean City, Maryland and Fenwick Island, Delaware to enjoy the open ocean views. Those open ocean views will no longer exist once construction starts and nearly all of the Maryland and Delaware coastlines will be affected.[149] Once constructed, "[o]bservers on Atlantic beaches, the first row of buildings or houses, and inland portions of Assateague Island and the island shores west of Assateague Island" will have clear views of these 114 turbine generators and 4 offshore substations for more than 35 years.[150] Not only will the turbine generators and substations, which will be just 10.7 miles from shore, be visible at all times of the day, but the flashing lights on each turbine generator and substation be visible from onshore at night. These lights will "[a]dd developed/industrial visual element," destroying the once dark, open ocean.[151] And during construction, which will take place over several summers (the prime tourist season), "viewers on the Delaware and Maryland coast would see upper portions of tall equipment, such as mobile cranes."[152] BOEM even admits that the view of the turbine generators will have major impacts on tourism in Ocean City and Fenwick Island and

---

[148] 43 U.S.C. § 1337(p)(4)(I).
[149] Final EIS *supra* note 3 at 3-496.
[150] *Id.* at 3-509.
[151] *Id.* at 3-508.
[152] *Id.* at 3-506.

that many visitors will "choose to visit other beaches without offshore lighting."[153] The Project's degradation of one of the main reasons why people visit Ocean City and Fenwick Island will have devastating impacts to the businesses, local economies, and local governments of Ocean City and Fenwick Island.

114.    As if the destruction of the view was not enough to drive tourists away, noise from offshore and onshore Project construction will utterly ruin "recreational enjoyment of the marine and coastal environments,"[154] and boaters and visitors will likely avoid the areas due to the noise.[155] Project construction over the course of several years will disturb visitors and, knowing that they will hear construction noise while sunbathing, swimming in the ocean, shopping on the boardwalk, eating at local food stands, and riding amusements, those visitors will likely opt to not return to Ocean City and Fenwick Island, harming the tourism industry substantially.

**The Project Interferes with Aviation, Air Traffic, and Radar Systems**

115.    Throughout the Final EIS, BOEM admits that the 118 structures will cause major radar interference. Turbine generators "reduce the effectiveness of both magnetron-based and Doppler-based MVR radar,"[156] and recent studies indicate that "[m]arine vessel radars are not presently optimized to operate in a [wind turbine] environment."[157] Turbine generators cause radars to malfunction and can cause radar clutter, ghost targets, and false reports. Vessels rely on

---

153 *Id.* at 3-508.
154 *Id.* at 3-506.
155 *Id.*
156 National Academies of Sciences, Engineering, and Medicine, *Wind Turbine Generator Impacts on Marine Vessel Radar* (2022) at 5, https://nap.nationalacademies.org/catalog/26430/wind-turbine-generator-impacts-to-marine-vessel-radar.
157 *Id.*

radar in times of heavy fog or bad weather, when visibility is low. Without reliable radar, vessels, when traveling through the lease area, will have difficulty discerning whether the radar is malfunctioning, increasing opportunities for collisions with other vessels or turbine generators. Cumulatively, the combined effects of the thousands of turbine generators on the Outer Continental Shelf will create high radar reflectivity, doppler-spread interference, multipath and range ambiguous concerns, and strong reflected signals.[158] Aircrafts, surveillances systems, and marine vessels that utilize radar will face substantial interference, and the lease area will not be safe.

**Third Cause of Action**
**Violation of the National Environmental Policy Act and**
**the Administrative Procedure Act**

116.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

117.    NEPA serves as our "basic national charter for [the] protection of the environment"[159] and requires "the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions" like the Maryland Offshore Wind Project.[160] NEPA achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences" of their proposed actions.[161] NEPA's "hard look" requires federal agencies to analyze and consider "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[.]"[162] To comply with NEPA, agencies must consider

---

[158] *Id.*
[159] 40 C.F.R. § 1500.1(a).
[160] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).
[161] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).
[162] 42 U.S.C. § 4332(C)(ii).

"[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment."[163]

118.    Under NEPA, agencies must "identify and develop methods and procedures . . . which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations."[164] Specifically, NEPA requires federal agencies to prepare a detailed statement for all major agency actions that significantly affect "the quality of the human environment,"[165] known as an Environmental Impact Statement (EIS). An EIS must "provide full and fair discussion of significant [environmental] effects" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives that would avoid or minimize adverse effects or enhance the quality of the human environment."[166] This must include discussions of direct, indirect, and cumulative impacts for each reasonable alternative and must identify "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented[.]"[167]

119.    The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[168] NEPA

> ensures that the agency, in reaching its decision, will have available and will
> carefully consider detailed information concerning significant environmental

---

[163] 42 U.S.C. § 4332(C)(ii).
[164] 42 U.S.C. § 4332(B).
[165] 42 U.S.C. § 4332(C).
[166] 40 C.F.R. § 1502.1.
[167] 42 U.S.C. § 4332(2)(C)(ii).
[168] *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981).

impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.[169]

120.    BOEM's July 29, 2024 Final Environmental Impact Statement is incomplete and inaccurate and fails to comply with multiple requirements of NEPA. And because BOEM failed to comply with NEPA by failing to take a hard look at the environmental impacts of the Maryland Offshore Wind Project, its September 4, 2024 Record of Decision approving the Project's Construction and Operations Plan was arbitrary, capricious, and not in accordance with law—and should therefore be set aside. NMFS's Marine Mammal Protection Act authorization is also arbitrary, capricious, and not in compliance with law. For the same reasons, any permit or authorization the Corps of Engineers may issue under the authority of the Rivers and Harbors Act or the Clean Water Act, or both, will also be arbitrary, capricious, and not in compliance with law to the extent they rely on BOEM's defective July 29, 2024 Final EIS.

**Defendants Have Violated NEPA by Impermissibly Segmenting Analysis of the Multiple Areas of the Offshore Wind Program and Ignoring the Cumulative Environmental Impacts of Thousands of Turbines on Millions of Acres of Ocean that BOEM Will Approve in the Near Future**

121.    NEPA requires that an Environmental Impact Statement include within its scope "[c]umulative actions [that] when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"[170] and similar actions that "when viewed with other reasonably foreseeable or proposed agency actions, . . . have similarities that provide a basis for evaluating their environmental consequences together."[171] This cumulative impact requirement ensures that agencies consider the collective

---

[169] *Robertson*, 490 U.S. at 349.
[170] *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1314 (D.C. Cir. 2014).
[171] *Id.*

effects of individually minor but related actions over time when analyzing the environmental impacts of a proposed government action.

122.    NEPA regulations define cumulative impacts as "on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions. Cumulative effects can result from actions with individually minor but collectively significant effects taking place over a period of time."[172]

123.    In preparing its EIS for the Maryland Offshore Wind Project, BOEM impermissibly segmented its NEPA review by dividing the connected, cumulative, and similar federal actions—approving construction and operation of thousands of wind turbine generators on millions of acres of offshore federal lands along the Atlantic Coast—into separate projects and thereby failed to address the true scope and impact of the activities that must be analyzed under NEPA. As the Supreme Court has held, under NEPA, "proposals for . . . actions that will have cumulative or synergistic environmental impact upon a region [] pending concurrently before an agency . . . must be considered together."[173]

124.    The Maryland Offshore Wind Project is a single segment of the "national offshore wind energy mandate"[174] to deploy at least 30 gigawatts of offshore wind energy by 2030, which includes coordinated steps to support rapid offshore wind deployment."[175] To meet the

---

[172] 40 C.F.R. § 1508.1(i)(3).
[173] *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).
[174] Department of the Interior, *Interior Department Approves Second-Major Offshore Wind Project U.S. Federal Waters* (Nov. 24, 2021), https://www.doi.gov/pressreleases/interior-department-approves-second-major-offshore-wind-project-us-federal-waters.
[175] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

Government's policy goals, BOEM "plans to advance new lease sales and complete review of at least 16 Construction and Operations Plans (COPs) by 2025, representing more than 19 GW of new clean energy for our nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050. . . ."[176] BOEM's approval of the Maryland Offshore Wind Project "represents the power of a government-wide approach to offshore wind permitting."[177]

125.    The Maryland Offshore Wind Project does not stand alone, but will be physically integrated into a single grid system to power major cities along the East Coast, creating one massive wind Project.[178] In a 2024 report titled *An Action Plan for Offshore Wind Transmission Development in the U.S. Atlantic Region*, the U.S. Department of Energy and BOEM set forth their plan to connect various projects along the eastern seaboard through subsea cables and offshore platforms.[179] In the mid-Atlantic and New England, there would be three independent, multi-terminal lines that would connect each of the three planning regions—Independent Systems Operator, New England Inc, New York Independent System Operator, and PJM Interconnection LLC—"via an HVDC system of subsea cables and offshore platforms."[180] "HVDC transmission lines use voltage converter stations to change the alternating current used

---

[176] *Id.*

[177] Department of the Interior, *Biden-Harris Administration Approves First Major Offshore Wind Project in U.S. Waters* (May 11, 2021), https://www.doi.gov/pressreleases/biden-harris-administration-approves-first-major-offshore-wind-project-us-waters.

[178] Biden Administration, *Fact Sheet: Biden-Harris Administration Advances Offshore Wind Transmission, Strengthens Regional Supply Chain Buildout, and Drives Innovation* (Sept. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/21/fact-sheet-biden-harris-administration-advances-offshore-wind-transmission-strengthens-regional-supply-chain-buildout-and-drives-innovation/.

[179] U.S. Department of Interior and Bureau of Ocean Energy Management, *An Action Plan for Offshore Wind Transmission Development in the U.S. Atlantic Region* (Apr. 2024), https://www.energy.gov/sites/default/files/2024-04/Atlantic_Offshore_Wind_Transmission_Plan_Report_v16_RELEASE_508C.pdf.

[180] *Id.* at 28.

70

in typical electricity transmission systems to direct current for transfer over the line."[181] Under this plan, Projects off Maryland and Delaware would be connected with Projects off New Jersey and New York—effectively creating one continuous Project.

126.    The Maryland Offshore Wind Project is one of about 30 projects already constructed or planned to be constructed off the east coast, with even more in the planning pipeline. When built out, there will be 3,141 turbines, 4,953 miles of export cables, 5,912 miles of inter-array cables, and tens of millions of gallons of coolants, lubricants, and fluids sitting in turbines, offshore substations, and cables,[182] all costing the United States taxpayer over $100 billion in subsidies and grants. Although BOEM included an appendix in its Final EIS entitled "Future Planned Activities," BOEM did not actually analyze the combined impacts of the thousands of turbines and thousands of miles of cables that will cover millions of acres of pristine seabed and open ocean on the human and natural environment.

127.    Defendants acknowledged the offshore wind program's interrelated and cumulative effects in 2007 when they produced a Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf.[183] Defendants intended this Programmatic Environmental Impact Statement to provide a "baseline analysis that helps to satisfy the requirements of NEPA for

---

[181] *Id.*

[182] *See* Bureau of Ocean Energy Management, *Maryland Offshore Wind Final Environmental Impact Statement—Appendix D Planned Activities Scenario* (July 29, 2024) at D-126–D-129, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Maryland%20Offshore%20Wind%20Final%20EIS_AppD%20Planned%20Activities%20Scenario.pdf.

[183] *See* Bureau of Ocean Energy Management and United States Department of the Interior, *Guide to the OCS Alternative Energy Final Programmatic Environmental Impact Statement,* https://www.boem.gov/renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-eis (last visited Oct. 23, 2024).

offshore renewable energy leasing,"[184] because "many wind energy projects will have similar environmental impacts."[185] This Programmatic Environmental Impact Statement does not satisfy NEPA's cumulative impacts requirement today because Defendants have significantly altered and expanded their offshore wind program, rendering the Programmatic Environmental Impact Statement's analysis of cumulative environmental impacts inaccurate and outdated and requiring a supplemental or new Environmental Impact Statement analyzing the current program as it now exists.

128.    Because BOEM's Final EIS for this Project fails to take a hard look at the cumulative impacts of the Maryland Offshore Wind Project in combination with the other projects that have been constructed, are awaiting final approval, or that are planned for the Atlantic Coast, it fails to comply with NEPA, and is arbitrary, capricious, and not in compliance with the law.

**BOEM Failed to Conduct a True Alternatives Analysis as NEPA Requires, Impermissibly Limiting Its Review of Available Alternatives**

129.    NEPA also requires that the Environmental Impact Statement provide a "detailed statement" on alternatives to the proposed action,[186] and that the agency "[s]tudy, develop, and describe appropriate alternatives to recommend[] courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[187] The Environmental Impact Statement must include consideration of alternatives, which include the

---

[184] *Id.* at 7.
[185] *Id.*
[186] 42 U.S.C. § 4332(2)(C).
[187] *Id.* § 4332(2)(E).

no-action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action) in an agency's environmental review of an action under consideration.[188]

130.    NEPA regulations state that the alternatives analysis is the "heart of the environmental impact statement."[189] Agencies are guided by a rule of reason when selecting alternatives and should select a reasonable range of alternatives that are "technically, economically, and environmentally feasible."[190] NEPA prohibits government agencies from limiting their analysis of reasonable alternatives "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives."[191] Nor can the agencies lawfully "craft a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party.[192] Under NEPA, government agencies are not permitted to limit their analysis of reasonable alternatives "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives," nor can they lawfully "craft a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party.[193]

131.    To allow the preparation of a proper alternatives analysis, NEPA requires that the agency first specify "the underlying purpose and need for the proposed agency action."[194] This identification of the purpose and need for the Project then allows the agency to identify and

---

[188] 40 C.F.R. § 1502.14.
[189] 40 C.F.R. § 1502.14.
[190] 40 C.F.R. § 1508.1(hh).
[191] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).
[192] *Id.*
[193] *Id.*
[194] 40 C.F.R. § 1502.13.

analyze reasonable alternatives to the proposed Project that may be less environmentally damaging.

132.    But, for the Maryland Offshore Wind Project Environmental Impact Statement, BOEM impermissibly limited its analysis to a set of alternatives that would allow US Wind to perform its existing private contract with the state of Maryland. BOEM rejected out-of-hand all true alternatives, and selected alternatives with only minor differences in number of turbines and the route for the power cables from the proposed action.

133.    Directly contrary to NEPA's requirements, BOEM flatly rejected the option of not authorizing the Maryland Offshore Wind Project—as though approval were foreordained, with only the details to be determined.

134.    Directly contrary to NEPA's requirements, BOEM also failed to analyze any alternatives that proposed a different location, had smaller turbines, caused less environmental impact, or were located farther off the shore. Defendants failed to study, develop or describe reasonable alternatives to the proposed Project outside and inside the Project area that would avoid, minimize, reduce, and compensate for the environmental impacts of the Project. Specifically, Defendants failed to consider:

- Options to meet the purpose and need of the action outside of the lease area through the onshore production of electrical energy, both fossil and nonfossil, including coal, gas, nuclear, solar, and onshore wind—among others, or methods to increase energy efficiency and reduce waste;

- Other offshore locations for the wind energy Project—a set of alternatives foreclosed by Defendants' failure to prepare the Environmental Impact Statement until after leasing the area to the Project's sponsor;

74

- Project designs and specifications that did not necessarily satisfy the terms of US Wind's contract with Maryland and had far less adverse environmental impact; or

- Project designs that only fulfilled US Wind's 248 MW and 808 MW agreements with Maryland and saved approving and considering any additional turbines/approved MW for future projects when agreements in Maryland would be in place.

135.    Despite the significant impacts of approving the Project in the lease area, Defendants impermissibly and summarily dismissed significant, concrete, well-justified, and reasonable alternatives that would locate the Project farther away from the shoreline and reduce the number of turbines. BOEM also failed to consider a wide range of reasonable alternative project layouts, structures, construction methods, and activities within the lease area that would have minimized or reduced the Project's adverse environmental impacts.

136.    BOEM's failure to consider numerous available alternatives to the proposed Project, including the no-action alternative, was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law.[195]

**Defendants' Failed to Disclose and Fully Analyze the Three Phases of the Project**

137.    The Maryland Offshore Wind Project consists of three phases: MarWin, "a wind farm of approximately 300 MW," Momentum Wind, a windfarm "of approximately 808 MW," and the final phase where US Wind will "build-out of the remainder of the Lease area to fulfill ongoing, government-sanction demands for offshore wind energy."[196]

---

[195] 5 U.S.C. § 706.
[196] Final EIS *supra* note 3 at ES-6.

138.    BOEM's Final EIS provides no discussion of just how many turbines are necessary to meet MarWin's 300 MW or Momentum Wind's 808 MW energy goals. Nor is there any discussion of how many additional turbines will be included in Phase 3. Instead, after mentioning the three phases and providing a map, BOEM lumps the three phases together and analyzes them together as though they will be built out as a single Project.

139.    The third phase, which was presented as an open, undefined future development, is not analyzed in the EIS at all. US Wind does not even include the third phase on its informational website. Even more troubling, BOEM rejected most of the alternatives because they did not "allow for full build out of the Project,"[197] even though full buildout was not necessary to meet Maryland's existing contracts with US Wind. And, based on the most recent COP, which was approved, US Wind has not obtained any additional energy credits or contracts from Maryland.

140.    By failing to fully discuss the Project components and what is needed to meet all three phases, BOEM failed to fully identify and analyze the Project and its impacts on the human environment and environmental resources, in violation of NEPA.

**Defendants Failed to Analyze Less Environmentally Damaging Alternatives**

141.    The Final Environmental Impact Statement confirmed that the Maryland Offshore Wind Project would harm the ecosystem, air quality, bats, benthic resources, birds, sea turtles, coastal habitat, fauna, commercial fisheries and for-hire recreational fishing, cultural resources, demographics, employment, economics, environmental justice, finfish, invertebrates, and essential fish habitats, land use and coastal infrastructure, marine mammals, navigation and

---

[197] Record of Decision *supra* note 2 at 30.

vessel traffic, national security and military, aviation and air traffic, scientific research, recreation and tourism, scenic and visual resources, water quality, and wetlands.[198]

142.    Despite these known impacts from the Project in the lease area, BOEM opted not to seriously consider any of the alternatives that would lessen the environmental impacts because they would not "allow for full build-out of the Project."[199] BOEM failed to select legitimate alternatives and the failure to consider alternatives that would avoid, minimize, or mitigate impacts was arbitrary, capricious, an abuse of discretion, and otherwise unlawful.

**Defendants Failed to Adequately Analyze Climate Change Effects of Constructing and Operating the Project**

143.    The Final Environmental Impact Statement does not sufficiently evaluate the Project's impacts on greenhouse gas emissions and climate change. BOEM analyzes partial, Project-specific climate impacts in the nearby geographic area but attempts to quantify only emissions offsets from the Project, with limited qualitative descriptions of emissions generated from construction.

144.    BOEM failed to analyze activities associated with the supply chain, such as minerals sourcing, component fabrication, and eventual disposal of turbine components in landfills, which would not occur under the No Action Alternative and differ among other alternatives BOEM did or should have considered.

145.    The Final Environmental Impact Statement only compares the Project's climate benefits with fossil-fuel generating stations[200] and does not compare the Project's climate impacts with other alternative renewable energy sources or Project locations and designs.

---

[198] *See* Final EIS *supra* note 3 at ES-9–ES-13.
[199] Record of Decision *supra* note 2 at 30.
[200] *See* Final EIS *supra* note 3 at 1-11.

146.    Nor is there any cumulative-level analysis of climate impacts (positive or negative) associated with the proposed scale of offshore wind development. In fact, BOEM admits that the Project will have no considerable impact to climate change: "U.S. offshore wind projects would likely have a limited impact on global emissions and climate change."[201]

147.    Because Defendants' Environmental Impact Statement fails to adequately analyze the impacts on the human environment of the Project, Defendants' authorizations and permits that rely on that Environmental Impact Statement are arbitrary, capricious, and otherwise not in accordance with law, and therefore should be declared unlawful and set aside.

148.    Defendants' actions have deprived Plaintiffs of the procedural protections in NEPA and will irreparably harm Plaintiffs' interests.

**Defendants Failed to Analyze Impacts of Blade and Turbine Failure and the Degradation of Project Components**

149.    Missing from BOEM's Final EIS is any discussion or analysis of the environmental impacts in the event of blade and turbine failure and the degradation of Project components, which are known and foreseeable possibilities that should have been reviewed and analyzed by BOEM. Risks of blade and turbine failure and component degradation are not hypothetical. Rather, they pose real dangers to the water quality of the ocean, fish and essential fish habitats, marine mammals, benthic resources, and recreational and commercial boaters.

150.    Recent events at the Vineyard Wind 1 Project—where a large portion of a 350-foot fiberglass and PVC blade broke off the turbine and shattered into thousands of pieces that were scattered by the ocean—underscores the risk of blade and turbine generator failure at wind

---

[201] *Id.* at 3-17.

facilities. In the last six months, two blades have failed at a large wind facility in England.[202] And

globally, 0.54% of blades fail each year, with around 3,800 blade failures yearly.[203] In 2022, a

blade at an Oregon wind farm—the height of an 11-story building weighing over four Toyota

Camrys—flew off a turbine at the Bigelow Canyon project and landed in a nearby field, creating

a four-foot-deep trench where it landed.[204] There are also repeated instances of turbines

collapsing across the world. Turbines in Germany, Oklahoma, Wisconsin, Whales, and Colorado

have all collapsed within the last several years,[205] and many were caused by turbine fires and

lightning strikes.

151.    The Final EIS neither addresses nor analyzes the risk of blade failure, turbine

collapse, turbine fires, or emergency response and mitigation measures in the event of a failure.

The COP also does not mention what would happen in the event of turbine or blade failure, and

the two appendices that may cover such events—Oil Spill Response and Safety Management

Systems—are labeled "confidential" and barred from public view and comment.

152.    Nor is there any discussion or analysis in the Final EIS regarding Project

component degradation. These metal turbines will be placed in corrosive ocean water,

encountering high winds, and experiencing temperature fluctuations of at least 80 degrees every

---

[202] *Second GE Vernova Turbine Blade Reportedly Fails at UK's Dogger Bank Wind Farm*,
Offshore (Aug. 23, 2024), https://www.offshore-mag.com/renewable-
energy/article/55135538/second-ge-vernova-turbine-blade-reportedly-fails-at-uks-dogger-bank-
wind-farm.
[203] Leon Mishnaevsky, Jr., *Root Causes and Mechanisms of Failure of Wind Turbine Blades:
Overview*, National Library of Medicine (Apr. 19, 2022),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9101399/pdf/materials-15-02959.pdf.
[204] Ted Sickinger, *Wind Bust*, The Oregonian (Aug. 27, 2022),
https://projects.oregonlive.com/wind-farms/.
[205] Tim Newcomb, *Giant Wind Turbines Keep Mysteriously Falling Over. This Shouldn't Be
Happening.*, Popular Mechanics (Jan. 23, 2023),
https://www.popularmechanics.com/technology/infrastructure/a42622565/wind-turbines-falling-
over/.

year. There is no discussion of what happens if one of the turbines starts to leak oil, coolant, or other fluids, or if the turbines start to rust, or if screws and other materials fall off the turbines. BOEM fails to analyze the environmental impacts of component degradation, writing off the risks as highly unlikely. But even highly unlikely events can still be devastating, as we have seen with major disasters at energy facilities.

153.    BOEM's failure to analyze the risk of blade failure, turbine, collapse, turbine fires, or component degradation is arbitrary and capricious and violates NEPA.

154.    In the wake of the Vineyard Wind disaster, BOEM should, at a minimum, have supplemented its EIS with analysis of the possibility of equipment failure. Plaintiffs even sent BOEM a letter on September 20, 2024, demanding a Supplemental EIS. Yet, BOEM has failed to undertake any analysis of the environmental impacts of blade or turbine failure—a failure that is arbitrary, capricious, and contrary to NEPA.

**Defendants Failed to Analyze the Project's Impacts on the Horseshoe Crab**

155.    The horseshoe crab is a species that is vital to the medical industry in the United States and the health and safety of nearly every citizen. The blood of horseshoe crabs contains the compound limulus amebocyte lysate (LAL), which is the only FDA-approved test for endotoxins. When LAL is in the presence of an endotoxin, it clots and traps the endotoxin in a gel-like substance. Every drug certified by the FDA must be tested using LAL and every medical device or instrument that will go into someone's body is also tested with LAL. This test is so ubiquitous that every single person in the United States who has ever had an injection, or a vaccine has been protected by the blood of horseshoe crabs. The blood of horseshoe crabs was essential in creating the COVID-19 vaccines.

156.    The areas off Delaware, Maryland, and New Jersey support a major stock of horseshoe crabs, and it is the primary area along the East Coast where horseshoe crabs live. Because of this region's importance, the Atlantic States Marine Fisheries Commission established the Carl N. Shuster Jr. Horseshoe Crab Reserve off the coast of Delaware, where horseshoe crab fishing is prohibited. This Reserve covers an area of nearly 1,500 square miles and 41.9 square miles of the Maryland Offshore Wind Project overlap with the Reserve. There are also additional offshore wind projects that overlap with the Reserve. Every fall and winter, horseshoe crabs migrate from inshore areas to the Reserve, which goes as far out as 30 miles from shore, and bury themselves in the sand and mud. The crabs do not return to shore until mid-June, where they mate and spawn. The Reserve is crucial to ensuring the stock of horseshoe crabs and their habitat are protected.

157.    In November of 2020, the Assistant Secretary of Health and Human Services sent a letter to the Secretary of the Interior, raising the importance of LAL and encouraging "the Department of the Interior to properly assess any impacts to the habitat of the North American Horseshoe Crab before any offshore wind project is approved on the East Coast."[206] The Department of Interior was warned that because LAL "is an important resource for the medical community," "the United States Government should fully understand any consequences before moving forward."[207] Even though the Department of Health and Human Services asked the Department of the Interior to assess the impacts on the horseshoe crab, BOEM failed to analyze the impacts on the horseshoe crab during its environmental review. BOEM failed to adequately analyze and assess the impacts of this Project, as well as the cumulative impacts, to the habitats

---

[206] Ex. 9, Decl. of G. Topping, Attachment 2, Letter from Assistant Secretary Giroir to Sec. Bernhardt (Nov. 13, 2020).
[207] *Id.*

within the Shuster Horseshoe Crab Reserve. BOEM also failed to evaluate the bio-medical importance of horseshoe crabs and how any decrease in population or changes in habitat might impact the medical industry and health and safety.

158.    Plaintiff, the Mayor and City Council of Ocean City, raised these concerns with BOEM in their comments on the Draft EIS.[208] In those comments they asked BOEM to defer their approval until further studies were conducted on the Project's impacts on the horseshoe crab from construction and acoustic noise. Ocean City also asked BOEM to consider an alternative that eliminated any development in the Reserve and provide additional analyses to support the conclusions that population levels would not be impacted and how the sensitive timing of the horseshoe crab movements from offshore to the beaches, bays, and wetlands to spawn as well as early finfish life cycles are to be avoided to minimize potential impacts. BOEM failed to address any of these concerns in the Final EIS and failed to fully analyze and identify impacts on the horseshoe crab.

**Defendants Failed to Analyze Impacts on Tourism and Local Economies**

159.    NEPA requires the Government to analyze impacts on the human environment. As part of that analysis, BOEM is required to analyze impacts on local economies, employment, housing, and local industries. Here, BOEM failed to adequately analyze the impacts on the local economy and tourism-based industries of Ocean City, Maryland, Fenwick Island, Delaware, and Worcester County, Maryland.

160.    BOEM relies on outdated, inapplicable studies to conclude that tourism will not be negatively impacted. But those studies, published following the construction of the Block

---

[208] *See* Ex. 1, Decl. of T. McGean, Attachment 1, Letter to BOEM RE Draft EIS for US Wind Proposed Wind Energy Facility Offshore Maryland (Nov. 17, 2023).

Island pilot project in Rhode Island—which has only five small turbines and is located near a sparsely populated area with fewer than ten hotels—are simply not applicable to major, tourism-based economies like the ones in Ocean City and Worcester County. Other than those studies, BOEM has no basis to support its conclusions that tourism will not be impacted. Even though Plaintiffs raised this issue in comments to the Draft EIS, BOEM did not supplement its analysis or conduct surveys in Ocean City or other major resort towns. Instead, it drew an unsupported conclusion that turbines do not affect tourism.

161.    BOEM also disregarded studies, including ones conducted by other offshore wind developers, that found that offshore wind turbines are unattractive to tourists.[209] One study by Orsted, another offshore wind developer, found that 15% of tourists would not return to Cape May County, New Jersey, once the wind projects were completed because the turbines would be visible from the beach. And a study from North Carolina State found that 80% of beachgoers surveyed would not return to the beach if wind turbines were visible.[210]

162.    BOEM's decision to rely on inapplicable studies to support its conclusions regarding tourism and its impacts on the local economy is arbitrary and capricious. BOEM had an obligation to conduct more research regarding these impacts. By failing to do so, BOEM violated NEPA.

---

[209] Mario F. Teisl, et al., *Seeing Clearly in Virtual Reality: Tourist Reactions to an Offshore Wind Project*, Energy Policy (2018), https://umaine.edu/vemi/wp-content/uploads/sites/220/2018/08/Teisl-etal-2018-EP-using-VR-with-wind-projects.pdf.
[210] Center for Environmental and Resource Economic Policy, *Offshore Wind: Tourism* (Apr. 3, 2016), https://cenrep.ncsu.edu/2016/04/03/offshore-wind-tourism/.

**BOEM Failed to Analyze the Impacts on Historic Properties in Ocean City and Fenwick Island**

163.    Despite having nationally listed historic properties, BOEM failed to identify impacts to the three historic properties in Ocean City, Maryland and the one historic property in Fenwick Island, Delaware. BOEM's failure to identify impacts and consult with these properties during the National Historic Preservation Act Section 106 process is arbitrary and capricious and violated NEPA.

**BOEM Failed to Analyze the Maryland Offshore Wind Project's Other Environmental Impacts**

164.    The July 29, 2024 Final EIS prepared by BOEM was inaccurate, incomplete, and failed to comply with multiple requirements of NEPA. Defendants failed to comply with NEPA by failing to fully analyze and take a hard look at the environmental impacts that will arise from the construction, operations and maintenance, and decommissioning of the Maryland Offshore Wind Project. For many of these failures, BOEM justifies its lack of analysis by stating that obtaining the information would be too time consuming or costly, but that alone does not excuse BOEM from ignoring concrete, adverse impacts on the environment and then approving a Project without complete analyses.

165.    BOEM failed to adequately analyze the Project's impacts on benthic resources. Defendants failed to analyze impact producing factors on benthic resources and conduct studies to determine "specific stimulus-response[s]" from underwater noise and electromagnetic fields.[211] BOEM also failed to analyze and understand "secondary impacts, such as changes in

---

[211] Final EIS *supra* note 3 at E-3.

diets throughout the food chain resulting from habitat modification and synergistic behavioral impacts. . . ."[212]

166.     BOEM failed to adequately analyze the Project's impacts on birds. BOEM does not have complete information on the distribution and habitat use of the 164 species of birds that are found in the area.[213] Defendants utilized data from onshore wind facilities to make their conclusions regarding birds and failed to examine how offshore bird mortality rates would differ from onshore bird mortality rates.[214] Defendants also failed to analyze and estimate mortality rates based on different species present in the area and the life history and behavior of the species.[215]

167.     BOEM failed to adequately analyze the Project's impacts on finfish and Essential Fish Habitat. Defendants also failed to analyze and discover the "spatial and temporal distribution of finfish and essential fish habitat" throughout the lease area.[216] Defendants failed to analyze the impacts of electromagnetic fields and underwater noise on vital invertebrate resources.[217] Defendants also failed to understand the "secondary impacts such as changes in diets throughout the food chain resulting from habitat modification," on finfish and invertebrates.[218]

168.     BOEM failed to adequately analyze the Project's impacts on marine mammals. Defendants have not considered the impacts of electromagnetic frequencies on marine mammal

---

[212] *Id.* at E-4.
[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] *Id.* at E-5.
[217] *Id.*
[218] *Id.*

populations or their prey in the geographic area,[219] and even though no studies have been conducted, BOEM erroneously concludes that "current literature does not support a conclusion that electromagnetic frequencies could lead to changes in behavior that would cause significant adverse effects on marine mammals."[220] BOEM also failed to fully understand and analyze the effect of underwater noise, noting that while "NMFS disturbance criteria appl[ies] a single threshold" "for impulsive noise sources and do[es] not consider the overall duration, exposure or frequency," "behavioral responses are not necessarily predictable."[221] BOEM failed to conduct studies and failed to fully analyze the behavioral effects of pile-driving noise on marine mammals other than harbor porpoises and seals,[222] and "uncertainty remains regarding the long-term cumulative acoustic impacts associated with multiple pile-driving projects that may occur over several years."[223] There is also uncertainty on how "vessel traffic, high-resolution surveys, geotechnical drilling, and dredging activities," impacts marine mammals' behavior.[224] BOEM also failed to analyze or research "the responses of large whale species to extensive networks of new structures" in the Atlantic Ocean.[225] And although there will be thousands of wind turbines along marine mammal migration routes, BOEM states, without any support, that "no physical obstruction of marine mammal migration routes or habitat areas are anticipated."[226] BOEM also does not know and failed to analyze and understand whether marine mammals will avoid "offshore wind lease areas due to new structures."[227]

---

[219] *Id.* at E-6.
[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] *Id.*
[224] *Id.*
[225] *Id.* at ES-7.
[226] *Id.*
[227] *Id.*

169.    BOEM failed to adequately analyze the Project's impacts on sea turtles. BOEM failed to fully analyze the distribution of sea turtle species in the lease area and failed to fully understand and evaluate the effects of the Project on sea turtles and their habitat.[228] BOEM does not know how electromagnetic fields will impact sea turtles.[229] Nor does BOEM know how sea turtles will respond to the Project's construction activities.[230] BOEM failed to understand how the hazard lights and navigation lights on the turbines would impact sea turtles.[231] BOEM also failed to understand and analyze how "sea turtles would interact with the long-term changes in biological productivity and community structure resulting from the reef effect of offshore wind farms across the geographic analysis area."[232]

170.    BOEM failed to adequately analyze the Project's impacts on commercial fisheries and for-hire recreational fishing. Defendants based their analysis on the impacts to commercial fisheries and for-hire recreational fishing, which are substantial, on "an incomplete understanding of fish stock dynamics and effects of environmental factors on fish populations."[233] BOEM also failed to obtain accurate and complete vessel monitoring system data for several species and fishery trips, making its analysis limited.[234]

171.    BOEM failed to adequately analyze the Project's impacts on navigation and vessel traffic. Defendants failed to fully analyze how these turbines will impact navigation. Defendants failed to mention and consider how turbines near the lease area have caused fishing

---

[228] *Id.*
[229] *Id.*
[230] *Id.* at E-8.
[231] *Id.*
[232] *Id.*
[233] *Id.* at E-9.
[234] *Id.*

vessels to sink.[235] In 2019, a fishing vessel sank off the Block Island wind farm, and search and rescue operations were halted due to an inability to maneuver around the turbines, resulting in the death of two fishermen. Defendants fail to mention this incident and analyze how adding 114 turbine generators will impact navigation and vessel traffic.

172.    BOEM failed to adequately analyze the Project's impacts on recreation and tourism. BOEM failed to analyze the Project's impacts on the sport and recreational fishing tournaments held in Ocean City. BOEM also failed to analyze how rental property values and residential property values would change due to the presence of this Project. BOEM failed to analyze and understand how the Project would impact annual visitors and local businesses.

173.    BOEM's failure to provide complete and accurate analyses makes BOEM's Final EIS arbitrary, capricious, and contrary to law and it should be set aside.

**BOEM Failed to Supplement the Environmental Impact Statement After the Blade Failure at the Vineyard Wind Facility Created Substantial New Circumstances**

174.    NEPA requires that an EIS "shall" be supplemented when "substantial new circumstances or information" arise that are relevant to the environmental impacts of the action.[236] A supplemental EIS is necessary when new information "provides a seriously different picture of the environmental landscape."[237] And "if the new information is sufficient to show that the remaining action will 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared."[238]

---

[235] *See* United States Coast Guard, *MISLE Incident Investigation Report for F/V Mistress Sinking/Loss of Life.*
[236] 40 C.F.R. § 1502.9(c)(1)(ii).
[237] *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984).
[238] *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374 (1989) (quoting 42 U.S.C. § 4332(2)(C)).

175.    In July 2024, only a few weeks before BOEM published its Final EIS, a
substantial portion of a 350-foot, fiberglass, Polyvinyl chloride (PVC), and polyethylene
terephthalate (PET) blade broke off a newly constructed turbine in the Vineyard Wind Project,
scattering thousands of shards across the ocean's surface. Over the next few days, additional
pieces of the blade also fell into the ocean, sinking to the ocean floor and adding to the mayhem.
The Coast Guard sealed off the area from ship transit, and the company attempted to remove
shards of the shattered blade from the ocean. These efforts were largely unsuccessful, and
thousands of tons of debris washed ashore not only in Nantucket, fifteen miles away—closing its
beaches—but were also carried many miles away to wash up on Martha's Vineyard, Cape Cod,
the beaches of Rhode Island, and even Montauk. The full extent of the environmental damage
this blade failure caused—to the marine environment, fish, marine mammals, water quality, fish
and benthic habitats, and coastal flora and fauna—is still unknown.

176.    The blades for this Project will be the same size and made of the same materials
as the blades at the Vineyard Wind facility. If blade failures like the one that happened at
Vineyard Wind happen at this Project, hundreds of tons of fiberglass and foam could contaminate
the ocean and wash up on the shores of Maryland and Delaware during the life of the Project,
devastating local communities, and the environment. For boaters and fishermen, colliding with
the debris could result in sinking vessels, injury, or loss of life. The debris would also be
dangerous for fish and marine mammals that come into contact with the debris or will eventually
consume the microplastics. For nearby communities, debris washing ashore impacts beaches,
tourism, and the coastal environment, resulting in financial hardship from cleaning debris and
decreasing tourism. For the Town of Ocean City and the Town of Fenwick Island, closing
beaches due to blade debris—which was required in Nantucket after the Vineyard Wind turbine

blade failure—will devastate the local economy and tourism. And debris and contaminants in the ocean will put residents and visitors at risk for injury or illness from coming into contact with the chemicals and toxins.

177.    Up until the Vineyard Wind blade failure, Plaintiffs were unaware that such an event could occur. The Draft EIS and the Construction and Operations Plan lacked any analysis of this type of failure and the environmental impacts on the release of the toxins from blade failures and Project equipment failures. While published after the blade failure incident, the Final EIS's analysis on the release of these toxins and debris from blade failures and Project equipment failures is also nonexistent.

178.    On September 20, 2024, Plaintiffs sent a letter to Defendants requesting a supplemental EIS to address the environmental impacts of blade and project equipment failures. BOEM neither responded to this letter nor supplemented the EIS. These environmental impacts from these failures, which were never addressed or analyzed by BOEM, "provide[] a seriously different picture of the environmental landscape,"[239] and a supplemental EIS is required under NEPA.

**Fourth Cause of Action**
**Violation of the Endangered Species Act and**
**Administrative Procedure Act**

179.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

180.    Congress enacted the Endangered Species Act (ESA) in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] to provide a program for the conservation of such endangered species and

---

[239] *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004).

threatened species."[240] "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."[241]

181.    Section 7 of the ESA imposes on every federal agency the duty to protect endangered species:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."[242]

The Supreme Court has stated that "[t]his language admits of no exception."[243]

182.    Here, Section 7 required BOEM to consult with NMFS to determine whether the Maryland Offshore Wind Project does or does not jeopardize the species' continued existence and recovery,[244] based on the "best scientific and commercial data available."[245] ESA regulations define "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[246]

183.    Because the Biological Opinion NMFS issued on June 18, 2024 was not based on the best scientific and commercial information available, and intentionally excluded consideration of the adverse impacts of up to 29 other offshore wind projects to be constructed

---

[240] 16 U.S.C. § 1531(b).
[241] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
[242] 16 U.S.C. § 1536(a).
[243] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536 (1976)).
[244] 16 U.S.C. § 1536(a)(2) & (b)(3)(A).
[245] 16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.14(g)(8).
[246] 50 C.F.R. § 402.02; *see also Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019) (confirming that "the plain language" of the regulation requires the agencies "to assess 'both the survival and recovery of a listed species'" (quoting 50 C.F.R. § 402.02)).

directly in the migration path of the endangered Right Whale, NMFS's no-jeopardy finding was arbitrary, capricious, and did not comply with the Endangered Species Act.

**The North Atlantic Right Whale Is in Grave Jeopardy**

184.    Few species are as imperiled as the North Atlantic Right Whale. As NMFS's Biological Opinion states, the species is extremely close to extinction, easily susceptible to stress and chronic injuries from construction, vessel strikes, or entanglements, and has low reproductive rates.[247] BOEM and NMFS report that, since 2011, roughly 237 North Atlantic Right Whales have died, and 42% of the population is known to be in reduced health.[248]

185.    Although the Right Whale was among the first species to be listed as endangered,[249] none of the species' recovery goals have been achieved: "Despite . . . efforts to reduce the decline and promote recovery, progress toward right whale recovery has continued to regress."[250] Today, North Atlantic Right Whales are experiencing an unusual mortality event,[251] and the population has dwindled to 338 individuals.[252] There are only about 70 breeding females capable of reproducing left.[253] The species has low genetic diversity and is not resilient.[254]

---

[247] National Marine Fisheries Service, *Maryland Offshore Wind Project Biological Opinion* (June 18, 2024) at 26–27, https://doi.org/10.25923/49f3-n596 (Biological Opinion) (The Biological Opinion contains two pages labeled "Page 26," due to a page numbering discrepancy. This cite is referencing the second page 26.).
[248] *See* Strategy on the North Atlantic Right Whale *supra* note 122 at 8.
[249] *See* National Oceanic and Atmospheric Administration, *North Atlantic Right Whale,* https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last visited Dec. 20, 2024).
[250] Biological Opinion *supra* note 247 at 35 (This cite is referencing the second "Page 35" in the Biological Opinion).
[251] Strategy on the North Atlantic Right Whale *supra* note 122 at 7.
[252] Biological Opinion *supra* note 247 at 25 (This cite is referencing the second "Page 25" in the Biological Opinion).
[253] Strategy on the North Atlantic Right Whale *supra* note 122 at 7.
[254] *Id.*

Calving rates have slowed from one calf per female every three to four years to one calf per female every seven to ten years.[255]

186.    BOEM and NMFS state that this species is at such a severe risk of extinction, that the loss of one individual reduces the likelihood of recovery, which is already almost non-existent:

> Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction . . . [and] the loss of even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[256]

187.    Since 2017, the species has experienced a tragic and unexplained increase in injuries and death. In the last seven years, 41 Right Whales have died, averaging to 5.8 whale deaths per year—an unsustainable number for this species. The year 2024 has already seen five deaths of North Atlantic Right Whales, four other severe injuries, and four missing calves.[257] In January of this year, a deceased female North Atlantic Right Whale, born in the 2021 calving season, was found near a beach in Martha's Vineyard, Massachusetts.[258] In February, another juvenile female was found dead off Savannah, Georgia.[259] In March authorities found a dead calf off Cumberland Island in Georgia.[260] And in April 2024, a company conducting whale surveys for the navy notified NMFS of a dead North Atlantic Right Whale female offshore Virginia

---

[255] *Id.*

[256] *Id.* at 10.

[257] *See* NOAA Fisheries, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness) (last visited Dec. 20, 2024).

[258] *Id.*

[259] *Id.*

[260] *Id.*

Beach/Norfolk, Virginia.[261] Notably, this female had just given birth to her sixth calf last winter and the calf was not seen in the vicinity of the carcass.[262]

**NMFS and BOEM Admit that the Offshore Wind Program Threatens the North Atlantic Right Whale**

188.    In October 2022, BOEM and NMFS issued a joint draft "North Atlantic Right Whale and Offshore Wind Strategy,"[263] in which the agencies admitted that, when viewed in its entirety, BOEM's Atlantic Offshore Wind Turbine program has the potential to harm North Atlantic Right Whales and cause population-scale impacts to the species: "This species, whose range overlaps with the area proposed for [offshore wind] development, is one of the most endangered large whales in the world,"[264] which makes them "more susceptible to threats generally, including the potential impacts from [offshore wind] development."[265]

189.    In January 2024, the agencies published the final version of their Strategy, concluding that "[t]he activities associated with [offshore wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales]."[266] These stressors include "exposure to noise and/or pressure (particularly from construction activities),"[267] resulting in "hearing impairment, masking of [North Atlantic Right

---

[261] *Id.*
[262] *Id.*
[263] National Marine Fisheries Service and Bureau of Ocean Energy Management, *Draft North Atlantic Right Whale and Offshore Wind Strategy* (Oct. 2022) at 4, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.
[264] *Id.* at 4.
[265] *Id.* at 6.
[266] *See* Strategy on the North Atlantic Right Whale *supra* note 122 at 12.
[267] *Id.*

Whale] vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury . . . ."[268]

190.    The Strategy also states that the Right Whale faces a "high risk of extinction" and that its population is small enough that "the loss of even one individual a year" reduces the likelihood of recovery and the species achieving an optimum sustainable population.[269] And the strategy concedes that the negative impacts of each project will be compounded:

> Effects to [North Atlantic Right Whales] could result from stressors generated from a single project; there is potential for these effects to be compounded by exposure to multiple projects. [North Atlantic Right Whales] migrating along the U.S. Atlantic Coast have the potential to travel near or through many currently proposed [Offshore Wind] developments along the Atlantic Coast.[270]

191.    Although BOEM and NMFS prepared this Strategy document to protect whales from undue harm and although they published the final Strategy months before NMFS issued its Biological Opinion, the wealth of scientific information, analysis, and conclusions contained in the Strategy is not mentioned once or referenced in the Maryland Offshore Wind Project's Biological Opinion. Nor is there any discussion regarding the compounded impacts on the North Atlantic Right Whale from all of the projects that will be built along its migration route.

192.    NMFS's failure to use this best scientific information, though readily available in its own "North Atlantic Right Whale and Offshore Wind Strategy," completely undermines the validity of its no-jeopardy conclusion and renders its Biological Opinion arbitrary, capricious, and irreconcilable with the requirements of the Endangered Species Act.

---

[268] *Id.*
[269] *Id.* at 8.
[270] *Id.* at 14.

**The Biological Opinion Also Excludes Critical Scientific Information About the Adverse Effects of Other Offshore Wind Projects Directly in the Migration Path of the North Atlantic Right Whale**

193.    The North Atlantic Right Whale breeds in the waters offshore New England and then migrates annually along the Atlantic coast through the waters where the Maryland Offshore Wind Project is situated down to Florida and other warmer waters to give birth.[271] While generally a migratory species, some individuals become residents of preferred locations and do not migrate, and North Atlantic Right Whales have been found to live in the waters of Maryland, Delaware, and Virginia year-round. Pregnant females give birth in shallow waters only a few miles offshore.[272] In the springtime, the females who have given birth to a calf migrate back up the Atlantic coast and return to high latitude foraging grounds.[273]

194.    Although BOEM has issued more than 30 offshore wind leases along the Right Whale's Atlantic migration path, and has already approved or is in the process of approving more than 20 of those projects, NMFS intentionally excluded the adverse effects of those other projects from ESA jeopardy consideration, stating that "reasonably foreseeable future actions by federal agencies must be considered (*see* 40 CFR 1508.7) in the NEPA process but not the ESA Section 7 process."[274] NMFS's Biological Opinion thus excluded critical scientific information about the adverse effects of these projects on the Right Whale—which must traverse all of them in its annual migration—undermining NMFS's conclusion that approving the Maryland Offshore Wind Project does not jeopardize the species. By considering the projects one at a time, rather

---

[271] *See id.* at 53-65. (Depicting North Atlantic Right Whale densities along the east coast during each month.).
[272] *See* Biological Opinion *supra* note 247 at 23 (This references the second "Page 23" in the Biological Opinion.).
[273] *Id.*
[274] *Id.* at 350.

than the program as a whole, NMFS came to a no-jeopardy opinion that is supportable only because it ignored the impacts of multiple projects on the survivability of the North Atlantic Right Whale, which migrates through these areas twice a year.

195.    NMFS also ignored the "takes" it has authorized (not to mention those it must authorize for future Atlantic Coast offshore wind projects) under the Marine Mammal Protection Act. To date NMFS has approved or proposed the take of 404 Right Whales in 12 offshore wind projects—an average of about 33 takes per project. NMFS has already authorized more takes of Right Whales than the total number of individuals remaining[275] and will continue to authorize takes in future projects, all of which will jeopardize the existence of the species. The effects of these takes on the individual whale are cumulative since a migrating Right Whale is threatened with take each time it swims through any one of the dozens of approved or planned offshore wind projects—accumulating damage as it goes and increasing its chances of injury, death or disease. By ignoring the damage done at each of the other projects, approved and planned, NMFS undermines the validity of its no-jeopardy opinion both scientifically and statutorily.

**NMFS Irresponsibly and Arbitrarily Failed to Consider Impacts from Turbine and Blade Failures on the North Atlantic Right Whale**

196.    In July 2024, a large portion of a 350-foot, 57-ton fiberglass PVC blade broke off a newly constructed turbine at the BOEM-approved Vineyard Wind 1 Project, scattering thousands of shards across the ocean's surface. This incident is just one many that have occurred both onshore and offshore over the last several years. The blade materials are hazardous to fish and marine mammals that come into contact with the toxic materials or eventually consume part

---

[275] *See id.* at 25 (This cite is referencing the second "Page 25" in the Biological Opinion) (NMFS' most recent Draft Stock Assessment Report estimates the population to be at 340 individuals.).

of the materials. Yet even though NMFS knew of the risk of blade failure or turbine components going into the ocean, NMFS never considered impacts to endangered species from these toxic materials. Nor has NMFS prepared a Supplemental Biological Opinion analyzing the effects of such mechanical and equipment failures on the North Atlantic Right Whale and other endangered species.

**NMFS Failed to Consider Other Available Scientific and Commercial Information**

197.    NMFS failed to assess the likely effects of oil and coolant spills from the 114 turbines that will be constructed in the lease area. This Project's turbines and offshore substations will hold 1,430,142 gallons of fluids, lubricants, and fuels.[276] Should one, or several turbines, fail, leak, or sustain damage from being exposed to the elements, equipment failure, or severe weather, the impacts will be catastrophic. NMFS dismissed any concern of possible spills or accidents as too remote and opted not to explain or consider the impacts to endangered marine species.

198.    NMFS arbitrarily and improperly failed to account for or otherwise incorporate population and habitat changes caused by other offshore wind projects when analyzing whether the harm caused by this Project would jeopardize the endangered species in the area. NMFS does not know what will happen once these projects begin construction and operation. There is no analysis of how the thousands of turbines across the 30-plus projects will impact the travel and behavioral patterns of these endangered whales. If there are wind projects all along migration routes, will whales stay in areas where construction has not yet started? Where will whales go to

---

[276] *See* Bureau of Ocean Energy Management, *Maryland Offshore Wind Final Environmental Impact Statement—Appendix D Planned Activities Scenario* (July 29, 2024) at D-128, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Maryland%20Offshore%20Wind%20Final%20EIS_AppD%20Planned%20Activities%20Scenario.pdf.

avoid increased vessel traffic, construction noises, explosions, and the destruction or displacement of food? Will whales continue to visit areas where these projects are built? If the construction and operation of Vineyard Wind, South Fork Wind, and Revolution Wind drives the North Atlantic Right Whale further south to off the coast of Maryland, for longer periods of the year, how will this Project's construction impact the species? NMFS's Biological Opinion does not answer or analyze any of those questions. NMFS further failed to use the best available science on the cumulative impacts of other offshore projects.

199.    NMFS arbitrarily and improperly failed to account for how climate change related alterations to population structures and distributions of threatened and endangered species will interact with the effects of the Project when analyzing whether the action would jeopardize endangered species.

200.    NMFS arbitrarily and improperly failed to independently analyze whether the proposed action would reduce the likelihood of recovery—as opposed to survival—of the North Atlantic Right Whale. ESA regulations require NMFS to "assess 'both the survival and recovery of a listed species.'"[277] NMFS makes the conclusory assertion that the "proposed action will not appreciably reduce the likelihood of recovery of North Atlantic Right Whales," because the Project is only anticipated to cause behavioral impacts to 6 individuals.[278] That statement, however, conflicts with NMFS's own analysis of the state of the species, which is that their "resilience to future perturbations"—behavioral impacts from noise, increased vessel traffic, and pile driving—is very low[279] Any action that causes behavioral distress, like the approved Level B

---

[277] *See Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019).
[278] Biological Opinion *supra* note 247 at 399.
[279] *Id.* at 28, 394 (This cite is referencing the second "Page 28" in the Biological Opinion).

takes, has the potential to be deadly, impact reproduction, or cause such distress that the whale

dies later, which would reduce the likelihood of recovery of the North Atlantic Right Whale.

201.    NMFS arbitrarily and improperly failed to analyze how the Project's impacts on

zooplankton and other food sources would impact endangered species when determining whether

the Project would jeopardize endangered species, which NMFS made a priority in their Strategy

on the North Atlantic Right Whale.[280]

202.    NMFS's conclusions that the proposed action will not jeopardize the continued

existence of the North Atlantic Right Whale is not based on rational scientific analyses nor does

it consider all relevant factors or use the best available science.

203.    For all these reasons, NMFS's Biological Opinion is arbitrary, capricious, an

abuse of discretion, and not in accordance with Section 7 of the Endangered Species Act, in

violation of the APA.

**NMFS's Mitigation Measures Are Inadequate and Fail to Ensure that Endangered Species Will be Protected**

204.    NMFS's Incidental Take Statement contains what it calls mitigation measures to

ensure that endangered species are protected. But just because those measures are in place, does

not mean they are effective or that those measures will have the intended effect of mitigating

harm.

205.    A July 2023 BOEM-funded study evaluating the effects of offshore wind

development on the North Atlantic Right Whale concluded that while an agency's mitigation

plans may include actions to protect the species, there is no guarantee or requirement that those

actions be effective:

Effectiveness of Mitigation Measures

---

[280] *See generally* Strategy on the North Atlantic Right Whale *supra* note 122 at 20.

> Broadly speaking, once implemented, conservation measures are not often evaluated for their effectiveness in achieving intended goals (e.g., Selig and Bruno 2010). Likewise, scant information exists on attempts to assess the effectiveness of measures designed and implemented to reduce the impacts of OSW activities on marine mammals.

***

> Given the species' vulnerable status, it is critical that action be taken from the start to prevent noise impacts which could further stress the species and impair its recovery.[281]

206.    Here, NMFS's mitigation measures fall far short of protecting the North Atlantic Right Whale because they will not mitigate impacts from pile driving noise. BOEM's only real mitigation measure for noise is a bubble curtain, which is a grouping of artificially made bubbles created around a source of underwater noise, such as a pile driver. While effective for some species, for baleen whales like the endangered North Atlantic Right Whale, Sei Whale, and Fin Whale, bubble curtains are not effective because they do not reduce low-frequency sounds—the noises that harm baleen whales—below 200 Hz.[282]

207.    There are also no mitigation measures that ensure the pile driving activities will not exceed the approved noise levels. NMFS's Biological Opinion sets forth very strict requirements for noise thresholds from pile driving, yet in practice, the mitigation measures provide no assurance that the Developer will not exceed those levels. In 2023, an acoustic specialist traveled to the Vineyard Wind lease area and acquired multiple acoustic recordings

---

[281] Bureau of Ocean Energy Management, *Offshore Wind Energy Development and North Atlantic Right Whales* (July 2023), https://espis.boem.gov/Final%20Reports/BOEM_2023-051.pdf.

[282] *See* Bureau of Ocean Energy Management*, Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* (Feb. 11, 2021) at 21, https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.

during monopile activities. After analyzing the recordings, he found that the pile driving noise and the noise generated from support vessels with the bubble curtain as mitigation exceeded the decibel threshold approved by NMFS in Vineyard Wind's Incidental Take Statement and Biological Opinion.[283] In the event that pile driving noise thresholds will be exceeded here, which is likely to occur, NMFS's mitigation measures fail to protect nearby endangered species.

208.    NMFS also requires vessels to reduce their speed to 10 knots or fewer. Not only is this speed ineffective at reducing vessel strike mortality, but none of the mitigation measures have any mechanisms to enforce construction vessels' speed. In the Biological Opinion, NMFS concedes that vessel speeds of 8.6 knots or higher increase the probability of a vessel strike being lethal for an endangered species from 21% to 79%.[284]

**Fifth Cause of Action**
**Violation of the Marine Mammal Protection Act**
**and the Administrative Procedure Act**

209.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

210.    The Marine Mammal Protection Act ("MMPA") was the first national legislation to mandate an ecosystem-based approach to marine resource management. Under the Marine Mammal Protection Act, Congress directed that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine mammals. In 2018, Congress enacted a general moratorium on the take of marine

---

[283] Rand Acoustics, LLC, *Pile Driving Noise Survey Technical Report* (Mar. 28, 2024), https://save-the-east-coast.org/wp-content/uploads/2024/04/RandAcoustics_PileDrivingNoiseSurvey.pdf.
[284] Biological Opinion *supra* note 247 at 265.

mammals without a permit: "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases. . . ."[285]

211.    The permit exception to this moratorium provides that "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock" if the Secretary "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock. . . ."[286]

212.    The Marine Mammal Protection Act also prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the jurisdiction of the United States or on the high seas.[287] The baseline under the MMPA is that "no permit may be issued for the taking of any marine mammal."[288] That said, NMFS is permitted to authorize the incidental take of only "small numbers of marine mammals of a species or population stock."[289] Under the MMPA, "take" means to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[290]

---

[285] 16 U.S.C. § 1371(a)(1).
[286] 16 U.S.C. §1371(5)(a).
[287] 16 U.S.C. § 1372(a)(l)-(2).
[288] 16 U.S.C. § 1371.
[289] *Id.*
[290] 16 U.S.C. § 1362(13).

213.    The National Marine Fisheries Service has further defined "harassment" as consisting of two types: Level A harassment, which "means any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild"; and Level B harassment, which "means any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns . . . but which does not have the potential to injure a marine mammal or marine mammal stock in the wild."[291]

214.    Exposure of marine mammals to anthropogenic underwater sound may constitute "take" if the pressure level of the received sounds has the potential to cause injury or behavioral disturbance.[292] Continuous sound sources like vibratory pile driving or drilling are considered takes when the root-mean-square sound pressure level is above 120 dB.[293] Non-explosive impulsive or intermittent sound sources are considered takes when the sound pressure level is above 160 dB.[294]

215.    In deciding whether to issue an Incidental Take Authorization under the Marine Mammal Protection Act, the Secretary of Commerce is required to "give full consideration to all factors which may affect the extent to which such animals may be taken[,]"[295] including:

(1) [E]xisting and future levels of marine mammal species and
population stocks;
         *      *      *
(3) [T]he marine ecosystem and related environmental considerations;
(4) [T]he conservation, development, and utilization of fishery
resources; and
(5) [T]he economic and technological feasibility of implementation.[296]

---

[291] 50 C.F.R. § 216.3.
[292] 89 Fed. Reg. 84674, 84690.
[293] *Id.*
[294] *Id.*
[295] 16 U.S.C. § 1373(b).
[296] 16 U.S.C. § 1373(b)(1), (3)-(5).

216.     On October 23, 2024, NMFS issued its final Incidental Take Regulations and Letter of Authorization authorizing US Wind to incidentally take marine mammals from 19 species, comprising 20 stocks during the Project's construction, including the take of 4 North Atlantic Right Whales and thousands of other protected marine mammals.[297]

**NFMS Has Authorized the Take of More Than a Small Number of Marine Mammals, Which Will Have More Than a Negligible Effect on Stocks of the North Atlantic Right Whale**

217.     For the Maryland Offshore Wind Project, NMFS authorized a maximum of 4,313 takes in any given year[298] 6,865 takes over the course of the five-year permit.[299] Of the marine mammals for which takes were authorized, three are also protected under the Endangered Species Act, the North Atlantic Right Whale, the Fin Whale, and the Sei Whale.

218.     There are fewer than 338 North Atlantic Right Whales still alive,[300] and more are dying each year. Each individual North Atlantic Right Whale is vital to the continuation of the species and NMFS has found that biological removal for the species—"defined as the maximum number of animals that can be removed annually while allowing the stock to reach or maintain its optimal sustainable population level"[301]—is 0.7 deaths per year.[302] Just this year, five North Atlantic Right Whales have been found dead and four calves are missing. Every year where there is more than one Right Whale mortality, is a year closer to the species' extinction.

---

[297] 89 Fed. Reg. 84674 (Oct. 23, 2024).
[298] *Id.* at 84692.
[299] *Id.* at 84691.
[300] *Id.* at 84692 (NMFS Stock Abundance 338).
[301] Strategy on the North Atlantic Right Whale *supra* note 122 at 7.
[302] National Marine Fisheries Service, *Population Size Estimation of North Atlantic Right Whales From 1990-2023* (Oct. 2024) at 5, https://www.fisheries.noaa.gov/s3/2024-10/TM324-508_0.pdf.

219.    NMFS's final decision to issue a Letter of Authorization and implementing regulations for the Maryland Offshore Wind Project's construction and operation was arbitrary, capricious, and not in accordance with law because it fails to comply with the Marine Mammal Protection Act and its implementing regulations, allows the take of a substantial, non-negligible, number of marine mammals; fails to analyze the cumulative effects of other approved and proposed offshore wind projects; fails to analyze the increased risk of vessel strikes caused by the Project's obstructions; and fails to analyze takes resulting from interference with migration routes, breeding and feeding grounds, and calving.

**NMFS's Incidental Take Regulation and Permit Fail to Fully Examine the Effects of the Project on the North Atlantic Right Whale**

220.    NMFS has determined that North Atlantic Right Whales have been "detected in the vicinity of the project area year-round" and

> the waters off the coast of Maryland, including those surrounding the project area in the [Maryland Wind Energy Area], have documented North Atlantic [R]ight [W]hale presence as the area is an important migratory route for the species to the Northern feeding areas. . . and to their southern breeding and calving grounds.[303]

Even though the North Atlantic Right Whale is frequently found in the waters near the Project, NMFS's regulations and authorization fail to address and mitigate the impacts on the North Atlantic Right Whale.

221.    Since 2017, the North Atlantic Right Whale has been experiencing an Unusual Mortality Event of "stranding[s] that [are] unexpected; involve[] a significant die-off of any marine mammal population; and demands immediate response."[304] As of October 2023, "this event has includes a total of 121 documented animals: 36 dead stranded NARWs [North Atlantic

---

[303] 89 Fed. Reg. 84674, 84707.
[304] 16 U.S.C. § 1361.

Right Whales], 34 seriously injured free-swimming NARWs, and 51 sublethal injuries/illness (i.e., morbidity)."[305] 2024 has already seen five dead North Atlantic Right Whales.[306] Even with this Unusual Mortality Event ongoing, NMFS has approved prior to this Project the take of 400 North Atlantic Right Whales—more than the current population—and proposed the take of an additional 149 North Atlantic Right Whales since 2020.

222.    For North Atlantic Right Whales, the loud underwater noise that will be generated during Project construction can cause "avoidance, temporary cessation of foraging or communicating, changes in respiration or group dynamics, masking)," "auditory impacts such as hearing loss," or "lower-level physiological stress responses (e.g., change in respiration, change in heart rate)."[307] The best available science establishes that the North Atlantic Right Whale is extremely sensitive to low-frequency continuous noise and the impacts of masking.[308] And recent research demonstrates that exposure to intermittent or continuous anthropogenic noise has the potential to induce a state of chronic stress in marine mammals.[309] Chronic stress can have adverse health consequences on marine mammals, including higher mortality and morbidity, reduced reproductive success, immuno-suppression, heart disease, depressed reproductive rates, physical malformations, and birth defects.[310] By extension, chronic stress induced by exposure to

---

[305] *See* Strategy on the North Atlantic Right Whale *supra* note 122 at 8.
[306] National Marine Fisheries Service, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness)-cases (last visited Oct. 23, 2024).
[307] 89 Fed. Reg. 84674, 84703.
[308] Christopher W. Clark et al., *Comments on Arctic Ocean Draft EIS* (Feb. 28, 2012) at 2, https://tinyurl.com/5fsfmwst.
[309] *See* J.W. Wright et al., *Concerns Related to Chronic Stress in Marine Mammals*, IWC SCI. COMM. DOC. IWC/SC/61/E16 (2009).
[310] *See* A.J. Wright et al., *Do marine mammals experience stress related to anthropogenic noise?*, 20 *Int'l J. Comparative Psychology* 274 (2007).

anthropogenic sound can have a detrimental impact on marine mammal populations by affecting fertility, mortality and growth rates.[311] Such impacts would directly reflect the health of marine mammals and as they are around more noise, the higher likelihood that they will experience injuries or behavioral deviations that lead to death. Plaintiff, Fenwick Island, raised concerns over the impact of construction noise on the North Atlantic Right Whale in its comments on NMFS's Proposed Incidental Take Regulations, but those concerns went unaddressed in NMFS's final regulations.

223.    Although NMFS was fully aware of the severe damage this type of noise causes North Atlantic Right Whales, the Project Incidental Take Regulations fail to require any meaningful measure to protect against risk. Nor do the regulations consider the fact that even intermittent noise from impact pile driving may cause stress beyond a Level B take. The Incidental Take Regulations underestimate the actual extent of the take and fail to consider a factor that is highly relevant to NMFS's determination to issue a permit.

224.    Further, NMFS ignored recent data from other offshore wind sites determined by independent acousticians that showed that pile driving activities exceeded the decibel levels authorized by NMFS's Incidental Take Regulations for other offshore wind projects. NMFS's decision to approve construction activities that consistently create noise above the decibel levels set by NMFS to protect marine mammals, without adequate mitigation measures, is arbitrary and capricious and not in accordance with law.

225.    NMFS also was fully aware that increases in noise over long periods of time cause habitat displacement. In fact, even temporary displacement increases energetic costs as the

---

[311] *See id*.; *see also* 87 Fed. Reg. at 79102 ("Chronic disturbance can cause population declines through reduction of fitness (e.g., decline in body condition) and subsequent reduction in reproductive success, survival, or both.").

whales search for new (and possibly less productive) foraging areas and in turn, "could lead to increased susceptibility to other stressors (e.g., a shift in distribution can change the overlap with vessel traffic and fishing activities)."[312]

226.    Here, NMFS acknowledges the Project may result in the displacement of North Atlantic Right Whales from the Project area and its surrounding vicinity,[313] yet fails to require any mitigation measures to reduce the likelihood of displacement for these whales.

227.    NMFS's decision to authorize the Project's construction and operation, in light of the severe impacts on the North Atlantic Right Whale and the increasing number of deaths, is arbitrary, capricious, and contrary to law and have deprived the Plaintiffs of the substantive protections of the Marine Mammal Protection Act and threaten to irreparably harm the Plaintiffs' interests.

228.

**Sixth Cause of Action**
**Violation of the Migratory Bird Treaty Act**
**and Administrative Procedure Act**

229.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

230.    The Migratory Bird Treaty Act[314] prohibits the take—the killing, capturing, selling, trading, and transportation—of protected migratory bird species.[315] The Act applies broadly to the killing of any migratory bird "at any time, by any means or in any manner."[316]

---

[312] *See* Strategy on the North Atlantic Right Whale *supra* note 263 at 14.
[313] 89 Fed. Reg. 84674, 84703.
[314] 16 U.S.C. § 703.
[315] *Id.*
[316] 16 U.S.C. § 703(a).

231.    The Maryland Offshore Wind Project lease area is a "major route for migratory birds, which are protected under the Migratory Bird Treaty Act of 1918"[317] and a broad group of avian species may pass through the Offshore Project area, including" migrants, coastal birds, and marine birds.[318] More than 164 species have been identified as potentially occurring along the Atlantic Flyway, which includes nine state-listed endangered birds, four state-listed as threatened birds, 19 state-listed special concern species, seven migratory birds that are listed as breeding birds of conservation concern, three federally listed threatened birds, and one federally listed endangered bird.[319] Four federally threatened and endangered birds are found in the area: roseate tern, piping plover, eastern black rail, and rufa red knot.

232.    The Maryland Offshore Wind Project will injure, displace, and even kill migratory birds in the following ways:

- Onshore construction will impact habitats for nesting shorebirds.[320]

- Offshore accidental releases of fuel, hazardous materials, and trash and debris could cause "mortality, decreased fitness, and health effects."[321]

- "Inclement weather and reduced visibility cause changes to migration altitudes and could lead to large-scale mortality events."[322]

- And the ESA listed piping plover and rufa red knot will encounter operating turbines, which will cause "direct mortality" due to collisions with wind turbine

---

[317] Final EIS *supra* note 3 at F-56.
[318] *Id.* at F-58.
[319] *Id.*
[320] *Id.* at F-77.
[321] *Id.* at F-78.
[322] *Id.* at F-81.

generators and "behavioral avoidance and habitat loss,"[323] and "adversely affect these species."[324]

233.    In approving the Construction and Operations Plan, BOEM failed to adequately consider the impact the Project will have on migratory birds, consider and adopt mitigation measures, alter the Project to avoid injuring or killing migratory birds, and require the Developer to apply for a Migratory Bird Take Permit. As such, the decision to approve the Construction and Operations Plans was arbitrary, capricious, and not in accordance with the law.

234.    Because the Maryland Offshore Wind Project will take migratory birds, in clear violation of the Migratory Bird Treaty Act, Defendants' approval of the Project is arbitrary, capricious, and not in accordance with the law and BOEM's approval should be invalidated and set aside.

**Seventh Cause of Action**
**Violation of the Coastal Zone Management Act**
**and Administrative Procedure Act**

235.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

236.    Congress enacted the Coastal Zone Management Act ("CZMA") to "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations."[325] To accomplish these goals, the CZMA encourages coastal states to create "management plans" for their coastal zones,[326] which the State of Maryland and Delaware have done.

---

[323] *Id.*
[324] *Id.*
[325] 16 U.S.C. § 1456(c)(1).
[326] 16 U.S.C. § 1456.

237.     The CZMA requires that "[e]ach federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs."[327] The Coastal Zone Management Act further requires that, for federal activities in the Outer Continental Shelf, "all federal license or permit activities . . . which affect any coastal use or resource are conducted in a manner consistent with approved management programs."[328] Violations of the CZMA by Federal agencies are reviewed under the Administrative Procedure Act.

238.     The State of Delaware has adopted, and the federal government has approved, the Delaware Coastal Zone Act as a comprehensive state coastal management plan under the CZMA.[329] The Delaware Coastal Zone Act provides

> [i]t is hereby determined that the coastal areas of Delaware are the most critical areas for the future of the State in terms of the quality of life in the State. It is therefore, the declared public policy of the state to control the location, extent and type of industrial development in Delaware coastal areas. In so doing, the State can better protect the natural environment of its bays and coastal areas and safeguard their use primarily for recreation and tourism.[330]

239.     The Act also declares that the "expansion of heavy industry" in the bay and coastal areas is "incompatible with the protection of that natural environment in those areas."[331] And "[w]hile it is the declared public policy of the state to encourage the introduction of new industry into Delaware, the protection of the environment, natural beauty and recreation potential of the State is also of great concern."[332]

---

[327] 16 U.S.C. § 1456(c)(1).
[328] 15 C.F.R. § 930.70.
[329] Del. Code Ann. tit. 7, § 7001-7015 (West 1953).
[330] Del. Code Ann. tit. 7, § 7001.
[331] *Id.*
[332] *Id.*

240.    The Maryland Offshore Wind Project is inconsistent with Delaware's Coastal Zone Act in numerous respects, including:

- The Project's visual impacts to nearby communities, from the turbines being located just 10.7 miles from the coast, destroys the open ocean view that draws tourists to the Town of Fenwick Island and the Delaware shore.

- The Project disrupts and excludes recreational anglers and boaters from the Project area.

- The Project disrupts the natural functions of fish and marine mammals, and there will be mortality to eggs, larvae, fish, shellfish, and benthic species at each turbine foundation, adversely impacting the fishery resources in the lease area, harming commercial and recreational fishing.

241.    Maryland has also adopted a Coastal Zone Management Policy, which is a partnership among local, regional and State agencies. Maryland's Coastal Zone Management Policy sets forth the following requirements for all developments in the coastal areas of Maryland, which include the area where the Maryland Offshore Wind Project will be built:

- "The environment shall be free from noise which may jeopardize health, general welfare, or property, or which degrades the quality of life."[333]

- "The safety, order, and natural beauty of State parks and forests, State reserves, scenic preserves, parkways, historical monuments and recreational areas shall be preserved."[334]

- "Operations on the Outer Continental Shelf must be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well 3 control, fires, spillages, physical

---

[333] MDE (C9) Md. Code Regs. 26.02.03.02."
[334] DNR (B1) Md. Code Ann., Nat. Res. § 5-209 (West).

obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or property, or which may endanger life or health."[335]

- "All waters of the State shall be protected for water contact recreation, fish, and other aquatic life and wildlife. Shellfish harvesting and recreational trout waters and waters worthy of protection because of their unspoiled character shall receive additional protection."[336]

- The "discharge of any pollutant in toxic amounts including: (a) Substances which accumulate to toxic amounts during the expected life of organisms in the surface water or (b) Substances which produce deleterious behavioral effects on [] organisms" is prohibited.[337]

242.   The Maryland Offshore Wind Project, as approved by BOEM, fails to comply with Maryland's Coastal Zone Management Plan in numerous respects:

- The Project will destroy the open ocean view along the coastal area of Maryland.

- The Project will disrupt the natural functions of fish and marine mammals and there will be mortality to eggs, larvae, fish, shellfish, and benthic species at each turbine foundation, adversely impacting the fishery resources in the lease area.

- The Project's components will hold 1,430,142 gallons of fluids, lubricants, and fuels and the Developer has failed to disclose its plans for if there is a leak from any of the components.

---

[335] (B2) Md. Code Ann., Envir. §§ 17-101 to -403; Md. Code Regs. 26.24.01.01; Md. Code Regs. 26.24.02.01, .03; Md. Code Regs. 26.24.05.01.
[336] MDE (A1) Md. Code Regs. 26.08.02.02.
[337] MDE (A4) Md. Code Regs. 26.08.03.01.

- There is a heightened risk of toxins entering the ocean and washing ashore due to turbine blades shattering and falling into the ocean.

- The Developer has not developed plans for the event of blade or turbine failure, turbine collapse, or turbine fire.

243.    Although Delaware and Maryland both issued consistency determinations for the Project, those determinations are not consistent with their coastal management plans and policies. Because BOEM's approval of the Project is inconsistent with the requirements of Delaware's Coastal Zone Management Act and Maryland's Coastal Zone Management Program, the approval constitutes final agency actions that is arbitrary, capricious, and otherwise not in accordance with the law. BOEM's approval should therefore be invalidated and set aside by this Court.

**Eighth Cause of Action**
**Violation of the National Historic Preservation Act**
**and Administrative Procedure Act**

244.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

245.    Ocean City is home to three historic properties listed in the National Register of Historic Places that are inescapably connected to their historic Atlantic Ocean viewshed:

- The Captain Robert S. Craig Cottage (Bay Breeze), located near the Boardwalk in Ocean City, Maryland, is listed on the National Register of Historic Properties. The Cottage is a "well-preserved 1 ½ story gable-front house, constructed n 1949-50 of concrete block with concrete, brick-edged, porch floors and four 4x4 unadorned posts

supporting the full-width front porch's shallow hipped roof."[338] The interior of the

home consists of "large living room/dining room, three bedrooms, one bath, and a

knotty pine kitchen (popular in Ocean City at the time)."[339] Bay Breeze is a

significant historic site in Ocean City due to its association with Captain Robert S.

Craig, who created and led the Ocean City Beach Patrol for more than 50 years and

helped contribute to Ocean City's growth as a beach resort. During his leadership,

Ocean City's Beach Patrol "became nationally known for its management and ocean

rescue work."[340] For more than three decades, Bay Breeze served as the patrol's

"informal headquarters, where meetings were held, records were kept, and summer

lifeguards found sleeping accommodations."[341] In 2017, the Maryland Historic Trust

Nominated Bay Breeze for designation on the National Register of Historic Places

and was added to the register that year.

- Sandy Point Archeological Site, located near Ocean City, Maryland. The Sandy Point

  Site is the southernmost component of the Townsend Series on the Delaware

  Peninsula and is one of the few known Woodland period village sites in this area.

  Sandy Point was listed on the National Register in 1975 due to its historical

  significance.

---

[338] Maryland's Historical Trust, *Maryland's National Register Properties: Captain S. Craig Cottage*, https://apps.mht.maryland.gov/nr/NRDetail.aspx?NRID=1678 (last visited Oct. 11, 2024).
[339] *Id.*
[340] *Id.*
[341] Department of Interior, *National Register of Historic Places Registration Form: Captain Robert S. Craig Cottage* (Nov. 9, 2017), https://apps.mht.maryland.gov/medusa/PDF/NR_PDFs/NR-1575.pdf.

- St. Paul's by-the-Sea Protestant Episcopal Church, located in Ocean City, Maryland, is listed on the National Register of Historic Properties. In the modern streetscape of Ocean City, the 1900-01 church and the 1923 rectory are among a diminishing collection of surviving buildings that represent the first quarter century of the resort's history.

246.    Several other properties in Ocean City are eligible for listing.

247.    Located in the Town of Fenwick Island, the 87-foot Fenwick Island Lighthouse Station was opened in 1859. The original Lighthouse lamp burned whale oil and was kept lit to warn ships off the Fenwick Shoals. The Lighthouse was added to the National Register of Historic Places in 1979.

**Violation of Section 106 of the National Historic Preservation Act**

248.    Section 106 of the National Historic Preservation Act[342] requires federal agencies to consider and take into account the effect of federal undertakings, permits, and projects on any historic property prior to approval of the undertaking.[343] Section 106 prevents federal agencies from approving any undertaking unless the agency takes into account the effects on historic properties and resolves the adverse effects on those properties.[344]

249.    As a major federal undertaking, the Maryland Offshore Wind Project is governed by Section 106 of the National Historic Preservation Act. Here, BOEM, as the lead federal

---

[342] 54 U.S.C. §§ 100101 to 307101.
[343] 54 U.S.C. § 306108.
[344] *Id.*

agency in charge of the Project's permitting review, failed to identify, and take reasonable steps to identify, historic properties that the Project would adversely affect. At the outset of permitting, BOEM impermissibly and arbitrarily narrowed the scope of its review of historic properties, resulting in a failure to identify historic properties in Ocean City, Maryland and Fenwick Island, Delaware.

250.    In approving the Maryland Offshore Wind Project, BOEM failed to comply with Section 106 of the National Historic Preservation Act in numerous respects, including:

- BOEM failed to identify historic properties that the Project would adversely affect.

- BOEM impermissibly and arbitrarily narrowed the scope of review of historic properties.

- BOEM failed to assess the adverse effects, including all direct, indirect, and cumulative effects including adverse economic effects of the Project, on all historic properties in Ocean City Maryland and Fenwick Island, as Section 106 requires.

- BOEM failed to determine appropriate avoidance, minimization, and mitigation measures based on the adverse effects of the Project on historic properties.

- BOEM executed an illusory Memorandum of Agreement (MOA) that failed to resolve adverse effects to all historic properties and called for the future development of "Historic Preservation Treatment Plans," which violates Section 106's requirement that adverse effects be avoided, minimized, or mitigated prior to approval of the undertaking.

251.    Authorizing the Maryland Offshore Wind Project without a proper Section 106 consultation and without Section 106 compliance was arbitrary, capricious, and contrary to law.

252.    As a direct and proximate result of the Government's approval of this Project, Plaintiffs have and will suffer substantial and direct injuries to their historic properties, and their property values, tax revenues, and local economies.

**PRAYER FOR RELIEF AS TO ALL COUNTS**

Plaintiffs, the Mayor and City Council of Ocean City, Maryland, et al., ask the Court for the following relief:

1.    An order holding unlawful, vacating, and setting aside Defendants' September 4, 2024 decision approving the Construction and Operations Plan for the Maryland Offshore Wind Project, June 18, 2024 Biological Opinion, and the October 23, 2024 Incidental Take Regulations;

2.    Remand of the matter to BOEM and NMFS, respectively, for further action not inconsistent with the Court's decision;

3.    That the Court maintain jurisdiction over this action until BOEM and NMFS are in compliance with the APA, OCSLA, NEPA, ESA, MMPA, Migratory Bird Treaty Act, Coastal Zone Management Act, and National Historic Preservation Act, and every order of this Court;

4.    Reasonable attorneys' fees and costs for bringing this suit; and

5.    Such other further relief as the Court deems appropriate.


Respectfully submitted,

Dated: January 3, 2025            /s/ Bruce F. Bright
                                 Bruce F. Bright (#27236)
                                 6200 Coastal Hwy., Suite 200
                                 Ocean City, Maryland 21842
                                 Tel: 410-723-1400
                                 Fax: 410-723-1861
                                 bbright@ajgalaw.com

119

/s/ Nancie G. Marzulla
Nancie G. Marzulla (pro hac vice)
Marzulla Law, LLC
1150 Connecticut Ave., NW
  Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com

/s/ Roger J. Marzulla
Roger J. Marzulla (pro hac vice)
Marzulla Law, LLC
1150 Connecticut Ave., NW
  Suite 1050
Washington, D.C. 20036
(202) 822-6760
roger@marzulla.com

Counsel for Plaintiffs