IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MAYOR AND CITY COUNCIL OF OCEAN CITY, MARYLAND, *et al.*, | * * * * | |
| Plaintiffs, | * | |
| v. | * * | Civil Case No.: SAG-24-3111 |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | * * * | |
| Defendants. | * * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Thirty-four Plaintiffs have filed an amended complaint to reverse and set aside final agency action against the Bureau of Ocean Energy Management ("BOEM"), the National Marine Fisheries Service ("NMFS"), the United States Department of the Interior, and several of their officials sued in their official capacities (collectively, "the Federal Defendants"). ECF 32. The lawsuit challenges the procedural legality of these agencies' approval of the construction and operations plan ("COP") for the Maryland Offshore Wind Project ("the Project") to be constructed by US Wind, Inc. ("US Wind") off the coast of Ocean City, Maryland and Fenwick Island, Delaware. BOEM's approval of the COP and the Final Environmental Impact Statement ("EIS") for the Project allows US Wind to commence construction. Plaintiffs allege that the Federal Defendants' final agency actions contravened the Administrative Procedure Act ("APA") by violating a number of federal environmental statutes.

The Federal Defendants have filed a partial motion to dismiss two counts of the eight-count Complaint. ECF 37. US Wind intervened in the lawsuit and has filed a motion to dismiss the Complaint in its entirety. ECF 39. Plaintiffs filed a consolidated opposition to the motions, ECF

46, and the Federal Defendants and US Wind each filed replies, ECF 49, 51. The parties have also filed a number of submissions relating to supplemental authority. ECF 50, 52, 54, 61–63, 65. This Court held a motions hearing on June 10, 2025. After consideration of all of the arguments, for the reasons stated below, the Federal Defendants' partial motion to dismiss will be GRANTED and US Wind's motion to dismiss will be GRANTED IN PART AND DENIED IN PART.

## I.    BACKGROUND

### A.  Plaintiffs

Although some discussion of individual Plaintiffs will be required, for ease of reference, the thirty-four Plaintiffs can generally be divided into seven categories as follows:

#### 1.  Government Plaintiffs

The Government Plaintiffs consist of the Mayor and City Council of Ocean City, Maryland, the Mayor and Town Council of Fenwick Island, Delaware, and the Commissioners of Worcester County, Maryland.

#### 2.  Fishing Business Plaintiffs

Six Plaintiffs' interests center around their participation in the fishing industry: Jeanene and Earl Gwin, George Topping, Michael Coppa, White Marlin Open, Inc., Ocean City Marlin Club, Inc., and Atlantic Coast Sportfishing Association, Inc.

#### 3.  Non-Fishing Business Plaintiffs

Eleven Plaintiffs cite business interests that are not fishing-related, but pertain to tourism and general business development in the coastal area: Ocean Amusements, Inc., Time, Inc., Castle in the Sand, Inc., Harrison Group General LLC, James Hospitality, LLC, Ocean City Development Corporation, Bay Shore Development Corporation, Sunset Marina, LLC, Fagers Island, Ltd., John Trader, and Spiros and Peter Buas.

### 4. *Business Association Plaintiffs*

Several business associations are Plaintiffs, including Coastal Association of Realtors, Delmarva Community Managers Association, Greater Ocean City Chamber of Commerce, and Ocean City Hotel-Motel Restaurant Association, Inc.

### 5. *Community Association Plaintiffs*

There are three community association Plaintiffs: Caine Woods Community Association, Inc., Little Salisbury Civic Association, Inc., and Ocean Pines Association, Inc.

### 6. *Public Advocacy Plaintiffs*

The Save Right Whales Coalition, the Caesar Rodney Institute, and Citizens of Ocean City, Inc. are the public advocacy Plaintiffs who allege that the Project will impact their public advocacy initiatives.

### 7. *Individual Resident Plaintiffs*

Two Plaintiffs, John Collins and Jennifer Pawloski, are residents of the area who contend that their ability to enjoy the environment and engage in their regular recreational activities will be impeded by the Project.

## B. Factual Background

The following facts are derived from the Amended Complaint, ECF 32, and are taken as true for purposes of these motions. Ocean City, Maryland and its neighboring town, Fenwick Island, Delaware, are beachfront communities with robust tourism industries and substantial commercial and recreational fishing industries. *Id.* ¶¶ 1, 2. The coastal area is also home to a large number of animals and migratory birds, including a number of endangered species. *Id.* ¶¶ 1, 2, 43–48.

Beginning in 2005, Congress authorized an agency within the Department of the Interior (then-Minerals Management Service ("MMS"), now-BOEM) to grant leases for offshore renewable energy projects. *Id.* ¶ 50. In so authorizing, Congress recognized that the Outer Continental Shelf ("OCS") "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332. Over the ensuing years, as administrations changed, MMS studied potential development of offshore wind projects in the area of Maryland, Delaware, and Virginia and the effects of such prospective development on the natural environment. *Id.* ¶ 52.

In 2011, MMS streamlined its offshore wind energy leasing regulations in an effort to "speed offshore wind energy development off the Atlantic Coast." *Id.* ¶ 53. In July, 2014, BOEM leased 80,000 acres off of the Maryland coast to US Wind. *Id.* ¶¶ 55; 79 Fed. Reg. 38060. Maryland then awarded US Wind a series of Offshore Wind Renewable Energy Credits. ECF 132 ¶ 56.

In 2021 and 2022, the government announced a target goal for its offshore wind energy projects and an intent to "proactively refine administrative procedures" to further that goal. *Id.* ¶ 54. In October 2022, BOEM and the National Marine Fisheries Service ("NMFS") issued a joint draft "North Atlantic Right Whale and Offshore Wind Strategy" ("Right Whale Strategy") publication, which noted that the North Atlantic Right Whales, "whose range overlaps with the area proposed for [offshore wind] development, is one of the most endangered large whales in the world," rendering them "more susceptible to threats generally, including the potential impacts from [offshore wind] development." *Id.* ¶ 188. On October 6, 2023, BOEM published a draft EIS for the Project, seeking public review and comment. *Id.* ¶ 58. Following the comment period, BOEM published its final EIS on August 2, 2024. *Id.*

On June 18, 2024, the NMFS published a biological opinion ("the BiOp"), concluding that the Project would not jeopardize any Endangered Species Act-listed species, including the North Atlantic Right Whale. *Id.* ¶ 59. And on September 4, 2024, BOEM and NMFS approved the COP for the Project. *Id.* ¶ 60. On October 23, 2024, NMFS issued Incidental Take Regulations, approving the "take" of thousands of marine mammals, including up to 10 North Atlantic Right Whales, during the period of construction. *Id.* ¶ 61. And on December 2, 2024, the Department of the Interior formally approved the COP and granted US Wind the easements to build. *Id.* ¶ 62. As of the time the Amended Complaint was filed in January, 2025, US Wind still awaited permits from the Army Corps of Engineers and the States of Maryland and Delaware. *Id.*

## II.   LEGAL STANDARDS

The motions to dismiss invoke Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Rule 12(b)(1) applies where the Court lacks subject-matter jurisdiction. *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003), aff'd, 85 F. App'x 960 (4th Cir. 2004). Under that rule, the plaintiff bears the burden of establishing subject-matter jurisdiction. *See Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). One component of subject-matter jurisdiction is standing, the legal capacity to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). If the court determines that the plaintiff has no injury-in-fact or standing, the court must dismiss the action. *See* Fed. R. Civ. P. 12(h)(3).

A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.

R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56. In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). But if a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.

## III.  ANALYSIS

### A.  Standing/Zone of Interest/FAST-41

US Wind contends that three jurisdictional or preliminary issues, in combination, preclude any of the Plaintiffs from asserting any of the claims in the Amended Complaint. Turning first to the jurisdictional issue, standing is an "irreducible constitutional minimum" of federal jurisdiction. *Lujan*, 504 U.S. at 560. Standing is "built on a single basic idea—the idea of separation of powers." *United States v. Texas*, 599 U.S. 670, 675 (2023). Where a plaintiff lacks standing, "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Castillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

"For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *TransUnion*, 594 U.S. at 423); *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (describing the fundamental question

of standing as "What's it to you?"). Standing "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 472 (1982); *see also* John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1220 (1993) (describing standing as a reflection of the "properly limited…role of courts in a democratic society"). This inquiry "serves to protect the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379–80.

Standing "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61).

Where a government action "require[s] or forbid[s] some action by the plaintiff…standing is usually easy to establish." *All. for Hippocratic Med.*, 602 U.S. at 382. When a plaintiff seeks to challenge the government's regulation of someone else, by contrast, "standing is not precluded, but it is ordinarily much more difficult to establish." *Id.* (quoting *Lujan*, 504 U.S. at 562). "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.*

To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A future

injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 389, 409 (2013). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All for Hippocratic Med*, 602 U.S. at 381.

As Plaintiffs rightly note, only one plaintiff must have standing for this case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

In the slide presentation it presented at the motions hearing, US Wind concedes that at least one of the thirty-four Plaintiffs has standing to assert each of the claims except one: the APA/CZMA claim. Slide Pres. at 6.[1] But US Wind argues that by overlaying lack of standing with two other statutory prerequisites applicable to the claims asserted in this case (zone of interests and FAST-41), all of the Plaintiffs are precluded from asserting all of the claims. Slide Pres. at 15. This Court disagrees with US Wind's analysis at this stage of the case.

Title 41 of the Fixing America's Surface Transportation Act ("FAST-41"), enacted in 2015, precludes judicial review of certain federal agency actions. 42 U.S.C. § 4370m-6. Pertinent to this case, FAST-41 provides that a claim for judicial review is barred "in the case of an action pertaining to an environmental review conducted under NEPA" unless "the claim is filed by a party that submitted a comment during the environmental review" and "any commenter filed a sufficiently detailed comment" so as to put the lead agency on notice of the issue on which the party seeks judicial review." 42 U.S.C. § 4370m-6(a)(1)(B).

---

[1] US Wind used a helpful presentation at the motions hearing to guide this Court's standing analysis. This Court will order US Wind to file the presentation on the docket so it is a formal part of the record.

US Wind advances a broad interpretation of FAST-41, urging this Court to conclude that it precludes judicial review of all the causes of action in the Amended Complaint, not just the NEPA claim. However, FAST-41's exhaustion provision falls within the category of "'contests surrounding the facts, the merits of a claim, or the applicability of defenses'" that courts typically decline to adjudicate in a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc*., 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies ... if all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250).

US Wind cites no cases suggesting that a plaintiff's compliance with FAST-41, including the contents of all environmental review comments received respecting a given matter, must be pleaded in or attached to a complaint. Moreover, the face of the Amended Complaint here does not clearly reveal a failure to exhaust FAST-41. This Court therefore declines to eliminate any claims at the motion to dismiss stage on the basis of FAST-41 compliance, because those exhaustion-based claims can be best adjudicated on a complete factual record.

The final component of US Wind's three-prong procedural argument is the "zone of interests" requirement to challenge agency action. *See TAP Pharms. v. U.S. Dep't of Health & Hum. Servs.*, 163 F.3d 199, 202 (4th Cir. 1998) (requiring plaintiffs to show that "the interest

sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute…in question."). The zone of interests test "is not 'especially demanding'" and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). Based on the chart US Wind employed in its slide presentation at the motions hearing, it concedes that as to the NEPA, OCSLA, MBTA, and NHPA claims, at least one Plaintiff has standing and is within the zone of interests. Slide Pres. at 13. As this Court will describe below, it further concludes, contrary to US Wind's position, that at least one plaintiff, John Collins, has standing and is within the zone of interests for Plaintiffs' ESA and MMPA claims.

While this Court recognizes it would have the authority to undertake US Wind's preferred claim-by-claim, plaintiff-by-plaintiff analysis at the motion to dismiss stage, such a review would not be a productive use of this Court's limited resources. As at least one plaintiff both has standing and is within the zone of interests for six of the seven asserted claims (and, as noted below, the Government Plaintiffs are arguably in that position for the seventh (CZMA) claim as well). All thirty-four Plaintiffs seek identical non-monetary relief, making the number of plaintiffs immaterial. This Court will therefore proceed to address each substantive claim on its merits below.

**B.  Individual Causes of Action**

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have

been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The parties do not contest that the relevant approvals and issuances in this case constituted final agency action.

Plaintiffs premise their APA claims on seven separate statutes: the Outer Continental Shelf Lands Act (OCSLA), the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), the Marine Mammal Protection Act (MMPA), the Migratory Bird Treaty Act (MBTA), the Coastal Zone Management Act (CZMA), and the National Historic Preservation Act (NHPA).

APA review is also limited, however, to final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Where "Congress has provided special and adequate review procedures relating to specific agencies, the general grant of review in the APA does not provide additional judicial remedies." *Bacardi & Co. Ltd. v. United States Pat. & Trademark Off.*, 104 F.4th 527, 535 (4th Cir. 2024) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)) (cleaned up). In enacting the APA, "Congress intended…to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). Two of the statutes at issue here have citizen-suit provisions. *See* 43 U.S.C. § 1349(a)(1) (OCSLA); 16 U.S.C. § 1540(g) (ESA). This Court will thus consider Plaintiffs' ESA and OCSLA claims under those statutes, not the APA. The others—NEPA, MMPA, MBTA, CZMA, and NHPA—do not contain private rights of action, and are properly enforced through the APA.

Plaintiffs argue that the agency actions must be held unlawful and set aside because they are "not in accordance with the law" and are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). As to the five environmental statutes without private rights of action, Plaintiffs allege that the agencies acted outside of the authority granted by the statutes.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning…of the terms of an agency action"). Each statute—whether considered independently or under the APA—will be addressed separately below.

### 1. Second Cause of Action (OCSLA)

OCSLA provides that the OCS is a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). OCSLA further provides that, when granting leases for renewable wind energy production and other energy uses, BOEM "must ensure that any activity under [OCSLA] is carried out in a manner that provides for" twelve different criteria, including but not limited to safety, protection of the environment, and "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." 43 U.S.C. § 1337(p)(4).

The parties disagree whether Plaintiffs' allegations are too broad and conclusory and whether OCSLA requires each of its twelve criteria to be met or contemplates a "balancing" exercise like that described in BOEM's regulations and *Seafreeze Shoreside, Inc. v. Dept. of the Interior*, 123 F.4th 1, 25–26 (1st Cir 2024). This Court rejects US Wind's contention that the detailed allegations in the Amended Complaint are "too broad and conclusory" to state an APA/OCSLA claim. Instead, US Wind's responsive arguments are essentially merits-based, arguing that the Federal Defendants appropriately conducted the necessary analyses and

appropriately weighed "environmental impacts against the imperative to make the OCS available for 'expeditious and orderly development' of its energy resources." ECF 39 at 41.

On a complete factual record, this Court will have to consider the parties' competing contentions regarding whether OCSLA requires "absolutist" compliance with each of its twelve enumerated (and potentially contradictory) factors, or whether some degree of balancing is warranted, as specified in the current regulations. That nuanced inquiry, however, is best suited for disposition at the summary judgment phase of the case.

### 2. Third Cause of Action (APA/NEPA)

NEPA requires federal agencies to consider environmental impacts of, and alternatives to, proposed action when approving a COP. *See* 30 C.F.R. § 585.628. Typically, an environmental impact statement (EIS) is used to conduct the NEPA analysis. 42 U.S.C. § 4332(c). However, NEPA "does not mandate particular results, but simply prescribes the necessary process" to evaluate an action's environmental impacts. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA also provides an opportunity for the public and other governmental agencies to respond to the proposed environmental effects of an action. *See id.* at 349 (noting that NEPA "provides a springboard for public comment").

In their APA/NEPA cause of action, Plaintiffs assert that BOEM approved an EIS that improperly failed to consider the cumulatively significant impacts of all of the East Coast wind programs together. Since this case was filed, the Supreme Court decided *Seven Cnty. Infrastructure Coalition v. Eagle Cnty., Colorado*, 145 S.Ct. 1497 (2025) in which it described the "substantial judicial deference required in NEPA cases" *Id.* at 1508. As the Supreme Court stated, "NEPA is a purely procedural statute that, as relevant here, simply requires an agency to prepare an EIS—in essence, a report. Importantly, NEPA does not require the agency to weigh

environmental consequences in any particular way." *Id.* at 1507. *Seven County* also decided that "when the effects of an agency action arise from a separate project—for example, a possible future project or one that is geographically distinct from the project at hand—NEPA does not require the agency to evaluate the effects of that separate project." *Id.* at 1515.

Although *Seven County* addresses the concept of "separate projects," it is unclear that it entirely resolves the cumulative impact issue raised in this case. Plaintiffs are correct that *Seven County* does not mandate that an agency ignore all separate projects entirely, because it recognizes that effects of one project "might extend outside the geographical territory of the project or might materialize later in time." *Id.* In other words, the agency is permitted to consider effects of the project at hand that might flow out into other geographic areas. The Supreme Court also noted, in *Seven County,* that the agency in that case "possesses no regulatory authority over those separate projects," where here, all of the offshore development at issue is within BOEM's purview. *Id.* at 1516. While it may be likely that, ultimately, the required "substantial judicial deference" will control, Plaintiffs' claim is not subject to dismissal under the low bar of a Rule 12(b)(6) standard..

In addition to their cumulative impact contention, Plaintiffs also argue that BOEM in its EIS provided an insufficiently detailed statement on feasible alternatives to the Project because it unreasonably narrowed the Project's purpose, entirely failed to consider the known risk of catastrophic turbine blade failure, and also failed to consider impact of the Project on the nearby horseshoe crab reserve. Once again, the merits of these NEPA-based contentions can be best addressed on a complete administrative record at the summary judgment stage.

### 3. Fourth Cause of Action (ESA)

Section 7 of the ESA requires agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the

14

destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Where an agency action "may affect" a listed marine species or critical habitat, the lead agency (here, BOEM) must consult with the NMFS, and the NMFS must issue a "biological opinion" regarding whether the action is "likely to jeopardize the continued existence" of the species or "result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.12(g)(4), (h). In this case, NMS issued a biological opinion ("BiOp") that assessed the potential effects of the Project on the ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the area. NMFS, *Endangered Species Act Section 7 Consultation Biological Opinion* (June 18, 2024), https://perma.cc/HX9W-D7M4.

Plaintiffs' Amended Complaint focuses on just one endangered species, the North Atlantic Right Whale. One of the individual resident plaintiffs, John Collins, has made a sufficient showing at this stage that he both has standing and is in the zone of interests. He alleges in the Amended Complaint that he visits the beach five days per week, where he regularly uses binoculars to observe the "whales breaching and feeding off the coast of Ocean City." ECF 32 ¶ 11. The Amended Complaint further alleges that, "The viewshed that Collins has enjoyed for years will be destroyed and will [sic] drive the whales that he views out of the area." *Id.* In sum, Collins has alleged that his aesthetic interest and his ability to view the whales for recreational purposes will be impaired if the Project deters whales from migrating nearby.[2]

---

[2] While the Amended Complaint does not specifically identify the species of whale that Collins views, at the motion to dismiss stage, the Court must resolve all doubts and inferences in favor of the plaintiffs and must view the allegations in a light most favorable to them. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). It is more than reasonable to infer that Collins views North Atlantic Right Whales, among other whales, during his frequent whale watching endeavors.

Plaintiffs allege that the ESA required BOEM to consult with NMFS to determine whether the Project would jeopardize the continued existence of the right whale. ESA regulations define "jeopardize the continued existence of" as "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; *Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019) (confirming that 'the plain language" of the regulation requires the agencies "to assess 'both the survival and recovery of a listed species'").[3] Plaintiffs allege that NMFS's BiOp is deficient and the Federal Defendants maintain that the BiOp conducts the required analysis.

### 4. Fifth Cause of Action (APA/MMPA)

Again, with respect to Plaintiffs' MMPA claim, which also focuses on the North Atlantic Right Whale, Collins has alleged sufficient facts to establish standing and positioning within the zone of interests. ECF 32 ¶ 11.

The MMPA mandates that NMFS determine that the activity will result in "the incidental, but not intentional, taking … of small numbers of marine mammals of a species or population stock." 16 U.S.C. § 1371(a)(5)(A)(i). Plaintiffs allege that NMFS's approval violates the MMPA by authorizing US Wind to take more than "small numbers of marine mammals of a species or population stock" and by "failing to analyze the cumulative effects" of other approved and possible offshore wind projects. Plaintiffs further allege a factual basis to believe that NMFS's approved total taking of 10 North American Right Whales may have more than a negligible impact on the species, given that there are fewer than 338 such whales still alive and that the whales have been

---

[3] In their opposition, Plaintiffs seemingly challenge the validity of BOEM's ESA regulation, citing *Loper Bright.* ECF 46-1 at 38–39. That challenge is not found in the Amended Complaint.

dying off from other causes. ECF 32 ¶ 218. Of course, the Federal Defendants may be able to establish through their administrative record that approved maximum annual take is within the "small number" range when evaluated proportionally to the number of existing whales. At the motion to dismiss stage, though, Plaintiff has alleged sufficient facts to state a claim even though simple whole number of "takes" must be viewed in context.

    **5. Sixth Cause of Action (APA/MBTA)**

The MBTA provides that "it shall be unlawful … to pursue, hunt, take, capture, kill, [or] attempt to take, capture, or kill … any migratory bird … included in the terms of the conventions between the United States and [various countries]." 16 U.S.C. § 703(a). The implementing regulations specify that "take" means "pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12. The MBTA specifies that violation of the act or its implementing regulations could subject "any person, association, partnership, or corporation" to misdemeanor charges. 16 U.S.C. § 707(a).

Plaintiffs allege that BOEM failed to adequately consider the impact of the Project on migratory birds, to implement mitigation measures to avoid injuring migratory birds, or to require US Wind to apply for a Migratory Bird Take Permit. ECF 32 ¶ 233. They further allege that the Project will "injure, displace, and even kill migratory birds." *Id.* ¶ 232.

Although the Fourth Circuit has not yet addressed the issue, other courts have persuasively held that regulatory review of third-party activity does not trigger the "take" provision of the MBTA. In other words, BOEM's action in approving US Wind's Project did not involve any direct take of migratory birds. As the District of Columbia District Court held in *Friends of the Capital Crescent Trail v. Federal Transit Administration*, 255 F. Supp. 3d 60, 75 (D.D.C. 2017), while an MBTA claim can lie "where the federal program *directly causes* the taking of migratory birds," it

17

was "unaware of any decision in our Circuit holding that the MBTA's take prohibition extends to a federal agency that authorizes third-party activity that may allegedly cause 'take.'" *Id.* at 75. Other judges have agreed, finding that the MBTA applies to deliberate acts committed "directly and intentionally" to migratory birds, not to commercial activity that indirectly impacts migratory birds and results in death. *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 488–89 (5th Cir. 2015); *Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997); *Seattle Audobon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir. 1991). Logically, then, federal agencies who merely approve such commercial activity would also not violate the MBTA. *See, e.g.*, *Oceans v. U.S. Dep't of the Interior*, 2025 WL 973540, at *15 (D.D.C. Apr. 1, 2025) ("[A] general allegation that the federal agencies' approval of the [Project] will cause a 'take' of migratory birds does not state a claim for relief under the MBTA."); *Protect Our Communities Found.*, 825 F.3d at 585-86 ("[T]he MBTA does not contemplate attenuated secondary liability on agencies … that act in a purely regulatory capacity, and whose regulatory acts do not directly or proximately cause the 'take' of migratory birds."); *Pub. Emps. For Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 117 (D.D.C. 2014) ("Given the statutory and regulatory text … BOEM did not violate the Migratory Bird Treaty Act by merely approving a project that, if ultimately constructed, might result in the taking of migratory birds."). This Court concurs and will dismiss the Sixth Cause of Action.

**6. Seventh Cause of Action (APA/CZMA)**

The parties dispute whether any Plaintiff has standing to assert the APA/CZMA claim in the seventh cause of action. Even if this Court applies *Sausalito v. O'Neill*, 386 F.3d 1186, 1201 (9th Cir. 2004), and determines in accordance with that opinion that the Government Plaintiffs have standing, Plaintiffs have still failed to state a viable CZMA-based claim. Essentially, the

CZMA requires that federal agencies' activities "within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone" be consistent with approved state management programs. 16 U.S.C. § 1456(c)(1).

In a situation like that involving US Wind, an "applicant for a required Federal license or permit to conduct an activity" "in or outside of the coastal zone," the applicant "shall provide in the application" "a certification that the proposed activity complies with the enforceable policies of the state's approved program." 16 U.S.C. § 1456(c)(3)(A). After receipt of the certification, the state "shall establish procedures for public notice" and then "shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification." *Id.* No license or permit shall be granted absent (1) actual or presumed state concurrence with the applicant's certification or (2) a finding by the Secretary, after providing an opportunity for detailed comments from the federal agency and from the state, that "the activity is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security." *Id.*

In this case, after receiving US Wind's certification, the states of Delaware and Maryland both issued consistency determinations confirming that the Project was consistent with their respective coastal zone management programs. Plaintiffs allege, however, "[a]lthough Delaware and Maryland both issued consistency determinations for the Project, those determinations are not consistent with their coastal management plans and policies." ECF 32 ¶ 243.

Plaintiffs object to the states' actions, not BOEM's, and cite no statutory provision that would have authorized BOEM to challenge the states' conclusions. "By asking the Court to 'reject the state's CZMA consistency determination,' Plaintiffs fail to state a claim because under the CZMA, there is no private right of action to challenge consistency certification concurrences from the states." *Oceans*, 2025 WL 973540, at *6. The CZMA allows for "a final override by the

19

Secretary of Commerce" only where the state finds that the federally permitted project is "not consistent with 'the enforceable policies of the state's approved'" program. *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 123 (4th Cir. 2008) (citing 16 U.S.C. § 1456(c)(3)(A)) (describing the state as having a "conditional veto"). Here, both states found that the Project was consistent with their state management plans. In the absence of any CZMA provision allowing BOEM to contravene those assessments, Plaintiffs' APA/CZMA claim must be dismissed.

### 7. Eighth Cause of Action (APA/NHPA)

US Wind has not challenged, as to the APA/NHPA claim, that the Government Plaintiffs have standing and are within the zone of interests. ECF 39 at 11 n.8, 21 n.16.

The governing NHPA standard is that the agency has to "make a reasonable and good faith effort to carry out appropriate identification efforts" for historic properties, 36 C.F.R. § 800.4. Plaintiffs allege that BOEM "impermissibly and arbitrarily narrowed the scope of its review of historic properties, resulting in a failure to identify historic properties" in the affected communities. ECF 32 at ¶ 249. US Wind contends that it did an appropriate investigation, citing the technical studies it used to identify the properties. But ultimately, the question of whether the investigation was "reasonable and good faith" is a merits inquiry and is not appropriate to address at the motion to dismiss stage.

Plaintiffs further allege that "BOEM executed an illusory Memorandum of Agreement (MOA) that failed to resolve adverse effects to all historic properties and called for the future development of 'Historic Preservation Treatment Plans'" in violation of NHPA requirements. ECF *Id.* ¶ 250. This specific factual allegation disproves US Wind's contention that Plaintiffs simply parroted the statutory requirements in their NHPA claim.

Accordingly, Plaintiffs have adequately pleaded an APA/NHPA claim, which will proceed to discovery.

### 8.  First Cause of Action (APA/Arbitrary and Capricious)

Finally, returning to the First Cause of Action, Plaintiffs allege simply that BOEM's decision violated the Administrative Procedure Act because it was arbitrary and capricious.[4] An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The scope of this review is narrow and deferential. *State Farm*, 463 U.S. at 43; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). Plaintiffs do not specify, in their First Cause of Action, any reason they allege the agency action was arbitrary and capricious, other than the statute-based reasons they assert in their other causes of action. *State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

---

[4] In their First Cause of Action, Plaintiffs also cite the APA for the proposition that agency action should be set aside if "otherwise not in accordance with law," noting the alleged violations of the seven underlying statutes that are the subject of their Second–Eighth Causes of Action. ECF 32 ¶¶ 64–66. Because this Court sees no reason to address the same alleged wrong in two separate causes of action, it will address Plaintiffs' contentions relating to those seven statutes in their combination APA/statute causes of action instead of their catch-all APA claim.

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). In the absence of any particularized factual allegations suggesting that the Defendants acted in an arbitrary and capricious manner, this Court will dismiss Count One without prejudice.

## IV.  CONCLUSION

For the reasons stated above, the Federal Defendants' Partial Motion to Dismiss Plaintiffs' Sixth (MBTA) and Seventh (CZMA) Causes of Action, ECF 37, is GRANTED. US Wind's Motion to Dismiss, ECF 39, is GRANTED IN PART as to the First, Sixth, and Seventh Causes of action and DENIED IN PART as to the remaining causes of action. A separate Order follows.


Dated: July 2, 2025                                        _____/s/_____
                                                           Stephanie A. Gallagher
                                                           United States District Judge

22