**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | | |
|---|---|---|
| **MAYOR AND CITY COUNCIL OF OCEAN CITY MARYLAND**, *et al.* | * | |
| | * | |
| Plaintiffs/Cross-Defendants | * | |
| v. | * | |
| **UNITED STATES DEPARTMENT OF THE INTERIOR**, *et al.* | * | Civil Action No: 1:24-cv-03111-SAG |
| Defendants/Cross-Defendants | * | |
| and | * | |
| **US WIND, INC.** | * | |
| Defendant-Intervenor/Cross-Plaintiff | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-
INTERVENOR AND CROSS-PLAINTIFF US WIND INC.'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1
II.     STATEMENT OF FACTS ....................................................................................4
        a.      The Maryland Offshore Wind Project ....................................................4
        b.      This Administration's War on Offshore Wind and the Project .................7
        c.      US Wind's Cross-Claims ......................................................................11
III.    STANDARD OF REVIEW ................................................................................12
IV.     ARGUMENT .....................................................................................................12
        a.      US Wind Has Standing to Seek Injunctive Relief. ..............................12
        b.      The Revocation Decision Is Imminent and Requires Injunctive Relief. ..............13
        c.      US Wind Is Likely To Prevail On The Merits of Its Challenge To the Revocation
                Decision. ............................................................................................15
                i.      The Revocation Decision Violates OCSLA. ............................15
                ii.     The Revocation Decision Violates Fifth Amendment Due Process. .........18
                iii.    The Revocation Decision Violates the APA...............................19
                        1.      The Revocation Decision Is a Final Agency Action. ...................19
                        2.      The Revocation Decision Is Arbitrary and Capricious.................20
                        3.      The Revocation Decision Is Not In Accordance With Law .........21
                        4.      The Revocation Decision Violates Section 558(c). ......................23
                        5.      The Revocation Decision Is a Result of Undue Political Influence.
                                ...................................................................................24
        d.      US Wind Will Suffer Irreparable Harm Absent an Injunction ..............24
        e.      The Balance of Equities and Public Interest Favors An Injunction......26
                i.      Neither the Government Nor Plaintiffs Would Be Harmed By The
                        Requested Injunction ............................................................26
                ii.     The Public Interest Would Be Served By An Injunction Protecting US
                        Wind's Federal Permits............................................................26
        f.      The Revocation Decision Is An Abuse of the Judicial Process that Independently
                Warrants an Emergency Injunction. ......................................................29
V.      CONCLUSION...................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*ACK for Whales, Inc. v. U.S. Dept. of Commerce*,
No. 2:25-cv-1678 (Sept. 3, 2025) ............................................................10

*Am. Fed. of State, et al. v. Social Sec. Admin.*,
771 F.Supp. 3d 717 (D. Md. 2025) ......................................................12, 25

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ................................................................14

*Baldi Bros, Inc. v. United States*,
165 Fed. Cl. 471 (2023) .......................................................................18

*Battle v. FAA*,
393 F.3d 1330 (D.C. Cir. 2005) ............................................................22

*Bell v. Burson*,
402 U.S. 535 (1971)............................................................................19

*Bennett v. Spear*,
520 U.S. 154 (1997)............................................................................20

*Bintz v. United States Department of the Interior, et al.*,
1:25-cv-00152-GBW (Aug. 22, 2025) ...................................................11

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)............................................................................22

*Bray v. City of New York*,
346 F. Supp. 2d 480 (S.D.N.Y. 2004).....................................................13

*Chamblee v. Espy*,
100 F.3d 15 (4th Cir. 1996) ..................................................................20

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023) .................................................................24

*D.C. Fed'n of Civic Ass'ns v. Volpe*,
459 F.2d 1231 (D.C. Cir. 1972).............................................................23

*E. Tenn. Nat. Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) ................................................................28

*FCC v. Fox TV Stations, Inc.*,
  556 U.S. 502 (2009)..................................................................................................20, 21

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021).........................................................................................................20

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002) ......................................................................................20

*Gallagher & Ascher Co. v. Simon*,
  687 F.2d 1067 (7th Cir. 1982) ........................................................................................24

*Matter of Grace Ocean Priv. Ltd.*,
  No. CV 24-00941-JKB (D. Md. Oct. 2, 2024) ................................................................30

*Greater Bos. Television Corp. v. F.C.C.*,
  463 F.2d 268 (D.C. Cir. 1971) ........................................................................................27

*Green v. Prince George's Cnty. Off. of Child Support*,
  641 B.R. 820 (D. Md. 2022), *aff'd*, 2023 WL 3051812 (4th Cir. 2023)...............................30

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  920 F.3d 1 (D.C. Cir.) .....................................................................................................30

*HIAS, Inc. v. Trump*,
  415 F. Supp. 3d 669 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021).............................27

*Immigrant Defs. L. Ctr. v. Noem*,
  781 F. Supp. 3d 1011 (C.D. Cal. 2025) ..........................................................................13

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024).........................................................................................................23

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).........................................................................................................13

*Maryland v. United States Dep't of Agric.*,
  770 F. Supp. 3d 779 (D. Md. 2025) ................................................................................12

*Merrill Lynch, Pierce, Fenner and Smith v. Bradley*,
  756, F.2d 1048, 1055 (4th Cir. 1985) .............................................................................26

*In re Microsoft Corp. Antitrust Litig.*,
  333 F.3d 517 (4th Cir. 2003) ..........................................................................................12

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
  530 U.S. 604 (2000).........................................................................................................16

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ....................................................25

*Nat. Res. Def. Council v. Kempthorne*,
525 F. Supp. 2d 115 (D.D.C. 2007) ....................................................29

*Nat'l Ctr. for Pres. L. v. Landrieu*,
496 F. Supp. 716 (D.S.C.), *aff'd*, 635 F.2d 324 (4th Cir. 1980) ....................................................23

*New York v. Trump*,
No. 1:25-cv-11221 (D. Mass. 2025) ....................................................8

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ....................................................13

*Ohio Valley Env't Coal. v. U.S. Army Corps. of Eng'rs*,
528 F.Supp.2d 625 (S.D. W.Va. 2007) ....................................................29

*Perez v. Mortgage Bankers Association*,
575 U.S. 92 (2015) ....................................................22

*Philip Morris USA Inc. v. Scott*,
561 U.S. 1301 (2010) ....................................................25

*PSEG Renewable Transmission LLC v. Arentz Fam., LP*,
No. 25-CV-1235-ABA, 2025 WL 1725814 (D. Md. June 20, 2025) ....................................................25

*Revolution Wind, LLC v. Burgum*,
1:25-cv-02999-RCL, (2025) ....................................................10, 21

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ....................................................26

*Sanchez v. McAleenan*,
No. GLR-19-1728, 2024 WL 1256264 (D. Md. Mar. 25, 2024) ....................................................26

*Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*,
No. 1:25-cv-02211 (D.D.C. 2025) ....................................................10

*Save Long Beach Island v. U.S. Dep't of Commerce*,
No. 1:25-cv-02214 (D.D.C. 2025) ....................................................14

*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*,
123 F.4th 1 (1st Cir. 2024), *cert. denied*, 221 L. Ed. 2d 955 (May 5, 2025) ....................................................23

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ....................................................27, 28

*Town and County of Nantucket v. Burgum,*
　　1:25-cv-00906 (D.D.C. 2025) ................................................................10

*Tri–County Paving, Inc. v. Ashe County,*
　　281 F.3d 430 (4th Cir. 2002) ................................................................18

*In re Weiss,*
　　111 F.3d 1159 (4th Cir. 1997) ..............................................................30

*Winter v. Nat. Res. Def. Council, Inc.,*
　　555 U.S. 7 (2008) ..................................................................................12

## STATUTES

7 U.S.C.A. § 1639p .......................................................................................17

16 U.S.C.A.
　　§ 1458 .....................................................................................................17
　　§ 3321 .....................................................................................................17

42 U.S.C.A. § 6947(a) ...................................................................................17

5 U.S.C.
　　§ 553 .......................................................................................................22
　　§ 558(c) ...................................................................................................24
　　§ 702 .......................................................................................................25
　　§ 705 ...............................................................................................4, 5, 12
　　§ 706 .......................................................................................................23
　　§ 706(2)(A) .............................................................................................22
　　§ 706(2)(C) .............................................................................................22
　　§ 706(2)(D) .............................................................................................22

43 U.S.C.
　　§ 1332(3) .............................................................................................6, 18
　　§ 1334(a)(1) ............................................................................................17
　　§ 1334(a)(2) ............................................................................................17
　　§ 1337(p)(1)(C) .........................................................................................6
　　§ 1341(c) .................................................................................................17
　　§ 1341(d) .................................................................................................17
　　§ 1349(a)(1) ......................................................................................15, 16
　　§ 1349(a)(3) ............................................................................................15
　　§ 1351(h)(1) ............................................................................................16

Pub. L. No. 109-58, 119 Stat. 594, 746 ........................................................6

## RULES

Federal Rule of Civil Procedure 65 .........................................................4, 30

## REGULATIONS

30 C.F.R.

§ 285.417.................................................................................................................17

§ 285.422.................................................................................................................17

§ 585.417.................................................................................................................17

§ 585.422.................................................................................................................17

§ 585.628(f).............................................................................................................16

§ 585.102(a)......................................................................................................16, 22

§ 585.415(b)............................................................................................................18

## CONSTITUTIONAL PROVISIONS

Fifth Amendment ........................................................................................18, 19, 26

## I.    INTRODUCTION

Despite fully approving US Wind, Inc's ("US Wind") Maryland Offshore Wind Project (the "Project") last year, the United States Department of the Interior ("USDOI") and other Federal defendants (collectively, "the Government") have suddenly changed course and reached a final decision to revoke the Project's Construction and Operations Plan ("COP") approval (the "Revocation Decision"), with the inevitable and intended effect of killing the Project.  US Wind will suffer irreparable harm if the Government takes any adverse action against the Project COP during the pendency of this litigation and, therefore, US Wind asks this Court to prevent such harm from occurring while it reviews the merits of the claims before it.

The Revocation Decision—the basis for which the Government first disclosed in its September 12, 2025, motion to vacate and remand the Project approval (the "Vacatur Motion"), ECF No. 81—is illegal. It violates US Wind's vested rights under its federal lease to construct the Project in accordance with the approved COP, in contravention of the Outer Continental Shelf Lands Act ("OCSLA"), US Wind's constitutional rights, and the Administrative Procedures Act ("APA"). The irreparable harm to US Wind from implementation of the Revocation Decision is manifest. The loss of its primary federal permit constitutes an existential risk for US Wind, as the Project cannot be built without it. And continued efforts to undermine it will have catastrophic consequences, preventing the company from fulfilling contractual obligations attendant to the construction of the Project, jeopardizing hundreds of millions of dollars in Project investments and ultimately killing the Project altogether.

US Wind accordingly seeks a preliminary injunction against implementation of the Revocation Decision to maintain the *status quo* until this Court has ruled on the merits of both challenges to the Project approvals brought by Plaintiffs and US Wind's cross claims against the Government for its Revocation Decision.

1

The Government's machinations to undermine the Project's COP approval before this Court can rule on its merits underscore the need for preliminary injunctive relief to restrain extra-judicial implementation of the Revocation Decision. The Government's first gambit was the Vacatur Motion. The Court declined to proceed with that bare request, instead ordering the parties to agree to a schedule that included certification of the Government's administrative record for merits briefing on the challenged Project approvals. ECF No. 84. But ominously, the Government stated in the same status conference that "we don't believe that a remand is strictly necessary for the agency to reconsider the decision at issue," *id.* at 4:11-13 and that it "intends to reconsider the COP approval"—*i.e.,* implement its Revocation Decision— "regardless of what happens with the" Vacatur Motion. *Id.* at 5:1-3. Transcript of Sept. 18 hearing is attached hereto as **Exhibit A**.

After being denied a quick sign-off on the Revocation Decision without consideration of the merits, the Government announced in the October 7, 2025 status conference that it would ask the Court to stay the litigation altogether—again, with no ruling on the merits—so the Government could take all the time it needs to implement the Revocation Decision, unhindered by judicial review. *See* ECF No. 85 (Toyja Kelley Correspondence re: Request for Status Conference (Sept. 30, 2025); ECF No. 89. The Court shot down that attempt, too, adhering to its prior determination that a decision on the merits is required. ECF No. 89.

Why the big rush to revoke the already-issued Project approvals before the Court can consider its merits? Two reasons. First, the Government knows the approvals will easily withstand judicial review, and—as explained in detail below—its Revocation Decision will not. The Government bases that decision on a contrived "legal error" in how OCSLA Section 8(p)(4) was applied to the COP approval, instead substituting a new interpretation of OCSLA Section 8(p)(4)

that violates the law and the Government's own regulations—and is being implemented retroactively to boot.

Second, by evading judicial review through vacatur, remand or even a stay of this litigation, the Government can dictate the fate of the Project in whichever way it pleases. If the COP is lost, surrendered, forfeited, revoked or otherwise not maintained in full force and effect, US Wind's investors have the right to declare US Wind to be in default on the repayment of the Company's debt and/or refuse to extend the additional financing needed to complete construction of the Project. Either of these consequences could result in US Wind's bankruptcy. Declaration of Jeffrey Grybowski, attached as **Exhibit B**, at ¶ 52. Such a default could force US Wind into bankruptcy. It is therefore no exaggeration to say that the preservation of COP approval is existential for both the Project and US Wind. The broader context for the Revocation Decision—numerous executive actions intended to hinder offshore wind permitting, "stop-work" orders aimed at halting specific projects, and a steady stream of rhetoric from the highest-ranking officials promising to "end wind development"—leaves no room for doubt that the Government will implement its Revocation Decision in one or both of these ways in the months to come.

The Government also knows that the longer the Revocation Decision hangs over US Wind's head, the harder it becomes for US Wind to build the Project. Every week or month of uncertainty and delay increases the risk that US Wind will fail to achieve its contractual commitments, rendering it incapable of completing the Project. Ex. B ¶¶ 42-48. By leaving the Project in limbo, the Government would achieve by inaction and uncertainty what it cannot achieve by any lawful action to suspend or cancel the Project. To wit, over the past several months, acting pursuant to President Trump's January 20, 2025 directive (the "Wind Presidential Memorandum"

or "Wind PM") to identify bases for terminating off-shore wind leases,[1] the Government has moved collaterally to block the Project, making it clear that USDOI would not review its required post-COP regulatory submissions for the Project, including the Facility Design Report ("FDR") that US Wind is required to submit prior to beginning offshore construction, thereby rendering meaningless any effort by US Wind to continue to submit its required post-COP filings for review. Ex. B ¶¶ 38-39, 44-46, 48. Prior to the Wind PM, USDOI would have reviewed these submissions in the ordinary course. Holding them up prevents US Wind from adhering to its construction schedule and endangers numerous contractual and financing commitments upon which the Project depends. The Government has also hindered the Project by laying the groundwork to revoke the Project's Maryland-issued air quality permit, and cancelling a $47 million federal grant intended to bolster the Project's port infrastructure.

To ensure that the Government cannot take any further adverse actions against the Project's COP or otherwise move to kill the Project while judicial review of the merits of the Project's federal approvals is pending, US Wind asks that the Court, pursuant to Federal Rule of Civil Procedure 65 and Section 705 of the APA, 5 U.S.C. § 705, preliminarily enjoin implementation of the Revocation Decision pending the Court's review on the merits, and order the Government to maintain the *status quo* pending a preliminary injunction ruling.

## II.     STATEMENT OF FACTS

### a.  The Maryland Offshore Wind Project

The Project consists of the construction and operation of up to 121 wind turbine generators sited between 11 and 26 statute miles off the coast of Maryland, up to four offshore substations,

---

[1] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 29, 2025) at § 1.

one meteorological tower, and up to four export cables into onshore substations in Delaware. Ex. B ¶ 5.

To date, US Wind has directly invested over $320 million into the project, including 14 years of intensive surveys, planning, analysis, public engagement, as well as significant contractual commitments for Project components, vessel charters, and engineering and construction services. *Id.* at ¶¶ 9, 10-11, 53-66. The Project is expected to supply approximately 1,710 megawatts of renewable energy to Maryland (enough to power over 718,000 homes and businesses) and is estimated to directly and indirectly create over 13,600 job-years during its development, construction, and operation. *Id.* at ¶ 7; *see also* Declaration of Paul G. Pinsky on behalf of the State of Maryland, ¶¶ 17, 20, attached as **Exhibit C.** The Project is projected to bring nearly $3.9 billion in direct and $2.4 billion in secondary economic benefits to the State of Maryland and save the ratepayers $12.6 billion over the first 20 years of operation.  Ex. B ¶ 7; Ex. C ¶ 17.

US Wind holds a contractual property right to develop the Project through a lease, OCS-A 0490 ("the Lease"), that it executed with the Bureau of Ocean Energy Management ("BOEM") in 2014, and that has been amended several times since then. Ex. B ¶ 17. The Lease is attached hereto as **Exhibit D**. The Lease was issued pursuant to BOEM's authority under OCSLA, which provides that "the outer Continental Shelf is a *vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development*, subject to environmental safeguards." 43 U.S.C. § 1332(3) (emphasis added). Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing USDOI to grant leases to "produce or support production, transportation, or transmission of energy for sources other than oil and gas," including offshore wind. 43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746. In expanding OCSLA to include offshore

wind development, Congress sought to "enhance the energy security of the United States," to "decrease dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

The Lease itself gives US Wind the right to "conduct activities… in the [leased] area… that are described" in a BOEM-approved COP. Ex. D at § 2(a)(2). The Lease also states that BOEM can only cancel or suspend the lease in the event of (1) US Wind's noncompliance or (2) a finding of serious irreparable, immediate, or imminent harm that BOEM finds is "particularized" and "can only be feasibly averted by suspension of on-lease activities"—and that USDOI must compensate US Wind for any lease cancellation. *Id.* at § 8. US Wind also holds both an express and implied covenant for the "full enjoyment of the [L]ease," which includes construction of the Project in accordance with the approved COP. *Id.* at § 6.

The Project obtained its federal approvals after 14 years of comprehensive environmental and safety review—nearly four years of collaboration between BOEM and other federal, state, and local agencies and the public to determine where to issue the Lease, followed by 10 years of surveys, studies, and engineering on the part of US Wind and further review and consultation by BOEM and a bevy of federal and state agencies. Ex. B ¶¶ 11-34. The Government's Vacatur Motion dismissively characterizes this rigorous and protracted process as "several intervening steps." ECF No. 81 at. 3. These reviews, documented in thousands of pages of data and analysis, concluded that the Project is safe, environmentally sound, and consistent with over a dozen federal laws and their regulations. Ex. B ¶ 12.

After its extensive, multi-year review, BOEM in September 2024 issued a Record of Decision documenting its adoption of the FEIS, its decision to approve the COP, and its findings as to other applicable statutory requirements. Ex. B ¶ 34. BOEM formally approved the COP on

December 2, 2024, permitting US Wind to proceed with construction and operation of the Project. *Id*. BOEM's approval requires US Wind to follow over 80 pages of detailed terms and conditions to build and operate the Project. *Id*.

### b. This Administration's War on Offshore Wind and the Project

This Administration has made no secret of its intent to halt offshore wind development in general, and the Project in particular. President Trump has long derided offshore wind, including by (baselessly) blaming it for the deaths of whales[2]; publicly proclaiming "I hate wind"[3] and that "[w]ind is bulls---"[4] and "THE SCAM OF THE CENTURY!"[5]; promising to "end[]" wind development[6]; and stating that "Any Country that relies on Windmills is DEAD."[7] This rhetoric has been echoed by members of his Administration—for example, Secretary Burgum recently stated that "[r]ight now, under this administration, there is not a future" for offshore wind projects[.]"[8]

On his first day in office, President Trump began following through on this rhetoric by issuing the Presidential Memorandum withdrawing the Outer Continental Shelf ("OCS") from offshore wind leasing and instructing USDOI, in consultation with the Attorney General, to review

---

[2] Leah Sarnoff, *Trump says 'drill, baby, drill,' but the record for US oil production isn't his*, abcNEWS (July 19, 2024) https://abcnews.go.com/Politics/drill-baby-drill-donald-trump-oil-gas-rnc/story?id=112108980 (last accessed Oct. 10, 2025), attached as **Exhibit E**.

[3] Oliver Milman, *Trump pledges to scrap offshore wind projects on 'day one' of presidency*, The Guardian (May 13, 2024) https://www.theguardian.com/us-news/article/2024/may/13/trump-president-agenda-climate-policy-wind-power (last accessed Oct. 10, 2025), attached as **Exhibit F**.

[4] Shail Kapur, *'I don't want to be nice': Trump ramps up personal attacks on Harris at Pennsylvania rally*, NBC (Oct. 9, 2024) https://www.nbcnews.com/politics/2024-election/trump-ramps-personal-attacks-kamala-harris-scranton-rally-rcna174292 (last accessed Oct. 10, 2025), attached as **Exhibit G**.

[5] TruthSocial, Donald J. Trump (Aug. 20, 2025), https://truthsocial.com/@realDonaldTrump/posts/115061417084982814, attached as **Exhibit H**.

[6] Ex. E.

[7] TruthSocial, Donald J. Trump (Sept. 7, 2025), https://truthsocial.com/@realDonaldTrump/posts/115164113502668318, attached as **Exhibit I**.

[8] *US Interior Secretary does not believe in future for offshore wind under Trump*, Energy Watch (Sept. 11, 2025), https://energywatch.com/EnergyNews/Policy___Trading/article18526636.ece?utm_source=Feed&utm_medium=latest (last accessed Oct. 10, 2025), attached as **Exhibit J**.

all existing wind leases and to identify legal bases for their rescission.[9]  The President prohibited all new and renewed leases and "approvals" pending "a comprehensive assessment" of "Federal wind leasing and permitting practices,"[10] although he has since proclaimed the Administration "will not approve" any wind projects, period.[11]  Eighteen states and an industry trade association have challenged the Wind PM, and the court has tentatively indicated that it violates the APA. *New York v. Trump*, 25-11221-WGY, Slip Op. at *38-43 (D. Mass. July 3, 2025). The President has also directed USDOI to revise its regulations to end what he deemed "preferential treatment to wind" facilities.[12]

Agencies have fallen in line with these directives, as the Government has admitted. *See* Answer, ECF No. 171, *New York v. Trump*, No. 1:25-cv-11221 (D. Mass. July 31, 2025) (admitting USDOI, BOEM, and NMFS "adopted and implemented" the Wind PM). USDOI is reviewing all wind-related procedures to remove allegedly "preferential treatment" of wind projects, authorizing the Solicitor to abandon the defense of wind projects in pending litigation.[13]

This Administration has also taken direct action to shutter or derail numerous other offshore wind projects—each time based on conclusory and non-substantive justifications:

- On April 16, 2025, BOEM abruptly issued a "stop work" order for Empire Wind 1, an 812 MW offshore wind farm outside of New York Harbor that was fully approved and on the cusp of starting offshore construction.[14]  The order contained no specific rationale beyond

---

[9] Wind PM, supra n. 1, at § 1.
[10] *Id.* § 2(a).
[11] Ex. H.
[12] Exec. Order 14,315, *Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources*, 90 Fed. Reg. 30,821 (July 7, 2025).
[13] Sec'y of Interior, SO 3437, *Ending Preferential Treatment for Unreliable, Foreign Controlled Energy Sources in Department Decision-Making* (July 29, 2025), https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign (last accessed Oct 10, 2025).
[14] BOEM Director's Order to Matthew Brotmann of Empire, (April 16, 2025) https://www.boem.gov/renewable-energy/state-activities/boem-directors-order-empire-wind (last accessed Oct. 10, 2025).

the vague insinuation that it had received "feedback" from the National Oceanic and Atmospheric Administration, a cross-defendant in this matter.[15]  BOEM just as abruptly lifted the order on May 19, 2025, this time with no explanation[16]—although it was widely reported that the governor of New York had persuaded the Administration to lift the order in return for pledging to support construction of a natural gas pipeline.[17]

- BOEM issued another stop-work order on August 22, 2025, this time on a project off Rhode Island, Revolution Wind, that was 80% constructed.[18]  BOEM was once again vague regarding the reasons for the order, this time averring only that it was "seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of OCSLA."  The project's developer, Ørsted, filed suit in the U.S. District Court for the District of Columbia and obtained a preliminary injunction to lift the stop-work order in a September 22, 2025 hearing. The presiding judge stated that the Government's actions were the "height of arbitrary and capricious" behavior. *Revolution Wind, LLC v. Burgum*, 1:25-cv-02999-RCL, ECF No. 36 (Sept. 22, 2025).

---

[15] *Id.*
[16] BOEM Amended Director's Order to Matthew Brotmann of Empire, (May 19, 2025) https://www.boem.gov/renewable-energy/state-activities/boem-directors-order-empire-wind-amendment.    (last accessed Oct. 10, 2025).
[17] Marie J. French, *Offshore wind revival linked to Trump-backed gas pipelines*, Politico.com (May 20, 2025), https://www.politico.com/newsletters/new-york-playbook-pm/2025/05/20/offshore-wind-empire-wind-1-pipeline-kathy-hochul-trump-00360247, attached as **Exhibit K**.
[18] BOEM Director's Order to Rob Keiser of Orsted, (August 22, 2025) https://www.boem.gov/renewable-energy/directorsorder-20250822pdf (last accessed Oct. 10, 2025), attached as **Exhibit L**; Orsted's Revolution Wind sues Trump administration over project halt, Reuters (Sept. 4, 2025), https://www.reuters.com/legal/litigation/orsteds-revolution-wind-sues-trump-administration-over-project-halt-2025-09-04/ (noting project was 80% complete at the time of the stop work order) (last accessed Oct. 10, 2025), attached as **Exhibit M**.

- The U.S. Department of Justice ("DOJ") has sought voluntary remand of final COP approvals for two projects, SouthCoast Wind and Atlantic Shores Offshore Wind, that like the Project have not yet started construction. *See Town and County of Nantucket v. Burgum*, 1:25-cv-00906, [ECF No. 21] (Sept. 18, 2025); *Save Long Beach Island, Inc. v. U.S. Dep't of Comm.*, No. 1:25-cv-02211 [ECF No. 13] (D.D.C. Sept. 26, 2025).[19]  Both motions are based on the same retroactive application of the Administration's new interpretation of Section 8(p)(4) that the Government proffered in its now-rescinded Vacatur Motion.  ECF No. 81.

The Administration is also specifically targeting the Project. USDOI has effectively halted its review of post-COP approval documents that US Wind is required to submit, including the pivotal FDR necessary for offshore construction to begin. Ex. B ¶¶ 38-39, 44-46. The U.S. Environmental Protection Agency ("EPA") has also sought jurisdiction over the air quality permit that US Wind obtained from the State of Maryland, in a calculated effort to remand the permit back to EPA.[20]  And most recently, the U.S. Department of Transportation ("USDOT") withdrew over $47 million in funding under its Port Development and Infrastructure Development Program for a steel manufacturing facility at Sparrows Point, in Baltimore County that "will produce the

---

[19] DOJ has also announced its intention to seek voluntary remand of the COP approval for a third project, New England Wind. *ACK for Whales, Inc. v. U.S. Dept. of Commerce*, No. 2:25-cv-1678 [ECF No. 16] (D.D.C. Sept. 3, 2025). Based on the September 12, 2025 scheduling order in this case, this fourth remand motion would have been filed on October 10, 2025 but for the ongoing government shutdown.

[20] EAB Appeal No. OCS 25-01. Both US Wind and the State of Maryland have moved for EPA's Environmental Appeals Board ("EAB") to dismiss the challenge for lack of jurisdiction. *See* US Wind brief at https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/Filings%20By%20Appeal%20Number/FDCE05595B12F17A85 258CD9006B10E7/$File/US%20Wind%20EAB%20Brief%208-1-2025.pdf;      Maryland      brief      at https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/Filings%20By%20Appeal%20Number/B561579E2BB0BFE685 258CD800433D58/$File/FINAL%20Response%20to%20EAB%20Petition-%20US%20Wind.pdf.

monopile foundations and other steel components" necessary for the Project.[21]  USDOT heralded this as a key step in terminating "funding for … doomed offshore wind projects."[22]

The sum of these actions and statements is a comprehensive effort to stop the Project, and indeed every offshore wind project from being built, based on conclusory rationales. The objective is clear, and every federal agency that touches offshore wind has been instructed to act accordingly. Moreover, these actions and statements have already significantly harmed US Wind, the Project, the public, and various stakeholders by, *inter alia*, forcing US Wind – in the middle of its construction activities – to defer commitments to purchase additional components, hire contractors, block production slots for long-lead items, charter vessels, and construct port facilities; increasing the cost of financing; and indefinitely delaying the myriad economic and environmental benefits of the Project. Ex. B ¶¶ 42-48.

### c.   US Wind's Cross-Claims

Once the Government indicated its intent to vacate the Project's COP approval by providing notice in another related matter,[23] US Wind amended its Answer on September 3, 2025 to lodge cross-claims against the Government asserting that its efforts to vacate or otherwise disturb the Project's approvals "violate the [APA], US Wind's due process rights, and multiple federal environmental and development statutes," including OCSLA.  ECF No. 77. US Wind requested that this Court "[d]eclare that the Federal Approvals were lawfully issued in compliance with" relevant statutes, "[p]reliminarily and permanently enjoin the Government and any person or entity acting in concert with them from taking any action to vacate, remand, or in any way

---

[21] US Wind, *Sparrows Point Steel*, https://uswindinc.com/sps/ (last visited Oct. 9, 2025); *see* U.S. Dep't of Transp., *Trump's Transportation Secretary Sean P. Duffy Terminates and Withdraws $679 Million from Doomed Offshore Wind Projects* (Aug. 29. 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-terminates-and-withdraws-679-million (last accessed Oct. 10, 2025), attached as **Exhibit N**.
[22] *Id.*
[23] *Bintz v. United States Department of the Interior, et al.*, 1:25-cv-00152-GBW, ECF No. 28 (Aug. 22, 2025) at 1-2 (concerning statutory challenges to the same Project).

undermine any or all of the Federal Approvals," and "[g]rant all other relief as the Court may deem just and proper, including, but not limited to, attorney's fees and costs." *Id.*

## III.    STANDARD OF REVIEW

The purpose of a preliminary injunction is to "protect the *status quo* and to prevent irreparable harm during the pendency of a lawsuit." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003); *see Am. Fed. of State, et al. v. Social Sec. Admin.*, 771 F.Supp. 3d 717, 792 (D. Md. 2025). A preliminary injunction is a matter of the Court's equitable discretion; the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Additionally, the APA allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings. . . [o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705.  The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction. *Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779, 817 (D. Md. 2025).

## IV.    ARGUMENT

### a.    US Wind Has Standing to Seek Injunctive Relief.

US Wind has standing to challenge the Government's Revocation Decision as cross-plaintiff. Article III standing requires a plaintiff to plead facts sufficient to show: (1) injury-in-fact; (2) a "causal connection between the injury and the conduct complained of;" and (3) a likelihood that the alleged injury "will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). US Wind has suffered an actual or imminent injury—the loss of

Government approvals required to proceed with timely construction of the Project, and resulting financial harm—that already has occurred and is certain to continue based on the Government's Revocation Decision. Ex. B ¶¶ 37-79. US Wind's imminent injury is redressable because this Court has the equitable authority to preserve the *status quo* by enjoining the Government from revoking or otherwise disturbing the COP approval pending the Court's merits review of that approval and other challenged federal permits.

### b.  The Revocation Decision Is Imminent and Requires Injunctive Relief.

The Government's course of conduct over the past nine months demonstrates a real and imminent threat that it will implement its Revocation Decision—without waiting for this Court to rule on the merits of this case. US Wind therefore requires preliminary injunctive relief now to preserve the *status quo* and to prevent the irreparable harm that would follow from implementation of the Revocation Decision, coupled with emergency equitable relief now to preserve the *status quo* pending a decision on the preliminary injunction.

"[P]ast wrongs [from similar challenged conduct or policies] are evidence bearing on whether there is a real and immediate threat of repeated injury" in the context of a preliminary injunction. *Immigrant Defs. L. Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1051–52 (C.D. Cal. 2025), *citing O'Shea v. Littleton*, 414 U.S. 488, 496–97 (1974); *see also Bray v. City of New York*, 346 F. Supp. 2d 480, 487 (S.D.N.Y. 2004) ("Where a defendant has previously engaged in a pattern of similar acts, there is a sufficient likelihood that it will do so again in the near future."), *citing Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001).

As an initial matter, the Government has baldly asserted to this Court that it has the power to do exactly what US Wind is afraid it will do: implement the Revocation Decision by blocking ongoing construction without awaiting judicial review by this Court. ECF No. 84 at 4:11-13, 5:1-3. The Government also recently stated in a filing in another matter that it "intends to undertake a

reconsideration of its COP approval" for another offshore wind project without seeking judicial approval. *Save Long Beach Island v. U.S. Dep't of Commerce*, No. 1:25-cv-02214 [ECF No. 25] (D.D.C. Sept. 30, 2025).[24]

The Government's recent deeds have matched its words. First, the Government has taken actions against the Project that functionally implement the Revocation Decision: (a) halting review of COP-required submittals that are necessary pre-requisites for offshore construction, which necessarily precludes US Wind from moving forward with the pre-construction contracting, procurement and manufacturing activity necessary to build the Project, as permitted and contracted, (b) seeking to claw back the Project's Maryland air quality permit, and (c) cancelling a USDOT grant intended to assist in financing the marshalling port for Project construction. *See* Section II.b. above. Moreover, in the past six months, the Government has twice done almost exactly what US Wind asks this Court to preemptively enjoin: halt an offshore wind project based on a conclusory rationale while a citizen suit challenging the project's permits was pending. *Id.* These discrete acts are also representative of a torrent of anti-offshore wind decisions aimed at killing the Project and the rest of the offshore wind industry, accompanied by strident rhetoric telegraphing this objective. *Id.* These events collectively constitute a "pattern of similar acts" creating a "real and immediate threat" that the Government will fully implement the Revocation Decision and vacate the Project's COP approval before this Court can rule on its merits. Only an injunction will prevent that imminent action and the irreparable harm it will cause.

---

[24] This is on top of the two offshore wind projects for which the Government continues to seek voluntary remand of COP approval, and the one additional project in which a voluntary remand motion is imminent. *See* Section II.b. above.

### c. US Wind Is Likely To Prevail On The Merits of Its Challenge To the Revocation Decision.

The Government's Revocation Decision is illegal in multiple respects, and US Wind is likely to prevail on the merits of its cross claims challenging it.

### i. The Revocation Decision Violates OCSLA.

OCSLA's citizen suit provision allows "any person having a valid legal interest which is or may be adversely affected" to "commence a civil action … to compel compliance with this subchapter against any person, including the United States … for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).[25] Here, implementation of the Revocation Decision would violate OCSLA by disregarding the contractually binding effect of US Wind's COP approval, and by effectively suspending or cancelling US Wind's COP-approved activities and Lease rights without satisfying the required standards and procedures for such actions.

*First*, US Wind's lease grants it "the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, *to … conduct activities in the [leased area] that are described in a … COP that has been approved by the Lessor*." Ex. D at § 2(a) (emphasis added).

Following that COP approval, under the express terms of the Lease, US Wind had a "*COP that has been approved by the Lessor*," and became entitled to "*conduct activities … that are described in*" the COP, subject to compliance with the Lease and the cross-referenced statutory and regulatory provisions. Ex. D § 2 (emphasis added). From that point forward, the Government could take no actions to prevent US Wind from conducting those activities, except to the extent

---

[25] US Wind is not required to provide the Government with 60 days' notice for its OCSLA claim because revocation of the COP approval would "immediately affect[s] a legal interest" of US Wind. 43 U.S.C. § 1349(a)(3).

15

permitted by the Lease or the statutory and regulatory provisions it incorporates by reference. Where the Government does "not convince" the Court that such post-approval "actions were authorized by any other contractually cross-referenced provision," the actions necessarily violate the Lease—and therefore OCSLA. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 620, (2000); *see also* 43 U.S.C. § 1349(a)(1) (holding the United States liable under OCSLA for "violation … of the terms of any… lease"). The Government has not identified, and cannot identify, any term of the Lease or "any other contractually cross-referenced provision" of any statute or regulation that authorizes them to withdraw a COP approval or otherwise suspend or delay US Wind's COP activities under the circumstances present here.

**Second**, the Lease and the statutory and regulatory provisions it incorporates *expressly foreclose* the Revocation Decision. For one, BOEM has only three alternatives in acting on an application for COP approval. "Upon completion of our technical and environmental reviews and other reviews required by Federal law … BOEM will *approve, disapprove, or approve your COP with conditions*." 30 C.F.R. § 585.628(f) (emphasis added); *see also* Ex. D § 3(b) ("The Lessor will decide *whether to approve or disapprove a … COP* in accordance with the applicable regulations in 30 CFR Part 585, including 30 CFR § 585.102(a).") (emphasis added).[26] Nothing in the Lease or its cross-referenced statutory or regulatory provisions permits BOEM to withdraw or revoke a prior COP approval outright. That is no accident. In numerous analogous statutes, where Congress intends to authorize USDOI or another agency to withdraw prior approvals, it states so explicitly.[27] OCSLA and the associated regulations contain no such authorization.

---

[26] OCSLA does not itself address approval of renewable energy COPs, but analogous provisions governing approval of oil and gas "development" and "production" plans similarly give BOEM just three options: "*approve, disapprove, or require modifications of the plan*." 43 U.S.C. § 1351(h)(1) (emphasis added).

[27] *See, e.g.,* 16 U.S.C. § 1458 (authorizing the Interior Secretary to "withdraw approval of the management program of any coastal state"); 16 U.S.C. § 3321 (Interior Secretary, "in consultation with the Secretary of Commerce, may withdraw approval of a [comprehensive enhancement] plan"); 7 U.S.C. § 1639p ("the [Interior] Secretary may revoke

Rather than allowing BOEM to withdraw a COP approval, the Lease and cross-referenced statutory and regulatory provisions permit the United States to suspend Lease activities or cancel the Lease altogether only under certain specified circumstances. *See* Ex. D §§ 3 & 8; *see also* 43 U.S.C. § 1334(a)(1) (conditioning suspension on "a threat of serious, irreparable, or immediate harm or damage"); 43 U.S.C. §§ 1341(c), (d) (allowing suspension for "state of war," "national emergency" and "national defense" on "payment of just compensation to the lessee"); 43 U.S.C. § 1334(a)(2) (setting forth process and limitations on lease cancellation); 30 C.F.R. §§ 285.417, 422; 30 C.F.R. §§ 585.417, 422. The Government does not claim and cannot show that any of these circumstances exist, nor that they would justify the Revocation Decision. Consequently, the Revocation Decision would violate US Wind's Lease rights along with various related statutory and regulatory provisions—all in contravention of OCSLA.

***Third*** and relatedly, implementation of the Revocation Decision violates OCSLA's express statutory and regulatory limitations on suspending and canceling OCS lease activities—and thus constitutes an illegal *de facto* suspension or cancellation. There is no general, unbounded supervisory authority in OCSLA to disavow a COP approval extempore. Indeed, the strict limitations on suspension and cancellation reflect one of OCSLA's principal goals: to advance the United States' policy that the OCS "*should be made available for expeditious and orderly development*." 43 U.S.C. § 1332(3) (emphasis added). The Revocation Decision would functionally bar US Wind from conducting any of its previously approved activities on the Lease, with the same consequences as a Lease suspension but without the prerequisite process. 30 C.F.R. § 585.415(b) ("Activities may not be conducted on your lease or grant during the period of a suspension except as expressly authorized under the terms of the lease or grant suspension."). "A

---

approval of the State or Tribal plan"); 42 U.S.C. § 6947(a) (EPA administrator, "after notice and opportunity for public hearing, shall withdraw his approval of" solid waste disposal plan).

constructive suspension has the same effect and consequences as an actual suspension, and relief should be granted as if an actual suspension order had been issued." *Baldi Bros, Inc. v. United States*, 165 Fed. Cl. 471, 476 (2023) (citation omitted).

### ii. The Revocation Decision Violates Fifth Amendment Due Process.

The Revocation Decision deprives US Wind of its protected interest in its COP approval without due process of law in violation of the Fifth Amendment. The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. US Wind proves a violation of its rights under the Due Process Clause by demonstrating "(1) that it had a property interest; (2) of which [the Government] deprived it; (3) without due process of law." *Tri–County Paving, Inc. v. Ashe County,* 281 F.3d 430, 436 (4th Cir. 2002) (citation omitted).

Those requirements are easily satisfied here. First, as set forth in US Wind's Opposition to Plaintiffs' Motion to Dismiss Counterclaims, ECF No. 90 at 18-21, and adopted herein, US Wind has a protected property interest in its Lease and in the COP approval that was required for US Wind to exercise its Lease rights.

Second, the Government gave US Wind no notice and no opportunity to be heard as to the grounds for the Revocation Decision. The Fifth Amendment requires any hearing to be "'meaningful, and 'appropriate to the nature of the case." *Bell v. Burson*, 402 U.S. 535, 541-42 (1971) (internal citation omitted). In particular, "a hearing *which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended* does not meet this standard." *Id.* (emphasis added).

The Government provided US Wind with no process whatsoever before reaching its Revocation Decision, let alone one that involved "consideration of… element[s] essential to the

18

decision." Instead, it was presented as a *fait accompli* in the Government's filing in another case.[28] Nor can the Government argue that this litigation itself constitutes due process, given that it believes it can vacate the COP approval irrespective of anything this Court does. Ex. A at 4:11-13, 5:1-3. The Court must therefore enjoin the Revocation Decision as a violation of US Wind's due process rights.

### iii. The Revocation Decision Violates the APA.

#### 1. The Revocation Decision Is a Final Agency Action.

As set forth in US Wind's Opposition to Plaintiffs' Motion to Dismiss Counterclaims and adopted herein the Revocation Decision is a reviewable final agency action under the APA. ECF No. 90 at 14-17. The Government has determined that the COP approval must be vacated and expressed this determination in its Vacatur Motion, stating that "BOEM will issue a new decision with new analysis that may significantly impact, or outright moot, Plaintiffs' claims." ECF No. 81 at 8. The Government has not withdrawn the Vacatur Motion or repudiated the reasoning behind it. Indeed, one only needs to review the totality of this Administration's actions—public statements, industry-wide orders and memoranda, actions intended to halt offshore wind projects, and corollary actions to harm US Wind—to understand that there is "no doubt" about the endgame: termination of the Project. *See* Section II.b above. Further, the Revocation Decision determines US Wind's legal rights and obligations because withdrawal of the COP approval precludes US Wind from conducting any construction activities on its Lease. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Just as a decision to issue—or deny—a particular permit, rule, or determination is final agency action, *see, e.g.*, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1037 (D.C. Cir.

---

[28] *See* FN 23, supra.

2002), so too is a decision to suspend, rescind, or withdraw one. *See, e.g.*, *Chamblee v. Espy*, 100 F.3d 15, 17 (4th Cir. 1996).

### 2.    *The Revocation Decision Is Arbitrary and Capricious.*

The Revocation Decision is arbitrary and capricious under the APA because the Government cannot provide a reasoned explanation for its about-face and has failed to consider US Wind's reliance interests in its COP approval. To survive arbitrary-and-capricious review, agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That burden increases when the agency changes course based on "factual findings that contradict those which underlay its prior policy" or where the "prior policy has engendered serious reliance interests." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). The Revocation Decision fails to meet these marks.

*First*, the Government's abrupt about-face is neither reasonable nor explained. The Government has had *nine months* since issuance of the Wind PM to identify material, substantive flaws in BOEM's robust COP approval process—and has yet to do so.[29] This is the definition of arbitrary and capricious decision making, as "[a]n agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Fox TV*, 556 U.S. at 537.

*Second*, the Revocation Decision fails to adequately account for US Wind's serious reliance interests on the COP approval and other federal permits. US Wind worked for a decade to secure the necessary approvals to proceed with the Project. Relying on those approvals, beginning

---

[29] To the extent the Government continues to rely on the representations in its Vacatur Motion that BOEM's analysis of search and rescue and commercial fisheries impacts was deficient, these justifications are not reasoned because they rest solely on citations to BOEM's own final environmental impact statement ("FEIS") demonstrating the completeness of BOEM's analysis, *see* ECF No. 81 at-7-8, ECF No. 81-1 ¶¶ 14-15, Ex. B ¶¶ 24-29, as well as on the Government's new *post hoc* interpretation of OCSLA (see Section IV.c.iii.3.).

in late 2024, US Wind started construction of the offshore and onshore substation electrical systems, continued engineering and work to prepare the Sparrows Point marshalling yard, filed updated PJM que details, continued geotechnical surveys for substation layouts, conducted onshore civil design work, among other development and construction activities. Ex. B ¶ 36. This is on top of US Wind's expenditures and commitments made in the preceding years in reliance on the expectation that it would receive a fair hearing for its COP and that the Government would respect its leasehold rights and comply with the law and the Constitution. *Id.* There is no evidence that the Government has even acknowledged, let alone meaningfully considered, these reliance interests. It is "arbitrary and capricious to ignore such matters." *Fox TV*, 556 U.S. at 515; *see also Revolution Wind*, No. 1:25-cv-02999 (D.D.C. Sept. 22, 2025), Tr. 42:25-43:7 (recognizing that offshore wind developers have "strong reliance interests" where they invest in "planning, developing, designing, manufacturing, and constructing" a project based on "approval[s] from . . . Interior and BOEM").

### 3.  The Revocation Decision Is Not In Accordance With Law

The Revocation Decision also violates the APA because it is "not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D). **First**, as stated in Section IV.c.i, the Revocation Decision violates OCSLA and its regulations—and therefore violates these provisions of the APA.

**Second**, the Government's proffered justification for the Revocation Decision is illegal in several respects. The Government has asserted that it must vacate the COP approval because it relied on an interpretation of OCSLA Section 8(p)(4) based on DOI Solicitor's Office M-Opinion 37059, which BOEM withdrew five months after the Project's COP approval in favor of the new Administration's M-Opinion 37086. ECF No. 81 at 10, *citing* ECF No. 81-1 at ¶¶ 11-12. But

BOEM was legally required to decide US Wind's COP pursuant to M-Opinion 37059. For one, M-Opinions are binding on DOI. *See* 209 Interior Department Manual 3.2(A)(11). More importantly, M-Opinion 37059 was adopted into BOEM's regulations in May 2024 following a notice-and-comment rulemaking. 30 C.F.R. § 585.102(a).[30]   Not only can agencies "not violate their own rules and regulations to the prejudice of others," *see Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005), but 30 C.F.R. § 585.102(a) *continues* to require adherence to M-Opinion 37059. The Government cannot now rescind it without following the same notice-and-comment rulemaking process. 5 U.S.C. § 553; *see Perez v. Mortgage Bankers Association*, 575 U.S. 92, 101 (2015) (agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."). Indeed, BOEM is bound by the terms of the Lease to review the COP in accordance with 30 C.F.R. § 585.102(a). Ex. D § 3(b).

Moreover, the Government's proffered basis for its Vacatur Motion constitutes a flagrantly illegal retroactive application of an interpretive rule. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). By applying a new rule to a prior decision, the Government has engaged in exactly the type of impermissible retroactivity that the law prohibits.[31]

[30] *See also* Renewable Energy Modernization Rule, 98 Fed. Reg. 42602, 42644 (May 15, 2024) ("The purpose of this change is to clarify that BOEM takes all of these relevant factors into consideration in planning and administering its renewable energy program and that no one factor or consideration, by itself, should outweigh the other relevant considerations.").
[31] The inappropriateness of basing the Revocation Decision on M-Opinion 37086 is compounded because only this Court can say whether that M-Opinion's interpretation is "the best" reading of Section 8(p)(4). *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) (quoting 5 U.S.C. § 706). Notably, the only circuit to interpret Section 8(p)(4) agreed with the reading of the statute that BOEM codified in its regulations and the Lease and relied upon to approve the Project's COP. In affirming BOEM's approval of another offshore wind project off Massachusetts, the First Circuit confirmed that OCSLA provides BOEM discretion to determine whether each "(p)(4)" factor is satisfied, and "BOEM must 'balance' the statutory mandate to develop energy projects on the [OCS] with the twelve statutory criteria for which it must provide." *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1, 25-26 (1st Cir. 2024), *cert. denied*, 221 L. Ed. 2d 955 (May 5, 2025), and 221 L. Ed. 2d 955 (May 5, 2025). The First Circuit rejected the "'absolutist' argument" advanced by plaintiffs (and echoed by the Government in its Vacatur

#### 4. *The Revocation Decision Violates Section 558(c).*

The Government's Revocation Decision, made without notice to US Wind, is inconsistent with APA Section 558(c), which prohibits the "withdrawal, suspension, revocation, or annulment of a license" without first giving the licensee: (1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements."  5 U.S.C. § 558(c). These requirements demonstrate that Congress recognized the need for additional procedural protection when it comes to licensing decisions. *See Gallagher & Ascher Co. v. Simon*, 687 F.2d 1067, 1074 (7th Cir. 1982) ("The legislative history of the section … demonstrates that the sole purpose of the second sentence was to provide a licensee threatened with the termination of its license an opportunity to correct its transgressions *before actual suspension or revocation of its license resulted*.").

As discussed in Section IV.c.ii above, the Government has not provided proper notice prior to its Revocation Decision, nor have they set forth "facts or conduct which may warrant" withdrawal of COP approval or given US Wind with an opportunity to demonstrate or come into compliance with all applicable requirements before unilaterally reaching its Revocation Decision. This plainly violates APA Section 558(c). *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 635 (5th Cir. 2023).

---

Motion) that "if a project is likely to have any modicum of impact on one or more of the twelve OCSLA criteria, the BOEM cannot approve it." *Id.* at 26. By the same token, the First Circuit noted that "[a] statute encouraging the development of offshore wind projects but obligating the BOEM to ensure that such projects be carried out in a manner that provides for safety, for example, cannot be read to prohibit project approval simply because one could imagine the project being involved in an accident." *Id.* Yet the Government would instead read OCSLA to mandate the rejection of *any* proposed activity that would cause non-*de minimis* interference, even if the proposed activity appropriately accounts for or promotes the eleven other statutory factors—virtually assuring the absurd result that BOEM must deny all COPs. *See* M-37059; M-37086.

**5. *The Revocation Decision Is a Result of Undue Political Influence.***

The Government's actions in the instant case have plainly been motivated by political pressure and undue influence and must therefore be set aside. *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1972); *Nat'l Ctr. for Pres. L. v. Landrieu*, 496 F. Supp. 716, 743 (D.S.C.)*, aff'd*, 635 F.2d 324 (4th Cir. 1980) (analyzing improper political influence using *Volpe*, 459 F.2d 1231, as the "controlling principle of law.").  An agency action influenced by political pressure "would not be immunized merely because [the agency] also considered some relevant factors." *Volpe*, 459 F.2d at 1247–48. There is voluminous *public* evidence detailed above that improper political considerations are driving the Government's decision-making process. *See* Section II.b. above. Furthermore, the harms caused by this undue political influence are already manifest and will continue to grow. *See* Ex. B at ¶¶ 37-79.

### d.  US Wind Will Suffer Irreparable Harm Absent an Injunction

The loss of US Wind's COP approval through the Government's execution of its Revocation Decision creates an existential threat to its entire business—and would cause irreparable financial and reputational harm even if somehow it did not permanently kill the Project.

US Wind is an offshore wind developer who owns one BOEM offshore wind lease that, by its own terms, can only be used to do one thing: construct and operate an offshore wind project. Ex. B ¶ 51. US Wind has obtained all its permits to construct the Project and cannot build it if it loses even one of them. Ex. B ¶¶ 5-6. The Revocation Decision thus "threaten[s] a party's very existence by… driving it out of business before litigation concludes," and thereby constitutes the very type of irreparable harm that justifies emergency relief. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 218 (4th Cir. 2019). As discussed at length in the Declaration, a complete loss of the project would also result in a loss of over $322 million in investments already made that may never be recouped among other

24

irreparable harms to US Wind. *See* Ex. B ¶¶ 9-10, 49-79 (extensively detailing the irreparable harm to US Wind should the Revocation Decision be implemented including the existential threat to US Wind's business, the harm of defaulting on financing obligations, loss of all expected revenues from the Project, loss of economic, societal, and environmental benefits to Maryland and Delaware, loss of hundreds of millions in payments to the U.S. Treasury, and irreparable reputational harms to US Wind.) *See Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) ("If expenditures cannot be recouped, the resulting loss may be irreparable.").

US Wind would still be irreparably harmed even if the Revocation Decision somehow only delayed construction of the Project—for instance, if the Government had another about-face and reissued a viable COP approval, or if US Wind re-applied for a COP approval in several years under a different administration or a different normative framework (*e.g.* without being able to claim the relevant investment tax credit, that are set to expire by 2034). Where, as here, an action threatens a project developer's ability to finish a project on time or fulfill financing requirements (Ex. B ¶¶ 42-52), there is irreparable harm. *See, e.g., PSEG Renewable Transmission LLC v. Arentz Fam., LP*, No. 25-CV-1235-ABA, 2025 WL 1725814, at *22 (D. Md. June 20, 2025) (finding irreparable harm where plaintiff "has shown that the project could be substantially delayed in the absence of an injunction, and that it likely will suffer substantial monetary harm from anticipated future financial losses (such as loss of revenue) as a result of the delay").[32]

Implementation of the Revocation Decision, whether by formal Project termination or by endless review or interim Project delays, would also cause US Wind irreparable reputational harm by forcing it to withdraw from myriad contractual and financing commitments. Ex. B ¶¶ 78-79.

---

[32] Moreover, the APA, which waives Defendants' sovereign immunity, does not allow for monetary relief. 5 U.S.C. § 702 (describing a right of review "other than money damages"). These types of losses are irreparable. *Am. Fed. Of State, Cnty., & Municipal Employees, AFL-CIO v. Social Security*, 771 F.Supp. 3d 717, 792 (D. Md. 2025).

"When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756, F.2d 1048, 1055 (4th Cir. 1985).

### e. The Balance of Equities and Public Interest Favors An Injunction

Both the balance of the equities and public interest strongly favor enjoining the Government from disturbing US Wind's COP approval.

#### i. Neither the Government Nor Plaintiffs Would Be Harmed By The Requested Injunction

As discussed in Section IV.d. above, US Wind will be grievously harmed by any action that abrogates its COP approval. The Government, on the other hand, "cannot suffer harm from an injunction that merely ends an unlawful practice." *Sanchez v. McAleenan*, No. GLR-19-1728, 2024 WL 1256264, at *14 (D. Md. Mar. 25, 2024) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). As discussed in Section III above, the Revocation decision violates OCSLA, the 5th Amendment, and the APA.

Even if this Court determines at the end of this case that US Wind's COP approval should be vacated, neither the Government nor Plaintiffs will be prejudiced by an order preserving the *status quo* in the interim. Such an order will in no way delay the very thing Plaintiffs have sought in filing this case: a judicial determination as to the validity of the COP approval. And the Government, for its part, cannot demonstrate any harm from preservation of the *status quo* while awaiting the adjudication of this case on the merits, which would reduce its administrative burden by forestalling the need for it to defend additional lawsuits arising from the same COP approval.

#### ii. The Public Interest Would Be Served By An Injunction Protecting US Wind's Federal Permits

The public interest would be served in numerous ways if this Court were to act expeditiously to preserve US Wind's COP approval during the pendency of this litigation, while

leaving the COP approval vulnerable to the whims of the Government would decidedly have the opposite result.

First, it is axiomatic that there is a strong public interest in Federal agencies following the law—which would be broken if the Government revoked US Wind's COP approval. *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021) (citation omitted). Second, the public has an interest in infrastructure project developers being able to rely on the finality of their federal permits. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013); *see also Greater Bos. Television Corp. v. F.C.C.*, 463 F.2d 268, 289 (D.C. Cir. 1971) (Where "investments may be made in reliance on" a construction permit, "the public interest in finality is dominant over the public interest in possibly improving the administrative result on further consideration. That interest in finality… permits the making of investments[.]").

The U.S. Chamber of Commerce drove this point home recently. Citing the Revocation Decision, the Chamber correctly noted that this Administration's "recent decisions to issue halt work orders on offshore wind projects that already have permits" both "inject significant uncertainty into the infrastructure development process" and "invariably increases the price of the projects and risks raising the cost of electricity, diminishing our ability to meet growing demand."[33] The Chamber urged this Administration to ensure that permits for energy projects, "once granted, remain secure and reliable to foster confidence, drive investment, and build the infrastructure essential for economic growth and energy security."[34]

---

[33] Martin Durbin, President, Global Energy Institute, U.S. Chamber of Commerce, *We Need Permitting Certainty, From Start to Finish* (Sept. 3, 2025), https://www.uschamber.com/economy/we-need-permitting-certainty-from-start-to-finish., *citing* Trump administration plans to cancel approval of Maryland offshore wind project, Reuters (Aug. 26, 2025) (last accessed Oct. 10, 2025), attached as **Exhibit O**.

[34] *Id.* Indeed, even the Government recognizes the adverse effect that unilateral executive actions against final permits can have on investor confidence. Perhaps worried that a future administration might treat his favored energy infrastructure as arbitrarily as he has done to offshore wind, Cross-Defendant Secretary Burgum has advocated for the creation of a "sovereign risk insurance fund," noting that "[f]uture administrations should not be able to say, 'No, with the stroke of a pen we're going to kill this pipeline project,' even though that company has $3 billion in the ground."

Lastly, denying an injunction would jeopardize US Wind's ability to deliver the Project's myriad benefits to the people of Maryland and Delaware. As even this Administration has admitted, this country is facing an increasing mismatch between electricity supply and demand.[35] This energy crunch has severe local implications: PJM Interconnection, the grid operator serving Maryland, has made clear that costs will rise as electricity demand exceeds its ability to bring new generation online. Ex. C ¶¶ 21-24.[36] The Project represents 1,710 megawatts of nearly shovel-ready capacity that Maryland has already procured through its offshore renewable energy credit mechanism—an injunction that preserves a path to adding this energy to the grid is plainly in the public interest. Ex. B ¶ 7; Ex. C ¶¶ 8, 28-31.

Beyond the Project's ability to meet rising energy demand and direct fiscal contributions to the region, it is expected to create 13,600 job-years and at least $6.2 billion in total economic impact to Maryland upon completion—in addition to saving ratepayers in Maryland and Delaware an estimated $12.6 billion over its first 20 years of operation. Ex. B ¶¶ 7; Ex. C ¶ 17; *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004) (finding completion of pipeline is in the public interest because "it will help in the efforts of local communities to attract much-needed new business."); *Sierra Club*, 990 F. Supp. 2d at 42 ("The public has a strong interest in the jobs and economic growth that construction and operation of the [] pipeline will create."). The Project will also reduce air emissions by 67,000 tons of nitrous oxide (NOx) and nearly 105,000 tons of sulfur dioxide (SO2), saving billions of dollars in avoiding health effects and over 1,400 avoided

Heather Richards, *Burgum wants to pay fossil companies when government halts projects*, E&E News (April 30, 2025), https://www.eenews.net/articles/burgum-wants-to-pay-fossil-companies-when-government-halts-projects/, attached as **Exhibit P**. The public interest in permitting certainty that Secretary Burgum recognizes for pipelines applies with equal force to the Project and others like it.

[35] *See, e.g.*, EO 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 20, 2025).

[36] *See also* PJM Inside Lines, *PJM Auction Procures 134,311 MW of Generation Resources; Supply Responds to Price Signal* (July 22, 2025), https://insidelines.pjm.com/pjm-auction-procures-134311-mw-of-generation-resources-supply-responds-to-price-signal/ (last accessed Oct. 10, 2025), attached as **Exhibit Q**.

mortalities per year.[37]  Ex. B ¶ 75; Ex. C ¶ 19; *see also Ohio Valley Env't Coal. v. U.S. Army Corps. of Eng'rs*, 528 F.Supp.2d 625, 634-35 (S.D. W.Va. 2007) ("The public has an interest in ensuring the safety and health of all its members . . . [a] denial of this injunction may have a negative effect on all of these interests."). Additionally, the public has an interest in the estimated $300 million in operating fees to the U.S. Treasury US Wind will pay over its 35-year operations period once the Project is built. Ex. B ¶ 70*; see also Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007) (finding that an energy project that would "generate millions of dollars in revenue" was "clearly in the public interest"). The public interest heavily favors taking emergency measures to preserve US Wind's right to build the Project during the pendency of this litigation.

### f.  The Revocation Decision Is An Abuse of the Judicial Process that Independently Warrants an Emergency Injunction.

Separately, the Government's effort to evade judicial review of the Project's COP approval and other federal permits constitutes abuse of process that justifies this Court issuing an injunction in furtherance of its inherent authority to manage its own docket.

Plaintiffs' lawsuit initially put the merits of the BOEM's COP approval and other permits before this Court. Now, the Government has switched from defending the COP approval to attacking it. Notably, the rationale the Government had proffered for vacating the COP approval— BOEM's alleged failure to "adequately ensure" that the project met the standards of OCSLA Section 8(p)(4)—is *the same* as the second count in Plaintiffs' Amended Complaint. *Compare* ECF No. 81 at 10, *to* ECF No. 32 at ¶¶ 68-115. In other words, both Plaintiffs and the Government have staked the legality of the Project's COP approval on this Court's interpretation of OCSLA.

Although this Court has directed the Government to certify an administrative record and participate in merits briefing, the Government has already begun implementing the Revocation

---

[37] FEIS at 3-25

Decision, (Ex. B ¶¶ 37-48), and has made clear its intent to revoke the challenged agency action regardless of when and how this Court rules on the merits. Ex. A at 4:11-13, 5:1-3. This is an abuse of process that, if allowed, would deprive this Court of its rightful jurisdiction over the merits of the Project's COP approval and other permits. *See, e.g., Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 15–16 (D.C. Cir.), *judgment entered,* 762 F. App'x 7 (D.C. Cir. 2019) (disapproving of "party manipulation of the judicial process through the false pretense of singlehandedly ending a dispute").[38]

This Court has the inherent authority to enjoin the Government from abusing the judicial process. *See Green v. Prince George's Cnty. Off. of Child Support*, 641 B.R. 820, 837–38 (D. Md. 2022), aff'd, No. 22-1705, 2023 WL 3051812 (4th Cir. 2023) ("Federal courts have inherent authority to enjoin litigants from abusing the judicial process[.]"), *citing In re Weiss*, 111 F.3d 1159, 1171 (4th Cir. 1997); *see also Matter of Grace Ocean Priv. Ltd.*, No. CV 24-00941-JKB, 2024 WL 4392087, at *1 (D. Md. Oct. 2, 2024) (invoking inherent authority to require party to ensure employees remain in the court's jurisdiction through the conclusion of proceedings). Thus, this Court may—and should—halt any effort by the Government to revoke the COP approval pending its review, whether it finds that the preliminary injunction standard under Federal Rule 65 has been met.

**V.    CONCLUSION**

For the foregoing reasons, this Court should grant US Wind's request for preliminary injunctive relief.

---

[38] The Government's conduct here is even worse than the scenario described in *Guedes*, in which an agency engages in "voluntary cessation" of a challenged action to evade judicial review but intends to reinitiate that action after the case is dismissed. Here, the Government endeavors to engage in the voluntary cessation of a permitting action with no intent to ever reinitiate it—and with the specific intent of prejudicing the permittee.

Dated: October 15, 2025

Respectfully submitted,

By: */s/ Toyja E. Kelley*
Toyja E. Kelley, Sr. (D. Md. Bar No. 26949)
Emily Huggins Jones (*pro hac vice*)
Gregory L. Waterworth (D. Md. Bar No. 20938)
**TROUTMAN PEPPER LOCKE LLP**
701 8th Street, N.W., Suite 500
Washington, D.C. 20001
Telephone: (202) 220-6900
Facsimile: (202) 220-6945
toyja.kelley@troutman.com
emily.hugginsjones@troutman.com
greg.waterworth@troutman.com

Hilary Tompkins (*pro hac vice*)
Sean Marotta (*pro hac vice*)
**HOGAN LOVELLS US LLP**
555 13th Street N.W.
Washington, D.C. 20004
Telephone: (202) 637-5617
hilary.tompkins@hoganlovells.com
sean.marotta@hoganlovells.com

David Newmann (*pro hac vice*)
**HOGAN LOVELLS US LLP**
1735 Market St., 23d Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
david.newmann@hoganlovells.com

*Attorneys for Defendant-Intervenor and Crossclaim Plaintiff US Wind, Inc.*

31