UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MAYOR AND CITY COUNCIL<br>OF OCEAN CITY MARYLAND, *et al.* | )<br>)<br>)<br>) |  |
| Plaintiffs/Counter-Defendants, | )<br>) |  |
| v. | )<br>) |  |
| UNITED STATES DEPARTMENT<br>OF THE INTERIOR, *et al.* | )<br>)<br>) | Civil Action No. 1:24-cv-03111-SAG |
| Defendants/Cross-Defendants, | )<br>)<br>) |  |
| and | ) |  |
| US WIND, INC. | )<br>)<br>) |  |
| Defendant-Intervenor/Cross-<br>and Counter-Plaintiff. | )<br>)<br>) |  |

**AMICUS BRIEF OF UNITED STEELWORKERS IN SUPPORT OF
DEFENDANT-INTERVENOR/ CROSS- AND COUNTER-PLAINTIFF
US WIND'S MOTION FOR PRELIMINARY INJUNCTION**

Over a decade after it leased 80,000 acres off the coast of Maryland to US Wind to propose and potentially develop and operate an offshore wind farm, and almost a year after approving the wind farm's Construction and Operations Plan ("COP"), the federal government reversed course, deciding to revoke its approval of the offshore wind farm's COP, interfering with Maryland's air-quality permitting process, and cancelling a previously approved $47 million grant to redevelop the legendary Sparrows Point Steel facility—despite having spent nearly a year defending the offshore wind farm in court. Defendant-Intervenor and Cross- and Counter-Plaintiff US Wind's crossclaims, Motion for a Preliminary Injunction, and supporting Memorandum and Exhibits persuasively demonstrate its likelihood of succeeding on the merits, that the Bureau of Ocean Energy Management (the "BOEM")'s revocation of the COP has irreparably harmed US Wind,

that the balance of the equities is strongly in its favor, and that the public interest supports a preliminary injunction.

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "United Steelworkers" or the "USW") submits this brief in support of US Wind's Motion to bring to the Court's attention particular interests the BOEM ignored in its ill-considered, arbitrary, and politically motivated cancellation of the COP: the interests of working Marylanders in the redevelopment of Sparrows Point—once the largest steel production facility in the world—and the development of the Maryland offshore wind farm, both of which will bring a considerable number of skilled jobs and a commensurate economic uplift to the Baltimore region and beyond. Protecting those critical social and economic interests is a compelling reason why a preliminary injunction here is in the public interest.

## STATEMENT OF INTEREST

United Steelworkers is an industrial union representing over 500,000 workers across more than 1,800 local unions in the United States, Canada, and the Caribbean. USW bargains on behalf of its members with respect to wages, safety issues, job security, and other terms and conditions of employment and, where it has a willing partner, advocates for the protection and expansion of America's manufacturing capacities. United Steelworkers represents workers in a diverse range of industries, but as its name indicates, its origins are in representing workers engaged in steelmaking. USW has a long history at Sparrows Point from when the union was voted in at the steel mill in 1941, where it represented generations of workers until the steel mill shut down in 2012.

The Sparrows Point real estate was sold, the steel plant assets were leveled, and the site was redeveloped for other purposes. Then, in August 2021, United Steelworkers and US Wind announced a partnership to develop a manufacturing facility on the historic Sparrows Point site to

fabricate monopile foundations and other steel components necessary for building the offshore wind farm that US Wind would develop off the shore of Maryland. USW and US Wind created a joint training fund to facilitate investment into the recruitment and training of local workers and agreed to allow those workers to unionize without company opposition.[1] United Steelworkers has an interest in returning well-paying union jobs—USW-represented and otherwise—to the Baltimore region, as well as the social and economic benefits that will flow from those jobs.

## ARGUMENT

### I. USW Represented Steel Workers at Sparrows Hill When It Was the Largest Steel Mill in the World and Helped Build America

The Pennsylvania Steel Company first broke ground at Sparrows Point in 1887, and by 1891, the mill was making steel used to build America's burgeoning railroads.[2] The workers at Bethlehem Steel's Sparrows Point plant produced steel used in the construction of the Empire State Building, the Golden Gate Bridge, and ships that helped win World Wars I and II.[3] In 1941, USW's predecessor, the Steel Workers Organizing Committee, was voted in as the labor union at the steel mill at Sparrows Point, and in 1942, the Committee became the United Steelworkers.[4] At its peak

---

[1] US Wind agreed to similar terms with other labor organizations for the construction and operation of the offshore wind farm. *Sparrows Point Steel*, US Wind, https://uswindinc.com/sps/ (last accessed Oct. 21, 2025).

[2] Frank Whelan, *Steel from the Sparrows Point perspective*, Morning Call (last updated Oct. 5, 2021), https://www.mcall.com/2005/03/04/steel-from-the-sparrows-point-perspective/; Donna K. Keesling, *Sparrows Point: From Steelmaking to Distribution Center Hub*, The Pursuit of Hist. (Dec. 22, 2021), https://thepursuitofhistory.org/2021/12/22/sparrows-point-from-steelmaking-to-distribution-center-hub/.

[3] Keesling, *supra*; Tyler Wilson, *Sparrows Point*, Balt. Heritage (last updated Jul. 21, 2022), https://explore.baltimoreheritage.org/items/show/714.

[4] *Forging America: The History of Bethlehem Steel – Chapter 5*, Morning Call (last updated Jan. 30, 2019), https://www.mcall.com/2003/12/10/forging-america-the-history-of-bethlehem-steel-chapter-5/.

of production in the 1950s, Sparrows Point employed over 30,000 USW members and was the largest steel mill in the world.[5] After decades of decline in domestic manufacturing and a series of sales and bankruptcies, the steel mill at Sparrows Point shut down in 2012.[6] Due to Sparrows Point's critical place in the history of the United States and the United Steelworkers, many USW members consider it "hallowed ground."[7]

II.     **The Plans for Sparrows Point Steel and Its Maryland Offshore Wind Project Stand to Revitalize a Key Part of America's Industrial Core, Bring Well-Paying Union Jobs to Maryland, and Create Significant Downstream Economic Benefits**

In 2021, United Steelworkers and US Wind announced a partnership to transform a portion of the former Sparrows Point steel mill into a manufacturing facility to fabricate necessary components for constructing US Wind's planned wind farm off the shore of Maryland.[8] Specifically, Sparrows Point Steel is intended to first fabricate monopile foundations,[9] and then other steel components, first for US Wind's Maryland offshore wind farm, and then for wind farms

---

[5] Bill Barry, *Historical Marker for Sparrows Point Steel Mill*, Lab. and Working-Class Hist. Ass'n (July 22, 2016), https://lawcha.org/2016/07/22/historical-marker-sparrows-point-steel-mill/.

[6] Keesling, *supra* n.6.

[7] *Offshore Wind, Onshore Benefits: Growing the Domestic Wind Energy Industry: Hybrid Hearing Before the Subcomm. on Energy of the H. Comm. on Energy & Commerce*, 117th Cong. 29 (2021) (statement of James Strong, Assistant to Dir., USW Dist. 8), https://www.congress.gov/117/chrg/CHRG-117hhrg56194/CHRG-117hhrg56194.pdf.

[8] *USW, US Wind Announce Partnership to Transform Historic Sparrows Point Site*, United Steelworkers, https://usw.org/press-release/usw-us-wind-announce-partnership-to-transform-historic-sparrows-point-site/ (Aug. 3, 2021).

[9] Monopiles are one type of offshore wind energy foundation, typically a hollow steel cylinder driven into the seabed with turbine components installed on top. Jeremy Stefek et al., Nat'l Renewable Energy Lab'y, *U.S. Offshore Wind Workforce Assessment*, (2022) ("Workforce Report") at 9 n.6, https://docs.nrel.gov/docs/fy23osti/81798.pdf.

up and down the East Coast.[10] USW and US Wind made two agreements in connection with the Sparrows Point Steel Facility. First, they entered into a Memorandum of Understanding under which US Wind has committed to remain neutral in union organizing efforts at Sparrows Point and to recognize USW as the workers' bargaining agent upon a showing of majority support.[11] Second, acknowledging that this project can only succeed if US Wind is able to draw upon a workforce that possesses the requisite skills for this complex manufacturing operation, they entered into a Trust Agreement to facilitate and fund the specialized and intensive training needed for workers to be able to do the various fabrication and manufacturing jobs at Sparrows Point Steel.[12]

Once completed, US Wind is expected to create, in connection with its development of the Maryland offshore wind farm, 530 new, permanent jobs at Sparrows Point Steel.[13] Those jobs, which will include rollers, millers, welders, and coaters,[14] are predicted to bring in over $1 billion in labor income, for what will likely be mostly, if not entirely, USW members, over the course of

---

[10] *Sparrows Point Steel*, *supra*.

[11] Strong Decl. ¶ 19; *Sparrows Point Steel*, *supra*.

[12] Strong Decl. ¶ 21.

[13] *Sparrows Point Steel*, *supra*.

[14] Rollers roll precut steel plates, prepare the rolled plates for welding, and bond and calibrate the hulls in the roller. As a result, the workers need experience in metalworking and with overhead cranes. Millers use a robotic saw to mill groves for welding activities. After the steel plates are rolled, the operator and submerged arc welders make weld connections on rolled steel plates using automatic or semiautomatic welding machines. These roles require experience in machine or manual welding, and typically the original equipment manufacturer provides specialized welding training that is unique to monopile production. Finally, coaters prepare and paint the monopile surface.

Workforce Report at 22.

20 years.[15] The total economic output of Sparrows Point Steel over 20 years is expected to be just shy of $3 billion.[16] And US Wind has already invested $35 million, and has further committed to invest $370 million, in the redevelopment of Sparrow's Point; costs so far have included "rental payments, site upgrade costs, tenant fees, O&M expenses, engineering and construction, property taxes, and insurance." Grybowski Decl. ¶¶ 64, 69(a), ECF No. 92-4,. Those substantial investments and expectations in USW-represented jobs, income, and productivity would be lost if the BOEM is allowed to cancel the COP.

    The Sparrows Point Steel facility is only a small fraction of US Wind's overall offshore wind farm project, which is expected to create over 6,200 direct job-years over the course of development, construction, and operations in the State of Maryland.[17] Those construction jobs are also likely to be union jobs, pursuant to memoranda of understanding US Wind entered into with other labor organizations including the Baltimore-D.C. Building Trades and the International Brotherhood of Electrical Workers Locals 126 and 313.[18] Those union jobs are expected to create over $700 million in direct labor income alone.[19] That does not include indirect job creation down the supply chain, which is expected to add an additional 7,300 job years—for a total of 13,600 job years—and an additional $410 million in indirect labor income at nearly 50 companies across

---

[15] *Sparrows Point Steel*, *supra*.

[16] *Sparrows Point Steel*, *supra*.

[17] *Skipjack Offshore Energy, LLC and US Wind, Inc.'s Offshore Wind Applications Under the Clean Energy Jobs Act of 2019*, Md. Pub. Serv. Comm'n, Case No. 9666, Doc. No. 172, US Wind Rebid Appl. (2024) ("Rebid Appl."), App. 5.1 at 21, https://webpscxb.psc.state.md.us/DMS/case/9666 (last accessed October 21, 2025).

[18] *Sparrows Point Steel*, *supra*.

[19] Rebid Appl., App. 5.1 at 20.

Maryland.[20] US Wind has already invested more than $320 million into the Maryland offshore wind farm project. Grybowski Decl. ¶ 9, ECF No. 92-4. And the total economic impact of the Maryland offshore wind farm project is expected to amount to over $6.2 billion.[21] The aforementioned investment, expected union jobs, and expected economic gains will be nullified if the BOEM is allowed to withdraw the COP and kill the wind farm.

### III. Protecting the Expected Well-Paying Union Jobs and Social and Economic Benefits of the Maryland Offshore Wind Farm and the Sparrows Point Steel Facility Is in the Public Interest

When evaluating whether a preliminary injunction against agency action is in the public interest, courts regularly weigh the social and economic costs of the challenged action. *See, e.g.*, *Gov't of Manitoba v. Zinke*, 849 F.3d 1111, 1121–22 (D.C. Cir. 2017) (weighing the costs of delaying construction of a water treatment plant in determining the public interest of modifying an injunction). Agencies must also consider the reliance interests of regulatory beneficiaries when rescinding reasoned determinations, *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020), including the reliance interests of workers "whose careers and livelihoods were upended" by the agency's change of course. *Thakur v. Trump*, 787 F. Supp. 3d 955, 974 (N.D. Cal. 2025). Similarly, agency action that "may lead to the total loss or paring back of projects that were years in the making . . . harms the public interest." *Id.* at 996–97; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring) (Agency action which "makes worthless substantial past investment incurred in reliance upon the prior rule" is arbitrary and capricious.).

---

[20] Rebid Appl., App. 5.1 at 18–21; Larry Ray & Jim Strong, *Union workers remain committed to forging the future at Sparrows Point*, Md. Matters (Oct. 17, 2025), https://marylandmatters.org/2025/10/17/union-workers-remain-committed-to-forging-the-future-at-sparrows-point/.

[21] Rebid Appl., App. 5.1 at 20.

To that end, courts are clear that there is a strong public interest in the jobs and economic growth that construction will create. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 42 (D.D.C. 2013).

Courts within the Fourth Circuit regularly consider such social and economic reliance interests. For instance, in *American Association of Colleges for Teacher Education v. McMahon*, when considering whether to enjoin the federal government's termination of several grant programs, the court placed great weight in "the asserted concrete, irreparable harm in the form of programmatic closures, staff terminations, and loss of funding of teacher preparation programs," emphasizing that "[t]he harms Plaintiffs identify also implicate grave effect on the public: fewer teachers for students in high-need neighborhoods, early childhood education, and special education programs." 770 F. Supp. 3d 822, 859–60 (D. Md. 2025). Similarly, in *PFLAG, Inc. v. Trump*, when considering whether to enjoin the federal government from withholding all federal funding from healthcare entities based on their provision of gender-affirming medical care to minors, the court found that the injunction was in the public interest because the Executive Orders in question "threaten[ed] to harm transgender youth, as well as access to medical care for entire communities if hospitals decide to continue to provide gender-affirming medical care and then lose significant federal funding." 769 F. Supp. 3d 405, 451 (D. Md. 2025). Courts in this circuit also regularly recognize the strong public interest in job creation. *See Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less*, 310 F. Supp. 3d 685, 696 (N.D. W. Va. 2018) (recognizing benefit to public of job creation); *Va. Chapter, Associated Gen. Contractors of Am., Inc. v. Kreps*, 444 F. Supp. 1167, 1186 (W.D. Va. 1978) (same).

Here, the social and economic costs of allowing the BOEM to withdraw the COP and kill the Maryland offshore wind farm project and Sparrows Point Steel are apparent and abundant.

8

From the cancellation of the Sparrows Point Steel facility alone, United Steelworkers members stand to lose over 500 expected jobs and over $1 billion in labor income—much less the promise of revitalizing the "hallowed ground" of what was once the largest steel mill in the world and a USW stronghold, along with being a vibrant part of Baltimore's economy. That is just a fraction of what US Wind, the state of Maryland, and other union workers—whose well-paying union jobs redound to the benefit of the USW and the communities where these union workers live—stand to lose. Protecting the community-sustaining union jobs and the social and economic benefits that the Maryland offshore wind farm and Sparrows Point Steel are expected to create from arbitrary, ill-considered government action is clearly in the public interest.

## CONCLUSION

The Court should grant US Wind's Motion for a Preliminary Injunction.


Dated: October 29, 2025                      Respectfully submitted,

*/s/ Abigail V. Carter*
Abigail V. Carter (D. Md. Bar No. 20952)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
(202) 842-2600
(202) 842-1888 (fax)
acarter@bredhoff.com

*Counsel for Amicus Curiae United Steelworkers*