# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MAYOR AND CITY COUNCIL OF OCEAN CITY, et al., | |
| Plaintiffs, | Case No. 1:24-cv-03111-SAG |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | |
| Defendants, | |
| and | |
| US WIND, INC., | |
| Defendant-Intervenor. | |

### Memorandum in Support of Plaintiffs' Cross-Motion for Preliminary Injunction

Bruce F. Bright (Bar No. 27236)
6200 Coastal Hwy., Suite 200
Ocean City, Maryland 21842
Tel: 410-723-1400
Fax: 410-723-1861
bbright@ajgalaw.com

Nancie G. Marzulla (pro hac vice)
Roger J. Marzulla (pro hac vice)
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com

Dated: November 5, 2025

Counsel for Plaintiffs

**Table of Contents**

Table of Authorities.................................................................................................................. iii

Table of Abbreviations ............................................................................................................. v

Factual Background ................................................................................................................. 1

Argument ................................................................................................................................. 2

   1.   Plaintiffs are likely to succeed on the merits of their OCSLA claim. ............................... 3

     A.   BOEM's decision not to ensure navigational safety, protection of the environment, or consideration of the use of the seabed for fishing and navigation invalidates its decision approving the Maryland Offshore Wind Project. ............................................................... 6

         i.   Navigational Safety ................................................................................................. 7

         ii.   Commercial and Recreational Fishing ................................................................... 7

         iii.   Destruction of the Marine Habitat ......................................................................... 9

         iv.   Peril to the North Atlantic Right Whale ................................................................ 9

         v.   Failure to Protect the Human Environment .......................................................... 10

     B.   Contrary to the requirements of OCSLA, this Project, if constructed, will cause long-term and irreversible harm to commercial and recreational fishermen and boaters and the health of the ocean environment and marine seabed. ...........................................................11

     C.   At least one Plaintiff has standing to bring this claim. ...................................................11

   2.   Ocean City Plaintiffs will suffer irreparable harm without injunctive relief. .................. 14

   3.   The balance of equities favors maintaining the status quo. ............................................ 16

   4.   The public interest strongly supports granting this cross-motion. ................................... 18

   5.   The Court should require only a nominal injunction. ..................................................... 22

Conclusion .............................................................................................................................. 22

## Table of Authorities

### Cases

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
    480 U.S. 531 (1987)..................................................................................................... 17, 18

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 3
    44 F. Supp. 2d 108 (D.D.C. 2004)...................................................................................... 12

*CTIA - The Wireless Ass'n v. City of Berkeley, California*,
    928 F.3d 832 (9th Cir. 2019) ............................................................................................ 19

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017)............................................................................................ 2, 3

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*,
    650 F.2d 495 (4th Cir. 1981) .............................................................................................. 2

*Fisheries Survival Fund v. Jewell*,
    No. 16-CV-2409 (TSC), 2018 WL 4705795 (D.D.C. Sept. 30, 2018).......................... 12, 14

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)......................................................................................................... 12

*Growth Energy v. Env't Prot. Agency*,
    5 F.4th 1 (D.C. Cir. 2021) ................................................................................................ 14

*Gulf v. Burgum*,
    775 F. Supp. 3d 455 (D.D.C. 2025) .................................................................................. 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)......................................................................................................... 12

*Long Term Care Partners, LLC v. United States*,
    516 F.3d 225 (4th Cir. 2008) ............................................................................................ 11

*Pursuing Am.' s Greatness v. FEC*,
    831 F. 3d 500 (D.C. Cir. 2016) ........................................................................................ 17

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F. Supp. 3d 10 (D.D.C. 2021).................................................................................... 14

*S.C. Dep't of Wildlife & Marine Res. v. Marsh*,
    866 F.2d 97 (4th Cir. 1989) .............................................................................................. 17

*South Carolina v. United States*,
    329 F. Supp. 3d 214 (D.S.C. 2018) .................................................................................. 22

*South Carolina v. United States*,
    912 F.3d 720 (4th Cir. 2019) ....................................................................................... 12, 22

*TAP Pharms. v. U.S. Dep't of Health & Hum. Servs.*,
    163 F.3d 199 (4th Cir. 1998) ............................................................................................ 12

*W. Virginia Rivers Coal., Inc. v. Chemours Co. FC, LLC*,
    No. 2:24-CV-00701, 2025 WL 2255032 (S.D.W. Va. Aug. 7, 2025).................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................................... 3

### Statutes

43 U.S.C. § 1332 ..................................................................................................................... 19

43 U.S.C. § 1332(2). .................................................................................................................. 4

43 U.S.C. § 1337(p)(4)(A)-(J). .................................................................................................. 4

43 U.S.C. § 1337(p)(4)(I), (J). ................................................................................................. 11

**Treatises**

§ 47:62. Public interest as factor for preliminary injunction, 19 Fed. Proc., L. Ed. § 47:62 ........ 19

**Table of Abbreviations**

| Abbreviation | Definition |
| --- | --- |
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| COP | Construction and Operations Plan |
| FDR | Facility and Design Report |
| OCSLA | Outer Continental Shelf Lands Act |
| ROD | Record of Decision |

Plaintiffs, Mayor and City Council of Ocean City, et al. (collectively, "Ocean City Plaintiffs") ask this Court to preliminarily enjoin Defendant-Intervenor, US Wind, Inc., from engaging in any irreversible construction activities—such as pile driving, digging trenches, and laying cable, or installing boulders and concrete mattresses to stabilize the sand around turbine foundations on the ocean floor—until there has been a final adjudication of the merits of Ocean City Plaintiffs' claims. The Ocean City Plaintiffs satisfy all requirements for preliminary injunctive relief.

**Factual Background**

This motion is prompted by US Wind's motion for preliminary injunction (which the Ocean City Plaintiffs oppose),[1] in which US Wind asks the Court to enjoin and restrain the Plaintiffs—who are all citizens and local governmental entities exercising their protected constitutional rights—from petitioning the federal Government regarding this enormous offshore power plant project and from seeking relief in court.[2]

US Wind filed its motion for preliminary injunction after the Government notified the Court that it intended to reconsider the Construction and Operations Plan ("COP") approvals for the Maryland Offshore Wind Project ("the Project"). US Wind's motion seeks the extraordinary relief of prohibiting the federal Government from reconsidering these approvals, and further asks the Court to enjoin Plaintiffs from "taking any action to . . . in any way undermine US Wind's" COP.[3] In its motion, US Wind, which is owned by a foreign entity and backed by private equity,

---

[1] *See* US Wind's Motion for PI, ECF No. 92 (Oct. 15, 2025); *see* Pls' Response to US Wind's Mot. for PI (Nov. 5, 2025).
[2] *See* US Wind's Proposed Order in Supp. of PI, ECF No. 92-2 (Oct. 15, 2025) (asking this Court to enjoin Plaintiffs from "acting in concert or participation with the Government" and "from taking any action to vacate, remand, withdraw, rescind, or in any way undermine US Wind's" COP approval.).
[3] *Id.*

1

argues that its private, commercial, and investment interests (financial interests) in the Project are more important than the Project's adverse impact on the environment and the coastal viewshed of Maryland and Delaware, and the interests and livelihoods of the many Ocean City Plaintiffs.[4] US Wind also claims that vaguely described and indirectly related state or national policy concerns should have primacy over the Project's direct, substantial, and adverse impact on Maryland's coastal environment, local viewshed, tourism market, and economy.[5] Indeed, in seeking its injunction, US Wind exaggerates the benefits to be achieved by building its enormous offshore wind turbines and ignores the many problems inherent in offshore wind energy.[6]

US Wind asks for an injunction against appropriate and reasonable federal reconsideration of the Project approvals based, in part, on its self-interested and unproven claim that a change of position by conscientious and responsible government officials must have arisen from "improper political considerations" and "undue influence" on the part of the Ocean City Plaintiffs[7]—a charge that is completely untrue.

**Argument**

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit."[8] A request for a preliminary injunction shall be granted if "the moving party clearly establishes entitlement to the relief sought."[9] To establish entitlement to a preliminary injunction, a plaintiff must demonstrate "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

---

[4] *See* US Wind's Memo. in Supp. of Mot. for PI at 26–29, ECF No. 92-1 (Oct. 15, 2025).
[5] *See id.*
[6] *See* US Wind's Memo. in Supp. of Mot. for PI at 26–29, ECF No. 92-1 (Oct. 15, 2025).
[7] *Id.* at 24.
[8] *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).
[9] *Id.* (citing *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981)).

2

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'"[10] The Ocean City Plaintiffs meet all four factors.

1.    **Plaintiffs are likely to succeed on the merits of their OCSLA claim.**

Although the Plaintiffs are likely to prevail on the merits of all five of their claims (National Environmental Policy Act, Endangered Species Act, Marine Mammal Protection Act, Outer Continental Shelf Lands Act, and National Historic Preservation Act), for purposes of this motion, Plaintiffs focus only on their OCSLA claim. The Bureau of Ocean Energy Management ("BOEM") issued its Record of Decision ("ROD") and COP for the Maryland Offshore Wind Project, applying an incorrect interpretation of the Outer Continental Shelf Lands Act ("OCSLA") that was not consistent with the statutory language—and that the agency has since repudiated.[11] Because BOEM's approval relied on an incorrect legal theory that its own Department has now disavowed, the COP rests on an unlawful foundation. Because the COP was issued in violation of OCSLA and the Administrative Procedure Act ("APA"), Plaintiffs are likely to succeed on the merits of their OCSLA/APA claim. A preliminary injunction is therefore warranted to maintain the status quo and prevent irreversible construction under this unlawful COP approval until the Court resolves the merits.

The plain language of Section 1337(p)(4) of OCSLA requires that the Secretary "shall ensure" that any offshore wind activity is carried out in a manner that provides for, among other things, "[s]afety;" "protection of the environment;" "conservation of the natural resources of the outer Continental Shelf;" and "consideration of . . . any other use of the sea or seabed, including

---

[10] *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).
[11] *See* Off. of the Solicitor, U.S. Dep't of the Interior, Memorandum Opinion on the Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059 (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

use for a fishery, . . . or navigation."[12] OCSLA further declares that the Act "shall be construed in such a manner that . . . the right to navigation and fishing therein shall not be affected."[13] These are not discretionary policy aims—they are binding, independent statutory commands that Congress required the Secretary to "ensure."

But in approving the COP for the Maryland Offshore Wind Project, BOEM ignored this mandatory "shall ensure" provision, and instead adopted a contrary 2021 Solicitor's Opinion that treated those statutory commands as discretionary goals that could be balanced rather than mandatory obligations.[14] Under that now-withdrawn interpretation,[15] BOEM concluded it could "rationally balance" the statutory criteria and approve projects even while conceding severe adverse effects on fishing, navigation, and the environment.[16] In the Project's Record of Decision, BOEM erroneously asserted that Section 1337(p)(4) "'does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension.'"[17] And the mitigation measures BOEM adopted were selected to "balance the need to prevent interference with other [Outer Continental Shelf] uses with BOEM's duty to further the

---

[12] 43 U.S.C. § 1337(p)(4)(A)-(J).

[13] 43 U.S.C. § 1332(2).

[14] *See* Bureau of Ocean Energy Management, Record of Decision (Sept. 4, 2024) at 5, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/ROD-OCS-A-0490_0.pdf.

[15] *See* Off. of the Solicitor, U.S. Dep't of the Interior, Memorandum M-37086 (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[16] *See* Off of the Solicitor, U.S. Dep't of the Interior, Memorandum on Secretary's Duties under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf (April 9, 2021), https://www.doi.gov/media/document/m-37067-pdf; *but see* Off. of the Solicitor, U.S. Dep't of the Interior, Memorandum M-37086 (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[17] Bureau of Ocean Energy Management, *Record of Decision for the Maryland Offshore Wind Project* at 5 (Sept. 4, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/ROD-OCS-A-0490_0.pdf (quoting Solicitor's Opinion M-37067).

4

U.S. policy to make [Outer Continental Shelf] energy resources available for expeditious and orderly development."[18]

On May 1, 2025, after this suit was filed, the Interior Department issued Solicitor's Opinion M-37086, formally withdrawing the Solicitor's Opinion BOEM cited and relied on as its authority for approving the Project.[19] The May 1, 2025 Solicitor's Opinion states that, because the legal analysis BOEM relied on "conflicts with the best reading of OCSLA," that interpretation "is hereby withdrawn . . . and any other Departmental action taken in reliance on the now withdrawn M-Opinion 37067, should be re-evaluated in light of this Memorandum."[20] On July 29, 2025, the Secretary of the Interior issued a Secretarial Order describing BOEM's prior offshore wind approvals as being "egregious misinterpretations" of the law and that the "prior Department's leadership chose to misapply section [1337(p)(4)] of OCSLA when making decisions to approve . . . offshore wind energy projects," and "[r]ather than recognizing that each section [1337(p)(4)] criterion constitutes an independent, affirmative obligation," the prior Department "operated under the erroneous assumption that it could meet some criteria while ignoring or minimizing others."[21]

Because BOEM's 2024 Record of Decision approving the Maryland Offshore Wind Project's COP fails to comply with OCSLA's mandatory statutory requirements and rests squarely on an incorrect (and now repudiated) statutory interpretation, that agency approval is

---

[18] *Id.*, Appendix B at 30.

[19] Off. of the Solicitor, U.S. Dep't of the Interior, Memorandum Opinion on the Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059 (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[20] Secretary of the Interior, U.S. Department of the Interior, Order on Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision Making at 2–3 (July 29, 2025), https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign.

[21] *Id.* at 2–3.

contrary to law and should be vacated. The Department's binding May 1, 2025 Solicitor's Opinion (M-37086) and the Secretary's July 2025 Order both confirm that § 1337(p)(4) imposes independent, mandatory duties to ensure safety, protect the environment, conserve resources, and consider other ocean uses, and that BOEM's prior "balancing" approach violated the statute's text.

Because the Interior Department itself now admits that its prior interpretation of OCSLA was wrong, Ocean City Plaintiffs are likely to succeed on the merits. BOEM's approval of the Project based on a now-repudiated interpretation is contrary to law, and its continued refusal to suspend or reconsider that approval—despite express departmental direction to re-evaluate actions taken under the withdrawn opinion—constitutes ongoing arbitrary and capricious conduct warranting immediate injunctive relief.

### A. BOEM's decision not to ensure navigational safety, protection of the environment, or consideration of the use of the seabed for fishing and navigation invalidates its decision approving the Maryland Offshore Wind Project.

BOEM treated OCSLA's mandatory requirements as discretionary, approving the Project without ensuring safety, environmental protection, or compatibility with navigation and fishing—the very mandates OCSLA requires to be protected. Rather than ensuring these protections shall be met, BOEM treated them as obstacles to be weighed—then dismissed them in favor of Project construction.[22]

---

[22] Bureau of Ocean Energy Management, *Final Environmental Impact Statement* at 3-444 (Aug. 2, 2024), https://www.boem.gov/renewable-energy/state-activities/maryland-offshore-wind-final-environmental-impact-statement-eis (Final EIS).

### i.  Navigational Safety

BOEM's own findings reveal just how harmful the Project will be to safety, navigation, and fishing. BOEM admitted that the installation of the 114 turbine generators and four offshore substations associated with the Project will create long-term "navigational complexity and increase the risk of allision or collision,"[23] threatening "damage to vessels, injury to crews, and vessel fuel spills."[24] BOEM also acknowledged that the turbines will degrade the efficacy of marine vessel radar, "the main tool used to help locate other nearby vessels that are not otherwise visible, particularly in adverse weather when visibility is limited."[25] And BOEM conceded that the Project's "layout and density" will complicate search and rescue "activities during operations and lead to abandoned [search and rescue] missions and resultant increased fatalities."[26]

### ii.  Commercial and Recreational Fishing

BOEM also ignored OCSLA's mandate to protect existing ocean uses, including Maryland and Delaware's longstanding commercial and recreational fishing industries. Maryland's fisheries contribute nearly $600 million annually to the State's economy.[27] Maryland also leads the nation in blue crab and soft clam production.[28] Delaware's industry adds millions to Delaware's economy each year. Sportfishing generates hundreds of millions more dollars to

---

[23] *Id.*
[24] *Id.* at 3-447.
[25] *Id.* at 3-448.
[26] *Id.* at 3-475.
[27] Maryland State Government, *Maryland At a Glance: Seafood*, https://msa.maryland.gov/msa/mdmanual/01glance/html/seafoodp.html#:~:text=Besides%20blue%20crabs%2C%20important%20commercial,million%20to%20the%20State's%20economy (last visited Oct. 16, 2024).
[28] *Id.*

Maryland and Delaware's economies,[29] with Ocean City hosting over 20 tournaments annually, including the world-renowned White Marlin Open,[30] which generates $20 to $30 million dollars for Ocean City annually.[31]

BOEM nevertheless approved the Project knowing it would severely disrupt these activities. Construction, anchoring, and cable emplacement will cause "vessel traffic congestion, difficulties with [ocean] navigating, and an increased risk for collisions,"[32] with 300 miles of cables that will endanger vessels using trawls and nets and close productive fishing grounds for extended periods of time.[33] BOEM acknowledged that fishermen would be excluded from their traditional fishing grounds, leading "to reduced revenue"[34] "due to fishing potentially less-productive fishing grounds, potentially having to switch to less valuable species, and potentially encountering more competition for a given resource[,]"[35] and that turbine installation will "restrict harvesting and fishing activities"[36] and reduce "the accessibility and availability of fish"[37] for the Project's lifetime. By approving the Project without ensuring safe sea lanes or adequate turbine spacing, BOEM violated OCSLA's requirement to protect the uses of the sea.

---

[29] American Sportfishing Association, *Sportfishing in America: A Reliable Economic Force*, at 8 (2021) https://asafishing.org/wp-content/uploads/2021/11/Sportfishing-in-America-Economic-Report-March-2021.pdf.
[30] Decl. of J. Motsko ¶ 3, ECF No. 1-21 (Oct. 25, 2024).
[31] Ronnell Foreman, *The 51st White Marlin Open Keeps Business Booming*, WMDT (Aug. 5, 2024), https://www.wmdt.com/2024/08/the-51st-white-marlin-open-keeps-business-booming/.
[32] Final EIS *supra* note 22 at 3-319.
[33] *Id.* at 3-320.
[34] *Id.*
[35] *Id.* at 3-331.
[36] *Id.* at 3-321.
[37] *Id.* at 3-328.

### iii. Destruction of the Marine Habitat

The agency approved construction knowing the Project would destroy benthic habitats and damage 41.9 miles of the Carl N. Shuster, Jr. Horseshoe Crab Reserve.[38] BOEM concluded that the jack-up vessels and spud barges would cause "total mortality" of benthic organisms,[39] that jet plowing and cable laying would harm crustaceans and mollusks,[40] and that only 46% of the disturbed seafloor would recover within a year of construction.[41] Finfish and invertebrate populations and essential fish habitats will also be decimated[42]—anchoring will smother sensitive species,[43] cable burial will kill clams and scallops "due to potential direct burial impacts,"[44] and daily pile driving will expose fish and larvae to injurious noise.[45] Once constructed, the turbines will alter currents, shrink habitat, and increase predation on benthic life.

### iv. Peril to the North Atlantic Right Whale

BOEM also disregarded the Project's impacts on the North Atlantic Right Whale—one of the most endangered marine mammals. Despite acknowledging that the species' population is so depleted that the removal of even a single whale threatens its recovery,[46] BOEM authorized high-noise construction and dense vessel activity without adequate, species-specific safeguards.[47] By

---

[38] *Id.* at 3-40.

[39] *Id.* at 3-67.

[40] *Id.* at 3-69.

[41] *Id.* at 3-73.

[42] *Id.* at 3-161.

[43] *Id.*

[44] *Id.* at 3-163.

[45] *Id.* at 3-167.

[46] Bureau of Ocean Energy Management, *BOEM and NOAA Fisheries North Atlantic Right Whale and Offshore Wind Strategy* at 7 (Jan. 2024), https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.

[47] *See* BOEM, *Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* at 21 (Feb. 11, 2021),

relying on ineffective mitigation measures, such as bubble curtains that fail to reduce the low-frequency noise most harmful to baleen whales,[48] BOEM ignored clear evidence that the Project would expose this fragile species to stress, injury, and potential death.

### v.  Failure to Protect the Human Environment

Finally, BOEM failed to protect the human environment. BOEM conceded that construction cranes would be visible from Delaware and Maryland beaches for years[49] and that completed turbines and substations will be seen from Ocean City "beaches, the first row of buildings or houses, and inland portions of Assateague Island[.]"[50] BOEM even acknowledged that visitors may seek out beaches elsewhere without turbine views—but by 2030, "few such beaches would exist between Ocean City and central New Jersey[.]"[51]

These admissions alone demonstrate that BOEM's approval of this Project fails to comply with OCSLA's plain commands that BOEM must ensure safety, protection of the environment, and other uses on the Outer Continental Shelf. The statute does not permit the Secretary to "balance away" safety and environmental protections. Plaintiffs are therefore likely to succeed on the merits of its OCSLA claim.

---

https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.

[48] Sean Hayes, *Letter from Sean A. Hayes, PhD, Chief of Protected Species, NOAA NEFSC to Brian R. Hooker, Lead Biologist of Bureau of Ocean Energy Management, Office of Renewable Energy Programs* (May 13, 2022), https://www.noaa.gov/sites/default/files/2022-11/North_Atlantic_Right_Whale_NARW_112022_0.pdf.

[49] Final EIS *supra* note 22 at 3-507.

[50] *Id.* at 3-509.

[51] *Id.*

**B.    Contrary to the requirements of OCSLA, this Project, if constructed, will cause long-term and irreversible harm to commercial and recreational fishermen and boaters and the health of the ocean environment and marine seabed.**

BOEM's Project approvals also show that BOEM violated OCSLA by failing to prevent unreasonable interference with commercial and recreational fishing in approving the Project. Once construction begins, commercial, recreational, and for-hire fishing off Ocean City, Maryland and Delaware will be harmed through increased cable placement, pile driving, noise, underwater infrastructure, turbine generators and substations, as well as increased vessel traffic. As BOEM admits, the construction of the turbine generators and offshore substations will "restrict harvesting and fishing activities in the Project area."[52] And "fishing vessels transiting in proximity to the Project area or ports being utilized by construction and installation vessels would be required to avoid" the area, resulting in exclusion from key fishing areas.[53]

By approving the Project, which will directly interfere with fishing interests on the Outer Continental Shelf, BOEM violated OCSLA's clear statutory prohibition that the Secretary must ensure "prevention of interference with reasonable uses" of the Outer Continental Shelf and consideration of the "use of the sea" for "a fishery, a sealane, a potential site of a deepwater port, or navigation[.]"[54]

**C.    At least one Plaintiff has standing to bring this claim.**

The moving party "bears the burden . . . to establish standing" to assert each of its claims.[55] "To establish standing," a party "must demonstrate (i) that [it] has suffered or likely

---

[52] *Id.* at 3-321.
[53] *Id.* at 3-322.
[54] 43 U.S.C. § 1337(p)(4)(I), (J).
[55] *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 241–2 (4th Cir. 2008) (Williams, J. concurring in part and dissenting in part).

will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the

defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."[56]

And, "as the Supreme Court has emphasized repeatedly, an injury-in-fact must be concrete in

both a qualitative and temporal sense."[57] The moving party must also show that "the interest

sought to be protected by the complainant is arguably within the zone of interests to be protected

or regulated by the statute . . . in question."[58] But, "[t]he zone of interests test 'is not especially

demanding' and 'forecloses suit only when a plaintiff's interests are so marginally related to or

inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

Congress authorized the plaintiff to sue.'"[59] Plaintiffs have standing to pursue their OCSLA

claim.

"[T]hose who use or depend on the use of the wind farm area and the natural resources

contained therein for fishing, navigation, and associated economic and recreational benefits" are

within OCSLA's zone of interests and have standing.[60] And when Government action threatens

economic and recreational interests—including the "livelihood of fishermen"—a justiciable

injury-in-fact under OCSLA has occurred.[61]

---

[56] *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

[57] *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (internal quotations omitted).

[58] *See TAP Pharms. v. U.S. Dep't of Health & Hum. Servs.*, 163 F.3d 199, 202 (4th Cir. 1998) (internal quotations omitted).

[59] Opinion Granting-in-Part and Denying-in-Part Mots. to Dismiss at 10, ECF No. 68 (July 2, 2025) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (internal quotations omitted)).

[60] *Fisheries Survival Fund v. Jewell*, No. 16-CV-2409 (TSC), 2018 WL 4705795, at *5 (D.D.C. Sept. 30, 2018).

[61] *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 117–18 (D.D.C. 2004).

As this Court has held, Plaintiffs need only show that one Plaintiff has met the requirements for Article III standing for a claim to go forward,[62] finding that "at least one plaintiff has standing and is within the zone of interests" of OCSLA.[63] Plaintiffs—George Topping, Earl Gwin, Michael Coppa, the White Marlin Open, and the Waterman's Association of Worcester County—all meet the requirements for standing under OCSLA.

Earl Gwin, a commercial fisherman, explains that the Project, if constructed, will "create risks to [his] gear getting caught, losing [his] catch, and devastating [his] ability to fish in the area, but the construction and operation will also have a devastating impact on the species" he fishes for.[64] For George Topping, a horseshoe crab fisherman, the construction of the Project over Carl N. Shuster, Jr. Horseshoe Crab Reserve "will devastate [his] business and the industry that [he] operate[s]" in.[65] For Michael Coppa, a commercial fisherman who has, for more than 20 years, "owned the most commercial fishing permits in Maryland," the Project's construction "will disturb and destroy the marine habitat where [he has] fished for decades."[66] If built, Coppa and his crew "will no longer be able to safely and efficiently traverse through the 80,000-acre lease area to access [his] traditional fishing grounds[,]" and he will be "forced to maneuver around these turbines and take longer routes to reach areas where [he] can fish."[67]

John O'Dell, the Public Relations Advisor for the Atlantic Coast Sportfishing Association, details that the Project will create navigational hazards, displace fish stocks, and

---

[62] Opinion Denying-in-Part and Granting-in-Part Mots. to Dismiss at 8, ECF No. 68 (July 2, 2025) ("As Plaintiffs rightly note, only one plaintiff must have standing for this case to proceed.").
[63] *Id.* at 10.
[64] Decl. of E. Gwin ¶ 7, ECF No. 1-13 (Oct. 25, 2024).
[65] Decl. of G. Topping ¶ 10, ECF No. 1-10 (Oct. 25, 2024).
[66] Decl. of M. Coppa ¶ 2–4, ECF No. 32-9 (Jan. 6, 2025).
[67] *Id.*

disrupt long-established tournament routes for the 140 Association members in Ocean City and the competitive game fishing industry as a whole. Since "[b]ig game fishing requires access to large expanses of open ocean" and "fishermen must go where the fish are located," the Project "will cause major navigational obstacles for [him] and other members."[68] These hazards and habitat disruptions from the Project will particularly harm the White Marlin Open, the largest billfishing tournament in the world. The Project's construction will occur "right where the gamefish migrate" and "the Project threatens to destroy both the fish population and the sport of large game fishing—that is, the Open itself."[69]

These injuries fall within the interests protected by OCSLA,[70] satisfy injury-in-fact, and are fairly traceable to federal approvals authorizing the Project.[71] Redressability is met because vacating those approvals would require a new review to ensure both compliance with OCSLA and measures to avoid or mitigate harm.[72] Plaintiffs therefore have more than adequately demonstrated standing to pursue their OCSLA claims.

## 2.    Ocean City Plaintiffs will suffer irreparable harm without injunctive relief.

Plaintiffs not only show a high likelihood of success on their OCSLA claim, but they also can demonstrate that irreparable harm will occur if US Wind is allowed to commence any onshore or offshore construction efforts related to the Project.

Fishing is essential to Ocean City, and these industries will be completely devastated by offshore construction of the Project. Along with his 49 years of commercial fishing experience

---

[68] Decl. of J. O'Dell ¶ 4, ECF No. 32-2 (Jan. 6, 2025).

[69] Decl. of J. Motsko ¶ 7, ECF No. 1-21 (Oct. 25, 2024).

[70] *See Fisheries Survival Fund v. Jewell*, No. 16-cv-2409 (TSC), 2018 WL 4705795, *5–6 (D.D.C. Sept. 30, 2018).

[71] *See Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 27 (D.C. Cir. 2021); *see also Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025).

[72] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021).

off the coast of Ocean City, Earl Gwin manages multiple seafood markets and serves as the President of the Waterman's Association of Worcester County. According to Gwin, "noise and vibration from underwater construction and the installation of project components will drive fish from the lease area and the places where [he is] allowed to fish, and the construction and installation will crush fish and crab larvae and eggs and destroy benthic resources and essential fish habitat."[73]

Similar to Gwin, George Topping works at a small fishery which harvests horseshoe crabs for the biomedical uses of the compound found in their blood. If construction on the Project were allowed to begin, Topping believes that the crushing effects on horseshoe crab populations "will not only impact [his] ability to fish, as more restrictions on harvesting will be put in place, but it will create a shortage of this vital biomedical resource, and could have devastating impacts on the human safety of drugs and medical devices."[74]

In addition to the offshore harms mentioned above, onshore Project construction will also negatively affect both the fishermen and residents of Ocean City by interfering with the use of their marinas and inlets. James Motsko has served as director and president of the White Marlin Open, Ocean City's signature sportfishing tournament for over 50 years. During this tournament, thousands of anglers depart from Ocean City's shore to compete for millions of dollars in prize money. Motsko has explained that construction of the Project's onshore harbor facilities will reduce the number of boats able to dock in the harbor and make maneuvering through the harbor dangerous, thus "impact[ing] the number of boats able to participate in the tournament, decreasing tournament revenues and threatening its future continued success as a high point in

---

[73] Decl. of E. Gwin ¶ 7, ECF No. 1-13 (Oct. 25, 2024).
[74] Decl. of G. Topping ¶ 7, ECF No. 1-10 (Oct. 25, 2024).

the Ocean City calendar."[75] The manager of Sunset Marina, LLC, a popular docking location for many White Marlin Open fishermen, has confirmed this fact, stating that "increased hazards and safety concerns will deter fishermen and boaters, who will not want to put their lives at risk. Because of the Maryland Offshore Wind Project, [the] marinas will suffer from a decreased customer base."[76]

Finally, the negative impacts of construction on the viewshed of Ocean City will impact many business owners that depend on tourism. As the founder of Fager's Island LTD, which owns and operates two luxury hotels in Ocean City, John Fager's business "depends on a consistent flow of tourists that visit and spend money at [his] restaurants and hotels. [His] visitors and tourists also depend on the pristine ocean views and healthy marine life."[77] If this viewshed and marine habitats are destroyed by Project construction, the consequential loss of tourism will be devastating to his business.

Noting that visitors traveling to Ocean City annually spend over $2 billion and support over 13,000 jobs in Ocean City, Susan Jones—the Executive Director of Ocean City Hotel-Motel-Restaurant Association, Inc.—estimates that construction of the Project will result in economic losses to local businesses in the hundreds of millions of dollars.[78]

**3.     The balance of equities favors maintaining the status quo.**

The balance of equities tips decisively in favor of the Ocean City Plaintiffs—toward preserving the status quo of no irreversible offshore construction so that, if Plaintiffs prevail on the merits, the Project is not so far along that it cannot be stopped. Ocean City Plaintiffs seek an

---

[75] Decl. of J. Motsko ¶ 11, ECF No. 1-21 (Oct. 25, 2024).
[76] Decl. of B. Tinkler ¶ 6, ECF No. 1-20 (Oct. 25, 2024).
[77] Decl. of J. Fager ¶ 5, ECF No. 32-6 (Jan. 6, 2025).
[78] Decl. of S. Jones ¶ 9, ECF No. 1-16 (Oct. 25, 2024).

injunction that prohibits any construction and cable installation for the Project while the Court adjudicates whether BOEM's approval complies with such statutory mandates as OCSLA's "shall ensure" requirement. Such a pause would maintain the true status quo and protect the Government's ability to administer OCSLA lawfully in compliance with the plain language of the Act. Enjoining irreversible construction activities now avoids compounding statutory and environmental harms and prevents irreversible changes that could outpace judicial review of the merits.

The Supreme Court has held that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."[79] The Fourth Circuit, too, has held that financial harms, and substantially higher costs, "by no means equates to the loss the environment and general public will suffer if the fisheries at the [Dam] are lost."[80]

Ocean City Plaintiffs, by contrast, face ongoing, irreparable injuries from the threat of offshore construction: degradation of coastal waters and viewshed that sustain the local tourism

---

[79] *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).
[80] *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (internal quotation omitted); *see also Pursuing Am.' s Greatness v. FEC*, 831 F. 3d 500, 511 (D.C. Cir. 2016) (when the government is a party, the balance of equities and public interest factors merge because "the government's interest is the public interest.").

economy;[81] navigation and radar interference;[82] exclusion from and damage to commercial and recreational fisheries, including the loss of benthic habitats essential to high-value species;[83] and harm to migratory birds,[84] marine mammals,[85] and horseshoe crabs.[86] These are precisely the interests Congress prioritized in OCSLA's statutory text and that BOEM is required to "ensure" are protected before authorizing offshore development. Because Plaintiffs' requested injunction would simply maintain the status quo and prevent permanent injuries, the balance of equities weighs strongly in favor of Plaintiffs.[87]

**4.    The public interest strongly supports granting this cross-motion.**

"The public interest inquiry in deciding whether to grant preliminary injunctive relief primarily addresses the impact on nonparties rather than parties," and "it embodies the Supreme

---

[81] *See* Decl. of T. McGean ¶ 1–2, ECF No. 1-2 (Oct. 25, 2024); Decl. of N. Magdeburger ¶ 2, 4, ECF No. 1-3 (Oct. 25, 2024); Decl. of R. Leslie ¶ 2, 5, ECF No. 1-4 (Oct. 25, 2024); Decl. of C. Jenkins ¶ 8–12, ECF No. 1-5 (Oct. 25, 2024); Decl. of J. Harrison ¶ 6, 8–10, ECF No. 1-11 (Oct. 25, 2024); Decl. of M. James ¶ 3–6, ECF No. 1-12 (Oct. 25, 2024); Decl. of J. Fager ¶ 5, ECF No. 32-6 (Jan. 6, 2025); Decl. of J. Trader ¶ 3–4, ECF No. 32-8 (Jan. 6, 2025); Decl. of A. Showell ¶ 5–7, ECF No. 1-7 (Oct. 25, 2024); Decl. of S. Buas ¶ 4–6, ECF No. 32-11 (Jan. 6, 2025); Decl. of J. Wilson ¶ 5, 7, 9, ECF No. 1-15 (Oct. 25, 2024).

[82] *See* Decl. of B. Tinkler ¶ 6, ECF No. 1-20 (Oct. 25, 2024); Decl. of A. Thompson ¶ 9, ECF No. 1-18 (Oct. 25, 2024); Decl. of E. Gwin ¶ 9, 14, ECF No. 1-13 (Oct. 25, 2024); Decl. of J. O'Dell ¶ 4–5, ECF No. 32-2 (Jan. 6, 2025); Decl. of D. Stevenson ¶ 3, ECF No. 32-3 (Jan. 6, 2025); Decl. of J. Toedtman ¶ 4, ECF No. 32-4 (Jan. 6, 2025); Decl. of J. Collins ¶ 4, ECF No. 32-5 (Jan. 6, 2025); Decl. of M. Coppa ¶ 4, ECF No. 32-9 (Jan. 6, 2025).

[83] Decl. of G. Topping ¶ 2–7, ECF No. 1-10 (Oct. 25, 2024); Decl. of E. Gwin ¶ 5, 7–8, 14, ECF No. 1-13 (Oct. 25, 2024); Decl. of M. Coppa ¶ 4, ECF No. 32-9 (Jan. 6, 2025).

[84] Decl. of J. Collins ¶ 6, ECF No. 32-5 (Jan. 6, 2025); Decl. of J. Trader ¶ 6, ECF No. 32-8 (Jan. 6, 2025).

[85] Decl. of J. Collins ¶ 5, ECF No. 32-5 (Jan. 6, 2025); Decl. of D. Stevenson ¶ 2, ECF No. 32-3 (Jan. 6, 2025).

[86] Decl. of G. Topping ¶ 2–7, ECF No. 1-10 (Oct. 25, 2024).

[87] *See Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 541 (1987).

18

Court's direction that, in exercising their sound discretion, courts of equity should pay particular

regard to public consequences when employing the extraordinary remedy of an injunction."[88]

Congress has vividly affirmed the public interest in maintaining "the right to navigation"

and "fishing" within the Outer Continental Shelf and high seas:

> It is hereby declared to be the policy of the United States that . . . this subchapter
> shall be construed in such a manner that the character of the waters above the outer
> Continental Shelf as high seas and *the right to navigation and fishing therein shall
> not be affected*; . . . the outer Continental Shelf is a vital national resource reserve
> held by the Federal Government for the public[.][89]

The construction of over a hundred mammoth turbine generators, plus electrical

substations and a meteorological tower offshore Ocean City and the Delaware coast, will

dramatically impair both fishing and navigation. As Earl Gwin, a commercial fisherman who has

fished in the lease area for decades, explained, the Project's turbines and cables "create risks to

[his] gear getting caught, losing [his] catch, and devastating [his] ability to fish in the area" and

"the construction and operation" of the Project "will also have a devastating impact on the

species" he fishes for.[90]

Further proof of this devastating impact is that US Wind offered to create a $20 million

mitigation fund to mitigate just the impacts of the Project on local fishermen.[91] Studies from

universities and offshore wind developers have also found that tourism to beaches will decline

---

[88] § 47:62. Public interest as factor for preliminary injunction, 19 Fed. Proc., L. Ed. § 47:62
(citing *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832 (9th Cir. 2019)).
[89] 43 U.S.C. § 1332 (emphasis added).
[90] Decl. of E. Gwin ¶ 7, Ex. 12 to Compl., ECF No. 1-13 (Oct. 25, 2024).
[91] Andrea Colosino, *US Wind Proposes $20 Million to Support Local Fishermen* (May 14,
2025), https://uswindinc.com/us-wind-proposes-20-million-to-support-local-fishermen/.

significantly,[92] real estate values will drop,[93] and local businesses will suffer due to lost revenue.[94]

Contrary to amici's assertions, the Government's own data confirm that this Project will neither mitigate climate change nor deliver affordable, dependable energy. Delaware's amicus brief in support of US Wind's motion for preliminary injunction demonstrates that "[a] typical residential customer would be expected to save $186 over the life of the US Wind contract (essentially twenty years)"[95]—only about $9 per year.

As David T. Stevenson, the longtime Director of the Caesar Rodney Institute's Center for Energy & Environmental Policy, explains in his declaration, these minimal projected savings are likely overestimated while the Project's claimed reduction in harmful emissions are largely overstated:

> The report from PA Consulting Group concludes that the Project will produce modest long-term bill savings at $253 million over its first twenty years. However, their modeling runs show aggregate power-and-capacity savings of only 0.5%, while the modeling error margin can be as large as

---

[92] Orsted, *Ocean Wind 1 Tourism*, https://cdn.orsted.com/-/media/www/docs/corp/us/oceanwind/ocwtourism062521.pdf?rev=9eb641a9017e4ad0a1983f0250fe7773&hash=8BE004973016BEBD5D354D27292CA7B6 (last visited Nov. 4, 2025) (noting that 15% of regular vacationers would not return to Jersey Shore if turbines are within 15 miles of coast); Landry et al., Wind Turbines and Coastal Recreation Demand, Resource and Energy Economics (2012) 93–111. https://doi.org/10.1016/j.reseneeco.2011.10.001 (80% of beachgoers surveyed in North Carolina would not return or rent at the beach if turbines are visible); Mario F. Teisl, et al., Seeing Clearly in Virtual Reality: Tourist Reactions to an Offshore Wind Project, Energy Policy (2018), https://www.sciencedirect.com/science/article/abs/pii/S0301421518305251.

[93] Decl. of B. Flax ¶ 8, ECF No. 1-8 (Oct. 25, 2024); Decl. of J. Harrison ¶ 11, ECF No. 1-11 (Oct. 25, 2024).

[94] *See* Decl. of C. Jenkins ¶ 12, ECF No. 1-5 (Oct. 25, 2024); Decl. of J. Harrison ¶ 6, 10, ECF No. 1-11 (Oct. 25, 2024); Decl. of M. James ¶ 6, ECF No. 1-12 (Oct. 25, 2024); Decl. of J. Fager ¶ 2–5, ECF No. 32-6 (Jan. 6, 2025); Decl. of J. Trader ¶ 4–5, ECF No. 32-8 (Jan. 6, 2025); Decl. of A. Showell ¶ 7–10, ECF No. 1-7 (Oct. 25, 2024); Decl. of S. Buas ¶ 6, ECF No. 32-11 (Jan. 6, 2025); Decl. of B. Tinkler ¶ 6, 10–11, ECF No. 1-20 (Oct. 25, 2024); Decl. of J. Wilson ¶ 7, ECF No. 1-15 (Oct. 25, 2024).

[95] Amicus Brief of State of Delaware at 7, ECF No. 98 (Oct. 29, 2025).

±2.5%, meaning modeled savings are statistically indistinguishable from zero and may even be negative.[] Further, the report failed to include any estimate of costs required to run backup generation, which is often needed to deal with drops in power production associated with intermittent energy sources such as offshore wind.[] Taking both these factors into account, the $253 million savings figure must be considered negligible.

. . . .

US Wind's emissions claims rely on an assumption that each megawatt-hour (MWh) produced will displace high-emitting (coal) generation. In contrast, the regional grid mix and independent consultant analyses show that the average local system emission rate in recent years is far lower than a coal-equivalent rate and has been falling steadily.[] Using realistic marginal-displacement assumptions (the actual marginal resource mix and expected future decarbonization) reduces the Project's per-MWh $CO_2$ displacement fivefold compared with the developer's calculation.[] . . . Because offshore generation is incremental to an already-decarbonizing grid, the net operational displacement of fossil-fuel generation is minimal, and in some modeling scenarios net emissions could be higher once transmission losses and location effects are included. Therefore, claims that the Project will produce substantial reductions in $CO_2$, $NOx$, $SO_2$, particulate matter, and volatile organic compounds are not supported by the evidence in the record when realistic grid behavior and displacement patterns are used.[96]

And while some temporary construction jobs may be delayed by granting Plaintiffs' motion, that delay is US Wind's own doing: "US Wind was developing engineering designs and coordinating review with its CVA to develop the Project's detailed FDR [facility design report] for submittal to BOEM and BSEE for their review"—but contrary to the requirements of the COP—"US Wind has not submitted additional post-COP plans for review, including the Facility Design Report ('FDR')[.]"[97] So, even if the existing COP were undisturbed, US Wind does not yet have the design approval its COP requires to start construction.

In short, preliminarily enjoining construction to allow the Court to resolve the merits of Plaintiffs' legal claims before irreversible construction begins is the only reasonable way to protect the public interest.

---

[96] *See* Ex. 1, Decl. of David T. Stevenson at ¶4, ¶6 (footnotes omitted).
[97] Ex. B to US Wind's Mot. for PI, ECF No. 92-4 (Oct. 15, 2025).

**5.      The Court should require only a nominal injunction.**

Although, a "district court must expressly address the issue of security before allowing any waiver[,]"[98] "'Courts have exercised this discretion to set nominal bond amounts in public interest litigation.'"[99] For example, in a Clean Water Act suit to stop the discharge of pollutants, a court exercised such discretion, stating: "[I]t is likely that the Plaintiff will succeed on the merits of its claim and there is a strong public interest in the matter. Anything more than a nominal bond would stifle the citizen suit provision of the CWA. Accordingly, I [find] $200.00 to be an appropriate bond in this matter."[100]

In this case, brought by local governments and community organizations, among others, to preserve the integrity of the Maryland and Delaware coasts and to protect the public interest, the Court should likewise impose only a nominal injunction bond.

**Conclusion**

The Court should grant the Ocean City Plaintiffs' cross-motion for a preliminary injunction.

Respectfully submitted,

/s/ Bruce F. Bright
Bruce F. Bright (Bar No. 27236)
6200 Coastal Hwy., Suite 200
Ocean City, Maryland 21842
Tel: 410-723-1400
Fax: 410-723-1861
bbright@ajgalaw.com

---

[98] *W. Virginia Rivers Coal., Inc. v. Chemours Co. FC, LLC*, No. 2:24-CV-00701, 2025 WL 2255032, at *23 (S.D.W. Va. Aug. 7, 2025) (internal citations and quotation marks omitted).
[99] *Id.* (quoting *South Carolina v. United States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018), *vacated on other grounds*, 912 F.3d 720 (4th Cir. 2019)).
[100] *Id.*

/s/ Nancie G. Marzulla
Nancie G. Marzulla (pro hac vice)
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
(202) 822-6760
nancie@marzulla.com

/s/ Roger J. Marzulla
Roger J. Marzulla (pro hac vice)
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
(202) 822-6760
roger@marzulla.com

Dated: November 5, 2025                    Counsel for Plaintiffs