# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| **MAYOR AND CITY COUNCIL** **OF OCEAN CITY MARYLAND**, *et al.* | * |
| | * |
| Plaintiffs/Cross-Defendants | * |
| v. | * |
| **UNITED STATES DEPARTMENT** **OF THE INTERIOR,** *et al.* | *    Civil Action No: 1:24-cv-03111-SAG |
| Defendants/Cross-Defendants | * |
| and | * |
| **US WIND, INC.** | * |
| Defendant-Intervenor/Cross-Plaintiff | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANT-INTERVENOR AND CROSS-PLAINTIFF US WIND INC.'S RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS CROSS CLAIMS

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   STATEMENT OF FACTS ...................................................................................2

    A.    US Wind's Reliance on the Lease and COP Approval..............................2

    B.    The Government's Revocation Decision. ...................................................4

    C.    The Revocation Decision's Legal and Practical Consequences for US Wind.........7

    D.    US Wind's Cross Claims .........................................................................8

III.  ARGUMENT .......................................................................................................9

    A.    US Wind Satisfies Standing and Ripeness Requirements ........................9

        1.    US Wind Has Standing .................................................................9

        2.    US Wind's Cross Claims are Ripe for Consideration...............11

            a)    The Fitness Prong Is Satisfied. ....................................12

            b)    The Hardship Prong Is Satisfied. .................................15

    B.    Cross Claim Counts I-III Challenge Final Agency Actions. ...............16

        1.    The Revocation Action Satisfies the Consummation Requirement...........17

        2.    The Revocation Decision Has Legal and Practical Consequences. ...........22

    C.    This Court Has Jurisdiction Over Cross Claim Counts VI-X..............25

    D.    US Wind's OCSLA Cross-Claim Is Not Barred by Statute. ................26

    E.    US Wind States a Due Process Claim....................................................27

IV.   CONCLUSION...................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ..................................................................................................13, 16

*Almond v. Cap. Props., Inc.*,
  212 F.3d 20 (1st Cir. 2000) .................................................................................................10

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
  778 F. Supp. 3d 685 (D. Md. 2025), *appeal pending*, No. 25-1411 (4th Cir.) ........................17

*Amadei v. Nielsen*,
  348 F.Supp.3d 145 (E.D.N.Y. 2018) .............................................................................17, 21

*Amoco Prod. Co. v. Fry*,
  118 F.3d 812 (1997) ...........................................................................................................28

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ....................................................................................17, 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................................26

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
  733 F.3d 939 (9th Cir. 2013) ..............................................................................................10

*Attias v. CareFirst, Inc.*,
  346 F.R.D. 1 (D.D.C. 2024) ...............................................................................................10

*Barrick Goldstrike Mines, Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000) .............................................................................................16

*Bazemore v. Best Buy*,
  957 F.3d 195 (4th Cir. 2020) ..............................................................................................26

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) ...........................................................................................................27

*Bell v. Burson*,
  402 U.S. 535 (1971) ...........................................................................................................27

*Bintz v. U.S. Dep't of Interior*,
  Case 1:25-cv-00152-GBW (D. Del.), ECF No. 28 (Aug. 22 Mot. to Stay) .............................4

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988).................................................................................................22

*Bowen v. Pub. Agencies Opposed To Soc. Sec. Entrapment*,
477 U.S. 41 (1986)..................................................................................................10

*CBY Design Builders v. United States*,
105 Fed. Cl. 303 (2012) .........................................................................................14

*Chamblee v. Espy*,
100 F.3d 15 (4th Cir. 1996) ....................................................................................23

*Chevron, U.S.A., Inc. v. FERC*,
193 F. Supp. 2d 54 (D.D.C. 2002) .....................................................................26, 27

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) ...........................................................................17, 21

*Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*,
367 U.S. 316 (1961).............................................................................................13, 14

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023) ..........................................................................16, 19, 20

*Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*,
915 F.2d 167 (5th Cir. 1990) ...................................................................................25

*Connecticut v. Doehr*,
501 U.S. 1 (1991).....................................................................................................28

*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013) .....................................................................11, 13, 14

*Cortes v. NLRB*,
145 F.4th 57 (D.C. Cir. 2025)..................................................................................25

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017).................................................................................................10

*EEOC v. Phase 2 Invs., Inc.*,
333 F. Supp. 3d 505 (D. Md. 2018) ...........................................................................9

*Evans v. United States*,
105 F.4th 606 (4th Cir. 2024) ..................................................................................26

*FEC v. Cruz*,
596 U.S. 289 (2022).................................................................................................11

*Fort Sumter Tours, Inc. v. Andrus*,
    440 F. Supp. 914 (D.S.C.), *aff'd*, 564 F.2d 1119 (4th Cir. 1977) ......................................20, 24

*Fort Sumter Tours, Inc. v. Andrus*,
    564 F.2d 1119 (4th Cir. 1977) ......................................................................................12, 19

*Foss v. Nat'l Marine Fisheries Serv.*,
    161 F.3d 584 (9th Cir. 1998) ..............................................................................................27

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ..........................................................................................16

*Frozen Food Express v. United States*,
    351 U.S. 40 (1956) ...............................................................................................................23

*FTC v. Std. Oil Co. of CA*,
    449 U.S. 232 (1980) ...............................................................................................22, 23, 24

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010) ..................................................................................27

*Ihnken v. Gardner*,
    927 F. Supp. 2d 227 (D. Md. 2013) ....................................................................................27

*Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*,
    105 F.4th 627 (4th Cir. 2024) .............................................................................................24

*KTK Mining of Va., LLC v. City of Selma, Ala.*,
    984 F. Supp. 2d 1209 (S.D. Ala. 2013) ...............................................................................27

*Kuhns v. Scottrade, Inc.*,
    868 F.3d 711 (8th Cir. 2017) ..............................................................................................10

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*,
    713 F.3d 187 (4th Cir. 2013) ..............................................................................................13

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) .................................................................................18

*Louisiana v. Haaland*,
    No. 2:23-CV-01157, 2023 WL 6450134 (W.D. La. Sept. 21, 2023), *order modified, appeal dismissed in part*, 86 F.4th 663 (5th Cir. 2023) ..........................................26

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................................9

*Marcum v. Salazar*,
    694 F.3d 123 (D.C. Cir. 2012) ...................................................................................13, 21

*Massachusetts v. Trump*,
    790 F. Supp. 3d 8 (D. Mass. 2025) ..................................................................................18

*Mayor & City Council of Baltimore v. Consumer Fin. Prot. Bureau*,
    775 F. Supp. 3d 921 (D. Md. 2025) ............................................................................15, 23

*Mayor & City Council of Baltimore v. Trump*,
    416 F. Supp. 3d 452 (D. Md. 2019) ..................................................................................22

*Memphis Light, Gas & Water Div. v. Craft*,
    436 U.S. 1 (1978)................................................................................................................28

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ........................................................................................9, 12

*Mitcheson v. Harris*,
    955 F.32d 235 (4th Cir. 1992) ..........................................................................................25

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
    530 U.S. 604 (2000)......................................................................................................11, 23

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
    397 F. Supp. 3d 430 (S.D.N.Y. 2019)...............................................................................17

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ............................................................................................19

*Nat'l Treasury Emps. Union v. Vought*,
    149 F.4th 762 (D.C. Cir. 2025) .........................................................................................15

*Nationwide Mut. Ins. Co. v. Welker*,
    792 F.Supp. 433 (D. Md. 1992) .........................................................................................25

*NLRB v. Constellium Rolled Prods. Ravenswood, LLC*,
    43 F.4th 395 (4th Cir. 2022) ........................................................................................24, 25

*P.L.S. Partners, Women's Med. Ctr. of R.I., Inc. v. City of Cranston*,
    696 F. Supp. 788 (D.R.I. 1988)..........................................................................................27

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)......................................................................................................12, 15

*Powder River Basin Resources Council v. U.S. Dep't of Interior*,
    No. 22-cv-2696, 2024 WL 195760 (D.D.C. Jan. 18, 2024)..............................................25

*Retail Indus. Leaders Ass' v. Fielder,*
    475 F.3d 180 (4th Cir. 2007) ...................................................................12, 13, 15

*Rhea Lana, Inc. v. Dep't of Lab.,*
    824 F.3d 1023 (D.C. Cir. 2016) ...................................................................16

*Rhode Island v. Trump,*
    781 F.Supp.3d 25 (D.R.I. 2025) ...................................................................17

*Richardson v. Town of Eastover,*
    922 F.2d 1152 (4th Cir. 1991) ...................................................................27

*Sackett v. E.P.A.,*
    566 U.S. 120 (2012) ...................................................................19, 22

*Sansotta v. Town of Nags Head,*
    724 F.3d 533 (4th Cir. 2013) ...................................................................28

*Satellite Broad. And Commc'ns Ass'n v. F.C.C.,*
    275 F.3d 337 (4th Cir. 2001) ...................................................................12

*Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.,*
    771 F.3d 632 (9th Cir. 2014) ...................................................................25

*Snider Int'l Corp. v. Town of Forest Heights,*
    906 F. Supp. 2d 413 (D. Md. 2012), *aff'd,* 739 F.3d 140 (4th Cir. 2014) ...............28

*Telecomms. Rsch. & Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ...................................................................16

*Tokyo Kikai Seisakusho, Ltd. v. United States,*
    529 F.3d 1352 (Fed. Cir. 2008) ...................................................................13

*Trinity Broad. of Fla., Inc. v. FCC,*
    211 F.3d 618 (D.C. Cir. 2000) ...................................................................27

*Trump v. New York,*
    592 U.S. 125 (2020) ...................................................................15

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    578 U.S. 590 (2016) ................................................................... *passim*

*United States v. Windsor,*
    570 U.S. 744 (2013) ...................................................................24

*Watt v. Energy Action Educ. Found.,*
    454 U.S. 151 (1981) ...................................................................10

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .................................................................................16

*Wild Virginia v. Council on Env't Quality*,
    56 F.4th 281 (4th Cir. 2022) ...................................................................15

*Zeigler v. Eastman Chem. Co.*,
    54 F.4th 187 (4th Cir. 2022) ...............................................................9, 16

**Statutes**

5 U.S.C. § 551(13) ...................................................................................16

42 U.S.C. § 4321 *et seq.* ............................................................................2

43 U.S.C. § 1334(a)(1) .........................................................................11, 14

43 U.S.C. § 1334(a)(2) .....................................................................3, 11, 14

43 U.S.C. § 1337(p)(4) ....................................................................*2*, 6, 18

43 U.S.C. § 1341(c) ................................................................................11

43 U.S.C. § 1341(d) ...............................................................................11

43 U.S.C. § 1349(a)(1) ........................................................................14, 23

43 U.S.C. § 1349(a)(3) ........................................................................26, 27

**Regulations**

30 C.F.R. § 285.417 ................................................................................11

30 C.F.R. § 585.102(a) ..............................................................................5

30 C.F.R. § 585.417 ................................................................................11

30 C.F.R. § 585.422 ........................................................................3, 11, 14

30 C.F.R. § 585.600(a) ..............................................................................7

50 C.F.R. § 13.29(e) ...............................................................................13

**Other Authorities**

90 Fed. Reg. 8363 (Jan. 29, 2025) ..................................................... *passim*

5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1407 (3d
    ed. 2025) ..........................................................................................9

Fed. R. Civ. P. 12(b) .................................................................................................9, 26

## I.    INTRODUCTION

The Government's September 12, 2025 Motion for "Voluntary Remand with Vacatur," ECF No. 81 (the "Vacatur Motion"), revealed that Defendant the Bureau of Ocean Energy Management ("BOEM") had taken multiple actions against US Wind and its Maryland Offshore Wind Project (the "Project") that violate the terms of US Wind's Lease and contravene the Outer Continental Shelf Lands Act ("OCSLA") and BOEM's own legally binding OCSLA regulations. Specifically, BOEM reached final decisions that BOEM's approval of the Project's Construction and Operations Plan ("COP") was invalid and had to be revoked, and that all "new or renewed" federal approvals for the Project would be banned indefinitely. The consequences of these actions for US Wind and the Project are immediate and devastating. They have effectively stopped US Wind's development activities in their tracks and, unless enjoined by the Court, threaten to destroy US Wind and deprive Maryland and its residents and workforce of the Project's extraordinary economic and environmental benefits.

Shortly after it learned that BOEM intended to switch sides in this case and seek vacatur of the COP, US Wind filed Cross Claims against the Government to challenge any such actions, asserting they violate OCSLA, the Due Process Clause, and the Administrative Procedure Act. The Government's motion to dismiss makes no attempt to defend BOEM's actions on the merits. Rather, the Government tries to avoid accountability for its clearly unlawful conduct on the theory that its review of the COP approval is "ongoing," arguing that US Wind cannot challenge the Government's actions—notwithstanding the immediate and existential threat they pose—until some indefinite point in the future when the definitive decisions revealed by the Vacatur Motion are somehow "formalized." All of the Government's arguments fail. The time for judicial review of the Government's unlawful conduct is right now.

## II.    STATEMENT OF FACTS

### A.    US Wind's Reliance on the Lease and COP Approval.

In December 2014, BOEM awarded US Wind Renewable Energy Lease No. OCS-A 0490 (the "Lease") for the Project. ECF Nos. 92-4 ¶ 17; 92-6. Over the next six years, US Wind spent millions of dollars in preliminary development work that culminated in its submission of the Project's COP in August 2020. *Id.* ¶ 18; Supplemental Declaration of Jeff Grybowski ("Supp. Decl.") at ¶ 3, attached as **Exhibit A**. During the next four years, US Wind spent millions more working with BOEM and other federal and state agencies to complete extensive analyses of the COP's environmental effects, repeatedly amending the COP along the way. ECF No. 92-4 ¶ 19; Supp. Decl. ¶ 3; Ex. B at 3.

On September 3, 2024, BOEM issued a Record of Decision ("ROD") that adopted the Final Environmental Impact Statement ("FEIS") for the COP pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and explained why BOEM had "decided to approve [the COP], with modifications," pursuant to Section 8(p)(4) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1337(p)(4). ROD at 1-2, 31-36, attached as **Exhibit B**. BOEM formally notified US Wind that BOEM "has approved the [COP] … subject to the enclosed conditions of COP approval[.]" Letter from David Diamond, Deputy Chief of Operations, Atlantic Outer Continental Shelf, Office of Renewable Energy Programs, BOEM to Riccardo Toto, President, US Wind Inc. (Dec. 2, 2024) ("COP Approval") at 1, attached as **Exhibit C**; ECF No. 92-4 ¶ 34.

The COP Approval was a watershed moment for US Wind. Supp. Decl. ¶ 3. Under the terms of the Lease, it gave US Wind "the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, to … conduct activities in the [Lease] area that are described in" the COP. ECF No. 92-6 § 2(a)(2). In addition to this vested right, the Lease

2

ensures that the Government cannot block any of those activities or suspend or cancel the Lease or the COP unless (1) US Wind "fails to comply" with OCSLA, its associated regulations, the COP or the Lease or (2) the Government finds that "continued activity pursuant to such lease or permit would probably cause serious harm or damage" to the environment, national security or defense. *Id.* § 8 (referencing 43 U.S.C. § 1334(a)(2) and 30 C.F.R. § 585.422). In purchasing the Lease, conducting 10 years of development activities that led to COP Approval and implementing the COP thereafter, US Wind relied on the certainty that COP Approval would provide under the Lease terms, OCSLA and associated regulations. Supp. Decl. ¶ 3. Accordingly, in late 2024, following issuance of the ROD and in anticipation of COP approval, US Wind immediately began onshore construction and related activities at great expense to the company. ECF No. 92-4 ¶ 36.

US Wind continued these activities in 2025 in reliance on the Lease and COP Approval, notwithstanding the President's January 20, 2025 Memorandum, 90 Fed. Reg. 8363 (Jan. 29, 2025) (the "Wind Memo"), and the Government's systemic attacks on offshore wind. ECF No. 92-4 ¶ 36; Supp. Decl. ¶ 4. In the weeks and months following issuance of the Wind Memo, BOEM and US Wind met and communicated regularly, including in regular bi-weekly meetings that had begun several years earlier. *Id.* ¶ 4. BOEM made, and US Wind responded to, numerous information requests, and BOEM provided input on multiple US Wind submissions required by the conditions of COP Approval. *Id.* Over time, however, BOEM's responses became increasingly and abnormally delayed, particularly after DOI issued a memorandum in July 2025 requiring senior level review of all wind-energy related approvals. ECF No. 92-4 ¶ 38; Supp. Decl. ¶ 13. These delays forced US Wind to postpone critical construction efforts, seriously harming the Project. ECF No. 92-4 ¶ 42-48. Yet during this period, the Government never notified US Wind that it intended to reconsider, withdraw or vacate the COP Approval. Supp. Decl. ¶ 4. Relying on its

contract and statutory rights to build the Project pursuant to the COP, US Wind spent approximately $19.4 million carrying out the COP in the first half of 2025 alone. Supp. Decl. ¶ 4.

**B.**    **The Government's Revocation Decision.**

In August and September 2025, the Government gradually disclosed, over the course of four weeks, that it had taken a series of actions which, absent injunctive relief by this Court, will not just delay but kill the Project. In emails and court filings from August 18, 2025 to August 25, 2025, the Government reported that it intended to seek "remand" and "vacatur" of the COP Approval, without citing any specific basis for doing so.[1] Not until September 12, 2025, did the Government finally set forth its reasons for doing so. That day, in its Vacatur Motion, ECF No. 81, and its supporting Declaration of Adam Suess, the acting Assistant Secretary for Land and Minerals Management who "oversee[s]" BOEM, ECF No. 81-1 at 1, the Government revealed that it had made multiple final adverse determinations specific to the Project (collectively, the "Revocation Decision") which have the legal and practical effect of revoking the COP Approval and foreclosing development of the Project altogether.

First, BOEM determined that the legally binding standard for review of the COP under OCSLA Section 8(p)(4)—the standard that BOEM applied in approving the COP in 2024[2]— should be replaced by a new, more restrictive standard endorsed by the DOI Solicitor's May 1, 2025 "M-Opinion." ECF No. 81-1 ¶¶ 11, 12. The legally binding standard (the "Section 8(p)(4) Rule"), both today and at the time of the COP Approval, requires "a rational balance among [the twelve Section 8(p)(4)] goals to the extent they conflict or are otherwise in tension." 30 C.F.R.

---

[1] *See* Aug. 18, 2025 Email from D. Tice, attached as Exhibit D.; *Bintz v. U.S. Dep't of Interior*, Case 1:25-cv-00152-GBW (D. Del.), ECF No. 28 (Aug. 22, 2025 Mot. to Stay) at 1; ECF No. 74 (Aug. 25, 2025 Mot. for Sched. Ord.) at 2-3.

[2] Ex. B, Appx. B at 14 n.36, 15 n.40, 17 & n., 18 n.47, 19 n.49, 20 n.52, 21 n.54, 22 n.57 & 58, 27 n. 68 & 69, 28 n.75.

§ 585.102(a). BOEM acknowledges that DOI's new interpretation, which rejects the rational balance standard, contradicts BOEM's current regulations. ECF No. 81-1 ¶ 11. BOEM nonetheless determined that, even though the Section 8(p)(4) Rule remains in effect and is expressly incorporated by the terms of the Lease, ECF No. 92-6 § 3(b), DOI's new interpretation retroactively controls the validity of COP Approval. ECF No. 81-1 ¶ 12. As a result, BOEM made the determination, "[b]ased in part on the ROD's express reliance on the now withdrawn" rational balance standard,[3] that "the decision to approve the COP did not fully comply with each of the factors in Section 8(p)(4) of OCSLA." *Id.* (emphasis added).[4]

Second, BOEM determined based on the FEIS and "other record documents" that, under the DOI Solicitor's new, inconsistent and retroactively imposed interpretation of Section 8(p)(4), Project's COP Approval "failed to account for all the impacts that the [Project] may cause," "understated or obfuscated impacts that were then improperly weighed," "was not properly informed by a complete understanding of the impacts from the project" and "did not adequately ensure that all activities in the COP will be carried out in a manner that provides for prevention of interference with other reasonable uses of the COP" as required by OCSLA Section 8(p)(4)(I). *Id.* ¶ 13 (emphasis added). In support of these conclusions, BOEM cites a wide array of specific findings as to "search and rescue operations" and "impacts to commercial fisheries" which it says establish that "BOEM's conclusion was faulty that the project complies with [OCSLA] section 8(p)(4)(I)" and that "the underestimation of impacts to search and rescue operations means that

---

[3] BOEM references the DOI Solicitor's 2021 M-Opinion, M-37067, which originally adopted the rational balance standard, but BOEM concedes that the same standard was incorporated into the formally promulgated Section 8(p)(4) Rule. ECF No. 81-1 ¶ 11.
[4] Even if BOEM eventually conformed its regulations to the May 1, 2025 M-Opinion, *id.*, that would not cure this impermissible retroactivity. *See* ECF 92-1 at 22.

BOEM's approval failed to ensure the COP complied with section 8(p)(4)(I)." *Id.* ¶ 14 (emphasis added).

Third, the Government's filings disclosed that, on the basis these determinations, "BOEM has identified a legal error under OCSLA that it seeks to correct," specifically, "that its prior analysis approving the COP failed to properly apply the § 1337(p)(4) factors and account for all the Project's potential impacts." ECF No. 81 at 10. The Government concluded that "these errors" are so "serious"—by themselves—that the COP Approval should be "vacate[d]," so that BOEM can "make a new COP decision." *Id.* at 9-10; ECF No. 81-1 ¶ 13.

Finally, the Government revealed that, in reaching these findings and conclusions, BOEM was "implementing the directives" set forth in the Presidential Wind Memo and related DOI directives. ECF No. 81 at 7; *see* ECF No. 81-1 ¶¶ 12, 17, 18. Specifically, BOEM's "reevaluation of this Project" was conducted pursuant to the directive in Wind Memo Section 1 "to conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, [and] identifying any legal bases for such removal[.]" ECF No. 81 at 3-4 (emphasis added; quoting Wind Memo § 1); *see* ECF No. 81-1 ¶ 12. In addition, BOEM determined the Project and the COP are subject to the directive in Section 2(a) of the Wind Memo that DOI and other agencies "refrain from issuing new or renewed approvals for offshore wind projects 'pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices.'" ECF No. 81-1 ¶¶ 9, 18 (emphasis added).

The determinations that the Government revealed on September 12, 2025 reflect a clear, final decision to revoke the COP Approval. BOEM has definitively concluded that the COP Approval reflected "legal error" that is "serious" and must be "correct[ed]" by "vacating" the approval and replacing it with a "new decision." But due to the determinations BOEM already has

made, and due to Wind Memo Section 2(a)'s ban on "new or renewed approvals," only one "new decision" is possible: to "disapprove" the COP.

### C.    The Revocation Decision's Legal and Practical Consequences for US Wind.

The Revocation Decision has enormous and immediate legal and practical consequences for US Wind. Supp. Decl. ¶ 7. Without an approved COP, US Wind cannot develop the Project. 30 C.F.R. § 585.600(a); ECF No. 92-6 § 2. Indeed, as the Government acknowledges, US Wind cannot conduct "any activity" in its Lease area without an approved COP. ECF No. 81-1 ¶ 4. The Government's claim that, "[a]s it stands, US Wind's lease and COP are still in place," ECF No. 105-1 at 5 (emphasis added), is irrelevant. For US Wind to continue investing in the Project, it must be able to rely on the United States' commitment in the Lease to allow US Wind to construct and operate the Project pursuant to the COP, during the entire term of the Lease. US Wind cannot continue development work without a reasonable prospect of a clear permitting and legal pathway to allow completion of the Project. Supp. Decl. ¶ 8. The Revocation Decision eliminates that prospect, thus effectively forcing a suspension of US Wind's critical Project activities, including in the areas of engineering, procurement, financing and construction. *Id.* ¶¶ 7, 8. US Wind cannot justify incurring the millions of dollars required to move forward with the COP activities it would otherwise be performing right now—including preparation of detailed designs and on-shore construction activities—when the Government claims that it did not validly approve the COP that authorizes those activities, and BOEM interprets Wind Memo Section 2(a) to prevent US Wind from obtaining many additional "approvals" it will need to proceed.[5] *Id.* ¶ 7.

---

[5] Specific examples of work that US Wind is unable to perform right now because of the Revocation Decision include preparation of the Facility Design Review ("FDR"), a key document required by BOEM regulations to proceed with construction, and reservations of construction vessels. Supp. Decl. ¶ 11. The FDR will cost millions of dollars to complete but be rendered worthless by the Revocation Decision, and reserving construction vessels when US Wind is unable to use them would subject it millions of dollars in contractual penalties. *Id.*

The immediate consequences of the Revocation Decision, beyond its effective suspension of US Wind's Lease rights and development activities, are grave. It creates an ever-present risk that the company's lenders could declare US Wind in default of its loan covenants, potentially forcing US Wind into bankruptcy. Supp. Decl. ¶ 9; ECF No. 92-4 ¶ 52. It postpones US Wind's access to more favorable lending terms during the Project's construction phase. Supp. Decl. ¶ 9. And it adversely impacts relationships with US Wind's existing vendors and contractors, who correctly assume that the Revocation Decision now places the entire Project at risk. *Id.* ¶ 10.[6]

Longer term effects are also dire. Even if US Wind survives and the Revocation Decision is reversed or enjoined, it and related federal actions have already caused delays that postpone completion of the Project by at least one year and probably longer. ECF No. 92-4 ¶¶ 45-47. Cancellation of the Project, the obviously intended effect of the Revocation Decision, will cause US Wind to lose more than $320 million in investments, plus an incalculable amount of revenues. *Id.* ¶¶ 53-56; Supp. Decl. ¶ 14. More fundamentally, as development of the Project is US Wind's sole corporate purpose, cancellation of the Project would cause the company to cease to exist. *Id.* ¶ 15.

### D.    US Wind's Cross Claims

On September 3, 2025, soon after the Government disclosed its intent to seek vacatur, but before its September 12, 2025 disclosure of the Revocation Decision, US Wind filed an Amended Answer which added Cross Claims challenging the Government's "determination to vacate, rescind or otherwise withdraw or undermine the Federal Approvals" for the Project, including the

---

[6] The immediate adverse effects of the Revocation Decision also include adverse funding decisions by the Government. On August 29, 2025, just days after the Government first announced its decision to vacate the COP Approval, the U.S. Department of Transportation terminated $47 million in funding for construction of a port facility critical to the Project, justifying the action on the ground that the Project was "doomed." ECF No. 92-4 ¶ 40.

ROD and the COP Approval (the "Federal Approvals"). ECF No. 77, Cross Claim ¶ 55; *id.* ¶¶ 50, 51. The Cross Claims assert that any such determination against Federal Approvals violates the APA (Counts I-III), violates OCSLA and Lease requirements for Project suspension or cancellation (Count IV) and violates the Due Process Clause (Count V). In addition, because the Government has abandoned its defense of the Federal Approvals and joined Plaintiffs in improperly seeking vacatur without any decision on the merits of the Federal Approvals, the Cross Claims seek declaratory judgment that the Federal Approvals were properly issued (Counts VI-X). US Wind did not know the full scope of and rationale for the Revocation Decision before filing its Cross Claim, but what was known at the time of filing and what information has come out since then both confirm that the Cross Claims are justiciable and adequately pleaded.

## III.    ARGUMENT

### A.    US Wind Satisfies Standing and Ripeness Requirements

A motion dismiss under Rule 12(b)(1) may be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187, 194 (4th Cir. 2022) (quotation omitted).[7] The Government cannot make these showings. US Wind satisfies Article III requirements for standing and ripeness.

#### 1.    US Wind Has Standing

US Wind alleged "an actual or threatened injury that is not conjectural or hypothetical," that is "fairly traceable to the challenged conduct," and that "a favorable decision [is] likely to redress." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The Revocation Decision injures US Wind by, among other things,

---

[7] "Cross claims . . . and complaints are evaluated the same when challenged by a motion to dismiss." *EEOC v. Phase 2 Invs., Inc.*, 333 F. Supp. 3d 505, 514 (D. Md. 2018); *accord* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1407 (3d ed. 2025).

depriving US Wind of its contractual and statutory rights to develop the Project in accordance with the approved COP, forcing US Wind to defer critical supply and vessel contracts, delaying completion of the Project, subjecting US Wind to increased supply and financing costs, adversely affecting relationships with existing vendors and contractors, risking a default of US Wind's debt covenants and a possible bankruptcy and impairing hundreds of millions of dollars in investments to date. *Supra* at II.C. These types of financial and contractual injuries satisfy Article III. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 161-162 (1981) (OCSLA violation causing possible adverse effect on "financial stake in federal OCS leasing off the California coast" constitutes "distinct and palpable injury" for standing); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury'").

Further, "[a] party to a contract ordinarily has 'standing' to seek enforcement of a contractual promise made to it by another party." *Almond v. Cap. Props., Inc.*, 212 F.3d 20, 24 (1st Cir. 2000).[8] US Wind contends that revocation of the COP Approval violates the express terms of US Wind's Lease and the OCSLA statutory and regulatory provisions incorporated by reference therein. ECF No. 92-1 at 15-17. The Lease grants US Wind "the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, <u>to … conduct activities in the [leased area] that are described in a … COP that has been approved by the Lessor</u>." ECF No. 92-6 at § 2(a) (emphasis added). Following COP approval, the Government cannot restrict or

---

[8] *See also Bowen v. Pub. Agencies Opposed To Soc. Sec. Entrapment*, 477 U.S. 41, 48–51, (1986) (agreeing that "agencies alleged an injury sufficient to confer standing because they claimed that [a federal statutory amendment] deprived them of their contractual rights"); *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017) ("a party to a breached contract has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged") (citation omitted); *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 952 (9th Cir. 2013) (plaintiffs "established 'injury in fact' when the alleged unlawful act deprived them of rights they held under contract"); *Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 9 (D.D.C. 2024) ("the breach of a contractual obligation to perform some duty has always been understood as a concrete injury that enables the aggrieved contracting party to proceed in an American court").

delay those activities unless it does so pursuant to the terms of the Lease or the OCSLA provisions incorporated by the Lease.[9] *Mobil Oil Expl. & Producing Se., Inc. v. United States,* 530 U.S. 604, 620 (2000). The Revocation Decision does not satisfy any of those provisions. US Wind's claims that the Government violated its contractual, regulatory and statutory lease rights—success on which the Court "must … assume" in analyzing standing, *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (collecting cases); *FEC v. Cruz*, 596 U.S. 289, 298 (2022) (same)—thus also establish actual injury.

US Wind's actual and threatened injuries are fairly traceable to the Government's conduct. Prior to the challenged actions, US Wind was on target to complete designs and enter construction and vessel contracts this year, install onshore and offshore components over the next two years, and begin commercial operation as scheduled in 2028. ECF No. 92-4 ¶¶ 35, 36. The Revocation Decision has made all of that impossible. US Wind cannot incur the vast expenses and liabilities required to develop the Project when BOEM, US Wind's chief regulator, has announced that the approved COP violates the Project's governing statute, OCSLA Section 8(p)(4). *Supra* at II.C. A favorable decision will redress US Wind's actual and threatened injuries by establishing that BOEM must honor the already-approved COP in accordance with the Lease and OCSLA. Supp. Decl. ¶ 14; *see also* ECF No. 92-4 (proposed Order on preliminary injunction motion). All requirements for Article III standing are met.

### 2. US Wind's Cross Claims are Ripe for Consideration.

US Wind's Cross Claims also satisfy the ripeness doctrine, which "prevents judicial

---

[9] *See* ECF No. 92-6 §§ 3 & 8; *see also* 43 U.S.C. § 1334(a)(1) (conditioning suspension on "a threat of serious, irreparable, or immediate harm or damage"); 43 U.S.C. §§ 1341(c), (d) (allowing suspension for "state of war," "national emergency" and "national defense" on "payment of just compensation to the lessee"); 43 U.S.C. § 1334(a)(2) (setting forth process and limitations on lease cancellation); 30 C.F.R. §§ 285.417, 422; 30 C.F.R. §§ 585.417, 422. The Government does not claim and cannot show that any of these circumstances exist, nor that they would justify the Revocation Decision.

consideration of issues until a controversy is presented in clean-cut and concrete form" and involves "balanc[ing] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller,* 462 F.3d at 318–19 (citations omitted). "[I]f an issue is 'predominantly legal,' not depending upon the potential occurrence of factual events, it is more likely to be found ripe." *Retail Indus. Leaders Ass' v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (citing *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 201 (1983)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiffs who would be compelled to act under threat of enforcement of the challenged law," and "may consider the cost to the parties of delaying judicial review." *Miller*, 462 F.3d at 319 (citations omitted).

### a)    The Fitness Prong Is Satisfied.

As to fitness, the issues presented by the Government's actions are predominantly legal— *i.e.,* whether the express Lease and incorporated OCSLA statutory and regulatory provisions bar BOEM from revoking or reconsidering the COP Approval; whether the Due Process Clause and APA Section 558 bar BOEM from doing so without giving US Wind notice and an opportunity to respond; and whether BOEM's already-stated rationales for its actions violate the APA because they are arbitrary and capricious, contrary to OCSLA, or reflect undue political influence. *See Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119, 1123 (4th Cir. 1977) ("issues … are legal in nature" where the "court must decide, as federal courts often must in reviewing administrative action, the precise scope of plaintiff's statutory entitlement and whether such entitlement was improperly denied"); *Satellite Broad. And Commc'ns Ass'n v. F.C.C.*, 275 F.3d 337, 369 (4th Cir. 2001) (whether agency "has articulated a reasonable explanation for its action" is "purely legal" for ripeness purposes). Resolution of these issues does not "depend[ ]" upon the potential occurrence of factual events," *Retail Indus. Leaders Ass'n,* 475 F.3d at 188, and "no further action from [the

12

agency] is needed" where, as here, BOEM "has already … manifested its views" that its prior COP Approval is invalid, *Cooksey*, 721 F.3d at 239–41, and has "no intention of voluntarily abandoning" that position. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013).

The Government argues that "judicial review [is] premature" because "BOEM's re-evaluation of the COP approval is 'ongoing'" or has not yet been "formalized." ECF No. 105-1 at 6. Yet the cases it cites are inapposite because they involved decision-making pursuant to formal administrative procedures established by statute or regulation. *Marcum v. Salazar*, 694 F.3d 123, 126 (D.C. Cir. 2012), concerned "an administrative appeal" filed by the plaintiff in the case "to the [U.S. Fish and Wildlife Service] Director pursuant to 50 C.F.R. § 13.29(e)," and *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 137–38 (1967), involved regulations "promulgated" after notice and comment pursuant to the Federal Food, Drug, and Cosmetic Act. Here, by contrast, no such formal procedure exists for BOEM's Star Chamber "reconsideration" of US Wind's COP Approval. As a result, the Government cannot tell the Court how or when that procedure will unfold, or why it could possibly result in a determination different from what BOEM already has decided.

This is because the Government's purported "reconsideration" procedure not only does not exist but is foreclosed by statute. As the Government's own authority recognizes, an agency cannot "reconsider its decisions … in a manner that is contrary to a statute" or "where a statute forbids the exercise of such power." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1361 (Fed. Cir. 2008). Further, "where a statute does expressly provide for reconsideration of decisions, the agency is obligated to follow the procedures for reconsideration set forth in the statute." *Id.* (citing *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 329 (1961)). In *Civil Aeronautics Board*, the Supreme Court held that, once the Civil Aeronautics Board had issued a

certificate pursuant to the Federal Aviation Act authorizing an airline to operate specific air routes, the Board could not "reconsider" that decision except in accordance with provisions of the Act which set forth the procedures and standards under which the Board "may amend, modify, or suspend any such certificate, … or may revoke any such certificate." 367 U.S. at 322–24. Otherwise, the Court explained, "the power to reconsider a case may be the lever for 'nullify(ing) an express provision of the Act.'" *Id.* at 328 (citation omitted).

Here not only does the Lease foreclose reconsideration, but OCSLA and associated regulations expressly limit the circumstances under which DOI may require "the suspension or temporary prohibition of any operation or activity … <u>pursuant to any lease or permit</u>," or the "<u>cancellation of any lease or permit</u>." 43 U.S.C. §§ 1334(a)(1), (2) (emphasis added); *see also* 30 C.F.R. § 585.422. The Lease incorporates those and other limits on "suspension" and "cancellation" of both the Lease and the COP. ECF No. 92-6 § 8. OCSLA in turn makes "<u>the terms of any permit or lease issued by the Secretary under this subchapter</u>" enforceable against the United States. 43 U.S.C. § 1349(a)(1). The Government's purported ability to "reconsider" a COP approval or other "issued" OCSLA permit, without satisfying the statutory suspension and cancellation requirements, would effectively nullify those requirements. As a result, the Lease and OCSLA foreclose the Government's purported reconsideration of the already approved COP. *Civ. Aeronautics Bd.*, 367 U.S. at 328. This is a merits issue which cannot be resolved in the Government's favor on a motion to dismiss, *Cooksey*, 721 F.3d at 239; the Government cannot use vague notions of a "reconsideration" that US Wind contends is illegal to stave off judicial review. In any event, even a valid reconsideration procedure cannot foreclose judicial review where, as here, the Government has informed the contracting party "of the corrective action that is actually *being taken*," and the party "has suffered a practical, legal effect of the corrective action, as it is not performing a contract

it has won." *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 334–35 (2012). The "fitness" prong for ripeness is satisfied.

### b)    The Hardship Prong Is Satisfied.

So, too, is the hardship prong satisfied. Like the nuclear plant construction addressed by the Supreme Court in *Pacific Gas & Electric*, US Wind's Project "requires the expenditures of millions of dollars over a number of years," and "considerable advance planning—on the order of 12-14 years," 461 U.S. at 201–02, all predicated on the validity of BOEM's COP Approval. As in that case, "[t]o require [US Wind] to proceed without knowing whether the [COP Approval] is valid would impose a palpable and considerable hardship" on US Wind. *Id.* Further, "'decisions to be made now or in the short future may be affected' by whether" the Court acts. *Id.* (citation omitted). Specifically, decisions that US Wind needs to make now or in the near future about whether and when to execute the design and construction contracts and to secure vessel reservations that are critical to completing construction hang in the balance. ECF No. 92-4 ¶¶ 42-46. Delay in resolving US Wind's dispute with the Government could also force US Wind to surrender its interconnection queue positions, further delaying completion of construction. ECF No. 92-4 ¶ 47. The Government's position that US Wind must simply endure these hardships until BOEM's Revocation Decision is "formalized" is baseless. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pacific Gas & Elec. Co.*, 461 U.S. at 201-02 (citation omitted); *Retail Indus. Leaders Ass' v. Fielder*, 475 F.3d at 184–85 (same). US Wind's Cross Claims are ripe.[10]

---

[10] The Government's ripeness cases are distinguishable. *Trump v. New York*, 592 U.S. 125, 132-33 (2020), rejected as unripe a challenge to a proposed modification of census procedures that was not "concrete" and that "the Government cannot feasibly implement." *Mayor & City Council of Baltimore v. Consumer Fin. Prot. Bureau*, 775 F. Supp. 3d 921, 938 (D. Md. 2025), rejected as unripe a challenge to a "disembodied and unrealized decision to drain the CFPB of its operating funds." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 782 (D.C. Cir. 2025) ("plaintiffs point to no regulation, order, document, email, or other

### B.     Cross Claim Counts I-III Challenge Final Agency Actions.

The Government also seeks dismissal of Cross Claim Counts I, II and III on the theory that US Wind "fails to challenge any 'final agency action.'" ECF No. 105-1 at 11. This theory—which the Government again has the burden of establishing "as a matter of law," *Zeigler*, 54 F.4th at 194—is baseless. The Revocation Decision clearly satisfies the two APA requirements for finality: it "mark[s] the consummation of the agency's decisionmaking process," and it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).[11] Courts have "long taken" a "'pragmatic' approach . . . to finality," *Id.* at 599 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)), a standard which "lacks many self-implementing, bright-line rules." *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1027 (D.C. Cir. 2016) (cleaned up). "And it is a pragmatic inquiry colored by the APA's embodiment of the 'basic presumption of judicial review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 636–37 (5th Cir. 2023) (quoting *Abbott*, 387 U.S. at 140). The Revocation Decision meets these standards.

---

statement, written or oral, purporting to shut down the CFPB"), is similar. *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 296 (4th Cir. 2022), rejected as unripe challenges to NEPA comment procedures because plaintiffs' alleged injuries were "contingent" on "how other agencies conduct their NEPA review of potential future actions." And *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984), was an unreasonable delay case where "the lack of a final order is the very gravamen of the petitioners' complaint." Here, by contrast, the Government's Revocation Decision is concrete, documented by the Government's own filings in this case, already implemented by BOEM itself, and not contingent on future action by any other agency.

[11] The Government does not and cannot dispute that each of these actions constitutes "agency action." The APA defines that term to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or the denial thereof, or failure to act." 5 U.S.C. § 551(13). The definition is read "comprehensively" to cover "every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Just as a decision to issue—or not issue—a particular permit, rule, or determination is an agency action, *see, e.g.*, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1037 (D.C. Cir. 2002), so too is a decision to suspend, rescind, or withdraw one—*i.e.*, the precise actions taken by the Government here. *See, e.g.*, *Clarke v. CFTC*, 74 F.4th 627, 637 (5th Cir. 2023).

### 1.    The Revocation Action Satisfies the Consummation Requirement.

The consummation requirement turns on whether an agency "for all practical purposes has ruled definitively" on an issue. *Hawkes*, 578 U.S. at 597 (emphasis added; cleaned up). What matters is whether an agency treats a particular policy or action as "a settled agency position," *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) (emphasis added), regardless of whether the position is formally or informally expressed. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 748 (D. Md. 2025), *appeal pending*, No. 25-1411 (4th Cir.); *see, also, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). Individual statements by agency officials may establish consummation. *See, e.g.*, *Amadei v. Nielsen*, 348 F.Supp.3d 145, 164–65 (E.D.N.Y. 2018) (collecting cases); *accord Rhode Island v. Trump*, 781 F.Supp.3d 25, 43–45 (D.R.I. 2025); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 n.7 (D.C. Cir. 1986) (final agency action can "result[] from a series of agency pronouncements rather than a single edict").

Here, the Revocation Decision plainly reflects a "settled agency position" as to multiple issues. Specifically, BOEM has reached the settled position that the COP Approval must be retroactively evaluated under a May 1, 2025 M-Opinion which rejects the "rational balance" standard imposed by the legally binding Section 8(p)(4) Rule and replaces it with more restrictive standard. ECF No. 81-1 ¶ 11,12. The May 2025 M-Opinion by itself, like any agency interpretation of a governing statute, constitutes final agency action. *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 446–50 (S.D.N.Y. 2019). But BOEM went even further in the Revocation Decision, definitively concluding "[b]ased in part on" on this change of statutory interpretation alone that "the decision to approve the COP did not fully comply with each of the factors in section 8(p)(4) of OCSLA." ECF No. 81-1 ¶ 12 (emphasis added).

Next, BOEM "ruled definitively," *Hawkes*, 578 U.S. at 597, that under its retroactively imposed interpretation of Section 8(p)(4), the COP Approval "<u>failed to account for all the impacts that the [Project] may cause</u>" and "<u>understated or obfuscated impacts that were then improperly weighed</u>" in approving the COP. *Id.* ¶ 13 (emphasis added). BOEM cites a wide array of specific findings as to "search and rescue operations" and "commercial fishing" which it says establish unequivocally that "<u>BOEM's conclusion was faulty that the project complies with [OCSLA] section 8(p)(4)(I)</u>." *Id.* ¶ 13 (emphasis added); *id.* ¶ 14. The Government admits these findings show that "BOEM <u>has identified a legal error</u> under OCSLA" in that it "<u>has concluded</u> that its prior analysis approving the COP failed to properly apply the § 1337(p)(4) factors and account for all the Project's potential impacts." ECF No. 81 at 10 (emphasis added). Indeed, the Government already has concluded that these already-determined "errors" are so "serious" that they require "vacat[ing]" the COP Approval and "mak[ing] a new decision." *Id.*

BOEM also reached the settled position that the Project is subject to reviews under Sections 1 and 2(a) of the Presidential Wind Memo and that, as a result, all "new or renewed approvals" or "permits" for the Project are banned until some unknown time in the future when DOI "complete[s] the comprehensive assessment directed in section 2(a)." ECF No. 81-1 ¶ 9, 18. Wind Memo Section 2(a) already has been held to be "de facto final" for APA purposes, consistent with the general principle that "<u>significant pauses and blanket moratoria are final agency actions</u>." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025) (emphasis added; quoting *Louisiana v. Biden*, 622 F. Supp. 3d 267, 285 (W.D. La. 2022)). *A fortiori,* BOEM's specific application of Wind Memo Section 2(a) to bar any new or renewed approvals and permits for the Project is final.

The Government argues that "BOEM's review of the Project's COP approval is not complete and may result in several potential outcomes," but all of them indisputably require "a new decision on the COP: to either approve, disapprove, or approve [the COP] with conditions." ECF No. 105-1 at 12 (emphasis added; quoting ECF No. 81-1 ¶ 16); *see also* ECF No. 81 at 4, 6, 8, 17 (repeatedly emphasizing that BOEM will make "new decision"). This is not a defense, but rather an admission that the Government has made a final decision to vacate the COP Approval: requiring "a new decision" necessarily means vacating the old one. And under the Wind Memo Section 2(a) "approvals" ban, there is only one decision that can be made: "to disapprove" the COP. [12] Further, the Government has articulated no scenario under which BOEM could re-approve the COP, having already decided that the COP violates OCSLA Section 8(p)(4) for multiple independent reasons. Nothing suggests there is any chance of BOEM changing its mind. Regardless, "the mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012); *see also Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79-80 (D.C. Cir. 2020).

Courts in analogous cases hold that final agency action occurs where, as here, the Government makes legal or factual determinations that are likely to result in denial of the plaintiff's contract or permit, whether or not a formal denial has issued. In *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119 (4th Cir. 1977), the National Park Service concluded that an incumbent park concessionaire waived his statutory preference for contract renewal, and on that basis entered

---

[12] Even accepting the counterfactual hypothesis that BOEM nominally retains the option to re-approve the COP at some point in the future after the Wind Memo § 2 ban is lifted, the consummation requirement is satisfied, because the Revocation Decision announced by the Vacatur Motion would represent an "interim agency resolution" during the pendency of the ban. "[A]n interim agency resolution" still "counts as final agency action" where it "is the final word from the agency on what will happen up to the time of any different permanent decision." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).

into negotiations with a competing bidder. *Id.* The Court held that "final agency action" had occurred, even though the Service had not executed a contract with the competing bidder, because "both Service's interpretation of the statutory preference and its legal relationship with the [incumbent concessionaire] have become fixed," absent a "break down" in negotiations with the competing bidder. *Id.* at 1123. [13] Similarly, in *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627 (5th Cir. 2023), the CFTC issued a "license" in the form of a staff "no-action letter," but later "determined as a preliminary matter that [the no-action letter] is void and should be withdrawn." *Id.* at 635. The court held that this withdrawal determination satisfied the consummation requirement, noting that the agency did "not promise to reconsider its [withdrawal] decision" and, in any event, "the possibility that the [agency] may reconsider is irrelevant to our inquiry." *Id.* at 638-639. The court reached that conclusion even though the CFTC called its withdrawal determination "preliminary" and "invite[d] the [plaintiff] to submit any objections it may have[.]" *Id.* at 639-640.

Here, as in *Ft. Sumter Tours* and *Clarke*, the Revocation Decision reflects "fixed" positions the COP Approval was invalid for multiple specific reasons, leaving no doubt that the decision already has been made. Thus, the Government's bare assertion that "BOEM's re-evaluation of the COP approval is 'ongoing,'" ECF No. 105 at 6, cannot stave off judicial review. The Government's claim that its decisions have not been "formalized," *Id.* at 10, is likewise specious. BOEM's decision-making process and detailed conclusions are expressly set forth in a declaration to this

---

[13] As the district court put it in the decision affirmed by the Fourth Circuit, the court "will not require" the "futile act" of "awaiting further administrative action" where it was "extremely unlikely … that the reviewing authorities in the … Interior Department would reverse themselves again," and "there is no indication from the Secretary as to what the Plaintiff could do at this time to compel the Secretary" to change its position. *Fort Sumter Tours, Inc. v. Andrus*, 440 F. Supp. 914, 919-920 (D.S.C.), *aff'd*, 564 F.2d 1119 (4th Cir. 1977).

Court submitted by a high-ranking U.S. official "under penalty of perjury." ECF No. 81-1 at 8. Nothing could be more "formalized."

Other evidence confirms that BOEM's express findings against the Project COP mean BOEM has "for all practical purposes . . . ruled definitively" that the COP Approval must be withdrawn. *Hawkes*, 578 U.S. at 597. BOEM concedes that, in making those findings, it was "[i]mplementing th[e] directives" set forth in "Presidential Wind Memo § 1" to conduct a "comprehensive review" for the singular purpose of <u>terminating or amending any existing wind energy leases</u>" and "<u>identifying any legal bases for</u>" doing so. ECF No. 81 at 7 (emphasis added; quoting Wind Memo § 1 (emphasis added); ECF No. 81-1 ¶ 12 (same); *id.*, Ex. B § 1. That purpose of course leaves no room for re-approval of a wind energy COP that BOEM already has found to violate OCSLA. The President issued the Wind Memo in accordance with his pledge to "end[]" all offshore wind projects "on day one" of his presidency. ECF No. 92-8 at 2. Consistent with that pledge and the express goal of the "comprehensive review" mandated by Wind Memo § 1, the President has since proclaimed that the Administration "will not approve" any wind projects, period. ECF No. 92-10 at 2. Having conceded that BOEM's findings against the COP were made at the President's bidding, it borders on the outlandish for the Government to maintain that there is any uncertainty about the outcome. The evidence all points in one direction.[14] The Revocation

---

[14] Contrary to the Government's argument, US Wind is not "launch[ing] a broad programmatic attack on the government's operations," ECF No. 105-1 at 12-13, but instead is challenging specific actions taken by the Government against the US Wind Project. The related Presidential and Interior directives provide context for those specific actions. To the extent the Government argues that US Wind bases its cross claims on "a series" of executive acts and statements, rather than "a single [formal] edict," *Geiby Corp.*, 801 F.2d at 435 n.7, "numerous courts" have rejected a requirement for such a "formal or official statement regarding the agency's position." *Amadei*, 348 F.Supp.3d at 165.

Decision, unless enjoined, means the COP is dead in the water. BOEM has consummated its decision making on that subject.[15]

### 2. The Revocation Decision Has Legal and Practical Consequences.

The Revocation Decision clearly affects US Wind's "rights or obligations," and carries serious "legal consequences." *Hawkes*, 578 U.S. at 597. In line with the Supreme Court's pragmatic approach, this second element of final agency action focuses on the action's "legal or practical effect[s]," including "effect[s] on the day-to-day business" of regulated parties. *FTC v. Std. Oil Co. of CA*, 449 U.S. 232, 243 (1980). As this Court has recognized, "[a]gency action has legal consequences if it 'alters the legal regime.' So too does action that grants or withdraws a regulatory 'safe harbor.'" *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 500 (D. Md. 2019) (citing, *inter alia, Bennett*, 520 U.S. at 178; *Hawkes*, 578 U.S. at 598)).

The Revocation Decision literally altered the legal regime governing the COP by replacing the "rational balance" standard set forth in the formally promulgated Section 8(p)(4) Rule with the far more restrictive interpretation retroactively "reinstate[d]" on May 1, 2025 by M-Opinion 37086. ECF No. 81-1 ¶ 11. That interpretation reads OCSLA Section 8(p)(4)(I) to bar any wind energy activity causing more than "*de minimis* or reasonable interference" with other "reasonable uses" of the OCS. M-37059 at 15. The effect of the interpretative change is dramatic. BOEM determined that the COP satisfied OCSLA Section 8(p)(4) under the Section 8(p)(4) Rule, *see* Ex. B, Appx. B at 13-27, but "[b]ased in part" on its new interpretation, BOEM has now reached the opposite conclusion, finding that "the COP did not fully comply" with Section 8(p)(4). ECF No. 81-1 ¶ 12.

---

[15] The Government baselessly calls these concerns "premature," citing *Marcum v. Salazar*, 694 F.3d 123, 128-130 (D.C. Cir. 2012), ECF No. 105-1 at 6, but in that case the plaintiffs filed an administrative appeal before the agency, which was still pending when the D.C. Circuit heard the case, and plaintiffs did not contend that they would "suffer any 'hardship' if th[e] appeal [was] dismissed." *Id.* That is nothing like this case, where US Wind has filed no administrative appeal, because no opportunity for such an appeal exists, and where the hardship to US Wind has been demonstrated.

BOEM has not only changed the legal standard but has applied the new standard retroactively, to evaluate a COP Approval issued under the controlling Section 8(p)(4) Rule, thereby violating black letter law against "promulgat[ing] retroactive rules," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), and disregarding the Lease's express incorporation of the Section 8(p)(4) Rule by reference. ECF No. 92-6 § 3. Where, as here, the agency adopts a legal position that "severely limits the [complainant's] ability to obtain a permit for" an existing project, the "legal consequences" requirement for finality is satisfied. *Sackett*, 566 U.S. at 126.

The Revocation Decision also withdraws the regulatory and contractual "safe harbor" that US Wind enjoyed following COP Approval in 2024. With that approval, under the express Lease terms, US Wind had a "COP that has been approved by the Lessor," and thus became entitled to "conduct activities … that are described in" the COP—*i.e.,* the construction and operation of the Project. ECF No. 92-6 § 2. As discussed above, these Lease rights, directly enforceable under OCSLA, 43 USC § 1349(a)(1), created a safe harbor by preventing the Government from suspending or cancelling any COP permit or activity except as authorized by the Lease or by "any other contractually cross-referenced [statutory or regulatory] provision." *Mobil Oil*, 530 U.S. at 620. Yet the Government is now asserting the power to suspend or cancel COP activities and permits, the guise of expedient of "reconsideration," without satisfying the Lease and statutory requirements for doing so. *Supra* at II.A.2.a. Here, as in *Baltimore*, BOEM's withdrawal of the "safe harbor" for an approved COP is itself final agency action. *See also Hawkes*, 578 U.S. at 599-600.

In addition to these "legal consequences" of the challenged actions, they also have serious "practical effect[s]" for US Wind's "day-to-day business." *Std. Oil*, 449 U.S. at 243; *see also Chamblee v. Espy*, 100 F.3d 15 (4th Cir. 1996) (agency's decision to "suspend" processing the

plaintiff's loan restructuring application "amount[ed] to final agency action" due to its "practical effect" on plaintiff's business). The effects requirement is satisfied, even without any formal action against a regulated entity, when the agency "leads private parties or State . . . authorities to believe that it will" implement a particular policy, *Appalachian Power*, 208 F.3d at 1021–22, or the stated policy forms "the basis for [regulated entities] in ordering and arranging their affairs." *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956). Here, BOEM is US Wind's lead government regulator, and its pronouncements directly impact the company's day-to-day decisions about how to deploy its resources and arrange its business affairs. Supp. Decl. ¶ 11. Faced with BOEM's unequivocal Revocation Decision, has had no choice but to effectively suspend its development activities. *Id.* ¶¶ 7-11. The devastating impacts of the *de facto* suspension have already been described in detail and include the possible loss of US Wind's investments and the end of its business. *Supra* at III.C. *See Fort Sumter Tours, Inc. v. Andrus*, 440 F. Supp. 914, 920 (D.S.C.), *aff'd*, 564 F.2d 1119 (4th Cir. 1977) ("final agency action" satisfied where, as a result of agency's threatened refusal to renew the plaintiff's contract, plaintiff "face[d] the possible loss of a business" and the loss of the value of assets used in carrying out the business).

In sum, all requirements for judicial review of the Revocation Decision are met.[16] It is a final agency action.

---

[16] The Government argues that the Vacatur Motion is not final agency action "because the authority to grant vacatur lies with the Court, not with BOEM." ECF No. 105-1 at 13. That argument fails. US Wind's cross claims do not challenge the relief sought from the Court, but instead challenge the Revocation Decision that the Vacatur Motion and supporting Suess Declaration articulate in substance - independently of BOEM's filing of the Vacatur Motion. The Government obviously reached these determinations and made that decision without any involvement of the Court, and without giving US Wind any notice or opportunity for hearing. Further, the Government has made clear that it considers itself free to implement the Revocation Decision "regardless of what happens with the pending motion." ECF No. 92-3 at 2-3. The Government's cited authorities are inapposite. *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631-32 (4th Cir. 2024), involved a subordinate agency office with no power to make final decisions. In *Standard Oil*, the agency took no action other than "issuance of its complaint" seeking judicial relief. 449 U.S. at 239.

### C.    This Court Has Jurisdiction Over Cross Claim Counts VI-X.

The Government argues that the Court lacks jurisdiction over US Wind's claims in Cross Claim Counts VI to X regarding the validity of COP Approval and other Federal Approvals (the "Federal Approvals Cross Claims") on the theory that US Wind and the Government are insufficiently adverse. ECF No. 105-1 at 14-16. That is wrong. US Wind and the Government are clearly adverse because the Government has switched sides and joined Plaintiffs in contending that the COP Approval and related federal approvals are invalid. The Federal Approval Cross Claims are essential to preserving the Court's jurisdiction over disputes at the heart of this case.

Parties "need not disagree about everything" to satisfy Article III's adversity requirement. *NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 401 (4th Cir. 2022). Indeed, the parties can "agree about essentially everything"—so long as they have "adverse interests in the litigation's *outcome*." *Id.* (citing *United States v. Windsor*, 570 U.S. 744, 756–59 (2013)). Where parties seek declaratory judgment against the government, then, the question is whether the government "seek[s] to do anything adverse to them or to withhold any action they desire." *Cortes v. NLRB*, 145 F.4th 57, 63 (D.C. Cir. 2025).

These claims easily satisfy those standards. As the Government seems to concede, US Wind has "an interest in the legal sufficiency of Federal Defendants' Project approvals." ECF No. 105-1 at 21. So it is true that US Wind has brought claims premised on the assertion that "Federal Defendants' *own* Project approvals are lawful." *Id.* But that is only because the Government is *no longer defending* those approvals —indeed, the Government contends that most important approval, the COP Approval, was issued in violation of the governing statute, OCSLA Section 8(p)(4), and must be vacated as a result. The Government bases its position on a declaration establishing that BOEM, the Project's lead agency, *already* has decided that the COP Approval was unlawful. ECF No. 81-1 at 7. The Government thus "seek[s] to do [something] adverse" to

US Wind—vacating the COP Approval and, ultimately, killing the Project. *Cortes*, 145 F.4th at 63. Put differently, the Government's and US Wind's "interest[s] in the litigation's outcome," *Constellium*, 43 F.4th at 401, could not be more adverse: the Government seeks to vacate the COP Approval, while US Wind's very *existence* rests on the COP Approval's continued vitality.[17] This Court has jurisdiction over US Wind's Federal Approval Cross Claims. The Government's attempt to evade that jurisdiction should be rejected.

### D.    US Wind's OCSLA Cross-Claim Is Not Barred by Statute.

Dismissal for failure to state a claim under Rule 12(b)(6) is "only appropriate where a [cross claim] does not 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Evans v. United States*, 105 F.4th 606, 616 (4th Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court "must draw all reasonable inferences in favor" of the cross claimant. *Id.* And the cross claimant's factual allegations must "raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible." *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020).

US Wind's OCSLA Cross Claim is not barred by statute for failure to give 60 days' notice. As explained in US Wind's Cross Claim, this 60-day notice requirement is "excused" when the alleged OCSLA violation "would immediately affect a legal interest of the plaintiff," 43

---

[17] The Government's cases are readily distinguishable. In *Powder River Basin Resources Council v. U.S. Dep't of Interior*, No. 22-cv-2696, 2024 WL 195760 (D.D.C. Jan. 18, 2024), where the agency "*agree*[*d*]" that it had "acted lawfully" at every step of the approval process, the court held that mere "possibility that [the agency] could change [its] position . . . at some future point" is speculation that "does not create" adversity "in the present." *Id.* at *3. In *Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 637 (9th Cir. 2014), the court found lack of adversity in an APA suit where the agency had not even been joined as a party. *See Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir. 1990) (similar). In *Mitcheson v. Harris*, 955 F.32d 235 (4th Cir. 1992), the Fourth Circuit declined jurisdiction solely because of federalism concerns—namely, a parallel state proceeding involving the same parties was ongoing, and adjudicating the federal declaratory judgment claim would require resolving "close" state-law questions. *Id.* at 236. This Court has upheld jurisdiction over declaratory judgment claims where, as here, "no such [state-court] action is pending." *Nationwide Mut. Ins. Co. v. Welker*, 792 F.Supp. 433, 437 (D. Md. 1992).

U.S.C. § 1349(a)(3); *Louisiana v. Haaland*, No. 2:23-CV-01157, 2023 WL 6450134, at *7 (W.D. La. Sept. 21, 2023), *order modified, appeal dismissed in part*, 86 F.4th 663 (5th Cir. 2023); Cross-Claim ¶ 84. The Government's argument to the contrary is essentially a reiteration of its argument that no final agency action has occurred. As further detailed above however, final agency action exists, and the Government's Revocation Decision has an immediate effect on US Wind's most valuable legal interests: its COP Approval and Lease rights.

Other courts applying the exception have agreed that exigencies like those US Wind faces satisfy the excusing requirement under OCSLA Section 1349(a)(3). *See Chevron, U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 64–65 (D.D.C. 2002) (on cross motions for summary judgement the court explained that section 1349(a)(3) is met where agency intended to "disclose the plaintiffs' commercially sensitive information within five days," which "would detrimentally affect the plaintiffs' legal interest in preserving the confidentiality of the information and in maintaining its suits [challenging disclosure orders]"); *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 636 n.8 (E.D. La. 2010) (immediate loss of business relationships satisfied requirements of Section 1349(a)(3)). Even though the existence of the underlying exigency is likely a factual consideration outside the scope of a Rule 12(b) motion, the immediacy contemplated by Section 1349(a)(3) has been met, and US Wind did not need to wait 60 days to seek judicial relief under OCSLA. *See Chevron*, 193 F. Supp. 2d at 65 (rejecting as "simply nonsensical" the argument that plaintiff needed to wait 60 days to file suit while the agency took an imminent action that plaintiff alleged would cause it severe commercial harm).

### E.    US Wind States a Due Process Claim.

The Government does not dispute that US Wind has a property interest in its Lease and COP Approval. "[A] property interest in a benefit" protected by the Due Process Clause results from "a legitimate claim of entitlement to it," as "defined existing rules or understandings that

27

stem from an independent source." *The Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (citation modified). Holders of "issued licenses" have a particularly strong claim for protection. *Bell v. Burson*, 402 U.S. 535, 539 (1971); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1156–57 (4th Cir. 1991). Consistent with these principles, courts routinely find protected property interests in governmental licenses and permits like the COP Approval and US Wind's associated Lease rights.[18]

The Government's only argument is that it "'never deprived' US Wind of its property rights because it has not withdrawn, revoked, suspended, or taken any other action on the COP approval or the lease." ECF No. 106 at 16. That argument fails for all the reasons discussed above, *supra* at III.B., but it is also irrelevant. It is elemental that the Due Process Clause provides a remedy not only for completed deprivations of property interests but also of "<u>threatened</u>" ones. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 12–16, (1978) (emphasis added) (finding due process implicated by the "threat of termination of service"); *Snider Int'l Corp. v. Town of Forest Heights*, 906 F. Supp. 2d 413, 423–24 (D. Md. 2012), *aff'd*, 739 F.3d 140 (4th Cir. 2014) (due process claim may be based on "the threatened deprivation of adequate procedures"). Here, the Government does not and cannot dispute that, at a minimum, it has made a clear threat to revoke the COP Approval.

The Government does not contest that formal withdrawal of the COP Approval would constitute a deprivation of property. As the Government's own otherwise distinguishable case notes, deprivation may be established by a regulatory act "that deprives an owner of all

---

[18] *See, e.g., Richardson*, 922 F.3d at 1157–58 (business operator's license); *Bell*, 402 U.S. at 539 (driver's license); *Ihnken v. Gardner*, 927 F. Supp. 2d 227, 236–38 (D. Md. 2013) (land use permit); s*ee also, e.g., Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (FCC broadcast license); *Foss v. Nat'l Marine Fisheries Serv.,* 161 F.3d 584, 588 (9th Cir. 1998) (NMFS fishing quota permit); *KTK Mining of Va., LLC v. City of Selma, Ala.,* 984 F. Supp. 2d 1209, 1225–26 (S.D. Ala. 2013) (building permit); *P.L.S. Partners, Women's Med. Ctr. of R.I., Inc. v. City of Cranston,* 696 F. Supp. 788, 798 (D.R.I. 1988) (building permit).

economically valuable uses of the" property in question. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (citation omitted).[19] The Government acknowledges that, without the approved COP, US Wind cannot conduct "any activity" on its Lease, thus precluding any valuable use of the Lease. Even "temporary or partial impairments to" US Wind's Lease and COP rights "merit due process protection." *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (1997) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)). US Wind has therefore stated a claim for a violation of its due process rights under the Fifth Amendment.

## IV.    CONCLUSION

For the foregoing reasons, this Court should deny the Government's motion to dismiss US Wind's Cross Claims.

[*signatures follow*]

---

[19] In *Sansotta*, the court recognized that interfering with ownership rights can constitute a due process violation, but found no violation that case because the town in that case was simply enforcing a traditional "nuisance ordinance." 724 F.3d at 541. No such issue is presented here.

Dated: December 5, 2025

Respectfully submitted,

By: *Toyja E. Kelley*
Toyja E. Kelley, Sr. (D. Md. Bar No. 26949)
Emily Huggins Jones (*pro hac vice*)
Gregory L. Waterworth (D. Md. Bar No. 20938)
**TROUTMAN PEPPER LOCKE LLP**
701 8th Street, N.W., Suite 500
Washington, D.C. 20001
Telephone: (202) 220-6900
Facsimile: (202) 220-6945
toyja.kelley@troutman.com
emily.hugginsjones@troutman.com
greg.waterworth@troutman.com

Hilary Tompkins (*pro hac vice*)
Sean Marotta (*pro hac vice*)
**HOGAN LOVELLS US LLP**
555 13th Street N.W.
Washington, D.C. 20004
Telephone: (202) 637-5617
hilary.tompkins@hoganlovells.com
sean.marotta@hoganlovells.com

David Newmann (*pro hac vice*)
**HOGAN LOVELLS US LLP**
1735 Market St., 23d Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
david.newmann@hoganlovells.com

*Attorneys for Defendant-Intervenor and Cross Claim Plaintiff US Wind, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on December 5, 2025, I filed and served the foregoing motion on counsel of record through this Court's CM/ECF system.

By: <u>*/s/ Toyja E. Kelley*</u>
Toyja E. Kelley, Sr. (D. Md. Bar No. 26949)