**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MAYOR AND CITY COUNSEL OF OCEAN CITY, MARYLAND, et al., | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 1:24-CV-03111 |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | § | |
| Federal Defendants, | § | |
| and | § | |
| US WIND, INC., | § | |
| Defendant-Intervenor. | § | |

**FEDERAL DEFENDANTS' COMBINED MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


I. Legal Background ........................................ **Error! Bookmark not defined.**
- A. Renewable Energy Leasing Under the Outer Continental Shelf Lands Act ........................................ **Error! Bookmark not defined.**
- B. National Environmental Policy Act.... **Error! Bookmark not defined.**
- C. Endangered Species Act...................... **Error! Bookmark not defined.**
- D. Marine Mammal Protection Act ......... **Error! Bookmark not defined.**
- E. National Historic Preservation Act .... **Error! Bookmark not defined.**

II. Factual Background.................................... **Error! Bookmark not defined.**
- A. BOEM's Review of the Maryland Offshore Wind COP................. **Error! Bookmark not defined.**
- B. NMFS's Issuance of the Biological Opinion **Error! Bookmark not defined.**
- C. NMFS's Issuance of the Letter of Authorization **Error! Bookmark not defined.**

III. Standard of Review ...................................... **Error! Bookmark not defined.**

IV. Argument.................................................... **Error! Bookmark not defined.**
- A. Count II: Interior Agrees Its OCSLA Finding Warrants Re-Evaluation ........................................ **Error! Bookmark not defined.**
- B. Counts III and VIII: Because MMA's COP Approval Should Be Remanded, the Court Need Not Reach Plaintiffs' NEPA and NHPA Challenges to that Same Agency Action **Error! Bookmark not defined.**
- C. Counts IV and V: Plaintiffs' ESA and MMPA Claims Lack Merit **Error! Bookmark not defined.**
  1. NMFS's analyses are consistent with its NARW Strategy. **Error! Bookmark not defined.**
  2. NMFS's cumulative effects analysis is consistent with ESA regulations. ............................... **Error! Bookmark not defined.**
  3. NMFS fulfilled its ESA Section 7 consultation requirements............................ **Error! Bookmark not defined.**
  4. NMFS's "small numbers" and "negligible impact" determinations under the MMPA are reasonable.............. **Error! Bookmark not defined.**

**V.** CONCLUSION............................................ **Error! Bookmark not defined.**

The Court should remand, without vacatur, the Department of the Interior's approval of the Construction and Operations Plan ("COP") for US Wind so that Interior can re-evaluate its compliance with the Outer Continental Shelf Lands Act ("OCSLA"). Given that remand, the Court need not reach Plaintiffs' National Environmental Policy Act ("NEPA") and National Historic Preservation Act ("NHPA") claims against the COP approval. Summary judgment should be granted in favor of Federal Defendants on the Endangered Species Act ("ESA") and Marine Mammal Protection ("MMPA") claims against the National Marine Fisheries Service ("NMFS").

## I. LEGAL BACKGROUND

### A. Renewable Energy Leasing Under the Outer Continental Shelf Lands Act

The Outer Continental Shelf ("OCS") consists of submerged ocean lands, including the subsoil and seabed, belonging to the United States or within its exclusive economic zone, generally from 3 to 200 miles seaward of the coastline.[1] 43 U.S.C. § 1331(a). Offshore wind development on the OCS occurs under OCSLA, pursuant to which the United States holds these submerged lands as "a vital national resource . . . for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards[.]" *Id.* § 1332(3). To that end, the Department of the Interior, in consultation with other relevant federal agencies and relevant parties, may grant leases on the OCS for purposes of energy

[1] The first three miles of submerged lands fall with state jurisdiction. *See* 43 U.S.C. § 1312. And the outer limits of the OCS boundary extend to the exclusive economic zone of the United States, which is 200 miles. *See*, *e.g.*, 33 C.F.R. § 2.30.

production, including from wind. *Id.* § 1337(p)(1)(C); *see* 30 C.F.R. Part 585 (setting forth the leasing process).

Offshore renewable energy development is governed by regulations set forth by the Bureau of Ocean Energy Management ("BOEM"), which was recently replaced by the Marine Minerals Administration ("MMA").[2] 43 U.S.C. § 1337(p)(8); 74 Fed. Reg. 19,638 (Apr. 29, 2009); 30 C.F.R. Part 585. After identifying "wind energy areas" for leasing, 30 C.F.R. §§ 585.210, 585.211, MMA may offer the identified areas or portions of those areas for lease sale via auction. *Id.* §§ 585.215, 585.216. Development of a lease, however, can only occur if MMA approves a site assessment plan and, later, a COP. *Id.* §§ 585.200(a)(1), 585.600, 585.605–585.613 (site assessment plan requirements), 585.620–585.628 (COP requirements). When approving a project under OCSLA, MMA must ensure that "any activity" that it authorizes is "carried out in a manner that provides for" twelve enumerated requirements, including: "safety;" "protection of the environment;" "conservation of the natural resources;" "prevention of interference with reasonable uses (as determined by the Secretary)" of the OCS; and consideration of other uses of the sea and seabed, including the use of the area for fishing and marine navigation. 43 U.S.C. § 1337(p)(4)(A)-(L); 30 C.F.R. § 585.102(a).

---

[2] On July 10, 2026, the Department of Interior reunified the BOEM and the Bureau of Safety and Environmental Enforcement into a single Bureau—the MMA. *See* DOI Secretarial Order 3451, available at https://www.doi.gov/document-library/secretary-order/so-3451-establishment-marine-minerals-administration (last visited Oct. 13, 2026). For purposes of this filing, "MMA" and "BOEM" are used interchangeably.

MMA is a subagency of the Department of Interior and has been expressly delegated authority over energy development on the OCS. *See* 30 C.F.R. § 585.100.

### B. NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is a procedural statute that serves the dual purpose of informing agency decision-makers of the environmental consequences of their proposed actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA does not mandate particular results. *Id.* NEPA requires preparation of an environmental impact statement ("EIS") for "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must examine, among other things, "alternatives to the proposed agency action," and the action's "reasonably foreseeable" impacts. *Id.* § 4332 (2)(C)(i)-(iii). "[T]he central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025).

### C. ENDANGERED SPECIES ACT

Section 7 of the ESA directs federal agencies to ensure that any action they authorize, fund, or carry out is "not likely to jeopardize the continued existence of" any ESA-listed species or destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2). To achieve that objective, if an agency's proposed action may affect and is likely to adversely affect an ESA-listed species or critical habitat, the agency must engage in formal consultation with the consulting agency (here, NMFS). 50 C.F.R. § 402.14.

Formal consultation culminates in the issuance of a "biological opinion" by the consulting agency. *Id.* § 402.14(g)(2)–(4). The biological opinion ("BiOp") evaluates the status of ESA-listed species and designated critical habitat, the environmental

baseline within the action area, the effects and cumulative effects of the agency's proposed action on those species, and includes the consulting agency's opinion as to whether the action is "likely to jeopardize the continued existence" of any listed species or result in the destruction or adverse modification of critical habitat. *Id.* § 402.14(g)–(h). If incidental "take" is anticipated, the BiOp must include an incidental take statement ("ITS") that specifies the extent or amount of incidental take and specifies "reasonable and prudent measures . . . necessary or appropriate to minimize such impact," and terms and conditions to implement those measures. 16 U.S.C. § 1532(19); *id.* § 1536(b)(4); 50 C.F.R. § 402.14 (i)(1)(ii), (iv). Any incidental take that occurs consistent with the specified measures in an ITS is exempt from ESA Section 9's prohibition on take of listed species. 16 U.S.C. § 1536(o).

### D. MARINE MAMMAL PROTECTION ACT

Subject to certain exceptions, the MMPA prohibits the "taking and importation of marine mammals." *Id.* §§ 1371(a), 1372. The term "take" is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362 (13); 50 C.F.R. § 216.3. The MMPA identifies two types of "harassment": "Level A" and "Level B". 16 U.S.C. § 1362(18)(A); 50 C.F.R. § 216.3. Level B harassment is defined as "any act of pursuit, torment, or annoyance" which has the "potential to disturb" a marine mammal or marine mammal stock in the wild by causing "disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii), (18)(A)(ii). By contrast, Level A harassment is defined as "any act of pursuit, torment,

or annoyance" having the "potential to injure" a marine mammal or marine mammal stock in the wild." *Id.* § 1362 (18)(A), (18)(A)(i).

The MMPA includes an exception under which, upon request "by [U.S. citizens] who engage in a specified activity(other than commercial fishing) within a specified geographical region, [NMFS] shall allow . . . the incidental, but not intentional, taking . . . of small numbers of marine mammals of a species or population stock if [NMFS] . . . finds that the total of such taking . . . will have a negligible impact on such species or stock[.]" *Id.* § 1371(a)(5)(A)(i)(I). If granted, an Incidental Take Regulation ("ITR"), together with a Letter of Authorization ("LOA"), may authorize such incidental take for a period of up to five years. *Id.* § 1371(a)(5)(A)(i), 50 C.F.R. §§ 216.105, 216.106. When NMFS approves a request for an ITR, it must prescribe: (1) the "permissible methods of taking" pursuant to the applicant's specified activity; (2) "other means of effecting the least practicable adverse impact" on the affected species or stock and its habitat; and (3) "requirements pertaining to the monitoring and reporting" of the authorized take. 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa); 50 C.F.R. § 216.105(b).

### E. NATIONAL HISTORIC PRESERVATION ACT

Two provisions of the NHPA are relevant to this case. The first is Section 106, which requires an agency, "prior to the issuance of any license, [to] take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108; *see*, *e.g.*, *Save Our Sound OBX, Inc. v. N. C. Dep't of Transp.*, 324 F. Supp. 3d 597, 610 (E.D.N.C. 2018), *aff'd*, 914 F.3d 213 (4th Cir. 2019). Like NEPA, Section 106 is procedural in nature and does not impose substantive preservation requirements.

*See*, *e.g.*, *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 514 (4th Cir. 1992) ("Section 106 of the NHPA requires a federal agency to *engage in a review process* to *take into account* effects on historic properties when it becomes involved in a federal 'undertaking.'" (emphasis added)). A "historic property" is one included on, or eligible for inclusion on, the National Register of Historic Places. 54 U.S.C. § 300308. An "undertaking" is defined broadly to include any "project, activity, or program" that requires a federal permit. *Id.* § 300320.

Regulations promulgated by the Advisory Council on Historic Preservation ("ACHP") govern federal agencies' compliance with Section 106. *See* 36 C.F.R. Part 800. The regulations generally set forth a four-step process: (1) initiation (*Id.* § 800.3); (2) identification of historic properties potentially affected, which requires determining an undertaking's area of potential effects (§ 800.4); (3) assessment of effects, including adverse effects that may impact the "characteristics of a historic property that qualify the property for inclusion in the National Register" (*id.* § 800.5(a)(1)); and (4) efforts to resolve any adverse effects (*id.* § 800.6). *See United Keetoowah Band of Cherokee Indians in Okla. v. Fed. Commc'ns Comm'n*, 933 F.3d 728, 745 (D.C. Cir. 2019). Agencies are to consult with the identified consulting parties in the second, third, and fourth steps. 36 C.F.R. §§ 800.2–800.6. Importantly, "resolution" in this context does not refer to the elimination of adverse effects or to a certain degree of reduction in adverse effects. Rather, it refers to the agreement of certain parties identified by regulation on how to move forward. *Id.* § 800.6.

The second relevant provision of the NHPA is Section 110(f), which concerns National Historic Landmarks ("NHLs"). NHLs are "historic and archeological sites, buildings, and objects . . . which possess exceptional value as commemorating or illustrating the history of the United States[.]" *Id.* § 65.1(b)(1). For any project "directly and adversely affect[ing] any [NHL]," Section 110(f) requires that an agency, to "the maximum extent possible[,] undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. Like Section 106, Section 110(f) does not impose substantive preservation requirements. *See Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1169 (9th Cir. 2016); *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006). Instead, it sets a heightened procedural standard for considering potential impacts to NHLs.

## II. FACTUAL BACKGROUND

The Maryland Offshore Wind Project (hereinafter, "the Project") is an offshore wind energy project off the coast of Maryland. MDW_139188. As set forth in the COP, the Project would consist of up to 114 wind turbine generators, four offshore substations, four offshore export cables, and a 100-meter-tall meteorological tower in a gridded array pattern across the Project area. MDW_139188–89.

In 2014, the Department of Interior held a competitive leasing process for two wind leases in offshore Maryland, and Defendant-Intervenor US Wind won both. MDW_139188. Those leases were combined in 2018. MDW_139203. Together, the leases encompassed about 80,000 acres off the coast of Maryland on the OCS. *Id*. To proceed, US Wind required permits or approvals from, among other federal agencies, BOEM and NMFS for various aspects of project development and eventual operation.

MDW_265540. BOEM and NMFS issued a joint Record of Decision ("ROD") in September 2024 for their respective permits and approvals. MDW_265388–564. Each agency's process for granting its respective approvals is discussed in turn below.

### A. BOEM'S REVIEW OF THE MARYLAND OFFSHORE WIND COP

Under BOEM regulations, the Project could not develop its lease unless the agency approved a COP. 30 C.F.R. §§ 585.620–585.628. US Wind submitted an initial COP for the Project to BOEM in 2020, and supplemented additional information requested by BOEM in February 2021. MDW_265535. Shortly thereafter, in June 2022, BOEM published a notice of intent to prepare an EIS for the proposed project. MDW_265537. The notice described the Project as proposed in US Wind's COP, including consisting of up to 121 wind turbine generators, 4 offshore substations, and 4 offshore export cables, and a meteorological tower. *See* 87 Fed. Reg. at 34902 (June 8, 2022). BOEM conducted an environmental review of the US Wind COP under various statutes, including NEPA, ESA, NHPA, OCSLA, the Coastal Zone Management Act ("CZMA"), and the Magnuson-Stevens Fishery Conservation and Management Act. MDW_265540.

BOEM's June 2022 notice commenced the NEPA process and also announced that BOEM would use the NEPA process to initiate and inform NHPA Section 106 consultation for the Project. MDW_265539. The notice began the public scoping process "for identifying issues and potential alternatives for consideration" in the EIS regarding the Project's COP. MDW_265554. In addition to taking written comments, BOEM held three public meetings during the scoping period where it received comments and answered questions. *Id.*

BOEM published a draft EIS in October 2023. MDW_265555 (citing 88 Fed. Reg. 69,658 (October 6, 2023)). Appendix A to the final EIS describes the process BOEM undertook to solicit and receive input from interested parties on the draft EIS. MDW_171358–73. There was a 45-day public comment period on the draft EIS, during which BOEM also held two in-person public meetings and two virtual public meetings. MDW_169507.

BOEM published the final EIS in August 2024. MDW_169531. The EIS assessed the reasonably foreseeable impacts that could result from the construction and installation, operations and maintenance, and conceptual decommissioning of the Project. The EIS analyzed multiple alternatives, including a "No Action" alternative, the Project as proposed by US Wind, and three additional action alternatives (one of which has sub-alternatives). MDW_169507. For each alternative, the EIS considered the potential impacts on a variety of resources. MDW_169508–10; MDW_169540–92. BOEM ultimately designated Alternative B—the proposed project, with modifications where appropriate—as its preferred alternative. MDW_169541.

BOEM also began the NHPA Section 106 consultation process for the Project in June 2022. MDW_170697–98. The same notice that began the NEPA scoping process sought "public comment and input through the [notice of intent] regarding the identification of historic properties or potential effects on historic properties from activities associated with approval of the COP." MDW_170697. BOEM invited 97 parties, representing various governments and organizations, to participate in

Section 106 consultation for the Project; 17 either accepted BOEM's invitation or were subsequently added as consulting parties by BOEM. MDW_171431–36. The consulting parties included representatives from various States; federally recognized Indian Tribes; local governments; other federal agencies, including the Department of Defense and ACHP; and nongovernmental organizations. MDW_171436.

Following consultation with consulting parties, consideration of public input, and review of a series of technical reports, BOEM published its Section 106 Finding of Adverse Effect with its Final EIS in August 2024. MDW_170672. The Finding described the Project's area of potential effects, how BOEM identified historic properties, BOEM's assessment of adverse effects to historic properties, and potential avoidance, minimization, and mitigation measures. MDW_170672–712. BOEM made a finding that three aboveground historic properties within the visual area of potential effects ("APE") would be adversely affected; one historic property within the terrestrial APE would be adversely affected; and there would be no adverse effect on 18 marine archaeological resources and 14 ancient, submerged landform features as a result of COP approval. No construction alternative would completely eliminate adverse effects, but BOEM set forth various efforts to mitigate those effects as conditions of approval of the COP. MDW_170708–09. However, BOEM also found that none of the affected properties would be so adversely affected that they would be disqualified from listing in the National Register of Historic Places. MDW_170706.

To resolve adverse effects under the NHPA, BOEM and consulting parties developed a Memorandum of Agreement ("MOA") regarding the Project.

MDW_001163–211. The MOA, fully executed in August 2024, was signed by US Wind, BOEM, the ACHP, and the State Historic Preservation Offices of Delaware, Maryland, and Virginia. MDW_265539; *see also* 36 C.F.R. § 800.6(c)(1). The MOA identified binding avoidance, minimization, and mitigation measures to resolve adverse effects to historic properties. MDW_001167–72.

Following publication of the Final Environmental Impact Statement for the Project and execution of the Section 106 MOA, BOEM published its ROD approving, with modifications, the COP for the Project. MDW_265388–564. The ROD adopted the proposed project alternative discussed above, subject to certain mitigation, monitoring, and reporting measures. MDW_265423.

### B. NMFS'S ISSUANCE OF THE BIOLOGICAL OPINION

MMA, on behalf of itself the U.S. Army Corps of Engineers and the Bureau of Safety and Environmental Enforcement, and the NMFS Office of Protected Resources submitted separate requests for initiation of formal Section 7 consultation to assess the effects of the COP and its associated permits and the MMPA ITR and LOA, respectively, on ESA-listed species and designated critical habitat. NMFS_00071736-37. In January 2024, NMFS's Greater Atlantic Regional Fisheries Office ("GARFO"), the consulting agency, deemed the information submitted by MMA and NMFS Office of Protected Resources sufficient to assess the effects of the proposed action on ESA-listed species and designated critical habitat and determined that the information constituted the best scientific and commercial data available and consolidated formal consultation was initiated. *Id.*; NMFS_00003001. In June 2024, NMFS issued a BiOp, in which it determined that federal authorization of the

Project is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of critical habitat. NMFS_00071728-2425.

### C. NMFS's Issuance of the Letter of Authorization

US Wind also sought and received an LOA from NMFS under the MMPA, authorizing the non-lethal take by Level A and Level B harassment of small numbers of marine mammals incidental to its construction of the Project. Upon publishing a notice of receipt of US Wind's application, NMFS provided a thirty-day public comment period. NMFS_00071615. In January 2024, NMFS published a proposed ITR that would govern the issuance of US Wind's requested LOA, and opened another thirty-day public comment period. *Id.* After consideration of public comments on the proposed rule, NMFS issued a final ITR in October 2024, NMFS_00071614-69, and an LOA to US Wind in November 2023, NMFS_00071674. The LOA governs US Wind's incidental taking of marine mammals during construction of the Project for a five-year period, from January 1, 2025 to December 31, 2029. *Id.* Per the terms of the LOA, "[t]ake by mortality (death) or serious injury of any marine mammal species is not authorized." NMFS_00071675.

## III. STANDARD OF REVIEW

Plaintiffs' claims are governed by the APA's standard of review, under which an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is narrow, asking only whether the agency considered the relevant factors and articulated a rational connection between the

facts found and the choice made. *See*, *e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019); *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020). In making this determination, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Review is limited to the administrative record, *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995), which consists of materials that were before the agency at the time its decision was made and were directly or indirectly considered by agency decision makers. *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462 (4th Cir. 2013) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

## IV. ARGUMENT

Of the eight claims in Plaintiffs' operative complaint, the Court has dismissed three: Count I (a standalone APA violation), Count VI (Migratory Bird Treaty Act), and Count VII (CZMA).[3] *See* Dkt. Nos. 68–69. Remaining at this juncture, then, are four of Plaintiffs' claims against Federal Defendants: Count II (OCSLA), Count III (NEPA), Count IV (ESA), Count V (MMPA), and Count VIII (NHPA).

Interior agrees that its OCSLA finding warrants re-evaluation, and the Court should accordingly remand BOEM's COP approval to the agency, without vacatur. As MMA has previously stated, "[MMA's] prior analysis approving the COP failed to properly apply the § 1337(p)(4) factors and account for all the Project's potential

[3] The Court also dismissed US Wind's crossclaims against Federal Defendants. *See* Dkt. No. 134.

impacts." Dkt. No. 81 at 16 (citing Dkt. No. 81-1 ¶ 13 (Suess Declaration)). The Court should thus remand the COP approval to MMA to weigh anew the § 1337(p)(4) factors. Given that remand without vacatur, the Court need not reach Plaintiffs' NEPA and NHPA claims challenging the COP approval. On Plaintiffs' remaining ESA and MMPA claims against NMFS, summary judgment should be granted in favor of Federal Defendants.

### A. COUNT II: INTERIOR AGREES ITS OCSLA FINDING WARRANTS RE-EVALUATION

Interior believes its prior OCSLA analysis for the Maryland Offshore Wind Project warrants re-evaluation. *See* Declaration of Michael D. Olsen ("Olsen Declaration") (attached as Exhibit 1). BOEM's ROD was accompanied by an OCSLA Compliance Review. MDW_265527–58. While BOEM found the Project could have beneficial impacts on some resources or uses, it also found that its preferred alternative was expected to have "major [adverse] impacts," including with respect to the "[North Atlantic Right Whale], scenic and visual resources, some commercial fisheries, and scientific research." MDW_265538. Despite these findings, BOEM approved the COP. And in its ROD, MMA stated that the approval "strike[s] a rational balance" between the goals in Section 1337(p)(4), noting the tension "between deconflicting OSC uses and maximizing wind energy harvesting" as proposed by the Project. MDW_265545.

Interior agrees that the Court should remand the COP approval to the agency for further review. Interior believes the decision documents for US Wind in this case do not adequately explain how the Project's potential moderate-to-major adverse

impacts to other uses of the OCS are consistent with the mandate in Section 1337(p)(4) to "ensure that any activity" carried out under that subsection "is approved in a manner that reflects compliance with" the twelve enumerated criteria. Olsen Declaration ¶ 5. Where the administrative record does not support the agency's determination, the ordinary course is remand to the agency for further evaluation or explanation. *See*, *e.g.*, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Austin v. Jackson*, 353 F.2d 910, 912 (4th Cir. 1965); *J.O.C. Farms, LLC. V. Rural Cmty. Ins. Agency, Inc*., 131 F. Supp. 3d 514, 526 (E.D.N.C. 2015).

Further, absent a specific statutory limitation, agencies have inherent authority to reconsider past decisions and to revise or replace them. *See*, *e.g.*, *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *Friends of Park v. Nat'l Park Serv*., No. 2:13-CV-03453-DCN, 2014 WL 6969680, at *2 (D.S.C. Dec. 9, 2014) (collecting cases from the Fourth, Sixth, and Tenth Circuits). Remand is appropriate where, as here, an agency has identified a "substantial and legitimate" concern about a prior decision. *Sierra Club v. Nat'l Marine Fisheries Serv*., 711 F. Supp. 3d 522, 534 (D. Md. 2024) (quoting *Keltner v. United States*, 148 Fed. Cl. 552, 563 (2020)). Indeed, various other courts in substantially similar cases along the eastern seaboard have granted motions for voluntary remand of offshore wind COP approvals to allow BOEM to address similar concerns. *See*, *e.g.*, *Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*, No. 25-CV-2211 (JMC), 2026 WL 2294613, at *5 (D.D.C. Aug. 10, 2026); *Town & Cnty. of Nantucket v. Burgum*, No. 25-CV-906 2025 WL 3120419, at *2 (D.D.C. Nov. 4, 2025).

The First Circuit's opinion in *Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*, 123 F.4th 1 (1st Cir. 2024), does not call for a conclusion affirming BOEM's prior COP approval, and indeed only highlights the appropriateness of remand here. In *Seafreeze*, the First Circuit affirmed a district court decision upholding a COP approval for a different project. The Circuit affirmed a district court decision that the Circuit described as "proceed[ing] from the premise that the BOEM must ensure that 'each criterion is met' in a manner that is 'not to the detriment of the other criteria'" in Section 1337(p)(4). *Id.* at 25 (quoting *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, Nos. 1:22-CV-11091-IT, 1:22-CV-11172-IT, 2023 WL 6691015, at *22 (D. Mass. Oct. 12, 2023)). The holding affirmed by the Circuit was "only that [] BOEM must have 'discretion' in considering whether each statutory criterion is satisfied, and that the BOEM must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide." *Id.* at 25–26. Federal Defendants do not argue to the contrary here. Rather, MMA believes it previously exercised that discretion in a way that was inconsistent with OCSLA's direction to ensure that the twelve criteria identified by Section 1337(p)(4) are provided for. Olsen Declaration ¶¶ 5–6. Given Interior's confessed need for re-assessment, the Court should remand the COP approval, without vacatur, for re-evaluation under 43 U.S.C. § 1337(p)(4).

### B. COUNTS III AND VIII: BECAUSE MMA'S COP APPROVAL SHOULD BE REMANDED, THE COURT NEED NOT REACH PLAINTIFFS' NEPA AND NHPA CHALLENGES TO THAT SAME AGENCY ACTION

Given the need to remand MMA's COP approval to Interior to re-evaluate its OCSLA compliance, the Court need not reach Plaintiffs' NEPA or NHPA challenge to

MMA's COP approval.[4] *See*, *e.g.*, *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 43 (D.D.C. 2013) (declining to litigate the merits upon determining remand was proper), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015) (per curiam). The Maryland Offshore Wind Project may well have adverse impacts on the environment, historic properties, and NHLs. But Federal Defendants' position that remand of the COP approval eliminates the need to address the NEPA or NHPA claims is not an endorsement of arguments made by other parties about the requirements of NEPA or the NHPA.

### C. COUNTS IV AND V: PLAINTIFFS' ESA AND MMPA CLAIMS LACK MERIT

Plaintiffs' cursory arguments about NMFS's ESA and MMPA analyses cram together unsubstantiated allegations about two distinct agency actions: NMFS's issuance of the BiOp under the ESA; and NMFS's issuance of the ITR/LOA under the MMPA. NMFS's BiOp is a comprehensive analysis of the Project's anticipated effects on ESA-listed species and critical habitat, in which NMFS concluded, based on its evaluation of the best available science and the agency's technical expertise, that the Project is not likely to jeopardize the continued existence of ESA-listed whales that may be affected by the Project, as the Project is not anticipated to result in any injury or deaths of any ESA-listed whales. NMFS_00072160. Separately, NMFS's LOA issued under the MMPA, together with the ITR that governs it, authorizes

---

[4] Plaintiffs' complaint asserts their NEPA claim against Federal Defendants generally, but their motion for summary judgment only argues that MMA violated NEPA. *See* Dkt. No. 140 at 19–26. To the extent that the NEPA claim pleaded in Plaintiffs' complaint was also targeted at NMFS, Plaintiffs have waived the NEPA claim against NMFS by failing to assert it in their motion for summary judgment. *See Cox v. SNAP, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017) (explaining that an issue raised in the complaint but ignored at summary judgment is waived).

harassment of a small number of marine mammals that is incidental to US Wind's construction activities which, based on NMFS's fulsome analysis, will have no more than a negligible impact on the species. NMFS_00071642–54. Plaintiffs' arguments fail to undermine NMFS's reasoned analyses under either statute.

### 1. <u>**NMFS's analyses are consistent with its NARW Strategy.**</u>

Plaintiffs' argument that NMFS "disregarded" its *North Atlantic Right Whale and Offshore Wind Strategy*, issued jointly with BOEM in 2024 ("NARW Strategy"), Pls.' Br. at 22 (citing NMFS_00076855–932), is blatantly inaccurate. As an initial matter, the NARW Strategy is a non-binding, "living" guidance document that is not "intended to modify or amend any Federal statutes, regulations, permits, or leases, nor create any rights or cause of action." NMFS_00076861. In other words, it is not intended to bind the agencies in any project-level decision-making nor does it purport to be a scientific document.

Regardless, NMFS did not "fail[] to utilize and incorporate the findings from this strategy," Pls.' Br. at 23. The BiOp acknowledges the presence of the stressors listed in the strategy, and specifically notes that the project may expose NARWs to construction noise, but ultimately concludes that noise exposure that could result in permanent loss of hearing sensitivity, other injury, or mortality is not expected to occur. NMFS_00072160. Additionally, the BiOp notes that while NMFS expects NARWs to experience temporary behavioral disturbance and associated physiological stress resulting from construction noise, "all of these impacts . . . are expected to be temporary with normal behaviors resuming quickly after the noise ends" and are "not expected to affect the long term health of any whale or its ability to migrate, forage,

breed, or calve." NMFS_00072160–61. Moreover, the Biological Opinion adopts multiple measures intended to avoid and minimize impacts to NARWs that are specifically suggested in the NARW Strategy, including seasonal restriction on impact pile driving, requirements to use noise attenuation devices, and clearance and shutdown measures. *Compare* NMFS_00071945–54 (BiOp) *with* NMFS_00076903-07 (NARW Strategy). In sum, the BiOp explicitly analyzes potential stressors noted in the NARW and adopts numerous of the NARW Strategy's suggested minimization measures listed in the NARW Strategy and Plaintiffs fail to demonstrate how the BiOp is inconsistent with the NARW Strategy.

**2. <u>NMFS's cumulative effects analysis is consistent with ESA regulations.</u>**

Plaintiffs next argue that the BiOp's cumulative effects analysis "exclude[s] most identified past, ongoing, and planned actions" including "other federal offshore wind projects" and "omits reasonably foreseeable non-federal activities and climate impacts." Pls.' Br. at 23. For the reasons explained below, both arguments fail.

As an initial matter, Plaintiffs disregard well-established law specifically defining "cumulative effects" under the ESA to exclude the effects of planned and future projects that have yet to undergo Section 7 consultation. ESA consultation regulations require NMFS to consider cumulative effects as part of the analysis of the agency action that is subject to ESA consultation. 50 C.F.R. § 402. "Cumulative effects are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* § 402.02 (emphasis added). As explained in the

preamble to the ESA consultation regulations, future federal actions—such as proposed offshore wind projects—are not analyzed as cumulative effects because they are speculative prior to federal approval, and because, if approved, they will be subject to their own ESA consultation process. 51 Fed. Reg. 19926, 19933 (June 3, 1986). The impacts of such projects will be fully considered at that time. NMFS does, however, consider the effects of other, *previously authorized* federal offshore wind projects as part of the "environmental baseline," as provided in 50 C.F.R. § 402.14(g)(2). *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001) (interpreting the ESA's regulations to mean that the "environmental baseline" analysis is the appropriate place to account for "other federal activities in the action area that impact [the species]").

To that end, NMFS properly assessed the impacts of other offshore wind projects for which NMFS has completed ESA consultation as part of its environmental baseline analysis. *See* NMFS_00071862; NMFS_00071903. And as explained in the BiOp, if a future action may affect an ESA-listed species, that project's effects will be analyzed against the new "environmental baseline," which considers the effects of all federally authorized projects that have previously undergone Section 7 consultation. *See* NMFS_00071862; *see also*, *e.g.*, *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009) (recognizing that "[f]ederal actions, and those involving federal agencies, are excluded from cumulative effects analysis because they are subject to their own [ESA Section 7] consultation process"); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th

Cir. 2021) (finding that a project was "properly excluded from the cumulative effects analysis because, at the time of the [biological] opinion, the [excluded] project was a *federal* action subject to its own consultation" (citations omitted)); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1113 (9th Cir. 2012) ("'[C]umulative effects' are 'those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation.'" (citation omitted)).

In addition, NMFS properly addressed impacts of both reasonably foreseeable non-federal activities and climate change on listed species that occur in the action area as part of its environmental baseline analysis. *See* NMFS_00071861–78 (analysis of impacts from federal, private, and state actions in the action area); NMFS_00072111–15 (analysis of the effects of the proposed action on listed species in the context of anticipated climate change due to past, present, and future activities in the action area). In its cumulative effects analysis, NMFS explained that it "did not find any information about non-Federal actions" other than what was described in the environmental baseline for the action area (*see* NMFS_00071861-78), and there is no "information to indicate that effects of these activities over the life of the proposed action will have different effects" than those already considered in previous sections of the BiOp. NMFS_00072116. NMFS also noted that most planned activities in the action area "do not meet the ESA definition of cumulative effects" because they would require "at least one Federal authorization or permit and would therefore require their own ESA section 7 consultation." NMFS_00072115. In

addition, given that cumulative effects are defined as "effects of future State or private activities," 50 C.F.R. § 402.02, NMFS explained that climate change effects were instead discussed in the "Effects of the Action" Section of the BiOp due to "the difficulty of parsing out climate change effects due to past and present activities from those of future state and private activities." NMFS_00072115–16. NMFS acknowledges that climate change is relevant to the status of the species, environmental baseline, effects of the action and cumulative effects sections of the BiOp. Instead of segmenting its analysis, it rationally chose to present a comprehensive synthesis of the effects of the proposed project in the context of climate change in one section of the opinion. NMFS_0007211–14.

Importantly, in line with NMFS's approach, the Fourth Circuit has held that analysis of climate change impacts "does not fit neatly" into a cumulative effects analysis, and inclusion of climate change impacts in another category is acceptable so long as climate change is "part of the analysis in some way." *See Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 270–71 (4th Cir. 2022). Indeed, while Plaintiffs cite to *Appalachian Voices* in support of their claims that NMFS's cumulative impacts analysis is insufficient, Pls. Br. at 23, the court in that case took issue with the agency's failure to analyze some anticipated effects of climate change at all, rather than the agency's failure to include climate change impacts specifically in its cumulative effects analysis. 25 F.4th at 276–78. Similarly, the court in *Appalachian Voices* found that the agency erred because it failed to account for impacts from several known non-Federal actions at any point in the BiOp, rather

than failing to include such actions in its cumulative effects analysis. *See id.* at 272. By contrast here, NMFS clearly analyzed all known impacts of both reasonably foreseeable non-federal activities and climate change in the action area. While the analyses ofimpacts of approved Federal projects were part of NMFS's environmental baseline and climate change was considered in the effects section, rather than its cumulative effects analysis, as explained above, NMFS sufficiently explained its reasoning for this, which is all that is required. *See Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1234 (E.D. Wash. 2016) ("It is, of course, not the Court's place to tell the agency how to . . . consider climate change in its analysis, it simply must consider it.").

For these reasons, NMFS's consideration of cumulative effects was appropriate and the Court should reject Plaintiffs' arguments to the contrary.

**3. <u>NMFS fulfilled its ESA Section 7 consultation requirements.</u>**

Plaintiffs' argument that NMFS "failed to ensure against jeopardy" of ESA-listed whales during the Section 7 consultation process, Pls.' Br. at 24–25, not only inaccurately characterizes the BiOp, but relies on a standard that does not align with the ESA's statutory text. To start, ESA Section 7(a)(2) requires federal agencies to, in consultation with NMFS, "insure that any action authorized, funded, or carried out by such agency" is "not likely to jeopardize the continued existence" of any ESA-listed species or result in the destruction or adverse modification of their critical habitat. 16 U.S.C. § 1536(a)(2). Thus, NMFS GARFO (the consulting agency) is not required to "ensure against jeopardy" as Plaintiffs claim, rather, the action

agencies—in this case, MMA and NMFS's Office of Protected Resources—is required to consult with NMFS to ensure approval of the Project is not likely to jeopardize listed species or adversely modify their critical habitat. NMFS GARFO, for its part, was required to provide an opinion assessing the effects of the proposed action and determining whether jeopardy or adverse modification is found. *Id.* § 1536(b)(3). In line with these requirements, NMFS's BiOp for the Project includes a detailed summary of the effects of the proposed action and determines, based on the best available scientific information and the agency's technical expertise, that the Project "is not likely to jeopardize the continued existence" of ESA-listed whales that may be affected by the Project. NMFS_00072174.

At any rate, Plaintiffs arguments rely on either mischaracterizations of the BiOp or blatantly inaccurate information. First, while it is true that NMFS identified a slight increased risk of vessel strikes from the Project, NMFS ultimately concluded that given "the measures required to reduce risk" including "vessel speed restrictions and use of enhanced monitoring measures," it is "extremely unlikely that any project vessel will strike [an ESA-listed] whale during any phase of the proposed project." NMFS_00072042. Plaintiffs do not credibly dispute this informed finding. Further, while Plaintiffs emphasize the potential impacts associated with noise exposure from the Project, Pls.' Br. at 24, the BiOp determines that because "it is extremely unlikely that ESA listed whales would stay in the close proximity to the source [of noise exposure] long enough to incur more severe effects," all potential behavioral disturbances and hearing effects are expected to be extremely temporary—lasting no

more than twenty-four hours. NMFS_00071956. As a result, NMFS concludes that "the anticipated disturbance" to ESA-listed whales from noise exposure "is not expected to impact individual animals' health or have effects on individual animals' survival or reproduction." *Id.* The BiOp makes similar conclusions regarding potential impacts due to vessel noise or noise from the operation of the wind turbines once they are installed. *See* NMFS_00071969 ("Based on the best available information, ESA-listed marine mammals are either not likely to respond to vessel noise or are not likely to measurably respond in ways that would significantly disrupt normal or essential behavior patterns[.]"); NMFS_00071970 ("We do not expect any [permanent loss of hearing sensitivity], [temporary loss of hearing sensitivity], or other potential injury to result from even extended exposure to the operating [wind turbines].").

And while Plaintiffs also claim that bubble curtains are ineffective and that implementation of other mitigation measures is uncertain, Pls.' Br. at 24–25, these contentions are simply untrue. The BiOp describes the use and proven effectiveness of bubble curtains and notes that noise attenuation can be achieved through bubble curtains in addition to another noise abatement system. NMFS_00071922. Moreover, multiple other mitigation measures—all of which are mandatory conditions of the Project despite Plaintiffs' claims—are intended to reduce impacts from noise exposure, including seasonal restriction on impact pile driving of foundations, sound field verification, clearance and shutdown zones, and soft start (i.e., providing marine mammals a chance to leave the area prior to the hammer operating at full capacity).

*See* NMFS_00071945–54 (analysis of proposed measures to minimize exposure of ESA-listed whales to pile driving noise); *see also* NMFS_00071767 ("The measures proposed by US Wind and/or BOEM are considered part of the proposed action, and thus mandatory for implementation through enforceable conditions in applicable approvals, authorizations and permits[.]").

In sum, NMFS sufficiently analyzed all potential impacts to ESA-listed whales from the Project and reasonably concluded that the Project is not likely to jeopardize the continued existence of ESA-listed whales.

**4. <u>NMFS's "small numbers" and "negligible impact" determinations under the MMPA are reasonable.</u>**

While Plaintiffs frame their argument to NMFS's MMPA authorization as a challenge to its "negligible impact" determination, Pls.' Br. at 25, they conflate the MMPA's negligible impact requirement with the separate "small numbers" requirement. *Id.* at 25. Under the MMPA, the "small numbers" requirement concerns the *number* of marine mammals for which take is authorized, 16 U.S.C. § 1371(a)(5)(A)(i), while the "negligible impact" requirement concerns the *impact* of that take, *id.* § 1371(a)(5)(A)(i)(I); *see, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 907 (9th Cir. 2012) (recognizing that NMFS's "small numbers" and "negligible impact" determinations are analyzed under "distinct, separate standard[s]").[5] Both NMFS's "small numbers" and "negligible impact"

[5] Plaintiffs also appear to wrongfully assume the ESA's requirement of reinitiation of consultation once take exceeds an amount allowed in an ITS applies to incidental take authorizations under the MMPA, *see* Pls.' Br. at 25. However, the MMPA does not have consultation requirements similar to the ESA and the two statutes involve completely different processes for approving incidental take. *See supra* Part I.C–D.

determinations for the ITR/LOA comply with the MMPA, were based on the best available science, and were neither arbitrary nor capricious.

First, Plaintiffs' appear to argue that NMFS violated the small numbers requirement by "authoriz[ing] up to 4,313 marine mammal takes per year and 6,865 Level B takes over five years," Pls.' Br. at 25. However, while Plaintiffs concede takes "must be evaluated proportionally to the number of whales in existence", *id.*, Plaintiffs fail to acknowledge that the "maximum number of instances of takes by combined Level A harassment and Level B harassment possible within any one year . . . is less than one-third for all species and stocks potentially impacted." NMFS_00071654. Moreover, for 13 of the 19 species for which NMFS authorized incidental take, the allowable take by Level A and/or Level B harassment equates to less than one percent as compared to the stock abundance. *Id.* For the NARW, the maximum amount of authorized take in any given year, which is by Level B harassment only, amounts to only 1.18 percent of the stock abundance. *Id.* Plaintiffs fail to meet their "heavy burden" to show these take authorizations are "arbitrary and capricious under the 'small numbers' requirement." *Save Long Beach Island v. U.S. Dep't of Com.*, 794 F. Supp. 3d 273, 328 (D.N.J. 2025) (rejecting challenge to NMFS's small number analyses for similar offshore wind MMPA take authorizations).

As the First Circuit has recognized, the MMPA's small numbers requirement "is not capable of being expressed in absolute numerical limits." *Melone v. Coit*, 100 F.4th 21, 30 (1st Cir. 2024) (quoting H.R. Rep. No. 97-228, at 19 (1981), as reprinted

in 1981 U.S.C.C.A.N. 1458, 1469). Thus, NMFS has adopted a "proportional approach"—which it applied here—"whereby it 'compares the number of individuals taken to the most appropriate estimation of abundance of the relevant species' to determine whether the authorized take is limited to 'small numbers' of that species." *Id.* (upholding NMFS's proportional approach and rejecting challenge to a small numbers determination for another offshore wind take authorization); NMFS_00071654; *see also*, *e.g.*, *Alaska Wildlife All. v. U.S. & Wildlife Serv.*, No. 23-35299, 2024 WL 1169411, at *4–5 (9th Cir. Mar. 19, 2024) (finding that an LOA's authorization of take through Level B harassment of 10.4% of polar bears annually or 48.84% over five years was reasonable under the MMPA's small numbers requirement); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1053 (D. Alaska 2013) (upholding NMFS's determination that Level B Harassment of 30 beluga whales, amounting to 10% of the population, over the course of a year was a "relatively limited or small portion" of the population). Plaintiffs fail to prove that NMFS's small numbers determination is unreasonable.

Further, while Plaintiffs claim that NMFS "fails to grapple with aggregate takes . . . instead segmenting consultations and assuming away cumulative harm," Pls.' Br. at 25, courts have agreed that the MMPA "does not require [NMFS] to consider takes resulting from <u>all</u> activities proposed by <u>all</u> citizens undertaking similar activities, but rather only those citizens who submit the [LOA] request." *Melone*, 100 F.4th at 32 (emphasis in original); *Save Long Beach Island*, 794 F. Supp. 3d at 326 ("There is nothing in the MMPA or NMFS's regulations requiring NMFS to

assess take numbers based on activities outside of the scope of each individual [LOA] application."). Thus, NMFS appropriately analyzed only the amount of take anticipated based on the activities in US Wind's individual LOA application.

Finally, with respect to the negligible impact determination, Plaintiffs disregard the fact that "no mortality or serious injury is anticipated to occur or may be authorized" by NMFS. NMFS_00071654. Using the best available science, NMFS analyzed the impacts resulting from the Project's activities and determined that the impacts cannot be reasonably expected to, and are not reasonably likely to, adversely affect any of the species or stocks for which take may be authorized through effects on annual rates of recruitment or survival. *Id.* The best available science indicates that the anticipated impacts from the specified activities potentially include avoidance, cessation of foraging or communication, temporary or permanent loss of hearing sensitivity , stress, masking, etc. NMFS_00071620. NMFS emphasizes that there is no evidence that noise resulting from offshore wind development-related specified activities would cause marine mammal strandings, and there is no evidence linking recent large whale mortalities and currently ongoing offshore wind activities. *Id.* Plaintiffs have offered nothing to substantiate their claims that the NMFS's negligible impact determination is unreasonable. As such, Plaintiffs arguments must fail.

## V. CONCLUSION

Interior agrees that its COP approval should be remanded without vacatur so that Interior can re-evaluate its OCSLA compliance. In light of that remand, the Court need not reach Plaintiffs' NHPA and NEPA claims concerning Interior's COP

approval. The Court should grant summary judgment in Federal Defendants' favor on Plaintiffs' claims against NMFS.

Dated: October 13, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Shawn D. Ren*___________
Shawn D. Ren, Trial Attorney
Texas Bar No. 24132873
Energy & Natural Resources Division
999 18th St., N Terrace, Suite 600
Denver, CO 80202
Tel: (202) 598-3141
Fax: (303) 844-1350
E-mail: shawn.ren2@usdoj.gov

Bonnie Ballard, Trial Attorney
Maryland Bar No. 2211280027
Energy & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-1513
Fax: (202) 305-0275
Email: bonnie.m.ballard@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVCE**

I certify that on October 13, 2026, the foregoing was filed and served on counsel of record for all parties via the Court's CM/ECF service.

*/s/ Shawn D. Ren*
Shawn D. Ren
Trial Attorney